## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

SHARMELL TAYLOR,

Plaintiff,

v.                                                    5:24-CV-188
                                                      (DNH/MJK)

EXPERIAN INFORMATION
SOLUTIONS, INC,

Defendant.

SHARMELL TAYLOR, Plaintiff, pro se

MITCHELL J. KATZ, U.S. Magistrate Judge

### ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court for review a pro se complaint filed by plaintiff Sharmell Taylor, in which she has asserted claims against defendant Experian Information Solutions INC ("Experian") under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692; the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681; and state law.  (Dkt. No. 1) ("Compl.").  Plaintiff has also moved to proceed in forma pauperis ("IFP"). (Dkt. No. 2).

I.      **IFP Application**

Plaintiff declares in her IFP application that she is unable to pay the filing fee. (Dkt. No. 2).  After reviewing her application and supporting documents, this court finds that plaintiff is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth

1

in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915.  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action,

2

supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)). The court will now turn to a consideration of plaintiff's complaint under the above standards.

## II.   **Complaint**

Plaintiff alleges that defendant Experian operates a "credit collection agency." (Compl. at 7).[1] Plaintiff further states that on October 18, 2023, she sent a "dispute" to Experian, "disputing the reporting of transactions on the plaintiff's consumer report that were not authorized to be furnished by the consumer." (*Id.*). On November 2, 2023, Experian "responded to the plaintiff sending out dispute results." (*Id.*). On December 3, 2023, plaintiff "reached out" to Experian "for the second time regarding the transactions still being reported on the consumer report without authorization." (*Id.*).

---

[1] The page numbers cited are those produced by the Electronic Case Filing ("ECF") system.

On December 22, 2023, Experian "responded with an identical letter and the transactions were still being reported." (*Id.* at 7-8).

The complaint alleges four counts against Experian. First, plaintiff states a cause of action for "Defamation of Character (Per Se)." (*Id.* at 6). Specifically, plaintiff alleges that Experian, through plaintiff's consumer report, made "false and damaging statements about the plaintiff." (*Id.*). Plaintiff states that, as a result of Experian's defamatory statements, plaintiff has suffered "negligent infliction of emotional and financial distress." (*Id.*).

Plaintiff next asserts a cause of action for "Negligent Enablement of Identity Fraud." (*Id.* at 6). She states that Experian's failure to investigate her submitted dispute "enabled identity fraud" against her, and, as a result of Experian's negligence, plaintiff has suffered "negligent infliction of emotional and financial distress." (*Id.*).

Plaintiff's third cause of action is brought under the FDCPA. (*Id.* at 6). Plaintiff alleges that Experian, "a debt collector as defined by the [FDCPA], violated the Act by not removing the debt or the portion of the debt the plaintiff dispute with in the 30-day period under 15 U.S.C. § 1692g(b)." (*Id.* at 6-7).

Plaintiff's final cause of action is brought under the FCRA. (*Id.* at 7). She states that Experian "willfully violated the [FCRA] by failing to comply with 15 U.S.C. § 1681b the permissible purpose of consumer reports and 1681a(2)(A)(i) definitions; rules of construction." (*Id.* at 7).

In her request for relief, plaintiff seeks compensatory damages in the amount of $4,000 for "pain and suffering due to an inability to utilize the credit system[,]" as well as for causing "emotional and financial damages due to reported information by" Experian. (Compl. at 4). Plaintiff also seeks punitive damages in the amount of $4,000 "based on the egregious and willful nature of" Experian's conduct, and to "punish and deter future similar conduct." (*Id.*). Last, plaintiff seeks injunctive relief in the removal of the disputed account from the consumer report. (*Id.*).

## DISCUSSION

### III.   <u>The Fair Debt Collection Practices Act</u>

The FDCPA prohibits deceptive and misleading practices by "debt collectors." *Anderson v. Experian*, No. 19-CV-8833, 2019 WL 6324179, at *2 (S.D.N.Y. Nov. 26, 2019) (quoting 15 U.S.C. § 1692e). The statute seeks to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Kropelnicki v. Siegel*, 290 F.3d 118, 127 (2d Cir. 2002) (quoting 15 U.S.C. § 1692(e)) (internal quotation marks omitted). "To accomplish these goals, the FDCPA creates a private right of action for debtors who have been harmed by abusive debt collection practices." *Anderson v. Experian*, 2019 WL 6324179, at *2 (citing 15 U.S.C. § 1692k).

"To establish a violation under the FDCPA, three elements must be proven: '(1) the plaintiff [must] be a 'consumer' who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt, (2) the defendant collecting the debt must be considered a "debt collector," and (3) the defendant must have engaged in an act or omission in violation of the FDCPA's requirements.' " *Skvarla v. MRS BPO, LLC*, No. 21-CV-55, 2021 WL 2941118, at *2 (S.D.N.Y. July 12, 2021) (quoting *Derosa v. CAC Fin. Corp.*, 278 F. Supp. 3d 555, 559-60 (E.D.N.Y. 2017)). "The term 'debt collector' is defined under the FDCPA as a person who, among other requirements, is engaged in any 'business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect . . . debts owed or due . . . another.' " *Perez v. Experian*, No. 20-CV-9119, 2021 WL 4784280, at *12 (S.D.N.Y. Oct. 14, 2021), *report and recommendation adopted*, 2021 WL 5088036 (S.D.N.Y. Nov. 2, 2021)(quoting 15 U.S.C. § 1692a(6)).

Plaintiff's complaint fails to state facts suggesting a claim for relief under the FDCPA.  Experian, the sole defendant named in this action, is "not normally identified as a debt collector."  *Anderson v. Experian*, 2019 WL 6324179, at *2; *see also Perez v. Experian*, 2021 WL 4784280, at *13 ("Equifax, Experian, and Trans Union are credit reporting agencies that do not collect debts, and therefore do not fall within the meaning 'debt collector' under the FDCPA, but instead under the term 'consumer reporting agency' [("CRA")] as defined in § 1681a(f).");  *compare* 15 U.S.C. 1692a(6) (defining

6

debt collector) *with* 15 U.S.C. § 1681a(f) (defining consumer reporting agency). Plaintiff does not credibly allege that Experian is a "debt collector."  Rather, plaintiff's allegations suggest her challenges to the consumer report issued by Experian in its capacity as a CRA. (Compl. at 7). Because the complaint fails to allege any non-conclusory allegations that Experian is a "debt collector," or that it has engaged in any debt collection activity, plaintiff has failed to state a claim under the FDCPA. *See Allen v. United Student Aid Funds, Inc*., No. 17-CV-8192, 2018 WL 4680023, at *5 (S.D.N.Y. Sept. 28, 2018) (granting motion to dismiss when plaintiff has not pled sufficient facts to classify defendants as debt collectors).

## IV.   <u>The Fair Credit Reporting Act</u>

"The FCRA regulates consumer credit reporting agencies to ensure accuracy, confidentiality, relevancy, and proper utilization of consumer credit information." *Perez v. Experian*, 2021 WL 4784280, at *5 (citing 15 U.S.C. § 1681(b)). "It 'places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies.' " *Id.* (quoting *Redhead v. Winston & Winston, P.C*., No. 01-CV-11475, 2002 WL 31106934, at *3 (S.D.N.Y. Sept 20, 2002) (citing 15 U.S.C. §§ 1681 et seq.)).

Liberally construed, plaintiff's complaint alleges FCRA claims against Experian pursuant to §§ 1681b, 1681e(b), and 1681i.  The court will address each claim in turn.

**A.  § 1681b**

"Section 1681b generally specifies the circumstances under which a consumer

report may be furnished and used[,] and protects consumer privacy by limiting access to

consumer credit reports." *Moore v. Experian*, No. 23 Civ. 673, 2023 WL 7169119, at *5

(S.D.N.Y. Oct. 13, 2023), *report and recommendation adopted*, 2023 WL 7166158

(S.D.N.Y. Oct. 31, 2023) (internal citations and quotation marks omitted).  "As

distinguished from many other provisions of the FCRA regulating CRAs, liability under

Section 1681b typically attaches to third parties who willfully or negligently 'use or

obtain' a consumer report for an impermissible purpose." *Id.* (internal quotation marks

omitted) (quoting *Rajapakse v. Shaw*, No. 20 Civ. 10473, 2022 WL 1051108, at *5

(S.D.N.Y. Feb. 18, 2022), *report and recommendation adopted,* 2022 WL 855870

(S.D.N.Y. Mar. 23, 2022)). However, liability may attach to a CRA where a third party

accessed or used a consumer report for an impermissible purpose, if the CRA "either

willfully or negligently fail[ed] to maintain reasonable procedures[2] designed to avoid

violations of" Section 1681b.  *Pietrafesa v. First Am. Real Estate Info. Servs.*, No. 05

Civ. 1450 (LEK/RFT), 2007 WL 710197, at *3 (N.D.N.Y. Mar. 6, 2007); *see also*

---

[2] Section 1681e(a) provides that "[e]very [CRA] shall maintain reasonable procedures designed to . . .
limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." 15
U.S.C. § 1681e(a). The court construes plaintiff's Section 1681b Claim as if brought pursuant to both
Sections 1681b and 1681e(a), and, as other courts have done, analyzes these claims together. *See
Hines v. Equifax Info. Servs., LLC*, No. 19 Civ. 6701, 2022 WL 2841909, at *23 (E.D.N.Y. July 16,
2022).

*Podell v. Citicorp Diners Club*, 859 F. Supp. 701, 705 (S.D.N.Y. 1994) (noting that Section 1681b "limits the purposes and uses of a credit report," and that the FCRA "imposes civil liability upon [CRAs] . . . who willfully or negligently violate the [FCRA]").  To determine whether the CRA maintained reasonable procedures, "the standard of conduct is what a reasonably prudent person would do under the circumstances." *Hines*, 2022 WL 2841909, at *23.

Plaintiff fails to plausibly allege a § 1681b claim against Experian, because the complaint does not allege that Experian provided plaintiff's consumer report to a third party, "which is fatal to any claim that [Experian] impermissibly shared her report." *Moore v. Experian*, 2023 WL 7169119, at *6.  On this basis alone, plaintiff's complaint is subject to dismissal.

Even if the complaint could be read to allege that Experian furnished a consumer report to an unnamed third party, the claim would still fail because plaintiff does not plausibly allege that a third party sought or used the information for an impermissible purpose, nor does it plausibly allege that Experian "either willfully or negligently fail[ed] to maintain reasonable procedures" to prevent an improper furnishing of information. *Pietrafesa*, 2007 WL 710197, at *3; *see also Selvam v. Experian Info. Sol*s., *Inc*., No. 13 Civ. 6078, 2015 WL 1034891, at *4 (E.D.N.Y. Mar. 10, 2015) (granting motion to dismiss where plaintiff failed to allege how the CRA acted unreasonably).  In her complaint, plaintiff states that Experian "willfully" violated the

9

FCRA, and also references that Experian "breached [its] duty through negligence." (Compl. at 6-7). However, "[m]erely stating that the violation was 'willful' or 'negligent' without more is insufficient." *Perez v. Experian*, 2021 WL 4784280, at *11 (citing *Perl v. Plains Com. Bank*, No. 11-CV-7972, 2012 WL 760401, at *2 (S.D.N.Y. Mar. 8, 2012)); *see also Perl v. Am. Exp.*, No. 11-CV-6899, 2012 WL 178333, at *2 (S.D.N.Y. Jan. 19, 2012) ("While [plaintiff] assert[s] that each [D]efendant's FCRA violation was willful, [he] do[es] so in a conclusory manner in [both] of the complaints . . . . [Plaintiff] ha[s] failed to allege any facts related to [D]efendants' state of mind when they allegedly [violated the FCRA]"). Accordingly, plaintiff's § 1681b claim should be dismissed.

### B.   §§ 1681e(b) and 1681i[3]

Section 1681e(b) imposes a duty on CRAs to "assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). To state a claim under Section 1681e(b), a plaintiff must allege that: "(1) the consumer reporting agency was negligent or willful in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the

---

[3] The following discussion of the applicable law is taken from U.S. Magistrate Judge James L. Cott's cogent summary in *Perez v. Experian*, No. 20-CV-9119, 2021 WL 4784280, at *1 (S.D.N.Y. Oct. 14, 2021), which report-recommendation was adopted in its entirety by U.S. District Judge Paul A. Engelmayer in *Perez v. Experian*, No. 20 Civ. 9119, 2021 WL 5088036 (S.D.N.Y. Nov. 2, 2021).

plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury." *Wimberly v. Experian Info. Sols.*, No. 18-CV-6058, 2021 WL 326972, at *5 (S.D.N.Y. Feb. 1, 2021) (quoting *Khan v. Equifax Info. Servs., LLC*, No. 18-CV-6367, 2019 WL 2492762, at *2 (E.D.N.Y. June 14, 2019)).

When the accuracy of a report is in dispute, Section 1681i outlines specific procedures that CRAs must follow to ensure the proper reinvestigation of disputed information. Section 1681i requires that if a consumer notifies a CRA of a dispute as to the accuracy of any item of information contained in his file, within 30 days of notification, the CRA "shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A); *Jones v. Experian Info. Solutions, Inc.*, 982 F. Supp. 2d 268, 272 (S.D.N.Y. 2013). Courts in this District have noted that "the parameters of a reasonable investigation will . . . depend on the circumstances of a particular dispute." *Frydman v. Experian Info. Sols, Inc.*, No. 14-CV-9013, 2016 WL 11483839, at *15 (S.D.N.Y. Aug. 11, 2016) (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 713 (3d Cir. 2010)), *report and recommendation adopted*, 2016 WL 5661596 (Sept. 30, 2016). The reinvestigation requirement demands "more than (a) forwarding the dispute information onto the furnisher of information and (b) relying on the furnisher of information's response." *Gorman v. Experian Info. Sols., Inc.*, No. 07-CV-1846, 2008 WL 4934047, at *5

11

(S.D.N.Y. Nov. 19, 2008) (citing *Cushman v. Trans Union Corp*., 115 F.3d 220, 225 (3d Cir. 1997)).

The threshold question under both Sections 1681e(b) and 1681i "is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." *Id.* (collecting cases). A credit report is inaccurate "either when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Wimberly*, 2021 WL 326972, at *5 (quoting *Wenning v. On-Site Manager, Inc*., No. 14-CV-9693, 2016 WL 3538379, at *9 (S.D.N.Y. June 22, 2016)). "Information provided by a consumer reporting agency is misleading where it is 'open to an interpretation that is directly contradictory to the true information.' " *Id*. (quoting *Wagner v. TRW, Inc*., 139 F.3d 898, 898 (5th Cir. 1998)).

Although plaintiff may have a cognizable cause of action against Experian under the FCRA, at this juncture the bare-bone allegations contained in her complaint fail to state a claim for purposes of this initial review.  As to the threshold question of the accuracy of the challenged information, Plaintiff states that Experian "report[ed] transactions on the plaintiff's consumer report that were not authorized to be furnished by the consumer."  (Compl. at 7).  Without more, the court cannot determine whether plaintiff is alleging that the information in her credit report was factually inaccurate, or if plaintiff's challenge is actually to the validity of a debt assessed by a third-party

12

lender, which ultimately appeared on her credit report.  If the latter, plaintiff's claim

must fail because "inaccuracies that turn on legal disputes are not cognizable under the

FRCA."  *See Mader v. Experian Info. Sols., Inc*., 56 F.4th 264, 270 (2d Cir. 2023)

(plaintiff failed to allege inaccuracy within the plain meaning of the FCRA because

"[t]he bespoke attention and legal reasoning required to determine the post-bankruptcy

validity of Mader's debt means that its status is not sufficiently objectively verifiable to

render Mader's credit report 'inaccurate' under the FCRA.").

    Even if the court were to interpret plaintiff's allegation to state that the

challenged information in plaintiff's credit report was factually inaccurate, plaintiff has

failed to set forth any allegations regarding the deficiencies in the procedures followed

by Experian in assuring the accuracy of its reporting in order to state a claim under §

1681e(b). Because plaintiff "fail[s] to make any allegations regarding . . . the

procedures followed" by Experian, *Nguygen v. Ridgewood Sav. Bank*, No. 14-CV-1058,

2015 WL 2354308, at *11 (E.D.N.Y. May 15, 2015), her "[t]hreadbare recitals of the

elements" do not state a plausible claim for relief under Section 1681e, *Iqbal*, 556 U.S.

at 678.

    Assuming, again, that plaintiff had sufficiently alleged that her credit information

was not factually accurate, the court could also construe that plaintiff is alleging

Experian violated the FCRA requirement to reasonably investigate her disputes under §

1681i.  However, to state such an action, plaintiff must allege that Experian was either

willful or negligent in its noncompliance with § 1681i.  *See Perez v. Experian,* 2021 WL 4784280, at *11 ("The FCRA allows for a cause of action for willful and negligent noncompliance 'with any requirement imposed' by the FCRA.") (citing 15 U.S.C. §§ 1681n, 1681o). "In regard to a plaintiff's obligation to allege that a defendant's violation was willful or negligent, various courts have held that . . . the plaintiff's complaint must allege specific facts as to the defendant's mental state" when the defendants committed the violation of the FCRA. *Braun v. Client Servs. Inc*., 14 F. Supp. 3d 391, 397 (S.D.N.Y. 2014).  Here, plaintiff has failed to allege any facts as to Experian's "mental state" when committing the alleged violations of the FCRA.  As detailed above, plaintiff's reference to the terms "willful" and "negligence" in her statement of claims, without more, is insufficient.  (Compl. at 6-7).  *See Perez v. Experian,* 2021 WL 4784280, at *11; *Perl v. Am. Exp*., 2012 WL 178333, at *2.

Moreover, in the FCRA context, "the Supreme Court made clear that 'a bare procedural violation, divorced from any concrete harm' fails to satisfy the injury-in-fact requirement of Article III. *Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 391 (E.D.N.Y. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), *as revised* (May 24, 2016)).  "In 2021, the Supreme Court, in another case involving the FCRA, again emphasized that the absence of any allegation of a concrete harm forecloses federal standing." *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417–18 (2021)); *see also In re FDCPA Mailing Vendor Cases*, 551 F. Supp. 3d 57, 62–63

14

(E.D.N.Y. 2021).  At the pleading stage, "standing allegations need not be crafted with precise detail, nor must the plaintiff prove the allegations of his injury." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 401-02 (2d Cir. 2015) (quoting *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003)). However, a plaintiff must allege facts "that affirmatively and plausibly suggest that [she] has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

Here, plaintiff has alleged injury to the extent that she has an "inability to utilize the credit system . . . due to reported information by" Experian.  (Compl. at 4).  There is no suggestion, however, that plaintiff has suffered any particularized injury, or that her information was actually disseminated to third parties.  *See Zlotnick v. Equifax Information Services, LLC*, 583 F. Supp. 3d 387, 391 (E.D.N.Y. 2022) ("[W]hile plaintiff claims that his credit score was lowered as a result of the alleged improper reporting . . . he fails to allege any particularized injury or actual dissemination to third-party creditors."); *Grauman v. Equifax Info. Servs., LLC,* 549 F. Supp. 3d 285, 291 (E.D.N.Y. 2021) ("Just as a plaintiff could not bring a defamation suit over a letter that merely sat in a desk drawer, these plaintiffs could not bring their FCRA suit over information that had never left the credit reporting agency's database.") (citation omitted).

Plaintiff's conclusory allegations of "emotional and financial distress" are further insufficient to allege a how Experian's purported violations caused plaintiff to suffer a

"concrete" harm. *See Gross v. TransUnion, LLC*, 607 F. Supp. 3d 269, 273 (E.D.N.Y. 2022) (Conclusory allegations in complaint were insufficient where "[t]he alleged harms are not expenses, costs, any specific lost credit opportunity, or specific emotional injuries[.]") (citing *Ashcroft v. Iqbal*, 556 U.S. at 678); *see also Maddox v. Bank of N.Y. Mellon Trust Co.*, 19 F.4th 58, 66 (2d Cir. 2021) ("A perfunctory allegation of emotional distress, especially one wholly incommensurate with the stimulant, is insufficient to plausibly allege constitutional standing."); *Garland v. Orlans, PC*, 999 F.3d 432, 440 (6th Cir. 2021) (plaintiff's injuries cannot create standing "[b]ecause bare allegations of confusion and anxiety do not qualify as injuries in fact"); *Pennell v. Glob. Tr. Mgmt., LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021) (stress and confusion - without accompanying physical manifestation - do not suffice for standing).

Accordingly, for the reasons stated above, the court recommends dismissing plaintiff's claims for violations of §§ 1681e(b) and 1681i of the FRCA against Experian.

## V.    <u>State Law Claims</u>

Section 1681h(e) of the FCRA provides that "no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, . . . . except as to false information furnished with malice or willful intent to

injure such consumer."  Otherwise stated, "[s]ection 1681h(e) preempts defamation [and other state-based] claims against CRAs unless the alleged false information is furnished with malice or willful intent to injure the plaintiff."  *Thompson v. Equifax Info. Servs. LLC*, No. 20-CV-6101, 2022 WL 2467662, at *10 (E.D.N.Y. Feb. 24, 2022) (citing *Frydman v. Experian Info. Sols., Inc.*, No. 14-CV-9013, 2016 WL 11483839, at *17 (S.D.N.Y. Aug. 11, 2016), *report and recommendation adopted*, 2016 WL 5661596 (S.D.N.Y. Sept. 30, 2016) ("[Section 1681h(e)] essentially affords . . . qualified immunity against the types of state law claims asserted by [plaintiff] unless he can establish that [defendants] acted 'with malice or willful intent to injure' him") (citations omitted)); *Ogbon v. Beneficial Credit Services, Inc.*, 10 Civ. 3760, 2013 WL 1430467, at *10 (S.D.N.Y. Apr. 8, 2013) ("Thus, defendants have qualified immunity against defamation actions, which can only be overcome where plaintiff shows that defendants acted with malice or willful intent.") (collecting cases)).

As previously discussed, plaintiff has failed to allege anything more than conclusory statements to suggest that Experian furnished any information with "malice" or "willful intent to injure" plaintiff.  Accordingly, plaintiff's state law claims related to the contents of her credit report are preempted.  Moreover, even if her claims were not preempted, her allegations lack the sufficient specificity required of such claims to put Experian on notice.  *See, e.g., Mitchell v. Experian Info. Sols., Inc.,* No. 22-CV-5883, 2023 WL 2990479, at *3 (E.D.N.Y. Apr. 18, 2023) ("In assessing whether a defamation

17

claim has been plead with sufficient particularity, courts look to whether [the] complaint references the alleged defamatory statement, identifies who made the statement, when it was made, the context in which it was made, whether it was made orally or in writing and whether it was made to a third party." ) (citation omitted). Accordingly, plaintiff's state law claims should be dismissed.

## VI.   **Opportunity to Amend**

Generally, before the court dismisses a pro se complaint or any part of the complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Here, the court is recommending dismissal with prejudice as to plaintiff's claims brought pursuant to the FDCPA.  There is no plausible suggestion that defendant Experian was operating outside of its capacity as a credit reporting agency with respect to the conduct at issue, and the court does not find it plausible that plaintiff could amend to state a claim against Experian in any capacity as a "debt collector."

With respect to plaintiff's FCRA and state law claims, the court is recommending dismissal without prejudice, providing plaintiff the opportunity to amend her complaint. If the court approves this recommendation and allows plaintiff to submit a proposed amended complaint, plaintiff should be warned that any amended complaint must be a

18

*complete and separate pleading*.  Plaintiff must state all of her claims in the new pleading and may not incorporate by reference any part of her original complaint.

WHEREFORE, based on the findings above, it is

ORDERED, that plaintiff's motion to proceed IFP (Dkt. No. 2) is **GRANTED**,[4] and it is

RECOMMENDED, that plaintiff's claims pursuant to the Fair Debt Collection Practices Act be **DISMISSED WITH PREJUDICE**, and it is

RECOMMENDED, that the complaint be **DISMISSED WITHOUT PREJUDICE** in all other respects, and it is

RECOMMENDED, that if the District Court adopts this recommendation, plaintiff be given forty-five (45) days to amend her complaint to the extent authorized, and that plaintiff be advised that any amended pleading must be a **COMPLETE PLEADING, WHICH WILL SUPERSEDE THE ORIGINAL**, and that plaintiff must include all remaining facts and causes of action in the amended complaint.  No facts or claims from the original complaint may be incorporated by reference, and it is

RECOMMENDED, that if the District Court adopts this recommendation, and plaintiff does not elect to amend her complaint within the imposed deadline, the case be dismissed in its entirety, with prejudice, and it is

---

[4]Although her IFP Application has been granted, plaintiff will still be required to pay fees that she may incur in this action, including copying and/or witness fees.

**RECOMMENDED**, that if the District Court adopts this recommendation, and plaintiff files a proposed amended complaint, the proposed amended complaint be returned to me for review of the amended complaint and any orders relating to service on the defendants, and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.[5]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: February 14, 2024

Mitchell J. Katz
U.S. Magistrate Judge

---

[5] The Clerk shall also provide plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 21 of 238

2016 WL 6267968
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eddie HOUSTON, Plaintiff,

v.

COLLERMAN, et. al., Defendants.

9:16-CV-1009 (BKS/ATB)
|
Signed 10/26/2016

**Attorneys and Law Firms**

EDDIE HOUSTON, 08-A-3122, Mid-State Correctional Facility, P.O. Box 2500, Marcy, New York 13403, Plaintiff, pro se.

**AMENDED DECISION AND ORDER** [1]

[1]     On October 20, 2016, the Court issued a Decision and Order upon initial review of plaintiff's complaint. Dkt. No. 4. This Amended Decision and Order is issued to correct clerical errors in the Conclusion of the Order.

BRENDA K. SANNES, United States District Judge

**I. Introduction**

**\*1** The Clerk has sent to the Court for review a civil rights action filed by pro se plaintiff Eddie Houston. Dkt. No. 1 ("Compl."). Plaintiff has not paid the statutory filing fee for this action and seeks leave to proceed in forma pauperis. Dkt. No. 2 ("IFP Application").

**II. IFP Application**

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 W L 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). Upon review of plaintiff's IFP Application, the Court finds that plaintiff has demonstrated sufficient economic need and filed the inmate authorization form required in the Northern District of New York. Plaintiff's IFP application (Dkt. No. 2) is granted. [2]

[2]     Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

**III. Initial Screening**

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

[3]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

**\*2** Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure. Rule 8 of

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 22 of 238

2016 WL 6267968

the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz,* No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank,* No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown,* 335 Fed.Appx. 102, 104 (2d Cir. 2009).

## IV. Summary of the Complaint [4]

[4] Plaintiff annexed exhibits to the complaint. Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the complaint, the Court will consider the complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,* 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz,* No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in plaintiff's complaint with the utmost leniency. *See, e.g.,* *Haines v. Kerner,* 404 U.S. 519, 521 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**\*3** Plaintiff, an inmate currently being held at Mid-State Correctional Facility ("Mid-State C.F."), asserts claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The incidents that form the foundation for this complaint occurred while plaintiff was confined at Elmira Correctional Facility ("Elmira C.F."). *See* Compl., *generally.* On July 13, 2013, plaintiff filed a grievance claiming that defendants Officer Copestick ("Copestick") and Officer Schieber ("Schieber") harassed him, on more than one occasion, about his medication. *See id.* at 6; *see* Dkt. No. 1-1 at 3-5. On August 5, 2013, after an investigation into the allegations, the Superintendent of Elmira C.F. denied plaintiff's grievance. *See* Dkt. No. 1-1 at 5.

On September 30, 2013, plaintiff was on his way to the masjid to participate in Ramadan when he was stopped by Copestick and Schieber and directed to the wall for a pat-frisk. *See* Compl. at 5. While plaintiff's hands were on the wall, Schieber "violently kicked" his legs from underneath him. *See id.* Schieber "stomped" on plaintiff's ankles while Copestick attempted to choke plaintiff. *See id.* During the assault, the officers yelled racial slurs. *See id.* Defendant Sergeant Collerman ("Collerman") watched the officers beat plaintiff. *See* Compl. at 5. As a result of the attack, plaintiff's eyeglasses were broken, his ankle was swollen, and he could not walk. *See id.* at 5, 9.

At approximately 5:00 p.m., plaintiff received medical treatment for complaints of pain in his right big toe and swelling in his right foot. *See* Dkt. No. 1-1 at 19. Plaintiff

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 23 of 238

received Motrin and was advised to follow with sick call requests, if needed. *See id.* A "use of force/inmate injury" report was compiled. [5] *See id.* At approximately 7:15 p.m., plaintiff, a diabetic, told a medical provider that he had not received his daily "medication." *See id.* The provider ordered various medications to be delivered to plaintiff on a daily basis. *See id.*

[5]   The Use of Force report was not annexed as an exhibit to the complaint.

On October 1, 2013, plaintiff received a misbehavior report charging him with assault on staff and with refusing a direct order and search. [6] *See* Compl. at 5. On the same day, plaintiff was placed in confinement in the Special Housing Unit ("SHU"). *See* Dkt. No. 1-1 at 19. On October 3, 2013, plaintiff attended a Hearing regarding the misbehavior report. [7] *See* Dkt. No. 1-1 at 10. On November 3, 2013, plaintiff received a copy of the hearing disposition dismissing all charges. *See* Dkt. No. 1-1 at 11; Dkt. No. 1 at 5.

[6]   The name of the officer who served the misbehavior report is not clearly legible on the Hearing Disposition annexed as an exhibit. *See* Dkt. No. 1-1 at 10. Plaintiff does not allege that Copestick, Schieber, or Collerman delivered the report. The disposition form indicates that the charges were reported by Schieber. *Id.* The misbehavior report was not annexed as an exhibit to the complaint.

[7]   The officer who presided over the hearing was a Captain at Elmira C.F. However, the name of the hearing officer is not clearly legible. *See* Dkt. No. 1-1 at 10-11.

On November 3, 2013, plaintiff was released from the SHU. *See* Compl. at 5. While plaintiff was in the SHU, he was unable to participate in Ramadan, denied religious meals, denied parole, and excluded from mental health programs. *See id.*

Construed liberally, the complaint contains the following claims: (1) Copestick and Schieber violated plaintiff's Eighth Amendment rights with use of excessive force (Fifth, Fifteenth, Twentieth, and Twenty-Second Causes of Action); (2) Collerman failed to protect plaintiff from the assault in violation of plaintiff's Eighth Amendment rights (Fifteenth Cause of Action); (3) defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment (Sixth, Seventh, and Fifteenth Causes of Action); (4) Copestick and Schieber retaliated against plaintiff in violation of plaintiff's First Amendment rights (Twenty-First Cause of Action); (5) plaintiff's First Amendment rights to religious freedom were violated (Fourth Cause of Action); (6) plaintiff's Fourteenth Amendment rights to due process and equal protection were violated (First, Second, Third, Sixth, Sixteenth, and Eighteenth Causes of Action); (7) defendants failed to investigate plaintiff's complaints and follow grievance procedures (Tenth and Thirteenth Causes of Action); (8) perjury claims against officers who filed the misbehavior report (Eleventh and Seventeenth Causes of Action); and (9) supervisory claims against DOCCS (Eighth, Ninth, Twelfth, Fourteenth, Nineteenth, Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty Sixth Causes of Action). *See* Compl., *generally.* Plaintiff seeks compensatory damages, injunctive relief, and criminal charges against defendants (Eleventh and Seventeenth Causes of Action). *See* Compl. at 9-13.

## V. Analysis

### A. Eleventh Amendment

**\*4**   The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 93-CV-1298 (RSP/GJD), 1996 W L 156764 at \*2 (N.D.N.Y. 1996).

Here, insofar as plaintiff seeks an award of money damages pursuant to Section 1983 against DOCCS, those claims are

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 24 of 238

2016 WL 6267968

dismissed as plaintiff seeks relief from a defendant immune from suit under section 1983. *See LeGrand v. Evan*, 702 F.2d 415, 417 (2d Cir. 1983); *see Meehan v. Kenville*, 555 Fed.Appx. 116 (2d Cir. 2014); *see Simmons v. Gowanda Corr. Facility*, No. 13-CV-0647, 2013 WL 3340646, at *1 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207*, 180 F.3d 409, 411 (2d Cir. 1999)).

### B. Eighth Amendment

### 1. Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases —not whether a certain quantum of injury was sustained."). "Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness." *Wynter v. Ramey*, No. 11-CV-0257 (DNH/DEP), 2013 W L 5465343, at *5 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

Plaintiff has identified the time, location and individuals involved in the alleged assault. Thus, the Court finds that plaintiff's Eighth Amendment excessive force claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to

whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Failure To Intervene

**\*5** The failure of corrections officers to employ reasonable measures to protect an inmate from violence by others may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985). Moreover, allegations that an officer failed to intervene and prevent assaults are sufficient to state an Eighth Amendment failure to protect claim. *See Rogers v. Artus*, No. 13-CV-21, 2013 WL 5175570, at *3 (W.D.N.Y. Sept. 11, 2013). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). In order to succeed on a claim of failure to protect, the inmate "must establish both that a substantial risk to his safety actually existed and that the offending [defendant] knew of and consciously disregarded that risk." *See Walsh v. Goord*, No. 07-CV-0246, 2007 WL 1572146, at *9 (W.D.N.Y. May 23, 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)). In addition, a failure-to-protect claim requires a showing that prison officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988).

At this early stage of the proceeding, plaintiff has alleged enough to require a response from Collerman to plaintiff's claim that he failed to protect plaintiff from the assault by Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 3. Deliberate Indifference to Serious Medical Needs

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component of an Eighth Amendment deliberate indifference

Houston v. Coleman, Not Reported in Fed. Supp. (2016)
Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 25 of 238
2016 WL 6267968

medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

In this instance, even assuming plaintiff's injuries were sufficiently serious, plaintiff must allege facts to demonstrate that defendants acted with a sufficiently culpable state of mind. *See Hathaway*, 99 F.3d at 553. Plaintiff claims that his medical treatment was inadequate because his ankle was not x-rayed until he was transferred to "his next facility," two months after the alleged incident. *See* Compl. at 10. "When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata*

*v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal citations omitted).

**\*6** Here, the complaint is void of any facts establishing that any defendant deliberately delayed plaintiff's medical treatment. On the day of the alleged attack, plaintiff received medical attention and prescription medication. *See* Dkt. No. 1-1 at 19. Plaintiff was treated on three other occasions in October 2013 for foot pain before undergoing x-rays on November 14, 2013. Dkt. No. 1-1 at 20-21. During those visits, plaintiff received ice packs, Motrin, and refused Ibuprofen. See id. Plaintiff does not allege that his condition deteriorated during that time. *See Rodriguez v. City of New York*, 802 F.Supp. 477, 482 (S.D.N.Y. 2011) (finding that the plaintiff did not establish that his condition worsened as a result of a delay between his request and receipt of medical attention). Plaintiff does not allege that he sought and was refused medical treatment during this two month time period. *See Kee v. Hasty*, No. 01 Civ. 2123, 2004 W L 807071, at *29 (S.D.N.Y. April 14, 2004) (holding that the plaintiff's Eighth Amendment claims were overly conclusory because the inmate failed to specify the dates on which he was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied by the defendants). The complaint lacks any facts to plausibly suggest that any defendant knew of the severity of plaintiff's injury and the risk posed by any delay in his treatment.

Plaintiff, a diabetic, also claims that he was unable to read or see for over one year because his eye glasses were not replaced until over a year after the assault. *See* Compl. at 10. The complaint does not contain any facts suggesting that plaintiff made any complaints or sick call requests to any defendant related to his eyeglasses. Plaintiff also failed to assert facts suggesting that he made any defendant "aware of the serious harm could occur" if he was not provided with his glasses. *See Myrie v. Calvo/Calvoba*, 591 F.Supp.2d 620, 628 (S.D.N.Y. 2008) (holding that the complaint did not suggest that any defendant was deliberately indifferent to the plaintiff's vision problems).

Plaintiff's Eighth Amendment allegations are also subject to dismissal based upon the failure to plead personal involvement on the part of any defendant. It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV-7263, 2008 W L 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). The complaint lacks any facts suggesting that Copestick, Schieber, or Collerman were involved in plaintiff's medical treatment or refused to allow plaintiff to receive medical attention. In the absence of factual allegations sufficient to plausibly suggest that any defendant was personally involved, the complaint fails to state a cognizable claim against him. Consequently, plaintiff's Eighth Amendment claims for deliberate indifference to plaintiff's medical needs are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### C. First Amendment

#### 1. Retaliation

Plaintiff alleges that Copestick and Schieber assaulted him in retaliation for plaintiff's grievance against them. *See* Compl. at 6,13. To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir. 2001)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983)); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir. 1988).

**\*7** It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf,* 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart,* No. 01-CV-1311, 289 F.Supp.2d 305, 314 (E.D.N.Y. Oct. 30, 2003) (the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

At this juncture, the Court finds that plaintiff's retaliation claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Religious Claims

Plaintiff alleges that the defendants violated his religious rights because he was unable to participate in Ramadan and denied his religious meals as a direct result of the false misbehavior report. Dkt. No. 1 at 5-6.

Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (citing *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990)). To state a First Amendment Free Exercise claim, a plaintiff must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

1988) (citations omitted). A prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 591). [8] A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476–77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

[8]    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

 **\*8**  In this case, plaintiff has not alleged who issued the misbehavior report and it is not attached to the complaint. An inmate "has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997). While a false misbehavior report may give rise to a claim under § 1983 "when done in retaliation for the exercise of a

constitutional right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015), here there is no such allegation. While the deprivation of religious meals in SHU may be sufficient to state a claim, *see Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016); *Skates v. Shusda*, No. 9:14-CV-1092 (TJM/ DEP), 2016 WL 3882530, at \*\*4-5 (N.D.N.Y. May 31, 2016), here there is no indication that the defendants had any personal involvement in that conduct. The allegations, without more, fail to plausibly suggest that any defendant burdened plaintiff's right to freely practice his religion. Thus, plaintiff's First Amendment claims against are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### D. Fourteenth Amendment

#### 1. Equal Protection/Discrimination

Plaintiff claims that the September 30, 2013 assault was racially motivated. *See* Compl. at 6, 12. "When verbal harassment and simultaneous physical abuse ... are considered together, [courts] have little doubt concluding that plaintiff's allegations [are] sufficient to state a § 1983 claim for discrimination on the basis of race. *Cole v. Fischer*, 379 Fed.Appx. 40, 43 (2d Cir. 2010). "Under the Fourteenth Amendment's Equal Protection clause, a plaintiff may be able to recover for a physical assault that would not meet the objective threshold for Eighth Amendment excessive force claims, if the defendant's conduct was motivated by racial or religious discrimination." *Bhuiyan v. Wright*, No. 9:06-CV-409 ATB, 2011 WL 1870235, at \*9 (N.D.N.Y. May 13, 2011) (citation omitted).

At this juncture, plaintiff has sufficiently plead a Fourteenth Amendment equal protection claim to warrant a response from Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Due Process

Plaintiff claims that defendants violated his due process rights when they failed to replace plaintiff's eyeglasses. *See* Compl. at 10. Plaintiff also asserts that his Fourteenth Amendment rights were violated because he was improperly confined to the SHU without a hearing as a result of a

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 28 of 238

Houston v. Coleman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

false misbehavior report. *See id.* at 10. During his SHU confinement, was allegedly unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from mental health programs. *See id.*

### a. Property Claim

The Supreme Court has held that the negligent or intentional deprivation of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009) (An alleged loss of property, "whether intentional or negligent – will not support a due process claim redressable under § 1983 if 'adequate state post-deprivation remedies are available.' ") (quoting *Hudson*, 468 U.S. 533). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia*, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001). Because plaintiff has access to adequate state law remedies, he has not been deprived of property without due process of law and therefore cannot state a claim for relief pursuant to Section 1983. *See Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983) (per curiam); *see also Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 360, 473-74 (S.D.N.Y. 1998) (dismissing the plaintiff's claim that defendants destroyed his eyeglasses in violation of his due process rights). Thus, plaintiff's due process claims related to his eyeglasses are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. SHU Confinement

**\*9** To establish a due process claim, plaintiff must establish: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted). In this case plaintiff alleges that the false misbehavior report resulted in a SHU sentence. [9]

[9]     The complaint contains conflicting factual allegations related to the length of plaintiff's SHU confinement. Plaintiff claims that after "one month of being housed in SHU," he was released. *See*

Compl. at 5. In the Third Cause of Action, plaintiff claims that he served "over 60 days in SHU." *See id.* at 9.

A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.*, 714 F.3d at 106; *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134; *Palmer*, 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer*, 364 F.3d at 65. W here the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Davis*, 576 F.3d at 133. [10]

[10]     The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short –less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66; *see Davis*, 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way

Houston v. Coleman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g., Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470 at *15 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege a protected liberty interest because there were no allegations of unusual confinement).

**\*10** In this case, the duration of the confinement, 30 to 60 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Plaintiff claims that while he was confined in the SHU, he was unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from his mental health program. *See* Compl. at 5, 10; Dkt. No. 1-1 at 1.

It is well established that prisoners do not have a constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "Where a state has created a statutory scheme for parole, the Due Process Clause protects prisoners insofar as they 'have a legitimate expectancy of release that is grounded in the state's statutory scheme.' " *Barna v. Travis*, 239 F.3d 169, 170–72 (2d Cir. 2001) (per curiam) (citing *Greenholtz*, 442 U.S. at 11–13). "New York's parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna*, 239 F.3d at 171. Plaintiff has also failed to plead that his inability to participate in mental health programs impacted a protected liberty interest. *See Nieves v. Prack*, No. 6:15-CV-6101, 2016 WL 1165820, at *4 (W.D.N.Y. March 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted). Here, the complaint lacks facts establishing when, how many times, and who deprived plaintiff of the right to attend his mental health program. With respect to plaintiff's religious claims, courts have found that the deprivation of communal religious services does not constitute an atypical and significant hardship. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (finding that eighteen days in administrative segregation, including loss of exercise and access to religious services, did not constitute atypical and significant hardship); *Holland v. Goord*, No. 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (holding the inability to attend Muslim services and celebrate the end of Ramadan while confined in the SHU for seventy-seven days is not an atypical hardship).

Even assuming that plaintiff had pled facts sufficient to show that his confinement imposed an atypical and significant hardship, however, and therefore pled the existence of a valid liberty interest, the complaint fails to state a claim based upon the Fourteenth Amendment and due process. It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). In this case, a hearing regarding the charges was held within two days of plaintiff's receipt of the misbehavior report. Plaintiff does not allege that he was denied any procedural due process during that hearing. Moreover, the complaint lacks facts suggesting that any named defendant issued the misbehavior report or presided over the disciplinary hearings. Based upon the aforementioned, plaintiff's Fourteenth Amendment claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Livingston v. Kelly*, 561 F.Supp.2d 329, 332 (W.D.N.Y. 2008) (dismissing plaintiff's false-report claims because the plaintiff failed to allege that the disciplinary hearings on the reports did not meet constitutional due process standards).

### E. Failure to Respond to Grievances and Failure to Investigate

**\*11** Plaintiff also claims that his constitutional rights were violated because the facility grievance program is "never followed." *See* Compl. at 11. There is no constitutional right of access to the established inmate grievance program. *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a constitutionally protected right"); *Shell v. Brzezniak*, 365 F.Supp.2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord*, No. 00. Civ. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("It is well-established that

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 30 of 238

Houston v. Coleman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

prison grievance procedures do not create a due-process-protected liberty interest.") (citing cases). Simply stated, there is no underlying constitutional obligation to afford an inmate meaningful access to the internal grievance procedure, or to investigate and properly determine any such grievance.

To the extent that plaintiff attempts to assert a separate constitutional claim based upon the Inspector General's failure to investigate, the law is also clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008) (collecting cases); *Torres v. Mazzuca*, 246 F.Supp.2d 334, 341-42 (S.D.N.Y. 2003) (Prisoners do not have a due process right to a thorough investigation of grievances.); *DeShaney v. Winnebego Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual); *Pine v. Seally*, No. 9:09-CV-1198, 2011 W L 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein*, 591 F.Supp.2d at 460).

In this regard, plaintiff's claims do not involve a constitutional violation and are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### F. Cause of Action for Criminal Charges/Perjury
"New York does not recognize a common law cause of action for [...] perjury." *Harris v. Summers*, No. 5:14-CV-0013 (LEK/DEP), 2014 W L 1340032, at *5 (N.D.N.Y. Apr. 3, 2014) (citing *Carvel v. Ross*, No. 12-CV-0722, 2011 W L 856283, at *12 (S.D.N.Y. Feb. 16, 2011) (dismissing the plaintiff's perjury claim because "there [is] no private right of action" for perjury)). Moreover, plaintiff's claim is not actionable because it is well-settled that a private citizen does not have a constitutional right to bring a criminal complaint against another individual. *Harper v. New York Child Welfare Comm'rs,* No. 3:12-CV-0646 (NAM/DEP), 2012 WL 3115975, at *4 (N.D.N.Y. May 14, 2012) (citing *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)). Consequently, plaintiff's request to charge defendants with "perjury" is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### G. Injunctive Relief Against DOCCS
Plaintiff demands injunctive relief directing DOCCS to require "each officer" to wear body cameras to prevent future assaults and other related injunctive relief. *See* Compl. at 10-12. Plaintiff is presently confined at Mid-State C.F. and therefore, plaintiff's request for injunctive relief involving changes to the operation of security at Elmira C.F., is dismissed as moot. *See Edwards v. Horn*, No. 10 Civ. 6194, 2012 WL 760172, at *23 (S.D.N.Y. March 8, 2012) (dismissing the plaintiff's claim for injunctive relief because the plaintiff had been released from prison).

**\*12** Even assuming plaintiff's request is broader and intended to encompass all DOCCS facilities, the request is nonetheless improper and subject to dismissal. The PLRA provides "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of the particular plaintiff." 18 U.S.C. § 3626(a)(1)(A). "[A] proposed order directing the installation of securities cameras – is beyond the narrow scope permitted by the PLRA." *Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y. 2011) (dismissing the plaintiff's request for injunctive relief seeking an order directing Green Haven to install security cameras as overly broad and unnecessary to correct the alleged past violations of his rights). Accordingly, plaintiff's request for injunctive relief is dismissed.

### VI. Conclusion
**ORDERED** that plaintiff's in forma pauperis application (Dkt. No. 2) is **GRANTED**; [11] and it is further

[11]    Plaintiff should note that, although the Court has granted his application to proceed in forma pauperis, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form, and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk of the Court provide a copy of plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 31 of 238

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's § 1983 claims for monetary damages against DOCCS; (2) constitutional claims based upon the failure to adhere to the grievance policy and investigate; and (3) plaintiff's claims related to perjury and filing criminal charges against defendants; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Eighth Amendment claims against defendants for deliberate indifference to plaintiff's serious medical needs; (2) First Amendment freedom of religion claims; (3) Fourteenth Amendment due process claims; and (4) claims for injunctive relief against DOCCS [12]; and it is further

[12]     If plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

**ORDERED** that DOCCS is **DISMISSED** as a defendant herein; and it is further

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response: (1) the Eighth Amendment use of excessive force claims against defendants Copestick and Schieber; (2) the Eighth Amendment failure-to-intervene claim against defendant Collerman; (3) the First Amendment retaliation claims against defendants Copestick and Schieber; and (3) the Fourteenth Amendment equal protection claims against Copestick and Schieber; and it is further

**ORDERED**, that the Clerk shall issue summons and forward them, along with copies of the Complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the Summons and Complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

 **\*13 ORDERED**, that a response to the complaint be filed by the remaining defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED**, in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), the Clerk of the Court is directed to provide plaintiff with copies of opinions from Westlaw and the Federal Appendix cited in this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

Dated: October 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6267968

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 6324179

2019 WL 6324179
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kaia ANDERSON, Plaintiff,

v.

EXPERIAN, Defendant.

19-CV-8833 (CM)
|
Signed 11/26/2019

**Attorneys and Law Firms**

Kaia Anderson, St. Albans, NY, pro se.

ORDER TO AMEND

COLLEEN McMAHON, Chief United States District Judge:

**\*1** Plaintiff, appearing *pro se*, brings this action asserting claims under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, and state law. By order dated November 8, 2019, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis*. For the reasons set forth below, the Court grants Plaintiff leave to file an amended complaint within sixty days of the date of this order.

**STANDARD OF REVIEW**

The Court must dismiss an *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *seeLivingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction. *See*Fed. R. Civ. P. 12(h)(3). While the law mandates dismissal on any of these grounds, the court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se*

pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

The Supreme Court has held that under Rule 8, a complaint must include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

**BACKGROUND**

Plaintiff brings this action against Experian, a credit reporting agency, asserting claims arising out of a debt. But Plaintiff's complaint is confusing. Although Plaintiff names Experian as the sole defendant, he appears to conflate his claims against Experian with that of an unnamed company, a debt collector who provided inaccurate information to the three credit reporting agencies. Plaintiff refers to both Experian and the unnamed company as "Defendant," but because he does not provide the underlying facts giving rise to his claims, it is impossible to determine the basis for Plaintiff's claims against Experian.

**\*2** Plaintiff alleges that the defendant acted in a "false, deceptive, misleading and unfair manner," in violation of the FDCPA by: communicating false and inaccurate information to the three major credit bureaus; engaging in abusive and harassing conduct through the mail and telephone in connection with the collection of a debt; misrepresenting the amount, character, and legal status of the debt; and threatening to take action against him, including having him arrested. (ECF No. 2, 5.) Plaintiff asserts that the defendant is a debt collector, who purchased the debt at a low price and is now attempting to collect the full amount of the original debt from him. But Plaintiff also refers to the defendant's failure to take the necessary steps to have an unnamed company comply

with the FDCPA after he reported that the debt at issue was not his.

Plaintiff further claims that the defendant acted in violation of the FCRA and invaded his privacy by mailing him letters, leaving him phone messages, and threatening to take legal action against him about a debt that does not belong to him. In addition, the defendant has refused to remove inaccurate information from his credit report, which has caused him serious injuries and harm. Plaintiff also claims that the three reporting credit agencies – including Experian – have conducted investigations and "found that Defendant had in fact been reporting false and inaccurate information [and] deleted the inaccurate information as per state and federal laws required." (*Id.* at 6.) But Plaintiff asserts that "the defendant continued [sic] to harassing [sic] Plaintiff through mail communication, constitutes [sic] an invasion of privacy and harassment violations." (*Id.*)

Plaintiff claims that as a result of the defendant's conduct, he sustained monetary damage, as well as injury to his reputation, credit, and privacy. He seeks compensatory damages.

## DISCUSSION

### A. The Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act (FDCPA) prohibits deceptive and misleading practices by "debt collectors." 15 U.S.C. § 1692e. The statute seeks to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Kropelnicki v. Siegel*, 290 F.3d 118, 127 (2d Cir. 2002) (quoting 15 U.S.C. § 1692(e)) (internal quotation marks omitted). To accomplish these goals, the FDCPA creates a private right of action for debtors who have been harmed by abusive debt collection practices. 15 U.S.C. § 1692k. The FDCPA applies to consumer debt "arising out of ... transaction[s]" that "are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5); *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547, 551 (S.D.N.Y. 2013) ("[T]he FDCPA is triggered when the obligation is a debt arising out of a consumer transaction").

Plaintiff fails to state facts suggesting a claim for relief under the FDCPA. He names Experian as the sole defendant,

appears to identify Experian as a debt collector, [1] and alleges that Experian used deceptive and misleading practices in its attempts to collect an unidentified debt. But as one of the three credit reporting agencies, Experian is not normally identified as a debt collector. Based on the information provided, plaintiff fails to state an FDCPA claim against Experian.

[1]      A debt collector is defined as: (1) a person whose principal purpose is to collect debts; (2) a person who regularly collects debts owed to another; or (3) a person who collects its own debts, using a name other than its own as if it were a debt collector. 15 U.S.C. § 1692a(6); *see also Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718 (2017) (holding that entities that regularly purchase debts originated by someone else and then seek to collect those debts for their own account are not necessarily debt collectors subject to the FDCPA).

**\*3** Because it is not clear that granting Plaintiff leave to amend would be futile, the Court grants Plaintiff leave to amend to replead his claims. If in fact Plaintiff seeks to bring FDCPA claims against Experian, he must allege facts suggesting that Experian is a debt collector and it used deceptive and misleading practices in connection with collecting a debt. Plaintiff must identify the debt, what Experian's relationship to the debt is, and the deceptive and misleading acts Experian took in its attempts to collect the debt in violation of the FDCPA.

### B. The Fair Credit Reporting Act

Congress enacted the Fair Credit Reporting Act (FCRA) to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). "The FCRA creates a private right of action against credit reporting agencies for the negligent or willful violation of any duty imposed under the statute." *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir. 1995) (citing 15 U.S.C. §§ 1681*o* & 1681n) (citations omitted).

Plaintiff's assertions implicate two provisions of the FCRA: the duty of consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" of the information contained in a consumer's credit report, 15 U.S.C.§ 1681e(b); and the obligation of such agencies to

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 34 of 238

Anderson v. Experian, Not Reported in Fed. Supp. (2019)

2019 WL 6324179

conduct a "reasonable reinvestigation" if a consumer disputes any information on his credit report, *id.* § 1681i(a)(1)(A). In order to state a claim under § 1681e(b), a plaintiff must allege facts indicating that:

> (1) the consumer reporting agency was negligent or willful in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury.

*Gestetner v. Equifax Info. Servs., LLC*, ECF 1:18-CV-5665, 13, 2019 WL 1172283, at *2 (S.D.N.Y. Mar. 13, 2019) (citation and internal quotation marks omitted); *see also Wenning v. On-Site Manager, Inc.*, ECF 1:14-CV-9693, 105, 2016 WL 3538379, at *8 (S.D.N.Y. June 22, 2016) (same). To state a claim under § 1681i (a)(1)(A), a plaintiff must allege facts showing that a credit reporting agency failed to reasonably reinvestigate a disputed item. *See Jones v. Experian Info. Sols., Inc.*, 982 F. Supp. 2d 268, 272 (S.D.N.Y. 2013). The threshold issue under either provision is whether the challenged or disputed credit information is inaccurate. *See id.* at 272–73 ("[A] plaintiff asserting claims under § 1681i must demonstrate that the disputed information is inaccurate."); *Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989) ("The threshold question in a § 1681e(b) action is whether the challenged credit information is inaccurate. If the information is accurate no further inquiry into the reasonableness of the consumer reporting agency's procedures is required.").

Plaintiff fails to state a claim under either § 1681e(b) or § 1681i(a)(1)(A) because he does not allege any facts suggesting that Experian failed to comply with its duties under either provision. Plaintiff's assertions suggest that inaccurate information was reported on his credit report. But he fails to state a claim under § 1681e(b) because he does not allege that Experian negligently or willfully failed to follow reasonable procedures to assure the accuracy of its credit report, that it reported inaccurate information about him, and that Experian's actions cause him injury. Nor does

Plaintiff assert facts indicating a claim under § 1681i(a)(1)(A), that is, Experian failed to conduct a reasonable reinvestigation of a disputed claim after he notified the agency of inaccuracies. In fact, Plaintiff claims that at some point, the three credit reporting agencies, including Experian, investigated the matter and deleted inaccurate information from his credit report.

**\*4** Should Plaintiff choose to replead his claims, he must provide facts suggesting a claim under the FCRA. In particular, he must identify the debt, allege what inaccurate information was furnished to Experian and placed on his credit report, that he disputed the inaccurate information, and that Experian failed to take reasonable measures initially or upon reinvestigation to assure the accuracy of Plaintiff's credit report.

### C. State-Law Claims

A district court may decline to exercise supplemental jurisdiction over state-law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Because the Court is granting Plaintiff leave to amend the complaint to state federal claims over which the Court has original jurisdiction, the Court will defer ruling on whether to exercise its supplemental jurisdiction over any state-law claims Plaintiff may be asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' " (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

### LEAVE TO AMEND

Plaintiff is granted leave to amend his complaint to detail his claims. In the statement of claim, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant named in the amended complaint. Plaintiff is also directed to provide the addresses for any named defendants. To the greatest extent possible, Plaintiff's amended complaint must:

a) give the names and titles of all relevant persons;

**Anderson v. Experian, Not Reported in Fed. Supp. (2019)**

2019 WL 6324179

b) describe all relevant events, stating the facts that support Plaintiff's case including what each defendant did or failed to do;

c) give the dates and times of each relevant event or, if not known, the approximate date and time of each relevant event;

d) give the location where each relevant event occurred;

e) describe how each defendant's acts or omissions violated Plaintiff's rights and describe the injuries Plaintiff suffered; and

f) state what relief Plaintiff seeks from the Court, such as money damages, injunctive relief, or declaratory relief.

Essentially, the body of Plaintiff's amended complaint must tell the Court: who violated his federally protected rights; what facts show that his federally protected rights were violated; when such violation occurred; where such violation occurred; and why Plaintiff is entitled to relief. Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wishes to maintain must be included in the amended complaint.

## CONCLUSION

The Clerk of Court is directed to assign this matter to my docket, mail a copy of this order to Plaintiff, and note service on the docket. Plaintiff is granted leave to file an amended complaint that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 19-CV-8833 (CM). An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

*5 The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Cf.Coppedge v. United States*, 369 U.S. 438,

444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ CV _____
(include case number if one has been assigned)

Write the full name of each plaintiff.

-against-

AMENDED

COMPLAINT

Do you want a jury trial?
☐ Yes   ☐ No

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 2/10/17

Anderson v. Experian, Not Reported in Fed. Supp. (2019)

2019 WL 6324179

## I.  BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

- ☐  **Federal Question**
- ☐  **Diversity of Citizenship**

### A.  If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

### B.  If you checked Diversity of Citizenship

#### 1.  Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
(Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____ , is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____ , is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| First Name | Middle Initial | Last Name | |
|---|---|---|---|

| Street Address | | | |
|---|---|---|---|

| County, City | State | Zip Code | |
|---|---|---|---|

| Telephone Number | Email Address (if available) | |
|---|---|---|

Page 3

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

Defendant 2:

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

Defendant 3:

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

Page 4

Defendant 4:

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

## III.  STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Page 5

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 37 of 238

**Anderson v. Experian, Not Reported in Fed. Supp. (2019)**
2019 WL 6324179

INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Page 6

V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature |
| First Name | Middle Initial | Last Name |
| Street Address | | |
| County, City | State | Zip Code |
| Telephone Number | | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6324179

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Skvarla v. MRS BPO, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2941118

2021 WL 2941118
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Brian SKVARLA, on behalf of himself
and all others similarly situated, Plaintiffs,

v.

MRS BPO, LLC and John and
Jane Does 1-10, Defendants.

21 Civ. 55
|
Signed 07/12/2021

**Attorneys and Law Firms**

Alla Gulchina, Price Law Group, APC, Hoboken, NJ,
Simon Goldenberg, Law Office of Simon Goldenberg PLLC,
Brooklyn, NY, for Plaintiffs.

Michael Thomas Etmund, Moss & Barnett, Minneapolis,
MN, for Defendant MRS BPO, LLC.

**OPINION & ORDER**

Ramos, D.J.:

**\*1**  Brian Skvarla, on behalf of himself and all persons
similarly situated, brings this action against MRS BPO, LLC,
and John and Jane Does 1-10, claiming that MRS improperly
attempted to collect an alleged debt from him in violation of
the Fair Debt Collection Practices Act ("FDCPA"). 15 U.S.C.
§§ 1692-1692p. Before the Court is MRS's motion to dismiss
pursuant to Fed. R. Civ. P. 12(b)(6). Doc. 10. For the reasons
set forth below, the motion is GRANTED.

## I. BACKGROUND

### a. Factual Background

MRS is a debt collector that regularly engages in the
collection of "defaulted consumer debts." Doc. 1 at 6. Skvarla
alleges that he received a letter (the "Letter") from MRS on
November 6, 2019, seeking to collect on a debt of $20,093.12
owed to JP Morgan Chase Bank. *Id.* at 7. The Letter included
the following language making several offers to settle the
debt:

| SINGLE PAYMENT | NEED MORE TIME? | MONTHLY PAYMENTS |
|---|---|---|
| Make a **ONE-TIME** payment of $7,233.52 by 11/20/2019 to resolve your account | Make **TWO PAYMENTS** of $4,621.42 as follows: Payment 1 by 11/20/2019 Payment 2 by 12/20/2019 to resolve your account | Can't make a settlement right now? We can work with you on a payment plan for the full balance of your account |

If you need additional time to respond to these offers, please
contact us. We are not obligated to renew these offers.

Ex. A to Pl.'s Compl.
The Complaint is premised on the contention that the phrase
"[w]e are not obligated to renew these offers" is false and
misleading. Doc. 1. at 7.

### b. Procedural History

On November 6, 2020, Skvarla filed this action in the
Supreme Court of the State of New York, County of New
York. Doc. 10. On January 5, 2021, it was removed to this
Court pursuant to 28 U.S.C. § 1441. *Id.* at 1. On February 19,
2021, MRS moved to dismiss the complaint pursuant to Fed.
R. Civ. P. 12(b)(6). *Id.*

## II. LEGAL STANDARD

*Motion to Dismiss Fed. R. Civ. P. 12(b)(6)*

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 39 of 238

Skvarla v. MRS BPO, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2941118

Under Rule 12(b)(6), a complaint may be dismissed for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss, the Court accepts that all the factual allegations are true and draws "reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim is one in which "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The question on a motion to dismiss " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

*Fair Debt Collection Practices Act*

The Fair Debt Collection Practices Act was enacted in 1977 to address practices that were "abusive, deceptive, and unfair" by debt collectors, "to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(a),(e). The FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Wiener v. Bloomfield*, 901 F. Supp. 771, 774 (S.D.N.Y. 1995); 15 U.S.C. § 1692(e). It also forbids debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

**\*2** To establish a violation under the FDCPA, three elements must be proven: "(1) the plaintiff [must] be a 'consumer' who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt, (2) the defendant collecting the debt must be considered a 'debt collector,' and (3) the defendant must have engaged in an act or omission in violation of the FDCPA's requirements." *Derosa v. CAC Fin. Corp.*, 278 F. Supp. 3d 555, 559–60 (E.D.N.Y. 2017) (citing *Scott v. Greenberg*, No. 15-CV-05527 (MKB), 2017 WL 1214441, at \*4 (E.D.N.Y. Mar. 31, 2017)).

To determine if there has been a violation of the FDCPA, this district applies the "least sophisticated consumer" standard to the communications in question. *See Ellis v. Solomon & Solomon, PC.*, 591 F.3d 130, 135 (2d Cir. 2010). When applying this standard, courts ask "how the least sophisticated consumer [...] would understand the collection notice." *Avila v. Riexinger & Assocs., LLC*, 817 F.3d 72, 75 (2d Cir. 2016).

### III. DISCUSSION

**A. The Letter is Not Misleading under the FDCPA**
In applying the least sophisticated customer standard, "courts have held that collection notices violate the FDCPA if the notices contain language that 'overshadows' or 'contradicts' other language that informs consumers of their rights." *Cloman v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993). Skvarla claims that the Letter is materially false, deceptive, and misleading under § 1692e of FDCPA. In particular, he alleges that the statement "we are not obligated to renew these offers" is false and misleading, because MRS is "always" obligated to renew such offers. Doc. 11 at 1. Skvarla also insists that the statement, in conjunction with the deadlines, created a sense of urgency of "one-time take-it-or-leave-it settlement offers" by requiring that the first payment be made only 14 days after the date of the Letter. *Id.;* Doc. 10 at 1. He also alleges that the Letter might influence the "least sophisticated consumer" to accept one of the offers in fear that it will not be renewed. Doc. 1 at 8.

MRS argues the statement "we are not obligated to renew this offer" is not misleading as a matter of law. In support, it cites several cases that have upheld this phrase as "safe harbor" language that does not violate the FDCPA, because it "merely inform[s] the consumer that there may not be other settlement offers, while 'dispel[ling] any false impression by the consumer as to his or her options.' " *Preston v. Midland Credit Mgmt., Inc.*, 948 F.3d 772, 778 (7th Cir. 2020); *see also Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007) (finding no FDCPA violation when the safe harbor language "[w]e are not obligated to renew this offer" was used). Other courts, including the Eastern District of New York, have also held that this "safe harbor" language provides a defense against allegations that a debt collection communication is false or misleading under the FDCPA. *See Saraci v. Capital Mgmt. Servs., L.P.*, 18-cv-05149-AMD-RER, 2019 WL 4602827 (E.D.N.Y. Sept. 23, 2019); *Dillard v. FBCS, Inc.*, 19-CV-968(KAM)(RER), 2020 WL 4937808, at \*5 (E.D.N.Y. Aug. 24, 2020).

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 40 of 238

Skvarla v. MRS BPO, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2941118

The Court finds MRS's argument more persuasive. In *Evory*, the Seventh Circuit concluded that identical language would adequately address the chance that a debtor would receive a "false impression of his options by the debt collector's including [the safe harbor language] with the offer." *Evory*, 505 F.3d at 776. The Seventh Circuit noted that the word "obligated" would effectively communicate to the unsophisticated consumer that "there is a renewal possibility but that it is not assured." *Id.* If debt collectors disclosed that their offers would continue even after a rejection, the court reasoned, then the offers would be useless and payments never paid. *Id.* at 775; *see also Sarder v. Acad. Collection Serv., Inc.*, No. 02-CV-2486 (NG)(VVP), 2005 WL 615831, at *3 (E.D.N.Y. Mar. 3, 2005) (concluding that if disclosure was necessary, then it would deter collectors "from ever offering a lower settlement amount, and thus eliminat[ing] settlement possibilities.").

**\*3** In *Saraci*, the E.D.N.Y. relied on *Evory* and rejected the challenge to the statement "we are not obligated to renew this offer." *Saraci*, 2019 WL 4602827 at *2. The court held that "[t]here is nothing misleading or improper about making a settlement offer and including a deadline with that offer." *Saraci*, 2019 WL 4602827 at *2 n.3 (citing *DeGeorge v. Financial Recovery Service, Inc.*, No. 11-CV-04288, 2012 WL 4473229, at *6 (E.D. Pa. Sep. 28, 2012)). According to the court, there was nothing in the statement that suggested the offer was a onetime deal. *Id.* Conversely, the court found that the intent of the letter was to communicate that "the defendant could renew the offer, but was not obligated to do so." *Id.* at *3 (citing *Evory, 505* F.3d at 769).

In *Dillard*, the defendant sent the plaintiff a letter offering to resolve her account, which provided four different options (three of which were payments and one of which offered the ability to discuss with a representative). *See Dillard*, 2020 WL 4937808 at *1. On the front page, the letter stated, "[p]lease see reverse side for important information," which included the language "FBCS, Inc. is not obligated to renew this offer." *Id.* at *1-2. The court held that the Defendant properly used the safe harbor language, and that it was not misleading to the least sophisticated consumer when viewing the letter as whole, even though the safe harbor language appeared on the back of the letter. *Id.* at *5. The court held that the letter was clear, reasonable and concise. *Id.* at *6.

Skvarla argues in response that the Court should not follow *Evory* and its use of the safe harbor language, contesting that MRS *is* obligated to renew the offer. *See Evory*, at 505 F.3d 769; *see also* Doc. 1. However, Skvarla's allegation is not supported by facts that would provide a basis for there being an obligation to renew the offer, and is thus conclusory. *See Iqbal*, 556 U.S. at 662 (citing *Twombly*, 550 U.S. at 544) (pleadings must allege facts that are plausible and not merely conclusory statements). It is true that "debt collectors [...] frequently renew their offers if the consumer fails to accept the initial offer." *Evory*, 505 F.3d at 775. However, this is not the same as MRS having an obligation to renew the offer. Rather, the safe harbor language exists so that the least sophisticated consumer does not believe that this offer will be final or that it will be certainly renewed. *See Evory, 505* F.3d at 769; *see also Preston*, 948 F.3d at 772.

The Court finds that the safe harbor language does not mislead the "least sophisticated consumer" by creating a false sense of urgency regarding the offers. Debt collection letters must be read as a whole, "[s]o long as nothing on the front of the letter overshadows or contradicts the [information required by statute]." *McStay v. I.C. Sys. Inc.*, 308 F.3d 188, 191 (2d Cir. 2002). When looking at the Letter as a whole, the safe harbor language follows the offers. Moreover, Skvarla's argument that the Letter creates a "sense of urgency" is rebutted by the language that immediately follows the offers, that "[i]f you need additional time to respond to these offers, please contact us." Doc. 1. This statement undermines Plaintiff's argument that the language is misleading.

Consistent with the decisions of other circuits that have analyzed the same language under similar circumstances, the statement made by MRS in the Letter is not misleading as a matter of law.

### B. Materiality Requirement

MRS also argued that "[e]ven if MRS' letter is misleading, there is no material violation of the FDCPA." Doc. 10 at 9. A statement is considered material "if it is capable of influencing the decision of the least sophisticated [consumer]." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 85 (2d Cir. 2018) (quoting *Jensen v. Pressler & Pressler*, 791 F.3d 413, 421 (3d Cir. 2015)); *see also Hahn v. Triumph Partnerships LLC*, 557 F.3d 755, 758 (7th Cir. 2009) ("A statement cannot mislead unless it is material, so a false but non-material statement is not actionable."). Here, it is not necessary to address the materiality requirement because the Court finds the safe harbor language adequate and not misleading as a matter of law. 15 U.S.C. §§ 1692-1692p. Because it is not misleading, it also cannot be *materially* misleading.

2021 WL 2941118

**IV. CONCLUSION**

 **\*4** For the foregoing reasons, MRS's motion to dismiss Skvarla's complaint is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 9, and enter judgment for MRS.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2941118

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Perez v. Experian, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 42 of 238

2021 WL 4784280

2021 WL 4784280
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eric Andrew PEREZ, Plaintiff,

v.

EXPERIAN, et al., Defendants.

20-CV-9119 (PAE) (JLC)

|

Signed October 14, 2021

**Attorneys and Law Firms**

Eric Andrew Perez, New York, NY, Pro Se.

Cealagh P. Fitzpatrick, Jones Day, Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Experian.

Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Equifax.

Camille Renee Nicodemus, Schuckit & Associates, P.C., Zionsville, IN, Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Trans Union.

Howard Alan Fried, McGivney Kluger Clark & Intoccia, P.C., Courtney Sophie Stieber, Seyfarth Shaw LLP, Danit Sibovits, Dean L. Pillarella, McGivney, Kluger, Clark & Intoccia, P.C., New York, NY, for Defendant Verizon.

Brendan Hoffman Little, Lippes Mathias LLP, Buffalo, NY, for Defendant Sequium Asset Solutions.

**REPORT & RECOMMENDATION**

JAMES L. COTT, United States Magistrate Judge

**\*1 To the Honorable Paul A. Engelmayer, United States District Judge:**

*Pro se* plaintiff Eric Andrew Perez brings this action alleging violations of the Fair Credit Reporting Act ("FCRA"), the Fair Debt Collection Practices Act ("FDCPA"), and the Federal Trade Commission Act ("FTC Act") against Experian Information Solutions ("Experian"), Equifax Information Services LLC ("Equifax"), Trans Union, LLC ("Trans Union"), New York SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon"), Sequium Asset Solutions ("Sequium"),

the Federal Trade Commission ("FTC"), and Citibank, N.A. ("Citibank"). [1] Sequium has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Experian, Equifax, Trans Union, and Verizon ("joint defendants") have jointly filed motion papers but under two different rules. As Equifax has not yet filed its answer, it has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted, while Experian, Trans Union, and Verizon, which have each filed an answer, have moved for judgment on the pleadings pursuant to Rule 12(c). For the reasons set forth below, I recommend that both motions be granted, but that Perez be given leave to file an amended complaint as to certain of his claims.

[1]  Citibank appears to have been served via certified return receipt to a registered agent at the CT Corporation System but has not responded to the complaint to date. Dkt. No. 19. As discussed *infra*, the Court previously dismissed all claims against the FTC. Dkt. No. 11.

**I. BACKGROUND**

**A. Perez's Allegations**

The following facts are taken from the complaint. Complaint ("Compl."), Dkt. No. 2. [2] All of its factual allegations are accepted as true for purposes of both motions. *See, e.g., Littlejohn v. City of New York,* 795 F.3d 297, 306 (2d Cir. 2015) (motion to dismiss); *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir. 2010) (motion for judgment on the pleadings). Because Perez is proceeding *pro se,* the Court also considers allegations made for the first time in his response opposing the motions. *See, e.g., Saudager v. Walgreens Co.,* No. 18-CV-437 (KPF), 2019 WL 498349, at *1 n.1 (S.D.N.Y. Feb. 8, 2019) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." (quoting *Walker v. Schult,* 717 F.3d 119, 122 n.1 (2d Cir. 2013))).

[2]  Attached to the complaint are exhibits that appear to be the credit reports issued by consumer reporting agency ("CRA") defendants Equifax, Experian, and Trans Union ("CRA defendants"), with annotations, presumably made by Perez, indicating that many of the outstanding debts listed

**Perez v. Experian, Not Reported in Fed. Supp. (2021)**

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 43 of 238

2021 WL 4784280

on the reports are disputed, as well as emails sent by Perez to the FTC. Compl., Exhibits ("Ex.") 1–12. The exhibits are properly considered under Rule 10(c), which provides that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." In the context of a Rule 12(b)(6) motion, courts "may permissibly consider documents other than the complaint," including "[d]ocuments that are attached to the complaint or incorporated in it by reference." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). The same applies to Rule 12(c) motions. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) ("[C]ourts may on a Rule 12(c) motion—just as on a Rule 12(b)(6) motion—consider extrinsic material that the complaint 'incorporate[s] by reference,' that is "integral" to the complaint ...." (citation omitted)).

**\*2** Perez was born on June 27, 1976. Compl., Ex. 4. He is a discharged United States Marine Corps veteran who suffers from post-traumatic stress disorder ("PTSD") and traumatic brain injury ("TBI"). Plaintiff's Opposition ("Pl. Opp."), Dkt. No. 73, at 1. Perez alleges that defendants have developed a "system of misreporting and manipulating credit files and scores for their own profit" (*id.* at 2) as part of a "civil criminal conspiracy" depriving him of his rights and charging him with "socioeconomic oppression ... in construction and collusion with various federal and state agencies." Compl. ¶25; Pl. Opp. at 3.

Perez alleges the CRAs Experian, Equifax, and Trans Union have all misreported accounts to his credit file and inaccurately reported his credit. Compl. ¶¶27, 29. He alleges the following inaccuracies:

**Table 1: Alleged Inaccuracies on Experian Report**

| | Reported | Alleged by Perez |
|---|---|---|
| Capital Bank | $21 | $0 |
| Verizon | $421 | $0 |
| Educational accounts | 4 accounts with 9 late payments | Educational account in forbearance and then disputed using the borrowers' defense application |
| Inquiries | 9 | 5 |

*Id.* ¶29, Ex. 1 at 23–44. [3]

[3] The page numbers cited are those produced by the Electronic Case Filing ("ECF") system.

**Table 2: Alleged Inaccuracies on Equifax Report**

| | Reported | Alleged by Perez |
|---|---|---|
| Best Buy | $753 | $0 |
| Capital Bank | $136 | $0 |
| Lead Bank | $259 | $0 |

*Id.*; Ex. 1 at 44–65.

**Table 3: Alleged Inaccuracies on Trans Union Report** [4]

| | Reported | Alleged by Perez |
|---|---|---|

Perez v. Experian, Not Reported in Fed. Supp. (2021)
Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 44 of 238
2021 WL 4784280

| Capital Bank | $136 | $0 |
|---|---|---|
| Best Buy CBNA | $753 | $0 |
| "Self" | $259 | $100 |
| Educational loans | 4 loans paid on time, and 6 educational loans with 9 late payments | 4 loans "on time placed in forbearance borrowers defense application pending" |
| Inquiries | 7 | 5 |

[4]   Perez attaches a "Trans Union Credit Report as of 10-29-20." However, it appears to be a duplicate of the Equifax Credit Report from October 14, 2020. *See* Compl., Ex. 1 at 65–84. For the purposes of the motion, the Court will take Perez's allegations in his Complaint as true reflections of the Trans Union credit report, although there is no report attached. *See* Compl. ¶28.

*Id.* ¶29. Lastly, Perez alleges that Experian, Equifax, and Trans Union have misreported his employment history by providing an incomplete history of United Way of America, J & J Towers, Kew Forest, and Stream America despite Perez having additional employment history, although he does not specify which employers are missing. *Id.* ¶28. Experian lists United Way of America and JJ Auto Repair, *see* Ex. 1 at 43, and Equifax lists Fresh Direct as his employer, *see* Ex. 1 at 63. Perez contends that the CRA defendants arbitrarily assigned him credit scores as part of a "scheme to disenfranchise en mass" by the CRA defendants and federal and state agencies. *Id.* ¶30. As part of the scheme, Perez alleges that the CRA defendants have assigned an "illegal synthetic identity to a confidential informant." *Id.* ¶31. Perez alleges that Citibank is also an active participant in the "alternate credit scheme." *Id.* ¶38. Additionally, he alleges that Verizon provided access to Perez's cable, internet, and cell phone accounts to informants and law enforcement without warrants and passed off the "debt of an unknown informant into his account and reported the debt to three credit bureaus after the debt was settled." *Id.* ¶¶35–36.

Perez has contacted Citibank, Verizon, and Sequium to dispute information that he believed was inaccurate and furnished to the CRAs. *Id.* ¶¶42, 47. Perez claims that he has provided information to validate that the debt was assigned to the wrong person, such as his driver's license, social security number, proof of residence, and proof of payment. *Id.* ¶43. Despite Perez's attempts to dispute the information, Citibank, Verizon, and Sequium have allegedly failed to remove the inaccurate information and continued to furnish it to the CRAs, without informing them that the information is disputed by Perez. *Id.* ¶¶44, 50. Perez also asserts that Sequium failed to issue him a debt settlement letter after his request. *Id.* ¶37. [5]

[5]   Debt settlement offers are letters that offer a specific amount of money in exchange for forgiveness of the consumer's debt. *See, e.g.,* *Cortez v. Forster & Garbus, LLP,* 999 F.3d 151, 156 (2d Cir. 2021) (describing debt settlement offers).

**\*3** Perez's credit file allegedly has several errors that he claims indicate proof of manipulation and control. Pl. Opp. at 6. For example, Perez complains that his gender is not included on the reports, his changes of physical addresses are delayed and not reported at the same time, and he still receives Experian notifications for new sex offenders added to his former zip code of 10304. *Id.* at 6–7. [6] Perez has allegedly reported the scheme and his claims of identity theft to the FTC on more than 12 occasions without any response. Compl. ¶¶76–78; Exs. 2–12 (11 emails from Perez to FTC from March 14, 2020 through October 6, 2020). Perez contends that as a result of the inaccuracy of his credit reports, he is unable to increase his existing credit and was denied economic opportunities, including entrepreneurship programs, more than 50 employment opportunities, and 30

2021 WL 4784280

opportunities for personal credit. Moreover, he alleges that he has suffered from character defamation and experienced pain and suffering over a ten-year period. Compl. ¶¶79–83; Pl. Opp. at 6.

[6]    Experian offers Sex Offender Monitoring to inform users of all registered sex offenders living within the user's area and notify the user when a new offender is added. *Non-Credit Monitoring Services*, EXPERIAN, https://www.experianpartnersolutions.com/identity-management/non-credit/ (last visited Oct. 12, 2021).

### B. Procedural History

Perez commenced this action on October 30, 2020, asserting claims under the FCRA, 15 U.S.C. §§ 1681 *et seq.*, against all defendants, including a violation of § 1681s-2(a) by furnishing information about him despite notice that it is inaccurate, and a violation of § 1681s-2(b) by failing to investigate upon notice of dispute and furnishing information without notice that the reported information is under investigation. Compl. ¶¶42–45; 46–48. He also asserts claims under the FDCPA, 15 U.S.C. §§ 1692-1692p, for the false representations by all defendants concerning the legal status of a debt. *Id.* ¶¶53–54. Perez seeks damages as well as declaratory and injunctive relief. *Id.* ¶¶ 20–21. Although Perez initially included the FTC as a defendant, the Court dismissed all claims against the FTC and all claims brought under the FTC, 15 U.S.C. § 45, in an Order of Service dated January 6, 2021. Dkt. No. 11.

On May 14, 2021, Sequium moved for judgment on the pleadings pursuant to Rule 12(c), arguing that Perez fails to state a claim upon which relief may be granted. Defendant Sequium's Brief in Support of its Motion ("Sequium Mem."), Dkt. No. 62. In particular, Sequium argues that: (1) Perez's claims under § 1681s-2(a) fail because the FCRA does not provide Perez with a private right of action; (2) his claims under § 1681s-2(b) of the FCRA fail because Sequium did not act as a furnisher of information regarding the debt at issue; and (3) his claims under the FDCPA fail because it does not have a requirement to issue debt settlement letters. Sequium Mem. at 1–2, 5.

On May 17, 2021, Equifax, Trans Union, Experian, and Verizon jointly filed motion papers. Defendants' Joint

Memorandum of Law in Support of Their Motions ("Joint Defs. Mem."), Dkt. No. 65. As Experian, Trans Union, and Verizon have all filed answers to the complaint, they moved for judgment on the pleadings. *Id.* at 1 n.1. Equifax has not yet filed its answer and therefore moved to dismiss the complaint for failure to state a claim. *Id.* Specifically, they argue that Perez failed to state a claim for a violation of the FCRA because: (1) a CRA cannot be held liable for the reporting of employment information; (2) the inaccurate reporting claim is based on a false allegation that defendants were engaged in a criminal conspiracy; (3) Equifax, Experian, and Trans Union are not furnishers of information; (4) there is no private right of action to assert a claim under § 1681s-2(a) against Verizon; and (5) Perez failed to allege that Verizon was notified of Perez's dispute by any CRA as required by § 1681s-2(b). *Id.* at 1–2. The joint defendants also argue that Perez failed to state a claim for a violation of the FDCPA because they are not debt collectors. *Id.* at 2. [7]

[7]    Despite the parties' briefing on the issue (Joint Defs. Mem. at 13–14), Perez's criminal negligence claims were only alleged against the FTC and have already been dismissed. *See* Dkt. No. 11. Similarly, Perez's claims of character defamation under state law were also only made against the FTC and were also dismissed. *Id.*; Compl. ¶83. Therefore, the Court need not address those claims.

 **\*4**  On June 13, 2021, Perez submitted his response to the motions, restating his claims against the CRAs for failure to report his complete and accurate information (Pl. Opp. at 3–4, 9–11), his claims against Verizon, *id.* at 12–13, and his claims against defendants as debt collectors, *id.* at 13–14. On July 1, 2021, Sequium submitted reply papers. Sequium's Reply Brief in Support Of Its Motion ("Sequium Reply"), Dkt. No. 75. On July 2, 2021, the joint defendants submitted reply papers as well. Defendants' Joint Reply to Plaintiff's Opposition ("Joint Defs. Reply"), Dkt. No. 76.

### II. DISCUSSION

### A. Applicable Standards

### 1. Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."

Perez v. Experian, Not Reported in Fed. Supp. (2021)

2021 WL 4784280

Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must plead facts in his complaint that "state a claim to relief that is plausible on its face" and that satisfy Rule 8(a)(2). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 677–78 (quoting Fed. R. Civ. P. 8(a)(2)). A claim is facially plausible when there exists "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (citing *Twombly*, 550 U.S. at 556). Nevertheless, this standard requires a plaintiff's pleadings to sufficiently "nudge[ ] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

When considering a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Littlejohn*, 795 F.3d at 306 (citing *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 300 (2d Cir. 2006)). "A complaint need not include 'detailed factual allegations,' but it must contain more than mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.' " *JCG v. Ercole*, No. 11-CV-6844 (CM) (JLC), 2014 WL 1630815, at *5 (S.D.N.Y. Apr. 24, 2014) (quoting *Iqbal*, 556 U.S. at 678) (internal quotations omitted), *adopted by* 2014 WL 2769120 (June 18, 2014). A complaint containing only "conclusory allegations or legal conclusions masquerading as factual conclusions" will not survive a motion to dismiss. *Womack v. Capital Stack, LLC*, No. 18-CV-4192 (ALC), 2019 WL 4142740, at *3 (S.D.N.Y. Aug. 30, 2019) (quoting *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)).

### 2. Motion for Judgment on the Pleadings Pursuant to Rule 12(c)

Under the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). The standard for evaluating a motion for judgment on the pleadings under Rule 12(c) is the same as the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See, e.g.*, *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004). "To survive a Rule 12(c) motion, [a] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Johnson v. Rowley*, 569 F.3d 40, 43–44 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). In considering such

motions, the court must take all factual allegations in the complaint as true and draw all reasonable inferences in the non-moving party's favor. *See, e.g.*, *Famous Horse Inc.*, 624 F.3d at 108.

### 3. Standards Applicable to *Pro Se* Litigants

**\*5** "A document filed *pro* se is to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (internal quotations omitted)). Courts within this Circuit grant *pro se* litigants a " 'special solicitude' by interpreting a complaint filed *pro se* 'to raise the strongest claims that it suggests.' " *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). However, the "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (quoting *2 Moore's Federal Practice* § 12.31[1][b] (2005), at 12–61 (internal quotation marks omitted)). Therefore, a court should "not hesitate to dismiss a *pro se* complaint if it fails altogether to satisfy the pleading standard." *Henry v. Davis*, No. 10-CV-7575 (PAC) (JLC), 2011 WL 3295986, at *2 n.5 (S.D.N.Y. Aug. 1, 2011), *adopted by* 2011 WL 5006831 (Oct. 20, 2011).

With these standards in mind, the Court will discuss each of Perez's claims in turn, beginning with his claims under the FCRA.

### B. Claims under the Fair Credit Reporting Act

Perez contends that all of the defendants have violated the FCRA. Compl. ¶¶39–51. The FCRA regulates consumer credit reporting agencies to ensure accuracy, confidentiality, relevancy, and proper utilization of consumer credit information. 15 U.S.C. § 1681(b). It "places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies." *Redhead v. Winston & Winston, P.C.*, No. 01-CV-11475 (DLC), 2002 WL 31106934, at *3 (S.D.N.Y. Sept 20, 2002) (citing 15 U.S.C. §§ 1681 *et seq.*). Perez alleges claims under the FCRA against both consumer reporting agencies (Experian, Equifax, and Trans Union) and alleged furnishers of information (Sequium and Verizon). Accordingly, the Court will address the two relevant types of obligations—first, obligations for furnishers

Perez v. Experian, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 47 of 238

2021 WL 4784280

of information, and then obligations for consumer reporting agencies.

### 1. Liability of furnishers of information

Although the primary function of the FCRA is to regulate the actions of consumer reporting agencies like Equifax, Experian, and Trans Union, the FCRA also imposes obligations on parties that furnish information to such agencies. *See* 15 U.S.C. § 1681s-2. Courts in this Circuit have "interpreted [furnishers of information] to mean entities that transmit, to credit reporting agencies, information relating to debts owed by consumers." *Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 426 n.11 (S.D.N.Y. 2010) (internal quotation omitted) (citing *Kane v. Guar. Residential Lending, Inc.*, No. 04-CV-4847 (ERK), 2005 WL 1153623, at *4 (E.D.N.Y. May 16, 2005)). "[T]hese obligations involve the duty to provide accurate information and to correct inaccurate information, 15 U.S.C. § 1681s–2(a), and to conduct an investigation after receiving notice of a credit dispute from a consumer reporting agency, § 1681s–2(b)." *Nguyen v. Ridgewood Sav. Bank*, 66 F. Supp. 3d 299, 303 (E.D.N.Y. 2014) (citing *Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 150 (2d Cir. 2012)). However, certain requirements are only triggered when a furnisher of information receives notice of a credit dispute from specified parties. If a consumer files a dispute with the furnisher of the disputed information, under § 1681s-2(a)(8) the furnisher must investigate the dispute. If a consumer files a dispute with the consumer reporting agency, then both the consumer reporting agency and the furnisher have a duty to investigate the dispute. 15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(b).

### a. Statutory Requirements

#### i. The duty to provide accurate information and correct inaccurate information under § 1681s-2(a)

**\*6** Perez alleges Verizon and Sequium have violated FCRA § 1681s-2(a). Compl. ¶¶41–45. FCRA § 1681s-2(a) provides that a furnisher of information has a duty to report information accurately to credit reporting agencies. 15 U.S.C. § 1681s-2(a). Moreover, if a person, or creditor, learns that any reported information is inaccurate, Subsection (a) obligates them to notify the credit reporting agency of the inaccuracies and provide corrections. 15 U.S.C. § 1681s-2(a).

However, it is well-settled that there is no private cause of action for alleged violations of Section 1681s-2(a). *See, e.g.*, *Longman*, 702 F.3d at 151 ("[T]he statute plainly restricts enforcement of that provision to federal and state authorities."). Enforcement of FCRA § 1681s-2(a) is limited to government agencies and officials as the statute provides that Subsection (a) "shall be enforced *exclusively* ... by the Federal agencies and officials and the State officials identified in section 1681s of this title." 15 U.S.C. § 1681s-2(d) (emphasis added).

Although Perez has alleged a violation of Subsection (a) of Section 1681s-2 of the FCRA, because that provision does not provide a private right of action, this claim fails as a matter of law.

#### ii. The duty to investigate after receiving notice of a credit dispute from a consumer reporting agency under § 1681s-2(b)

Perez also alleges defendants have violated § 1681s-2(b) of the FCRA. Compl. ¶¶46–48. In contrast to § 1681s-2(a), which is triggered when a consumer sends a dispute directly to a furnisher of information, § 1681s-2(b) is triggered when the furnisher is notified by the CRA that a consumer disputes the accuracy of the furnished information. *Compare* 15 U.S.C. § 1681s-2(a)(8) *with* 15 U.S.C. § 1681s-2(b)(1).[8] Section 1681s-2(b) requires the furnisher to "conduct an investigation with respect to the disputed information," after receiving notice from a CRA. 15 U.S.C. § 1681s-2(b)(1); *see, e.g.*, *Redhead*, 2002 WL 31106934, at *4 ("The category of duties in [1681s-2(b)] governs the furnishers' duty once notice is received from a credit reporting agency that there is a dispute as to the completeness or accuracy of the information provided to that reporting agency."). Upon such notice, a furnisher must:

> (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided by the consumer reporting agency...; (3) report the results of the investigation to the consumer reporting agency; (4) where an investigation finds that the information is incomplete or inaccurate, report those results to all other consumer

Perez v. Experian, Not Reported in Fed. Supp. (2021)

2021 WL 4784280

> reporting agencies to which the person furnished the information ...; and (5) where the information is found to be inaccurate, incomplete, or unverifiable, promptly modify, delete, or permanently block the reporting of that information.

*Frederick v. Cap. One Bank (USA), N.A.,* No. 14-CV-5460 (AJN), 2018 WL 1583289, at *6 (S.D.N.Y. Mar. 27, 2018) (internal quotations omitted) (citing 15 U.S.C. §§ 1681s-2(b)(1)(A)-(E)).

[8]      Although § 1681s-2(a) of the FCRA does not provide a private right of action, § 1681s-2(b) has been recognized to provide a private right of action for willful or negligent noncompliance with the statute. *See, e.g., Nguyen v. Ridgewood Sav. Bank,* 66 F. Supp. 3d 299, 305 (E.D.N.Y. 2014) (collecting cases).

To satisfy a claim under § 1681s-2(b), a plaintiff must first establish that the defendant is a "furnisher of information" within the meaning of the statute. *Id.* at *6. Then, he must establish that: "(1) the furnisher received notice of a credit dispute from a credit reporting agency, and (2) the furnisher thereafter acted in 'willful or negligent noncompliance with the statute.' " *Markovskaya v. Am. Home Mortg. Servicing, Inc.,* 867 F. Supp. 2d 340, 343 (E.D.N.Y. 2012) (quoting *Redhead,* 2002 WL 31106934, at *5). "Notice from an individual consumer, in the absence of notice from a credit reporting agency, is insufficient to trigger the duties contained in Subsection (b)." *Kane,* 2005 WL 1153623, at *4; *see also O'Diah v. New York City,* No. 02-CV-274 (DLC), 2002 WL 1941179, at *13 (S.D.N.Y. Aug. 21, 2002) (§ 1681s-2(b) requires plaintiff to "show that the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information is disputed").

**b. Perez failed to allege the CRAs are "furnishers of information" as defined under FCRA § 1681s-2(b).**

**\*7** Equifax, Experian, and Trans Union argue they are not "furnishers of information" under § 1681s-2(b) of the FCRA, as they are consumer reporting agencies and therefore not liable under § 1681s-2(b). Joint Defs. Mem. at 9.[9] Perez failed to allege in his complaint that the CRA defendants were

furnishers of information. Moreover, in his opposition papers, Perez concedes that the "CRA defendants are not furnishers of information." Pl. Opp. at 11. Because Perez does not allege that the CRA defendants are furnishers of information, he fails to state a plausible claim under Section 1681s-2(b) as against them and that claim should also be dismissed. *See Frederick v. Cap. One Bank (USA), N.A.,* No. 14-CV-5460 (AJN), 2015 WL 5521769, at *6 (S.D.N.Y. Sept. 17, 2015), *opinion amended on reconsideration sub nom. Frederick v. Cap. One (USA) N.A.,* No. 14-CV-5460 (AJN), 2015 WL 8484560 (Dec. 8, 2015) (dismissing for failure to allege defendants were furnishers of information).

[9]      As defined in the FCRA, the term "consumer reporting agency" means "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

Accordingly, the Court recommends that all of Perez's claims under FCRA § 1681s-2(b) against Equifax, Experian, and Trans Union be dismissed. However, Verizon concedes it is a "furnisher of information" and therefore can be liable under § 1681s-2(b). Joint Defs. Mem. at 10. Additionally, Perez alleges sufficient facts to support a reasonable inference that Sequium is a furnisher of information. *See* Compl. ¶14 ("As part of its debt collection activities, ... Sequium ... furnishes information to CRAs"). The Court will thus analyze the remaining claims against Verizon and Sequium as furnishers of information under the FCRA.

**c. Perez fails to state a claim against Verizon or Sequium under FCRA § 1681s-2(b).**

In response to his allegations that they violated § 1681s-2(b), both Verizon and Sequium contend that Perez failed to allege that he disputed the information with a consumer reporting agency, who then reported the dispute to the furnishers of information (Verizon and Sequium). Joint Defs. Mem. at 11; Joint Defs. Reply at 7; Sequium Mem. at 5.[10] In his complaint, Perez alleges that he had reported disputes directly to Citibank, Verizon, and Sequium regarding information that

they had furnished to the CRAs. Compl. ¶42. In his opposition papers, Perez further stated that he disputed "several accounts electronically and by mail" but it is unclear if he is referring to his communications with the FTC, the CRA defendants, or Verizon and Sequium. Pl. Opp. at 13. Perez also contends that he contacted Verizon directly to dispute the charges in Small Claims Court in the Bronx in 2019 and when Verizon "over charged him for his devices and bills," Perez notified them that he wanted "to pay [the charges] off prior to having these charges appear on his credit." *Id.* at 12–13. However, to state a § 1681s-2(b) claim, Perez must allege that Verizon and Sequium were contacted by a *consumer reporting agency* about a dispute, not contacted by Perez himself, and that those agencies followed up with a notice of dispute to Verizon and Sequium (which in turn must then conduct an investigation into the information in question). *Kane*, 2005 WL 1153623, at *4 (granting motion to dismiss for failure to allege furnisher received notice of dispute from CRA). This he has failed to do.

> 10    In its motion papers, Sequium Mem. at 5, Sequium cites to the declaration of its chief compliance officer and general counsel, *see* Dkt. No. 29-1, which it has attached to its answer, but on a motion for judgment on the pleadings, a court cannot consider matters outside the pleadings. Moreover, Sequium did not move in the alternative for summary judgment, or provide Perez with the appropriate notice under Local Rule 56.2 that it intended to do so. For these reasons, the Court has not considered this declaration in its review of the motion papers.

**\*8** In sum, Perez's "furnishers of information" FCRA claims should be dismissed. Specifically, Perez's claim under 15 U.S.C. § 1681s-2(a) should be dismissed with prejudice, as that Subsection affords no private right of action and any amendment would be futile. However, Perez's claim under 15 U.S.C. § 1681s-2(b) against Verizon and Sequium should be dismissed without prejudice to his filing an amended complaint, pleading all the necessary elements of a claim under that Subsection to the extent they exist, given that the complaint is difficult to parse through but suggests he might have a viable claim. *See, e.g.*, *Branum v. Clark*, 927 F.2d 698, 705–06 (2d Cir. 1991) (where *pro se* pleading contained "the seeds" of viable claims, it should not be dismissed "without granting leave to amend at least once"); *Kane*, 2005 WL 1153623, at *11 (while plaintiff's complaint "le[ft] much to be desired," it was not "so clearly deficient that amendment would necessarily be futile"). Moreover, "[t]he

Second Circuit has cautioned that district courts should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Olsson v. ABM Taxi Dispatch Laguardia Airport*, No. 18-CV-8815 (PGG), 2020 WL 5038742, at *3 (S.D.N.Y. Aug. 26, 2020) (internal quotations omitted) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

### 2. Liability of credit reporting agencies

Perez also alleges claims under the FCRA against the CRA defendants. Compl. ¶¶39–48. Specifically, Perez alleges the CRA defendants violated § 1681s of the FCRA. However, as previously discussed, § 1681s-2(a) does not provide for a private cause of action and credit reporting agencies do not have a duty under § 1681s-2(b). In his opposition papers, Perez alleges that defendants "are not in compliance with the FCRA." Pl. Opp. at 12. Given its obligation to construe Perez's *pro se* complaint liberally, the Court will construe these allegations as making claims for the negligent, *see* 15 U.S.C. § 1681*o*, or willful, *see* 15 U.S.C. § 1681n, violation of duties or requirements imposed under the FCRA for credit reporting agencies, specifically § 1681e(b) (requiring reasonable procedures to assure accuracy) and § 1681i(a) (requiring reinvestigation of disputed information). *See, e.g.*, *Braun v. United Recovery Sys., LP*, 14 F. Supp. 3d 159, 173 (S.D.N.Y. 2014) (construing complaint under Section 1681(f) not Section 1681-2(b) as "a context in which [his claims] make much more sense, and a context in which Plaintiff may have intended to assert them"); *Caraveo v. Nielsen Media Rsch., Inc.*, No. 01-CV-9609 (LBS) (RLE), 2003 WL 1745064, at *2 (S.D.N.Y. Mar. 31, 2003) ("At this stage of the litigation, *pro se* Plaintiff's citations to specific statutory provisions in his memoranda of law do not supersede the plain language of the complaint."), *aff'd sub nom.Caraveo v. U.S.E.E.O.C.*, 96 F. App'x 738 (2d Cir. 2004). In other words, construing Perez's allegations liberally, the complaint can be read to allege the CRA defendants to be willfully, or in the alternative, negligently noncompliant, in violation of § 1681e(b) and § 1681i. Accordingly, the Court will consider Perez's allegations in that light.

### a. Statutory Requirements under §§ 1681e(b) and 1681i

Section 1681e(b) imposes a duty on CRAs to "assure maximum possible accuracy of the information concerning

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 50 of 238

Perez v. Experian, Not Reported in Fed. Supp. (2021)

2021 WL 4784280

the individual about whom the report relates." 15 U.S.C. § 1681e(b). To state a claim under Section 1681e(b), a plaintiff must allege that: "(1) the consumer reporting agency was negligent or willful in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury." *Wimberly v. Experian Info. Sols.*, No. 18-CV-6058 (MKV), 2021 WL 326972, at *5 (S.D.N.Y. Feb. 1, 2021) (quoting *Khan v. Equifax Info. Servs., LLC*, No. 18-CV-6367 (MKB), 2019 WL 2492762, at *2 (E.D.N.Y. June 14, 2019)).

**\*9** When the accuracy of a report is in dispute, Section 1681i outlines specific procedures that CRAs must follow to ensure the proper reinvestigation of disputed information. Section 1681i requires that if a consumer notifies a CRA of a dispute as to the accuracy of any item of information contained in his file, within 30 days of notification, the CRA "shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A); *Jones v. Experian Info. Solutions, Inc.*, 982 F. Supp. 2d 268, 272 (S.D.N.Y. 2013). The Second Circuit has not directly addressed what constitutes a "reasonable reinvestigation" under section 1681i. *Jones*, 982 F. Supp. 2d at 273. However, courts in this District have noted that "the parameters of a reasonable investigation will ... depend on the circumstances of a particular dispute." *Frydman v. Experian Info. Sols., Inc.*, No. 14-CV-9013 (PAC) (FM), 2016 WL 11483839, at *15 (S.D.N.Y. Aug. 11, 2016) (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 713 (3d Cir. 2010)), *adopted by* 2016 WL 5661596 (Sept. 30, 2016). The reinvestigation requirement has demanded "more than (a) forwarding the dispute information onto the furnisher of information and (b) relying on the furnisher of information's response." *Gorman v. Experian Info. Sols., Inc.*, No. 07-CV-1846 (RPP), 2008 WL 4934047, at *5 (S.D.N.Y. Nov. 19, 2008) (citing *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997)). To state a claim under Section 1681i, the plaintiff must also allege that "the disputed information is inaccurate." *Khan*, 2019 WL 2492762, at *3.

The threshold question under both Sections 1681e(b) and 1681i "is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." *Id.* (collecting cases). A credit report is inaccurate "either when it is patently incorrect

*or* when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Wimberly*, 2021 WL 326972, at *5 (quoting *Wenning v. On-Site Manager, Inc.*, No. 14-CV-9693 (PAE), 2016 WL 3538379, at *9 (S.D.N.Y. June 22, 2016)). "Information provided by a consumer reporting agency is misleading where it is 'open to an interpretation that is directly contradictory to the true information.' " *Id.* (quoting *Wagner v. TRW, Inc.*, 139 F.3d 898, 1998 WL 127812, at *1 (5th Cir. 1998)).

### b. Perez fails to state a claim against the CRA defendants under §§ 1681e(b) and 1681i.

Perez argues that the CRA defendants violated the FCRA by their failure to report his gender, address changes, and complete employment information. Compl. ¶¶28–32; Pl. Opp. at 6-7. The Court interprets these claims to assert violations under § 1681e(b) and § 1681i. The CRA defendants did not address these specific statutory allegations in their motion papers, as in making such allegations, Perez cited to a different section of the FCRA. Nevertheless, in arguing that Perez's claims against them under the FCRA should be dismissed, the CRA defendants contend that they do not have a duty to report gender or address changes (Joint Defs. Reply at 8) or to report "complete" employment information (Joint Defs. Mem. at 5–6).

### i. Failure to report gender and change of address

Perez argues that the CRA defendants violated the FCRA by failing to report his gender and changes of his physical addresses. Pl. Opp. at 6. However, inaccuracies are only actionable if they affect an assessment of a consumer's credit, insurance, or employment and fit within the definition of a "consumer report" under the FCRA. *See* 15 U.S.C. § 1681a(d)(1) (listing factors in establishing the consumer's eligibility); *Williams-Steele v. Trans Union*, No. 12-CV-0310 (GBD) (JCF), 2014 WL 1407670, at *4 (S.D.N.Y. Apr. 11, 2014) ("[N]o restriction is put on the use of information that is not a 'consumer report' ... Address information on a consumer, for example, is not a consumer report because it is not information that bears on any of the characteristics described in 15 U.S.C. § 1681a(d)(1).") (citing *Ali v. Vikar Management, Ltd.*, 994 F. Supp. 492, 497 (S.D.N.Y. 1998)), *adopted by* 2015 WL 576707 (Feb. 10, 2015), *aff'd sub nom. Williams-Steele v. TransUnion*, 642 F. App'x 72 (2d Cir. 2016). A "consumer report" communicates information bearing on a consumer's

Perez v. Experian, Not Reported in Fed. Supp. (2021)

2021 WL 4784280

"credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living," which information is used, expected to be used, or collected for purposes of establishing the consumer's eligibility for credit, insurance, and employment, or for certain other limited purposes. 15 U.S.C. § 1681a(d)(1). Perez's gender and address history do not fit within the definition of a "consumer report" nor does the Experian sex offender monitoring and notification tool. Therefore, Perez's allegations regarding his address changes and gender do not state a claim for inaccurate information under the FCRA as a matter of law. *See* *Williams-Steele*, 2014 WL 1407670, at *4 (recommending dismissal for claim based on "inaccurate contact information").

### ii. Incomplete employment history

**\*10** Perez also contends that the CRA defendants have "deliberately and maliciously reported plaintiff's incomplete work history for a number of years." Compl. ¶28. However, in order to state a cognizable claim, Perez would need to allege that his incomplete work history has been "prejudicial to an assessment of the plaintiff's eligibility for credit under the FCRA," or otherwise adversely affected the other factors listed in § 1681a(d)(1). *Williams-Steele*, 2015 WL 576714, at *2 ("Plaintiff's claim that her '[p]lace of employment [is] not [a]ccurate' is not actionable."). Perez has not done so. Thus, Perez has failed in his present pleading to state a claim under the FCRA for the reporting of incomplete work history. This particular claim should be dismissed without prejudice to his filing an amended complaint, but only if he can provide the necessary information to show how the alleged reporting of his allegedly incomplete work history bore on his credit worthiness.

### c. Perez fails to allege a violation of §§ 1681e and 1681i for inaccurate reporting of his trade lines.

Perez also alleges the CRAs reported inaccurate information in his trade lines, including his Capital Bank balance, Verizon Wireless balance, Best Buy balance, as well as other accounts. Compl. ¶29; Ex. 1. [11] He claims that the CRA defendants "do not conduct a meaningful investigation, or an investigation at all, when it receives a notice of dispute from a [sic]." *Id.* ¶47. The party providing notice to the CRA is omitted and the sentence is incomplete, so it is unclear if Perez's allegations refer to a notice from a consumer, as in Perez himself, or from

a furnisher of information, such as Citibank or Verizon. In his opposition papers, Perez states that he has notified Experian, Equifax, and Trans Union of inaccuracies in his reports "on at least a dozen cases" over a ten-year period, with "no action... taken on the part of any of these defendants." Pl. Opp. at 6. He also alleges that he filed "at least a dozen complaints within the last [six] years in reference to mistakes that he has discovered on his reports" that were "summarily dismissed." *Id.* at 11. Perez contends that Experian, Equifax, and Trans Union are all "complicit" in a scheme of misreporting. Compl. ¶32. The CRA defendants respond that Perez made no claim that they failed to meet their obligations under the FCRA, and instead only contends the issues with his credit report arise from a "criminal conspiracy." Joint Defs. Mem. at 7, 15. The Court construes Perez's claims to allege willful or negligent noncompliance with Section 1681e(b) as to the CRAs' procedures to assure maximum possible accuracy, as well as Section 1681i as to the CRA's procedures to investigate disputes as to a report's accuracy.

[11] A trade line is a "record of activity for any type of credit extended to a borrower and reported to a credit reporting agency." *Trade Line*, INVESTOPEDIA, https://www.investopedia.com/terms/t/trade-line.asp (last visited Oct. 12, 2021).

Taking his allegations to be true, the Court finds that Perez satisfies the threshold requirement as he has alleged his credit information is not accurate. *See* Compl. ¶¶27, 29; *Khan*, 2019 WL 2492762, at *3. However, Perez fails to set forth any allegations regarding deficiencies in the procedures followed by the CRAs. Because Perez "fail[s] to make any allegations regarding ... the procedures followed" by Equifax, Experian, and Trans Union, *Nguyen*, 2015 WL 2354308, at *11, his "[t]hreadbare recitals of the elements" do not state a plausible claim for relief under Section 1681e and should be dismissed. *Iqbal*, 556 U.S. at 678.

Because he has alleged his credit information is not accurate, Perez also satisfies the threshold requirement for a claim under § 1681i. *See* Compl. ¶¶27, 29; *Khan*, 2019 WL 2492762, at *3. Additionally, Perez directly disputed the inaccuracies with Experian, Equifax, and Trans Union. Pl. Opp. at 6. Perez's notification of dispute triggered the CRA defendants' obligation to conduct a "reasonable reinvestigation" and notify the "furnisher" of information that Perez disputed the items. 15 U.S.C. §§ 1681i(a)(1); 1681(a)(2). However, Perez states that the CRA defendants took "no action" in response to his disputes regarding his reports. Pl. Opp. at 6. Thus, liberally construed, Perez has alleged

that the CRA defendants violated the FCRA requirement to reasonably reinvestigate under § 1681i. To state such a cause of action, Perez must also allege that the CRA defendants were either willful or negligent in their noncompliance with § 1681i. Accordingly, the Court will now consider whether Perez has satisfied the requirements of § 1681n or § 1681o for willful or negligent noncompliance with § 1681i.

### i. Perez fails to allege sufficient facts to establish that the CRA defendants' actions were willful or negligent.

**\*11** To maintain a claim under § 1681i for the failure to reinvestigate the inaccurate reporting of his trade lines, Perez must allege the CRA defendants were willful or negligent in their noncompliance. The FCRA allows for a cause of action for willful and negligent noncompliance "with any requirement imposed" by the FCRA. 15 U.S.C. §§ 1681n, 1681o. "In regard to a plaintiff's obligation to allege that a defendant's violation was willful or negligent, various courts have held that, in order to survive a motion to dismiss, the plaintiff's complaint must allege specific facts as to the defendant's mental state" when the defendants committed the violation of the FCRA. *Braun v. Client Servs. Inc.*, 14 F. Supp. 3d 391, 397 (S.D.N.Y. 2014). Merely stating that the violation was "willful" or "negligent" without more is insufficient. *Perl v. Plains Com. Bank*, No. 11-CV-7972 (KBF), 2012 WL 760401, at \*2 (S.D.N.Y. Mar. 8, 2012); *Perl v. Am. Exp.*, No. 11-CV-6899 (KBF), 2012 WL 178333, at \*2 (S.D.N.Y. Jan. 19, 2012) ("While [plaintiff] assert[s] that each [D]efendant's FCRA violation was willful, [he] do[es] so in a conclusory manner in [both] of the complaints.... [Plaintiff] ha[s] failed to allege any facts related to [D]efendants' state of mind when they allegedly [violated the FCRA]").

### ii. Willful and Negligent Noncompliance with the FCPA

#### a. Willfulness

To allege willful noncompliance with the FCRA, a plaintiff must allege facts "related to defendants' state of mind when they allegedly [violated the FCRA]." *Id.* at \*2. The requirement of willfulness in this context can be satisfied by evidence of "reckless disregard" for statutory duties. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–57 (2007). To constitute reckless disregard, a CRA's interpretation of

its statutory duties must be "objectively unreasonable," not merely "erroneous." *Id.* at 69.

Perez alleges that Experian, Equifax, and Trans Union have "deliberately and maliciously" misreported his work history and credit accounts. Compl. ¶¶28–29. Throughout his complaint, he alleges the CRA defendants have participated in a "deliberate scheme" with the other defendants and government agencies. Compl. ¶25. In his opposition papers, Perez contends that the CRAs are "in collusion with the inaccurate reporting," of his accounts and have been informed "of their indiscretions and violations." Pl. Opp. at 9, 12.

Perez adequately alleges that his credit report contained inaccuracies, but he fails to allege sufficient facts to establish the CRA defendants' actions were willful. While Perez asserts the CRA defendants' violations were "deliberate," he does so in an entirely conclusory manner and does not allege any facts related to the CRA defendants' state of mind when they allegedly failed to meet their statutory requirements. The facts he does assert do not include enough information to allow the Court to draw a reasonable inference that the alleged violations were willful or that the CRA defendants knew that they recklessly disregarded their obligations to reinvestigate the disputed information. *See, e.g.*, *Perl*, 2012 WL 178333, at \*3.

#### b. Negligence

The Court also construes Perez's complaint as alleging the negligent violation of the FCRA under § 1681o. In his opposition papers, Perez states that "the CRAs should have been able to identify inaccuracies in the information being reported and the agencies reporting this information." Pl. Opp. at 12. However, like his allegations as to the CRA defendants' supposed willfulness, these allegations are pleaded in conclusory fashion, and do not constitute facts from which the Court can infer that the CRA defendants should have known that they were violating the provisions of the FCRA.

Additionally, a complaint alleging a claim for negligent violation of the FCRA under § 1681o must allege actual damages. To do so, the complaint need allege only enough facts demonstrating that the plaintiff suffered an injury entitling him to actual damages. *See, e.g.*, *Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 240 (S.D.N.Y. 2014). Perez alleges actual damages in his complaint. *See* Compl.

Perez v. Experian, Not Reported in Fed. Supp. (2021)

2021 WL 4784280

¶80 ("Perez has also been unable to use or increase his existing credit"); ¶82 ("[D]enial of Personal credit card occurred without written notification: Apple Credit, Chase Business Credit, Bank of America business credit, American Express"). These allegations are enough to satisfy Perez's burden to allege actual damages. *See Braun v. Client Servs. Inc.*, 14 F. Supp. 3d at 400 (burden of actual damages satisfied by allegations of "loss of credit, loss of the ability to purchase and benefit from credit, and lowering of credit lines").

**\*12** Accordingly, the Court recommends dismissing Perez's claims for a violation of § 1681i of the FCRA against the CRA defendants as they are, on the present record, entirely conclusory in nature, but granting him leave to amend his complaint with the requisite facts—to the extent they exist —to give him one final opportunity to make these claims cognizable under the FCRA.

### C. Claims under the Fair Debt Collection Practices Act

Additionally, Perez alleges violations of § 1692e of the FDCPA. Compl. ¶¶53–54. The FDCPA prohibits debt collectors from engaging in "any conduct the natural consequences of which is to harass, oppress, or abuse any person," and from using "any false, deceptive, or misleading representation or means" in connection with the collection of any debt. 15 U.S.C. §§ 1692d, 1692e. "To establish a violation under the FDCPA, three elements must be proven: '(1) the plaintiff [must] be a "consumer" who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt, (2) the defendant collecting the debt must be considered a "debt collector," and (3) the defendant must have engaged in an act or omission in violation of the FDCPA's requirements.' " *Skvarla v. MRS BPO, LLC*, No. 21-CV-55 (ER), 2021 WL 2941118, at \*2 (S.D.N.Y. July 12, 2021) (quoting *Derosa v. CAC Fin. Corp.*, 278 F. Supp. 3d 555, 559–60 (E.D.N.Y. 2017)).

The term "debt collector" is defined under the FDCPA as a person who, among other requirements, is engaged in any "business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect ... debts owed or due... another." 15 U.S.C. § 1692a(6). By contrast, " 'creditors' are not considered 'debt collectors' under [the FDCPA] and [its] provisions ... do not apply to them." *Reid v. Toyota Motor Credit Corp.*, No. 12-CV-7436 (PAC) (JLC), 2013 WL 1397143, at \*6 (S.D.N.Y. Apr. 8, 2013) (quoting *Masudi v. Ford Motor Credit Co.*, No. 07-

CV-1082 (CBA) (LB), 2008 WL 2944643, at \*3 (E.D.N.Y. July 31, 2013)), *adopted by* 2013 WL 3776201 (July 18, 2013). A "creditor" is defined as "any person who offers or extends credit creating a debt or to whom a debt is owed" except to the extent the person "receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." *Masudi*, 2008 WL 2944643, at \*3 (quoting 15 U.S.C. § 1692a(4)).

The FDCPA prohibits, *inter alia*, conduct whose "natural consequence" is to "harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. To this end, the FDCPA gives a consumer the right to dispute a debt claimed by a debt collector, and to seek verification of the validity of the debt. *Id.* § 1692g(b). The FDCPA also regulates the debt collector's written notice, within five days of its initial communication with the consumer, stating the amount of debt and the name of the creditor to whom the debt is owed. *Id.* §§ 1692g(a)(1), 1692g(a)(2).

### 1. Perez failed to allege that Verizon, Equifax, Experian, and Trans Union are "debt collectors" under the FDCPA.

Perez alleges defendants have violated § 1692e of the FDCPA by using false representations concerning the character, amount, and legal status of a debt, and by failing to communicate to the CRA that the debt is disputed. Compl. ¶53. In response, Equifax, Experian, Trans Union, and Verizon argue that Perez failed to allege that they are debt collectors and that as a result, he has failed to state a claim against them for violation of the FDCPA. Joint Defs. Mem. at 11–12; Joint Defs. Reply at 8. Perez alleges that Sequium, Verizon, and Citibank serve as a debt collector "at times." Pl. Opp. at 14.

**\*13** Equifax, Experian, and Trans Union are credit reporting agencies that do not collect debts, and therefore do not fall within the meaning of "debt collector" under the FDCPA, but instead under the term "consumer reporting agency" as defined in § 1681a(f). *Compare* 15 U.S.C. 1692a(6) (defining debt collector) *with* 15 U.S.C. § 1681a(f) (defining consumer reporting agency). *See also Allah v. New Century Mortg. Corp.*, No. 06-CV-3031 (JG), 2006 WL 3196851, at \*2 (E.D.N.Y. Nov. 4, 2006) (company only becomes subject to the FDCPA as debt collector or there is an "indicat[ion] that a third person is collecting... debts" in its name). Perez does not allege that the CRA defendants are "debt collectors."

Perez v. Experian, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 54 of 238

2021 WL 4784280

Instead, he alleges that the defendants "do not always collect debts but hire debt collection companies like Sequium." Pl. Opp. at 13. Because the complaint contains no non-conclusory allegations that any of the CRA defendants are "debt collectors" or have engaged in any debt collection activity, Perez fails to state a claim under the FDCPA against them. *See Allen v. United Student Aid Funds, Inc.*, No. 17-CV-8192 (VSB), 2018 WL 4680023, at *5 (S.D.N.Y. Sept. 28, 2018) (granting motion to dismiss when plaintiff has not pled sufficient facts to classify defendants as debt collectors).

Similarly, Verizon is not a "debt collector" as Perez's pleadings, if anything, establish that it extends credit, thus creating a debt. *See Vallecastro*, 2014 WL 7185513, at *3; *Mazzei v. Money Store*, 349 F. Supp. 2d 651, 658 (S.D.N.Y. 2004) ("Creditors are generally not considered debt collectors under the FDCPA.") (citing 15 U.S.C. § 1692a(6)(F)). Perez instead alleges that Verizon "hire[s] debt collection companies like Sequium." Pl. Opp. at 13. Further, Perez does not allege that Verizon used the name of a third party in connection with his debt so as to fall within the narrow category of "creditors" who are also considered "debt collectors." *Scalercio-Isenberg v. Citizens Fin. Grp., Inc.*, No. 18-CV-9226 (JGK), 2019 WL 7187247, at *8 (S.D.N.Y. Dec. 26, 2019) (creditors only subjected to the FDCPA if they use third party name to collect debts). Because Verizon is a "creditor" who hires a debt collection company seeking to collect its debts, Perez has failed to allege that Verizon is a "debt collector" within the meaning of the FDCPA. *See Houck v. U.S. Bank, N.A. for Citigroup Mortg. Loan Tr. 2007-AR5*, 689 F. App'x 662, 664 (2d Cir. 2017) (affirming dismissal against creditor under FDCPA).

Sequium, on the other hand, concedes that it falls within the definition of a "debt collector." Sequium Mem. at 5. Accordingly, the Court will analyze whether Perez's claim that Sequium violated the FDCPA is cognizable.

#### 2. Perez fails to allege Sequium violated the FDCPA.

Perez alleges that Sequium's failure to issue a debt settlement letter violates § 1692e and § 1692*l*(a) of the FDCPA. Compl. ¶¶ 37, 54. Sequium counters that Perez has failed to state a claim under the FDCPA because there is no requirement to issue settlement letters. Sequium Mem. at 6. [12] The Court agrees with Sequium. The FDCPA requires that, *inter alia*, debt collectors issue written collection letters to consumers, with language requirements to ensure the consumers are

informed of the amount of debt, name of creditor, and their right to dispute the validity within 30 days but does not require debt collectors to offer settlements. *See* 15 U.S.C. § 1692g. Because Perez has only alleged that he did not receive a settlement letter, he has failed to state a FDCPA claim against Sequium.

[12]  Sequium also contends that Perez waived any claims against it by failing to address the arguments in its Memorandum of Law. Sequium Reply at 2. However, "a litigant's failure to oppose a motion does not by itself merit dismissal of a complaint." *Bernheim v. New York City Dep't of Educ.*, No. 19-CV-9723 (VEC) (JLC), 2020 WL 3865119, at *4 (S.D.N.Y. July 9, 2020) (citing *Goldberg v. Danaher*, 599 F.3d 181, 183-84 (2d Cir. 2010), *adopted by* 2020 WL 4383503 (July 31, 2020)). "When presented with an unopposed motion, a court remains obligated to review the pleadings and determine whether there is a sufficient basis for granting the motion." *Id.* (citing *Goldberg*, 599 F.3d at 183).

*14 In sum, Perez's FDCPA claims against Equifax, Experian, Trans Union, Verizon, and Sequium should all be dismissed for failure to state a claim.

### III. CONCLUSION

For the foregoing reasons, the Court recommends that the following claims be dismissed with prejudice:

1) Perez's claims under 15 U.S.C. § 1681s-2(a);

2) Perez's claims under 15 U.S.C. § 1681s-2(b) against Equifax, Experian, and Trans Union; and

3) Perez's claims under the FDCPA.

The Court recommends that the following claims be dismissed without prejudice, so that Perez may replead them within thirty (30) days of the Court's decision:

1) Perez's claims under 15 U.S.C. § 1681s-2(b) against Verizon and Sequium;

2) Perez's claims under the FCRA against Equifax, Experian, and Trans Union related to the reporting of his employment history; and

Perez v. Experian, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 55 of 238

2021 WL 4784280

3) Perez's claims under 15 U.S.C. § 1681i against Equifax, Experian, and Trans Union.

## PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Engelmayer, United States Courthouse, 40 Foley Square, New York, New York.

Any requests for an extension of time for filing objections must be directed to Judge Engelmayer.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See* *Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Garwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

## All Citations

Not Reported in Fed. Supp., 2021 WL 4784280

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Perez v. Experian, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 56 of 238

2021 WL 5088036

2021 WL 5088036
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eric Andrew PEREZ, Plaintiff,
v.
EXPERIAN, et al., Defendants.

20 Civ. 9119 (PAE) (JLC)
|
Signed 11/02/2021

**Attorneys and Law Firms**

Eric Andrew Perez, New York, NY, Pro Se.

Cealagh P. Fitzpatrick, Jones Day, Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Experian.

Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Equifax.

Camille Renee Nicodemus, Schuckit & Associates, P.C., Zionsville, IN, Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Trans Union.

Howard Alan Fried, Danit Sibovits, Dean L. Pillarella, McGivney Kluger Clark & Intoccia, P.C., Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Verizon.

Brendan Hoffman Little, Lippes Mathias LLP, Buffalo, NY, for Defendant Sequium Asset Solutions.

## OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

**\*1** Plaintiff Eric Andrew Perez brings this action alleging violations of the Fair Credit Reporting Act ("FCRA"), the Fair Debt Collection Practices Act ("FDCPA"), and the Federal Trade Commission Act ("FTC Act") against Experian Information Solutions ("Experian"), Equifax Information Services LLC ("Equifax"), Trans Union, LLC ("Trans Union"), New York SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon"), Sequium Asset Solutions ("Sequium"), the Federal Trade Commission ("FTC"), and Citibank, N.A. ("Citibank") (collectively, the "defendants").

Currently pending is Sequium's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), Dkt. 61, and Experian, Equifax, Trans Union, and Verizon's joint motion to dismiss under Rule 12(b)(6) and motion on the pleadings under Rule 12(c), Dkt. 64. [1] Before the Court is the October 14, 2021 Report and Recommendation of the Hon. lames L. Cott, United States Magistrate Judge, recommending that the Court grant these motions, but that Perez be given leave to file an amended complaint as to some of his claims. Dkt. 82 (the "Report"). The Court incorporates by reference the summary of the facts provided in the Report. For the following reasons, the Court adopts this recommendation and extends Perez's time to file an amended complaint.

[1]     Citibank has not responded to the complaint to date, and the Court previously dismissed all claims against the FTC. Dkt. 82 ("Report") at 1 n. 1.

## DISCUSSION

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are timely made, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). "To accept those portions of the report to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Ruiz v. Citibank, N.A.*, No. 10 Civ. 5950 (KPF) (RLE), 2014 WL 4635575, at *2 (S.D.N.Y. Aug. 19, 2014) (quoting *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009)); *see also, e.g.*, *Wilds v. UPS*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report and Recommendation strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012). "This is so even in the case of a *pro se* petitioner." *Perez v. Mason Tenders Dist. Council Tr. Funds*, No. 17 Civ. 1022 (PAE) (AJP), 2017 WL 5125542, at *2 (S.D.N.Y. Nov. 1, 2017), *aff'd*, 742 F. App'x 584 (2d

Perez v. Experian, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 57 of 238

2021 WL 5088036

Cir. 2018). Further, "[c]ourts generally do not consider new evidence raised in objections to a magistrate judge's report and recommendation." *Tavares v. City of New York,* No. 08 Civ. 3782 (PAE), 2011 WL 5877548, at *2 (S.D.N.Y. Nov. 23, 2011) (collecting cases).

**\*2** Because neither Perez nor the defendants have submitted objections to the Report, review for clear error is appropriate. Careful review of Judge Cott's thorough and well-reasoned Report reveals no facial error in its conclusions; the Report is therefore adopted in its entirety. The Report explicitly states that failure to object within 14 days will result in a waiver of objections and will preclude appellate review. Report at 35. Accordingly, the failure to object operates as a waiver of appellate review. *See Caidor v. Onondaga Cty.,* 517 F.3d 601, 604 (2d Cir. 2008) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)).

## CONCLUSION

For the foregoing reasons, the Court adopts Judge Cott's report and recommendation in its entirety and grants defendants' motions. The Court grants leave to Perez to file an amended complaint, as set out in the Report, within 60 days of this decision. [2]

[2]     On October 26, 2021, Perez submitted a letter on this docket requesting an extension of time to file an amended complaint. Dkt. 83. The Report recommended granting Perez leave to replead certain claims within 30 days of this Court's decision. Report at 34. The Court hereby grants such leave.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5088036

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Allen v. United Student Aid Funds, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4680023

2018 WL 4680023
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Hepzibah Z. ALLEN, Plaintiff,
v.
UNITED STUDENT AID
FUNDS, INC., et al., Defendants.

17-CV-8192 (VSB)
|
Signed 09/28/2018

**Attorneys and Law Firms**

Hepzibah Z. Allen, New York, New York, Pro Se Plaintiff.

Silvia L. Serpe, Serpe Ryan LLC, New York, New York, Counsel for Defendant United Student Aid Funds, Inc.

Eric Matthew Hurwitz, Jacqueline Marie Aiello, Stradley Ronon Stevens & Young, LLP, New York, New York, Counsel for Defendants Navient Solutions LLC & Pioneer Credit, Inc.

## OPINION & ORDER

VERNON S. BRODERICK, United States District Judge

**\*1** Pro se Plaintiff Hepzibah Allen brings this action against Defendants Navient Solutions LLC ("NSL"), Navient,[1] Pioneer Credit Recovery, Inc. ("Pioneer," and collectively with NSL and Navient, the "Navient Defendants"), and United Student Aid Funds, Inc. ("USAF"), alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. Before me are the motions of the Navient Defendants and USAF to dismiss the Complaint. Because Defendants do not qualify as debt collectors under the FDCPA, Defendants' motions are GRANTED.

[1]
The Navient Defendants explain that Navient Corporation, the parent company of NSL and Pioneer, has been misidentified by Plaintiff as Navient, an entity that does not exist. (Navient Defs.' Mem. 1.) For the purposes of this motion, I construe any claims asserted against Navient as if they had been asserted against Navient Corporation. "Navient Defs.' Mem." refers to the Memorandum of Law in Support of Motion to

Dismiss of Defendants Navient Solutions, LLC, "Navient," and Pioneer Credit Recovery, Inc., filed January 4, 2018. (Doc. 15-1.)

## I. Background[2]

[2]
The following factual summary is drawn from the allegations of the complaint, which I assume to be true for the purposes of this motion, see Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007), and documents attached to or relied upon in the complaint, Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

On January 21, 2003, Plaintiff obtained a student loan (the "Loan") under the Federal Family Education Loan Program ("FFELP"). (Compl. Ex. B.)[3] FFELP loans are guaranteed by state agencies or private non-profit organizations and are reinsured and often subsidized by the Department of Education ("DOE"). See 20 U.S.C. §§ 1078, 1087-1. In the event a borrower defaults in repaying the loan, the guarantor, pursuant to its guarantee commitment, pays on the claim to the holder of the loan, and ownership of the loan then vests with the guarantor. See 20 U.S.C. § 1078(b); 34 C.F.R. § 682.401(b)(9). After the loan vests with the guarantor, the guarantor may independently try to collect the debt from the debtor. NSL serviced Plaintiff's Loan from origination, and the guarantor at the time the Loan was originated was designated as USAF. (See Compl. Ex. A, B, D.)

[3]
"Compl." refers to Plaintiff's complaint ("Complaint"), filed October 24, 2017. (Doc. 1.)

On October 14, 2016, Plaintiff defaulted on the Loan, and USAF, acting as guarantor, purchased the Loan. (See id. Ex. A, D.) Thereafter, USAF sent Plaintiff a letter dated April 30, 2017 (the "April 2017 Letter"), indicating what efforts USAF could take to recover the amount due and owing under the note. (Id. Ex. C.) The April 2017 Letter also informed Plaintiff that future collection efforts might include, among other things, garnishment, offset of income tax refunds, and civil litigation. (See id.)

**\*2** Plaintiff alleges that Defendants improperly assigned the debt, misrepresented the amount owed, engaged in improper wage garnishments, and failed to supply Plaintiff with debt verification language in USAF's April 2017 Letter.

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 59 of 238

Allen v. United Student Aid Funds, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4680023

## II. **Procedural History**

On October 24, 2017, Plaintiff filed her Complaint. (Doc. 1.) On January 4, 2018, the Navient Defendants filed their motion to dismiss the Complaint, (Doc. 15), along with a memorandum of law in support of their motion, (Doc. 15-1). On the same day, USAF filed its motion to dismiss the Complaint, (Doc. 16), and memorandum in support, (Doc. 17). On January 11, 2018, Plaintiff filed oppositions to Defendants' motions. (Docs. 19, 21.) The Navient Defendants filed their reply in further support of their motion on January 18, 2018, (Doc. 23); USAF did the same on February 14, 2018, (Doc. 24).

On February 20 and 21, 2018, Plaintiff filed letters in further opposition to Defendants' replies, (Doc. 25, 26), which attached, among other documents, (i) a letter dated September 18, 2017 from Navient to Plaintiff and (ii) a letter dated August 9, 2017 from USAF to Plaintiff. On February 23, 2018, the Navient Defendants submitted a letter requesting that I disregard Plaintiff's letters because the additional information was not included in the Complaint or in Plaintiff's oppositions.[4] (Doc. 27.)

[4]     The additional information provided in and attached to Plaintiff's letters does not change the outcome of this Opinion & Order. USAF's request to disregard Plaintiff's letters is therefore denied as moot.

### III. **Legal Standards**

#### A. *Motion to Dismiss*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ).

#### B. *The FDCPA*

**\*3** "[T]he FDCPA is 'primarily a consumer protection statute.' " *Avila v. Riexinger & Assocs., LLC*, 817 F.3d 72, 75 (2d Cir. 2016) (quoting *Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 95 (2d Cir. 2008) ). Courts construe the FDCPA liberally to further the purpose Congress intended for the Act, which was to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Id.* (quoting 15 U.S.C. § 1692(e) ).

In determining whether there has been a violation of the FDCPA, courts "apply the 'least sophisticated consumer' standard." *Id.* (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993) ). The "least sophisticated consumer" is a "naïve" and "credulous" person who possesses a "rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193–94 (2d Cir. 2015) (quoting *Greco v. Trauner, Cohen & Thomas, L.L.P.*, 412 F.3d 360, 363 (2d Cir. 2005) ). In applying this standard, courts "ask how the least sophisticated consumer ... would understand the collection notice" at issue. *Avila*, 817 F.3d at 75. "Under this standard, a collection notice can be misleading if it is 'open to more than one reasonable interpretation, at least one of which is inaccurate.' " *Id.* (quoting *Clomon*, 988 F.2d at 1319). "Thus, even if a

Allen v. United Student Aid Funds, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4680023

debt collector accurately conveys the required information, a consumer may state a claim if she successfully alleges that the least sophisticated consumer would inaccurately interpret the message." *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 216 (2d Cir. 2017). FDCPA protection, however, "does not extend to every bizarre or idiosyncratic interpretation of a collection notice, and courts should apply the standard in a manner ... that protects debt collectors against liability for unreasonable misinterpretations of collection notices." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 173 (2d Cir. 2015) (quoting *Easterling v. Collecto, Inc.*, 692 F.3d 229, 233–34 (2d Cir. 2012) ).

### C. *Pro Se Litigant*

Even after *Twombly* and *Iqbal*, a "document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ). Further, pleadings of a pro se party should be read "to raise the strongest arguments that they suggest." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (quoting *Jorgensen v. Epic/ Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) ). Nevertheless, dismissal of a pro se complaint is appropriate where a plaintiff fails to state a plausible claim supported by more than conclusory factual allegations. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal quotation marks omitted).

### IV. Discussion

Defendants argue that Plaintiff fails to differentiate between each Defendant in her Complaint, (Navient Defs.' Mem. 4– 5; USAF Mem. 7–8),[5] which provides an independent basis for dismissal, *see, e.g., Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (upholding dismissal of a complaint pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure where the complaint alleged "a host of constitutional and state common law claims" but "failed to differentiate among the defendants, alleging instead violations by 'the defendants' "). Defendants are correct, but in light of Plaintiff's pro se status, I will not dismiss the Complaint on this basis alone.

[5] "USAF Mem." refers to USAF's Memorandum of Law in Support of its Motion to Dismiss, filed January 4, 2018. (Doc 17.)

**\*4** Defendants also argue that they are not debt collectors under the FDCPA and that the Complaint otherwise fails to adequately allege that Defendants violated the FDCPA. Because I find that Defendants do not fall within the definition of debt collectors under the Act, I do not reach Defendants' remaining arguments.

### A. *"Debt Collector" Under the FDCPA*

#### 1. Applicable Law

To establish a violation of the FDCPA, a plaintiff must satisfy three elements: (i) the plaintiff must be a "consumer;" (ii) the defendant must be a "debt collector;" and (iii) the defendant must have committed some act or omission in violation of the FDCPA. *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 508, 514 (S.D.N.Y. 2013) (quoting *Schuh v. Druckman & Sinel, L.L.P.*, 751 F. Supp. 2d 542, 548 (S.D.N.Y. 2010) ). Accordingly, "a defendant can only be held liable for violating the FDCPA if she is a 'debt collector' within the meaning of the [FDCPA]." *Feldman v. Sanders Legal Grp.*, 914 F. Supp. 2d 595, 599 (S.D.N.Y. 2012) (citing *Daros v. Chase Manhattan Bank*, 19 F. App'x 26, 27 (2d Cir. 2001) (summary order) ). A "debt collector" is a person "who regularly collects ... debts owed ... another" or a person involved "in any business the principal purpose of which is the collection of any debts." 15 U.S.C. § 1692a(6).

The same provision exempts "any person collecting or attempting to collect any debt owed or due ... to the extent such activity ... concerns a debt which was originated by such person; [or] concerns a debt which was not in default at the time it was obtained by such person" from the FDCPA's definition of a debt collector. *Id.* "District courts in the Second Circuit have interpreted [§] 1692a(6) to exclude originating creditors and their assignees, as well as loan servicers who obtain a debt prior to default, from the definition of an FDCPA debt collector." *Vallecastro v. Tobin, Melien & Marohn*, No. 3:13–cv–1441 (SRU), 2014 WL 7185513, at \*3 (D. Conn. Dec. 16, 2014) (collecting cases); *cf. Maguire v. Citicorp Retail Serv., Inc.*, 147 F.3d 232, 235 (2d Cir. 1998) (finding that the FDCPA does not apply to entities attempting to collect debts owed to them). In other words, "[w]hen a loan servicer obtains an account prior to its default, that loan servicer

Allen v. United Student Aid Funds, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4680023

operates as a creditor, not a debt collector, for the purposes of the FDCPA." *Vallecastro*, 2014 WL 7185513, at *3.

Section 1692a(6) also exempts "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is incidental to a bona fide fiduciary obligation." 15 U.S.C. § 1692a(6)(F)(i). "Two requirements must be satisfied for an entity to come within the exception to the FDCPA for collection activities 'incidental to a bona fide fiduciary obligation.' " *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1032 (9th Cir. 2009) (quoting § 1692a(6)(F)(i) ).[6] "First, the entity must have a 'fiduciary obligation.' " *Id.* Second, the entity's collection activity must be 'incidental to' its 'fiduciary obligation.' " *Id.* Although "[f]ew courts have addressed the fiduciary obligation exception," *Hooks v. Forman Holt Eliades & Ravin LLC*, No. 11 Civ. 2767(LAP), 2015 WL 5333513, at *13 (S.D.N.Y. Sept. 14, 2015), at least one court explicitly concluded that USAF fits within this exemption under the FDCPA, *see Davis v. United Student Aid Funds, Inc.*, 45 F. Supp. 2d 1104, 1109 (D. Kan. 1998) ("The court thus concludes that [USAF], as a guaranty agency, 'holder' of [the plaintiff's] note, and trustee owing a fiduciary duty to the Secretary of Education, fits within the 'fiduciary' exemption stated in 15 U.S.C. § 1692[a](6)(F)(i).").

[6]     Defendants do not cite to, nor am I aware of, any Second Circuit case discussing the fiduciary obligation exception in this context. However, I see no reason to depart from the out-of-Circuit authority cited herein.

### 2. Application

#### a. The Navient Defendants

**\*5** Accepting Plaintiff's assertions as true for the purposes of the motion to dismiss, as I must, she has not pleaded sufficient facts to classify any of the Navient Defendants as debt collectors within the meaning of the FDCPA. As to Navient and Pioneer, there are no non-conclusory allegations in the Complaint that Navient or Pioneer was a debt collector, or that Navient or Pioneer engaged in any debt collection activity. Nor are there any allegations that Navient or Pioneer was ever the servicer of the Loan, owned the Loan, or made any efforts to collect the Loan.

As to NSL, Plaintiff concedes that NSL was the servicer of the Loan, which in turn is confirmed by the documents attached to the Complaint. (Compl. ¶ 7; *id.* Ex. B.) Moreover, Plaintiff admits that NSL was formerly known as Sallie Mae, Inc.—the originator of Plaintiff's Loan—and thus NSL has serviced the Loan since origination. *See Spyer v. Navient Sols., Inc.*, No. 15-3814 (NLH/JS), 2016 WL 1046789, at *3 (D.N.J. Mar. 15, 2016), *reconsideration denied*, No. 15-3814 (NLH/JS), 2016 WL 5852849 (D.N.J. Oct. 4, 2016) ("Navient is not a 'debt collector' under the FDCPA under these circumstances because it became the loan servicer (first as Sallie Mae before it changed its name) while plaintiff's loan were not in default."). By definition, Navient began servicing the loans *prior* to any default. *See Caione v. Navient Corp.*, No. 16-0806(NLH/JS), 2016 WL 4432687, at *5 (D.N.J. Aug. 18, 2016) (holding that "the facts pled indicate Navient (as corporate successor to Sally Mae) was the loan originator" and "[b]y definition, then, Navient began servicing the loans prior to any default"). Plaintiff does not plausibly allege any facts to support the claim that any of the Navient Defendants were debt collectors, and her FDCPA claims against the Navient Defendants are therefore dismissed.

#### b. USAF

Nor has Plaintiff pleaded sufficient facts to classify USAF as a debt collector within the meaning of the FDCPA. Plaintiff attempts to allege that USAF is a debt collector by stating that Defendants "admitted in ... exhibit C that they were acting collectively as 'debt collectors.' " (Compl. ¶ 19.) Exhibit C is a letter dated April 30, 2017 from USAF to Plaintiff, which states: "This is an attempt to collect a debt and any information will be used for that purpose." (Compl. Ex. C, at 3.) An attempt to collect a debt, however, does not amount to the FDCPA's definition of a "debt collector."

Plaintiff does not dispute that USAF acted in its capacity as guarantor for the Loan. (*See* Compl. ¶ 13 ("The Communication confessed that an alleged 'guarantor' purchased the loan on October 24, 2016 although the details of the alleged purchase remains shrouded in mystery.").) Moreover, the materials attached to Plaintiff's Complaint further demonstrate that USAF acted in its capacity as guarantor. (*See id.* Exs. A, C.) USAF administers the loan program and conducts collection activities as fiduciaries of the DOE. *See, e.g., Rowe*, 559 F.3d at 1034 ("Every court that has addressed whether a guaranty agency owes a fiduciary obligation to the DOE has held that it does." (citing cases) ).

Furthermore, Plaintiff does not allege that USAF's central activity (as opposed to an "incidental" activity) is that of a debt collector. 15 U.S.C. § 1692a(6)(F). Instead, "[g]enerally speaking, the collection of defaulted debts by a guaranty agency is 'incidental to' its primary function." Rowe, 559 F.3d at 1035 (explaining that "a central part of a guaranty agency's administrative function is—as the name suggests—guaranteeing student loans made by other entities").

**\*6** Further, although the fiduciary obligation exception has rarely been addressed in this Circuit, and even less so in this context, this particular issue was raised in a litigation outside of this Circuit, in which the district court explicitly exempted USAF under the fiduciary obligation exception. *See Davis v. United Student Aid Funds, Inc.*, 45 F. Supp. 2d 1104, 1109 (D. Kan. 1998). I see no reason to depart from the reasoning in *Davis* and the other cases cited herein. Because USAF, acting as a guarantor, has a bona fide fiduciary obligation to the DOE, and because USAF's collection activity is incidental to that fiduciary obligation, USAF is not a "debt collector" as defined by the FDCPA. *See* 15 U.S.C. § 1692a(6)(F)(i) (exempting "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is incidental to a bona fide fiduciary obligation"). Plaintiff's FDCPA claims against USAF are therefore dismissed.

### B. *Declaratory Relief*

Count One of Plaintiff's Complaint seeks declaratory relief under the FDCPA. Although the Second Circuit has not had occasion to address this issue, *see Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 223 n.1 (2d Cir. 2012), district courts in this Circuit have held that neither equitable nor declaratory relief is available to private litigants under the FDCPA, *see Sparkman v. Zwicker & Assocs., P.C.*, 374 F. Supp. 2d 293, 298 (E.D.N.Y. 2005) (collecting cases and explaining that "[t]he FDCPA contains no express provision for injunctive or declaratory relief in private actions"). Similarly, courts outside of this Circuit have concluded that neither injunctive nor declaratory relief is available to private litigants under the FDCPA. *See, e.g., Weiss v. Regal Collections*, 385 F.3d 337, 342 (3d Cir. 2004) (concluding that the FDCPA contains no express provision for declaratory or injunctive relief in private actions); *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) ("[A]ll private actions under the Fair Debt Collection Practices Act

are for damages."). Because the FDCPA does not expressly provide for injunctive or declaratory relief in private actions, Plaintiff's claims for declaratory relief under the Act are dismissed.

### C. *Dismissal With Prejudice*

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). "[I]t is within the sound discretion of the court whether to grant leave to amend." *In re Alcon S'holder Litig.*, 719 F. Supp. 2d 280, 281 (S.D.N.Y. 2010) (quoting *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) ). Complaints brought by pro se litigants are typically dismissed without prejudice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (leave to amend should be given unless there is no indication that the pro se plaintiff will be able to assert a valid claim); *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999) (per curiam) (pro se complaints generally "not dismiss[ed] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated" (citation omitted) ).

Here, I granted Plaintiff leave to amend her Complaint after she received Defendants' motions to dismiss, (*see* Doc. 18), and she chose not to file an amended pleading. Nor has Plaintiff requested leave to amend in the event that Defendants' motions are granted. Although I am cognizant of Plaintiff's pro se status, a liberal reading of the Complaint does not suggest any indication that a valid claim might be stated. Accordingly, Plaintiff's claims are dismissed with prejudice.

### V. Conclusion

For the foregoing reasons, Defendants' motions are GRANTED, and Plaintiff's claims are dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 15, 16), enter judgment for Defendants, and close this case.

**\*7** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4680023

**Allen v. United Student Aid Funds, Inc., Not Reported in Fed. Supp. (2018)**

2018 WL 4680023

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 64 of 238

Redhead v. Winston & Winston, P.C., Not Reported in Fed. Supp. (2002)

2002 WL 31106934

2002 WL 31106934
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Scott R. REDHEAD, Plaintiff,

v.

WINSTON & WINSTON, P.C., Arthur Winston, Jay
Winston and Bank of America, N.A., Defendants.

No. 01 Civ. 11475(DLC).
|
Sept. 20, 2002.

**Synopsis**

Debtor sued bank and its attorneys for violation of Fair
Debt Collection Practices Act (FDCPA) and Fair Credit
Reporting Act (FCRA), and related tort and contract claims.
On attorneys' motion to dismiss, the District Court, Cote,
J., held that: (1) Firm did not violate FDCPA; (2) no private right
action existed for firm's alleged violations of FCRA; (3) firm
did not breach contract; (4) firm could not be held liable to
debtor for professional negligence; and (5) complaint failed
to allege fraud with requisite particularity.

Motion granted.

West Headnotes (5)

**[1]** **Finance, Banking, and Credit** 🔑 Debt
collection practices

Law firm representing creditor could not be
held liable, under Fair Debt Collection Practices
Act (FDCPA), for creditor's alleged breach of
settlement agreement to cause debtor's credit
report to reflect that debt had been paid and that
debtor had top rating; there was no allegation
that firm had communicated or threatened to
communicate any credit information, or that
it had engaged in any false representation or
deception to collect debt. Consumer Credit
Protection Act, § 807(8, 10), as amended, 15
U.S.C.A. § 1692e(8, 10).

10 Cases that cite this headnote

**[2]** **Finance, Banking, and Credit** 🔑 Credit
reporting

Debtor had no private cause of action against
creditor or creditor's counsel for their alleged
violations of provision of Fair Credit Reporting
Act (FCRA) imposing duty on furnishers of
credit information to provide consumer reporting
agencies with accurate information. Consumer
Credit Protection Act, § 623(a, d), as amended,
15 U.S.C.A. § 1681s-2(a, d).

60 Cases that cite this headnote

**[3]** **Attorneys and Legal Services** 🔑 Evidence

Under New York law, law firm could not be held
personally liable for client's alleged breach of
settlement agreement which firm had negotiated
for client, absent evidence firm had assumed
personal liability.

1 Case that cites this headnote

**[4]** **Attorneys and Legal Services** 🔑 Evidence

Under New York law, law firm for creditor
could not be held liable to debtor for negligence,
based on creditor's alleged breach of settlement
agreement which firm had negotiated for it,
absent evidence of attorney-client relationship
between firm and debtor.

3 Cases that cite this headnote

**[5]** **Federal Civil Procedure** 🔑 Fraud, mistake
and condition of mind

Fraud complaint against law firm, seeking to
hold it liable for inducing plaintiff to enter into
settlement agreement which firm's client had
then allegedly breached, failed to allege fraud
with requisite particularity; complaint failed
to allege any particular statements or explain why
they should be taken as fraudulent. Fed.Rules
Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Case that cites this headnote

Case 5:24-cv-00188-DNH-MJK  Document 4  Filed 02/14/24  Page 65 of 238

Redhead v. Winston & Winston, P.C., Not Reported in Fed. Supp. (2002)
2002 WL 31106934

**Attorneys and Law Firms**

Adam J. Fishbein, Attorney at Law, Cedarhurst, NY, for Plaintiff.

Janice J. DiGennaro, Douglas Tischler, Rivkin Radler LLP, Uniondale, NY, for Defendants Winston & Winston, P.C., Arthur Winston and Jay Winston.

*OPINION AND ORDER*

COTE, J.

 **\*1** Plaintiff Scott R. Redhead ("Redhead") brings this action against defendants the Bank of America, N.A. (the "Bank") and its counsel Winston & Winston, P.C., Arthur Winston, and Jay Winston (the "Winston Defendants"), alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 18 U.S.C. § 1692 *et seq.,* and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* as well as breach of contract, negligence, fraud, and assault. The Winston Defendants now move to dismiss Redhead's amended complaint as against them for lack of subject matter jurisdiction, failure to state a claim, and failure to plead fraud with sufficient particularity under Rules 12(b)(1), 12(b)(6), and 9(b), Fed.R.Civ.P., respectively. Redhead cross-moves for leave to file a second amended complaint pursuant to Rule 15, Fed.R.Civ.P. For the reasons stated, the Winston Defendants' motion is granted and Redhead's motion is denied.

Background

The following facts are as alleged in Redhead's amended complaint unless otherwise noted. Redhead is a resident of New York. Defendants Arthur and Jay Winston are lawyers at the law firm of Winston & Winston, P.C., located in New York. The Bank is a national banking association with its principal place of business in Delaware.

On January 21, 2000, the Winston Defendants filed an action in the Civil Court of the City of New York on behalf of the Bank to collect credit card debt that the Bank alleged was owed to it by Redhead. On May 23, 2000, Redhead and the Bank entered into a Stipulation of Settlement (the "Stipulation of Settlement"), which is attached to the amended complaint, under which the Bank agreed *inter alia* to reimburse Redhead

in the amount of $118.00 for overpayment and to "report to any credit reporting agencies that they have reported to update [*sic* ] and correct [Redhead's] credit report to reflect a zero '0' balance and 'R1' rating." It is not clear from Redhead's amended complaint whether the Winston Defendants were involved in the negotiations leading to the Stipulation of Settlement. In their motion papers, however, the Winston Defendants have stated that they were involved in those negotiations.

By letter dated September 5, 2000, also attached to the amended complaint, the Bank informed Redhead that "as of today's date we are changing our records to show your account closed R1 and zero Balance [*sic* ] with the local and national credit reporting agencies." Despite this representation and apparently unsatisfied with the Bank's performance under the Stipulation of Settlement, in December 2000, Redhead filed an action in the Civil Court of the City of New York against the Bank and the Winston Defendants, alleging that they had breached the terms of the Stipulation of Settlement by failing to repair his credit rating. When, on December 19, 2000, Redhead and an unidentified friend allegedly attempted to serve the Civil Court complaint on the Winston Defendants at their office, Arthur and Jay Winston and one "Alex" allegedly threatened Redhead and his friend with physical violence. Redhead states that he fled the office. The amended complaint states that Redhead "continued to prevail upon the Winston [D]efendants to cause plaintiff's credit reports to be updated accordingly," but that "Bank of America failed to update plaintiff's credit reports." [1]

[1]     According to documents supplied by the Winston Defendants, by Order dated January 23, 2001, the Civil Court dismissed Redhead's complaint without prejudice to repleading in the Supreme Court claims unrelated to the Stipulation of Settlement.

 **\*2** Redhead filed the instant action on December 14, 2001, alleging violations of the FDCPA and assault. Redhead filed an amended complaint on February 7, 2002, adding a claim under the FCRA, as well as breach of contract, negligence, and fraud. The time for the Bank to respond to the plaintiff's pleadings has been extended to a time following the entry of this Opinion.

With respect to Redhead's claims under the FDCPA, paragraph 1.9 of the amended complaint states:

 Defendants violated the FDCPA. Defendants' violations include, but are not limited to, the following:

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 66 of 238

Redhead v. Winston & Winston, P.C., Not Reported in Fed. Supp. (2002)

2002 WL 31106934

(a) The defendant violated 15 U.S.C. § 1692e(8) by communicating credit information which should be known to be false.

(b) The defendant violated 15 U.S.C. § 1692e(10) by using false deceptive and misleading means in connection with the collection of an alleged debt.

The amended complaint does not specify to which "defendant" it is referring in paragraph 1.9. With respect to Redhead's claims under the FCRA, the amended complaint states: "This is an action for damages brought by an individual consumer for defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq." The amended complaint does not specify which sections of the FCRA the Winston Defendants or the Bank allegedly violated. In alleging fraud against the Winston Defendants, the amended complaint states: "Defendants induced plaintiff to agree to a stipulation whereby defendants would cause plaintiff's credit reports to reflect a zero balance and a top credit rating. Plaintiff relied upon defendants' fraudulent representations and agreed to sign the stipulation."

Discussion

A court may dismiss an action pursuant to Rule 12(b)(6) only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997) (citation omitted). The court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.* The court is generally prohibited from considering matters outside the pleadings. *Tewksbury v. Ottaway Newspapers,* 192 F.3d 322, 325 n. 1 (2d Cir.1999).

I. Redhead's FDCPA Claim

[1] The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S .C. § 1692(e). To this end, "[t]he FDCPA establishes certain rights for consumers whose debts are placed in the hands of professional debt collectors for collection, and requires that such debt collectors

advise the consumers whose debts they seek to collect of specified rights." *Kropelnicki v. Siegel,* 290 F.3d 118, 127 (2d Cir.2002) (citation omitted). The FDCPA sets forth examples of particular practices that debt collectors are forbidden to employ, *see* 15 U.S.C. § 1692e. Specifically, Section 1692e(8) forbids "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). Section 1692e(10) forbids "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10).

*3 Redhead's claim against the Winston Defendants under the FDCPA appears to be that by acting as counsel for the Bank in a debt collection action that led to a settlement that was subsequently breached by the Bank, the Winston Defendants engaged in conduct in violation of the FDCPA. Specifically, Redhead's amended complaint alleges that the Winston Defendants' conduct violated Sections 1692e(8) and 1692e(10) of the FDCPA. Redhead has failed to allege any facts, however, establishing that the Winston Defendants communicated or threatened to communicate any credit information concerning him. Nor does Redhead allege any facts establishing that the Winston Defendants engaged in any false representation or deception to collect a debt from him. In sum, Redhead has failed to identify and the Court is unaware of any provision of the FDCPA under which the Winston Defendants should be held liable for the Bank's alleged breach of the Stipulation of Settlement as it is described in Redhead's amended complaint.

II. Redhead's FCRA Claim

[2] The FCRA was enacted "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit ... in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681b. The FCRA places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies. *See* 15 U.S.C. § 1681, *et seq.; Aklagi v. Nationscredit Financial Services Corp.,* 196 F.Supp.2d 1186, 1192 (D.Kan.2002); *Thomasson v. Bank One, Louisiana, N.A.,* 137 F.Supp.2d 721, 722 (E.D.La.2001).

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 67 of 238

Redhead v. Winston & Winston, P.C., Not Reported in Fed. Supp. (2002)

2002 WL 31106934

Redhead has not specified into which of the above three categories the Winston Defendants fall. Even when construed broadly, Redhead's amended complaint fails to allege any facts establishing that the Winston Defendants constitute a "consumer reporting agency" as that term is defined in Section 1681f of the FCRA, 15 U.S.C. § 1681a(f), [2] or "users of consumer reports" as that term is used, but not defined, in Section 1681m of the FCRA, 15 U.S.C. § 1681m. *See Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 48–49 (2d Cir.1997) (noting that the FCRA does not define "users of information" and declining to offer a "categorical definition" of the term because defendant automobile dealership clearly qualified as such a user).

[2]    Section 1681a(f) states:

> The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.
> 15 U.S.C. § 1681a(f).

Redhead's amended complaint may, however, allege that the Winston Defendants are "furnishers of information" to consumer reporting agencies as that term is used, but not defined, in the FCRA, and that they have failed to fulfill their duties as furnishers of information under the FCRA. 15 U.S.C. § 1681 *et seq.* Specifically, the amended complaint states that Redhead "continued to prevail upon the Winston [D]efendants to cause [Redhead's] credit reports to be updated."

**\*4**  The FCRA imposes two duties on furnishers of information, codified at 15 U.S.C. §§ 1681s–2(a) and (b). The category of duties in subsection (a) relates to the furnishers' duty to report accurate information and their ongoing duty to correct inaccurate information. Section 1681s–2(a) provides in relevant part as follows:

> A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate....

> A person shall not furnish information relating to a consumer to any consumer reporting agency if (i) the person has been notified by the consumer ... that specific information is inaccurate; and (ii) the information is, in fact, inaccurate....

> A person who ... has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

15 U.S.C. §§ 1681s–2(a)(1) and (2).

The category of duties in subsection (b) governs the furnishers' duty once notice is received from a credit reporting agency that there is a dispute as to the completeness or accuracy of the information provided to that reporting agency. Subsection (b) states as follows:

> After receiving notice [from a credit reporting agency] pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

> (A) conduct an investigation with respect to the disputed information;

> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

> (C) report the results of the investigation to the consumer reporting agency; and

> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s–2(b)(1).

There is no private cause of action under Section 1681s–2(a), for the FCRA limits the enforcement of this subsection

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 68 of 238

Redhead v. Winston & Winston, P.C., Not Reported in Fed. Supp. (2002)
2002 WL 31106934

to government agencies and officials. 15 U.S.C. § 1681s–2(d); *see also Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057, 1059 (9th Cir.2002); *Aklagi v. Nationscredit Financial Services Corp.,* 196 F.Supp.2d 1186, 1192 (D.Kan.2002); *Hasvold v. First USA Bank, N.A.,* 194 F.Supp.2d 1228, 1234 (D.Wyo.2002); *Scott v. Amex/Centurion S & T,* 2001 WL 1645362, at *4 (N.D.Tex. Dec.18, 2001); *Fino v. Key Bank of New York,* No. 00 Civ. 375E, 2001 WL 849700, at *4 (W.D.Pa. July 27, 2001); *Yelder v. Credit Bureau of Montgomery, L.L.C.,* 131 F.Supp.2d 1275, 1283 (M.D.Ala.2001); *Quigley v. Pennsylvania Higher Education Assistance Agency,* No. 00 Civ. 1661, 2000 WL 1721069, at *2 (N.D.Cal. Nov. 8, 2000); *Olexy v. Interstate Assurance Co.,* 113 F.Supp.2d 1045, 1047 (S.D.Miss.2000).

**\*5** Although there has been some disagreement, the majority of courts who have considered the issue have concluded that consumers may pursue claims for willful or negligent noncompliance with Section 1681s–2(b). *See, e.g., Nelson,* 282 F.3d at 1058; *Aklagi,* 196 F.Supp.2d at 1193; *Hasvold,* 194 F.Supp.2d at 1236; *Scott,* 2001 WL 1645362, at *4; *Fino,* 2001 WL 849700, at *5; *Wexler v. Banc of America Auto Finance Corp.,* No. 00 Civ. 865, 2001 WL 428155, at *2 (N.D.Ill. Apr. 26, 2001); *Thomasson v. Bank One, Louisiana, N.A.,* 137 F.Supp.2d 721, 723 (E.D.La.2001) (collecting cases); *Whitesides v. Equifax Credit Info. Servs., Inc. .,* 125 F.Supp.2d 807, 812 (W.D.La.2000); *McMillan v. Experian Info. Servs., Inc.,* 119 F.Supp.2d 84, 88 (D.Conn.2000); *Olexy,* 113 F.Supp.2d at 1047–48; *but see Carney v. Experian Info. Solutions, Inc.,* 57 F.Supp.2d 496 (W.D.Tenn.1999). Those courts that have concluded that a private right of action exists under Section 1681s–2(b) have required a plaintiff to show that the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information is disputed. *See, e.g., Young v. Equifax Credit Info. Servs., Inc .,*—F.3d—, 294 F.3d 631, 2002 WL 1277584, at *7 (5th Cir.2002). Since Redhead's amended complaint appears to claim a violation of subsection (a) rather than (b), it is unnecessary for this Court to determine whether a private right of action exists under subsection (b).

Broadly construed, Redhead's allegations in the amended complaint better fit Section 1681s–2(a). Redhead alleges that the Winston Defendants failed to "cause" his credit reports to be corrected. Because there is no private right of action under subsection (a), Redhead's claims pursuant to the FCRA must be dismissed.

### III. Redhead's State Law Claims

#### A. Redhead's Breach of Contract Claim

**[3]** Redhead alleges that the Winston Defendants breached the Stipulation of Settlement by failing to update his credit information. The Winston Defendants, however, were not a party to the Stipulation of Settlement. In essence, Redhead seeks to hold them liable for an alleged breach of contract by their client. Under New York law, however, the Winston Defendants cannot be held personally liable under a contract negotiated for a client unless they personally assumed liability. *See Four Finger Art Factory, Inc. v. Dinicola,* 99 Civ. 1259, 2001 WL 21248, at *4 (S.D .N.Y. Jan 9, 2001); *Sefi Fabricators, Inc. v. Tillim,* 79 Misc.2d 213, 360 N.Y.S.2d 146, 147 (App. Term 1973) (per curiam); *see also Aetna Casualty and Surety Co. v. Hambly Constr. Co.,* 65 A.D.2d 612, 409 N.Y.S.2d 552, 553 (2d Dep't 1978). Having failed to allege any facts establishing that the Winston Defendants personally assumed liability under the Stipulation of Settlement, Redhead's breach of contract claim against the Winston Defendants must be dismissed.

#### B. Redhead's Negligence Claim

**[4]** Redhead alleges that the Winston Defendants were negligent for failing to update his credit reports. Under New York law, however, it is well settled that "before a party may recover in tort for pecuniary loss sustained as a result of [a legal professional's] negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity.... Such a requirement is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability." *Parrott v. Coopers & Lybrand, L.L.P.,* 95 N.Y.2d 479, 483, 718 N.Y.S.2d 709, 741 N.E.2d 506 (2000) (citation omitted). *See also National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 511 N.Y.S.2d 626, 628 (1st Dep't 1987) ("[I]t is well settled that an attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity."). Because Redhead has failed to allege any facts establishing an attorney-client relationship between him and the Winston Defendants, his negligence claim against them must be dismissed.

#### C. Redhead's Fraud Claim

**\*6** **[5]** Rule 9(b), Fed.R.Civ.P., requires that when alleging fraud "the circumstances constituting fraud ... must be stated

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 69 of 238

Redhead v. Winston & Winston, P.C., Not Reported in Fed. Supp. (2002)

2002 WL 31106934

with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* "To satisfy this requirement, a plaintiff should specify the time, place, speaker, and content of the alleged misrepresentations. In addition, the complaint should explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Caputo v. Pfizer, Inc.,* 267 F.3d 181, 191 (2d Cir.2001) (citations and alteration omitted).

Redhead's amended complaint fails to allege any particularities with respect to its allegations of fraud. It merely states that "[d]efendants induced plaintiff to agree" to the Stipulation of Settlement and that Redhead "relied upon defendants' fraudulent misrepresentations and agreed to sign the stipulation." The amended complaint does not explain what caused the inducement, when and where they did so, what they said, why their statements should be taken as fraudulent, or how he was harmed by the alleged misrepresentations. Redhead's claim of fraud against the Winston Defendants is dismissed.

### D. Redhead's Assault Claim

To establish a claim for assault under New York law, Redhead must show "an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden v. Sandals Int'l,* 262 F.3d 195, 203 (2d Cir.2001) (citation omitted) The Amended Complaint alleges that on December 19, 2000, when Redhead attempted to serve the Winston Defendants with a summons and complaint, Arthur and Jay Winston and "Alex" made "threatening physical gestures ... to attempt to persuade [him] from serving the defendants." This led Redhead to "fear that there would be an imminent battery upon his person."

Although Redhead's amended complaint may allege sufficient facts to establish an assault claim against the Winston Defendants, this is Redhead's only remaining claim in the instant action and is entirely distinct from the claims he has asserted against the Bank. Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" over supplemental claims if it "has dismissed all claims over which it has original jurisdiction." "[T]he discretion implicit in the word 'may' in subdivision (c) of § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994). Here, Redhead's assault claim

bears little if any relation to his dispute with the Bank, and since this litigation is in its initial stages, the Court declines to exercise supplemental jurisdiction over it.

### III. Redhead's Cross–Motion for Leave to Amend

**\*7** Rule 15, Fed.R.Civ.P., governs the amendment of pleadings. Rule 15(a) instructs that leave to amend should be "freely given." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 18 (2d Cir.1997) (citation omitted). Leave to amend should be denied, however, where the proposed amendment would be futile, if defendants have demonstrated undue delay, bad faith, or dilatory motive, or where defendants would suffer undue prejudice. *Dluhos v. Floating and Abandoned Vessel,* 162 F.3d 63, 69 (2d Cir.1998). Where, as here, "a cross-motion for leave to file an amended complaint is made in response to a motion to dismiss under Fed.R.Civ.P. 12(b)(6), leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.,* if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001).

Nothing in Redhead's proposed second amended complaint, even when broadly construed, will enable his FDCPA, FCRA, breach of contract, fraud, or negligence claims to survive dismissal. With respect to his FDCPA claim, Redhead's proposed second amended complaint alleges that sometime after May 2000, a company named "Total Debt Management" attempted to collect from him the debt that was released by the Stipulation of Settlement. Total Debt Management is not a party to this action and Redhead does not allege that it is associated in any way with the Winston Defendants. This new allegation fails to make the Winston Defendants liable under the FDCPA.

With respect to his FCRA claim, Redhead's proposed second amended complaint alleges that, "[u]pon information and belief, the Winston [D]efendants are users of consumer credit information." This, however, is a legal conclusion unsupported by any alleged facts and cannot prevent dismissal. *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (citation and alteration omitted)). At any rate, even if the Winston Defendants were users of consumer credit information for purposes of FCRA analysis, Redhead is still not entitled to bring a private cause of action against them under the FCRA.

2002 WL 31106934

With respect to his breach of contract and fraud claims, in his proposed second amended complaint, Redhead merely merges his fraud allegations into those appearing under his breach of contract claim. This saves neither cause of action.

The proposed second amended complaint amends the negligence claim to include details concerning certain credit cards which were denied to Redhead. This does not revive the claim.

## Conclusion

For the reasons stated, the Winston Defendants' motion is granted and Redhead's motion is denied. Redhead's assault claim is dismissed without prejudice to its refiling in state court.

**\*8** SO ORDERED:

**All Citations**

Not Reported in Fed. Supp., 2002 WL 31106934

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 7169119
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Erisa MOORE, Plaintiff,

v.

EXPERIAN and TransUnion, Defendants.

CIVIL ACTION NO. 23 Civ. 673 (PAE) (SLC)

|

Signed October 13, 2023

**Attorneys and Law Firms**

Erisa Moore, Bronx, NY, Pro Se.

Victoria Dorfman, Jones Day, Washington, DC, Justin Harris, Jones Day, New York, NY, for Defendant Experian.

Camille Renee Nicodemus, Schuckit & Associates, P.C., Zionsville, IN, for Defendant TransUnion.

**REPORT AND RECOMMENDATION**

SARAH L. CAVE, United States Magistrate Judge.

**\*1  TO THE HONORABLE PAUL A. ENGELMAYER**, United States District Judge

## I. INTRODUCTION

Pro se Plaintiff Erisa Moore ("Ms. Moore") asserts claims for "[d]efamation of character" and an "[i]naccurate [c]onsumer report" against Defendants Experian and TransUnion (collectively, "Defendants"). (ECF No. 1-1 (the "Complaint")). Experian moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) ("Experian's Motion"), and TransUnion moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(c) ("TransUnion's Motion," together with Experian's Motion, "Defendants' Motions"). (ECF No. 13). In opposition, Ms. Moore submitted a Proposed Amended Complaint (ECF No. 18 (the "PAC")), which the Court construes to be a cross-motion to amend the Complaint under Federal Rule of Civil Procedure 15(a)(2) ("Ms. Moore's Motion"). (ECF No. 19). The PAC asserts proposed claims under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq. (the "FCRA"), as well as identity theft and frauds and swindles under

federal and New York state criminal statutes. (ECF No. 18 at 3–6). Specifically, Ms. Moore claims that her consumer reports in 2021 and 2023 were "incomplete, inaccurate, and [contained] false information," and that Defendants conducted an "unauthorized investigation" which negatively affected her credit. (Id. at 18 ¶¶ 7–19). Defendants oppose Ms. Moore's Motion. (ECF No. 22).

For the reasons set forth below, the Court respectfully recommends that Defendants' Motions be GRANTED, Ms. Moore's Motion be DENIED, leave to amend be DENIED, and the action be dismissed with prejudice.

## II. BACKGROUND

### A. Factual Background [1]

[1]    The following facts are drawn from Ms. Moore's allegations in the Complaint and in the PAC with annexed exhibits, which the Court presumes to be true for purposes of deciding Defendants' Motions. See Spoleto Corp. v. Ethiopian Airlines Grp., Inc., No. 21 Civ. 5407 (PAE), 2022 WL 329265, at *1 n. 1 (S.D.N.Y. Feb. 3, 2022), aff'd, 2022 WL 17574469 (2d Cir. Dec. 12, 2022) (summary order). The Court also considers the credit disclosure Experian sent to Ms. Moore on March 9, 2023 (ECF No. 22-1), as incorporated by reference in the PAC and integral to the PAC because: (i) Ms. Moore discusses its contents in the PAC (ECF No. 18 ¶ 17), (ii) Ms. Moore attaches part of the document to the PAC (compare ECF No. 18-4 at 2–4 with ECF No. 21-1 at 2–5), and (iii) Ms. Moore has not disputed its authenticity. See, e.g., Rosenberg v. Loandepot, Inc., No. 21 Civ. 8719 (PMH), 2023 WL 1866871, at *3 (S.D.N.Y. Feb. 9, 2023) (considering a "statement of dispute" attached to defendant's motion because it was referenced in the complaint and integral to plaintiff's claims); Boyer v. TransUnion, LLC, No. 21 Civ. 918 (KAD), 2023 WL 1434005, at *2 n.1 (D. Conn. Feb. 1, 2023) (considering as integral to the complaint a credit report plaintiff referenced in the complaint and defendant attached to its motion); see also Hello I Am Elliot, Inc. v. Sine, No. 19 Civ. 6905 (PAE), 2020 WL 3619505, at *3 n.3 (S.D.N.Y. July 2, 2020) (considering integral documents submitted in connection with a

motion to dismiss in the absence of a dispute as to the documents' authenticity) (citing DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010)).

**\*2** At an unspecified time, Ms. Moore "wanted to obtain a car" and was attempting to build her credit to "provide for [her] family." (ECF No. 18 ¶ 7). In 2021, Ms. Moore obtained a copy of her consumer report and determined that it contained "incomplete, inaccurate, and false information." (Id.) In 2021, Ms. Moore disputed the "accuracy of the debt for Capital One." (Id. ¶ 8). In 2023, Ms. Moore lodged disputes regarding her debt with "Victoria Secret" and "Amsher Collections" ("Amsher"). (Id.) Her report, however, remained "incomplete, inaccurate, and with false information." (Id.) Ms. Moore filed a lawsuit against Capital One (the "Capital One Action"),[2] and lodged a dispute with Experian. (Id. ¶ 9).

[2]     The Capital One Action was initially filed in the Supreme Court of the State of New York, County of Bronx, and was subsequently removed to this District. See Notice of Removal, Moore v. Cap. One Bank (USA), N.A., No. 21 Civ. 9654 (S.D.N.Y. Nov. 22, 2021), ECF No. 1. The Honorable Jesse M. Furman dismissed Ms. Moore's complaint and entered judgment in favor of the defendants in the Capital One Action. Moore v. Cap. One Bank (USA), N.A., No. 21 Civ. 9654 (JMF), 2022 U.S. Dist. LEXIS 123221, at \*2 (S.D.N.Y. July 12, 2022).

Experian and TransUnion conducted an investigation, which Ms. Moore characterizes as "[i]dentity theft," "unauthorized," and lacking a "protocol in place to protect [her] credit file." (ECF No. 18 ¶ 10). She claims that Experian and TransUnion "allowed their legal counsel to submit a dispute without [her] consent or request and they accepted it." (Id. ¶ 11). Experian and TransUnion did not "seek [her] participation or permission." (Id.) As part of the investigation, Experian and TransUnion sent "[f]alse and misleading statements" to Capital One, Victoria Secret, and Amsher. (Id. ¶ 12). On February 17, 2023, Ms. Moore mailed a handwritten letter to TransUnion providing "notice of [her] dissatisfaction with the unauthorized dispute and other issues." (Id. ¶ 13; see ECF No. 18-1 at 2–4 (the "Letter")). In the Letter, Ms. Moore informed TransUnion of her belief that her report contained inaccurate information, including with respect to her accounts with Capital One and Victoria Secret. (ECF No. 18-1 at 2–4, 7). In an attachment to the Letter,

Ms. Moore stated that (i) the balance on her Capital One account was too high and that the "fall off date" TransUnion provided was different than that provide by Experian and Equifax, and (ii) her Victoria Secret account reflected an inaccurate "[l]ast payment made" and inaccurate "[p]ayment received," in addition to reporting a different "[f]all off date" than Experian and Equifax. (Id. at 7). In response to the Letter, TransUnion did not submit a dispute or otherwise take action. (ECF No. 18 ¶ 13).

In March 2023, Amsher was "removed from the Plaintiff's credit file ... by [Experian and TransUnion]." (ECF No. 18 ¶ 14). On March 1, 2023, Experian documented that Ms. Moore had submitted an "authorized dispute." (Id. ¶ 15). On March 5, 2023, Ms. Moore asked Experian to provide a "description of the procedure for the results of the authorized dispute, and provided an Affidavit of Truth [(the "Affidavit")] against the unauthorized dispute." (Id. ¶ 16; see ECF No. 18-3 at 5–7). In a February 1, 2023 email to counsel for Experian (the "Email"), Ms. Moore listed purported inaccuracies concerning Capital One in her credit report, including, inter alia, that (i) incomplete data, (ii) inaccurate balances, (iii) inaccurate dates of closure of the account, (iv) an inaccurate credit limit, (v) an incorrect fall off date, and (iv) incorrect comments. (ECF No. 18-3 at 2).

Experian did not respond to the Affidavit. (ECF No. 18 ¶ 16). On March 9, 2023, Ms. Moore received from Experian "[d]ispute results from another unauthorized investigation," which she claims she had not requested and to which she did not consent. (Id. ¶ 17; see ECF No. 18-4 at 2–4 and ECF No. 21-1 at 2–5 (the "Investigation Results")). On the Investigation Results, Ms. Moore hand-wrote that the reported balance of $792 in the investigation results as inaccurate and circled other items as being false or incomplete, although it is unclear the extent to which she communicated these issues to Experian. (ECF No. 18-4 at 2-4).

**\*3** Ms. Moore characterizes Defendants' actions as "identity theft" and "mail fraud," and claims to have suffered damages in the form of "[m]ental and emotional distress, severe humiliation, experiencing low credit expectancy, ruined credit reputation, tampered credit file, prolonging an important purchase, and limiting the Plaintiff's ability to provide [for her] family['s] needs." (ECF No. 18 ¶¶ 18–19).

**B. Procedural Background**

On or about November 7, 2022, Ms. Moore filed a Summons with Endorsed Complaint in New York State Court, in the Civil Court of the City of New York, County of Bronx. (ECF No. 1-1). The Complaint contained only two allegations: "Other for $10,000.00 with interest from 10/22/2021. Defamation of Character, Inaccurate Consumer report." (Id.) On January 26, 2023, Defendants removed the case to this Court. (ECF No. 1). On February 1, 2023, TransUnion filed an Answer to the Complaint. (ECF No. 11).

On March 6, 2023, Experian moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), and TransUnion moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(c). (ECF No. 13). After Ms. Moore missed the March 20, 2023 deadline to oppose Defendants' Motions, the Court sua sponte extended her deadline to March 29, 2023. (ECF No. 17). On March 30, 2023, rather than opposing Defendants' Motions, Ms. Moore filed the PAC, which asserts eleven claims for relief under the following statutes: 15 U.S.C. § 1681b (first claim) (the "Section 1681b Claim"); 15 U.S.C. §§ 1681i(a)(2), 1681i(a)(4), 1681i(a)(5), 1681i(a)(6)(a), 1681i(a)(6)(b)(iii), and 1681i(a)(7) (second through seventh claims) (the "Section 1681i Claims"); New York General Business Law § 380-s (eighth claim) (the "Identity Theft Claim"); and 18 U.S.C. §§ 1028(a)(7), 1028A, and 1341 (ninth through eleventh claims) (the "Federal Criminal Claims"). (ECF No. 18 ¶¶ 20–66).[3] The PAC omitted a defamation claim that Ms. Moore had asserted in the Complaint (the "Defamation Claim"). (See ECF No. 18).

[3]    The Court notes that the PAC is not signed (or dated), and therefore does not comply with Federal Rule of Civil Procedure 11(a). Should this Report and Recommendation not be adopted such that the PAC would survive Defendants' Motions, in whole or in part, Ms. Moore should be directed to file a signed copy of the PAC.

Because, under Federal Rule Civil Procedure 15, Ms. Moore could not amend as of right and without leave of the Court or consent of the parties, the Court: (i) construed the PAC as a motion to amend the Complaint, (ii) deemed Defendants' Motions as directed to the allegations in the PAC, and (iii) ordered Defendants to file a reply by April 14, 2023. (ECF No. 19). On April 14, 2023, Defendants filed a reply. (ECF No. 22). The Honorable Paul A. Engelmayer has referred this matter to the undersigned for general pretrial supervision

and to issue a Report and Recommendation on Defendants' Motions. (ECF No. 16).

## III. DISCUSSION

### A. Legal Standards

**1. Motions to Dismiss under Rules 12(b)(6) and 12(c)**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 119 (2d Cir. 2013); Blackson v. City of N.Y., No. 14 Civ. 452 (VEC), 2014 WL 6772256, at *2 (S.D.N.Y. Dec. 2, 2014).[4] "[T]he Court must assess whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " Blackson, 2014 WL 6772256, at *2 (quoting Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see Myers v. City of N.Y., No. 11 Civ. 8525 (PAE), 2012 WL 3776707, at *2 (S.D.N.Y. Aug. 29, 2012) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). A complaint "cannot withstand a motion to dismiss unless it contains factual allegations sufficient to raise a 'right to relief above the speculative level.' " Blackson, 2014 WL 6772256, at *2 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. For purposes of Rule 12(b)(6), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

[4]    Internal citations and quotation marks are omitted unless otherwise indicated.

**\*4** "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Palin v. N.Y. Times Co., No. 17 Civ. 4853 (JSR), 2020 WL 353455, at *2 (S.D.N.Y. Jan. 21, 2020) (quoting Hogan v. Fischer, 738 F.3d 509, 514–15 (2d Cir. 2013)).

**2. Motion to Amend**

Federal Rule of Civil Procedure 15 provides that a court "should freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Rule encourages courts to determine claims "on the merits" rather than disposing of claims or defenses based on "mere technicalities." Monahan v. NYC Dep't of Corr., 214 F.3d 275, 283 (2d Cir. 2000) ("Rule [15] reflects two of the most important principles behind the Federal Rules: pleadings are to serve the limited role of providing the opposing party with notice of the claim or defense to be litigated, and 'mere technicalities' should not prevent cases from being decided on the merits").

The Second Circuit has explained that "district courts should not deny leave [to amend] unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility." Friedl v. City of New York, 210 F.3d 79, 87 (2d Cir. 2000). This District has held that a Court should deny a motion to amend where "(1) the movant is guilty of undue delay, (2) the movant has acted in bad faith, (3) the amendment would be futile, or (4) the amendment would prejudice the opposing party." Procter & Gamble Co. v. Hello Prods., LLC, No. 14 Civ. 649 (VM) (RLE), 2015 WL 2408523, at *1 (S.D.N.Y. May 20, 2015) (citing State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981)); see also Williams v. Citigroup Inc., 659 F.3d 208, 213–14 (2d Cir. 2011) (per curiam) (reiterating Supreme Court precedent that finds proper grounds for denying a motion to amend as "undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment") (citing Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). "Consistent with the liberal principles underlying Rule 15(a)(2), the party opposing the amendment has the burden of establishing that leave to amend would be unduly prejudicial or futile. Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am., No. 18 Civ. 8152 (JFK), 2021 WL 4991422, at *5 (S.D.N.Y. Oct. 27, 2021).

"Where a plaintiff seeks to amend [her] complaint while a motion to dismiss is pending, a court 'may either deny the pending motion to dismiss as moot or consider the merits of the motion, analyzing the facts as alleged in the amended pleading.' " Cotto v. Fed. Nat'l Mortg. Ass'n, No. 20 Civ. 6487 (MKV), 2021 WL 4340668, at *4 (S.D.N.Y. Sept. 22, 2021) (quoting Pettaway v. Nat'l Recovery Sols., LLC, 955 F.3d 299, 303 (2d Cir. 2020)). Accordingly, here, the Court

analyzes Defendants' arguments against the sufficiency of the PAC. (ECF No. 19). See MB v. Islip Sch. Dist., No. 14 Civ. 4670 (SJF) (GRB), 2015 WL 3756875, at *4 (E.D.N.Y. June 16, 2015) (collecting cases); Conforti v. Sunbelt Rentals, Inc., 201 F. Supp. 3d 278, 291 (E.D.N.Y. 2016) ("[F]or the purpose of procedural efficiency, the Court, in its discretion, considers the Defendants' sufficiency arguments, along with their futility arguments, in light of the [proposed amended complaint]").

**3. The FCRA**

**\*5** "The FCRA regulates consumer credit reporting agencies ["CRAs"] to ensure accuracy, confidentiality, relevancy, and proper utilization of consumer credit information." Perez v. Experian, No. 20 Civ. 9119 (PAE) (JLC), 2021 WL 4784280, at *5 (S.D.N.Y. Oct. 14, 2021) ("Perez I"), adopted by 2021 WL 5088036 (S.D.N.Y. Nov. 2, 2021) ("Perez II"). "The FCRA creates a private right of action against [CRAs] for the negligent or willful violation of any duty imposed under the statute." Braun v. United Recovery Sys., LP, 14 F. Supp. 3d 159, 165 (S.D.N.Y. 2014).

Section 1681b "generally specifies the circumstances under which a consumer report may be furnished and used[,]" Braun, 14 F. Supp. 3d at 165, and "protects consumer privacy by limiting access to consumer credit reports." Perl v. Am. Express, No. 12 Civ. 4380 (ER), 2012 WL 2711270, at *2 (S.D.N.Y. July 9, 2012). As distinguished from many other provisions of the FCRA regulating CRAs, liability under Section 1681b typically attaches to "third parties who willfully or negligently 'use or obtain' a consumer report for an impermissible purpose." Rajapakse v. Shaw, No. 20 Civ. 10473 (VEC) (OTW), 2022 WL 1051108, at *5 (S.D.N.Y. Feb. 18, 2022), adopted by 2022 WL 855870 (S.D.N.Y. Mar. 23, 2022). A CRA may be liable where a third party accessed or used a consumer report for an impermissible purpose if the CRA "either willfully or negligently fail[ed] to maintain reasonable procedures designed to avoid violations of" Section 1681b.[5] Pietrafesa v. First Am. Real Estate Info. Servs., No. 05 Civ. 1450 (LEK) (RFT), 2007 WL 710197, at *3 (N.D.N.Y. Mar. 6, 2007); see Podell v. Citicorp Diners Club, 859 F. Supp. 701, 705 (S.D.N.Y. 1994) (noting that Section 1681b "limits the purposes and uses of a credit report," and that the FCRA "imposes civil liability upon [CRAs] ... who willfully or negligently violate the [FCRA]"). To determine whether the CRA maintained reasonable procedures, "the standard of

2023 WL 7169119

conduct is what a reasonably prudent person would do under the circumstances." Hines, 2022 WL 2841909, at *23.

5  The provision of the FCRA providing that CRAs must maintain reasonable procedures to avoid violations of Section 1681b is Section 1681e(a), which provides that "[e]very [CRA] shall maintain reasonable procedures designed to ... limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." 15 U.S.C. § 1681e(a). The Court construes the Section 1681b Claim as if brought pursuant to both Sections 1681b and 1681e(a), and, as other courts have done, analyzes these claims together. See Hines v. Equifax Info. Servs., LLC, No. 19 Civ. 6701 (RPK) (RER), 2022 WL 2841909, at *23 (E.D.N.Y. July 16, 2022) (report and recommendation).

Section 1681i outlines the "procedures [CRAs] must follow to investigate disputes as to the accuracy of reported information," including "reinvestigating a consumer's record within a reasonable period of time after a consumer 'directly conveys' a dispute as to the 'completeness or accuracy of an item on his credit report' to the [CRA]." Khan v. Equifax Info. Servs., LLC, No. 18 Civ. 6367 (MKB), 2019 WL 2492762, at *3 (E.D.N.Y. June 14, 2019) (quoting Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997)). If a consumer files a dispute with the CRA, Section 1681i imposes on "both the [CRA] and the furnisher of the disputed information [ ] a duty to investigate the dispute." Nguyen v. Ridgewood Sav. Bank, 66 F. Supp. 3d 299, 304 (E.D.N.Y. 2014); see also Fashakin v. Nextel Commc'ns, No. 5 Civ. 3080 (RRM), 2009 WL 790350, at *10 (E.D.N.Y. Mar. 25, 2009) ("Where credit information is disputed, § 1681i(a) requires [CRAs] to 'conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate.' " (quoting 15 U.S.C. 1681i(a)(1)(A))). CRAs have thirty days to conduct a reinvestigation after receiving "notice of the dispute from the consumer or reseller." 15 U.S.C. § 1681i(a)(1)(A). "If after reinvestigation a [CRA] determines that the disputed information is inaccurate, incomplete, or cannot be verified, the agency must delete or modify the disputed item of information." Phipps v. Experian, No. 20 Civ. 3368 (LLS), 2020 WL 3268488, at *2 (S.D.N.Y. June 15, 2020). To state a claim under Section 1681i, "the plaintiff must [ ] plausibly allege that the disputed information is inaccurate." Thompson v. Equifax Info. Servs. LLC, No. 20 Civ. 6101 (RPK) (ST), 2022 WL 2467662, at *8 (E.D.N.Y. Feb. 24, 2022); see Gestetner v. Equifax Info. Servs. LLC, No. 18 Civ. 5665 (JFK), 2019 WL 2343659, at *1 (S.D.N.Y. June 3, 2019)

(same). A credit report is inaccurate "either when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." Perez I, 2021 WL 4784280, at *9.

**4. Pro Se Considerations**

**\*6** "It is well established that the submissions of a pro se litigant must be construed liberally and interpreted to 'raise the strongest arguments that they suggest.' " Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam). Courts undertake to "ensure that inexperienced pro se litigants do not inadvertently forfeit rights or winning arguments," Tartt v. City of N.Y., No. 12 Civ. 5405 (VEC), 2014 WL 3702594, at *2 (S.D.N.Y. July 16, 2014), and therefore apply "a more flexible standard to evaluate the[ ] sufficiency [of their complaints] than ... when reviewing a complaint submitted by counsel." Lerman v. Bd. of Elections in City of N.Y., 232 F.3d 135, 140 (2d Cir. 2000); see Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers").

**B. Application**

**1. FCRA Claims**

**a. Section 1681b Claim**

Ms. Moore claims that Defendants violated Section 1681b by failing to certify that Amsher (i) had legal or lawful authority to procure her consumer report, and (ii) would use the consumer report lawfully. (ECF No. 18 ¶¶ 20–21). Defendants argue that the Section 1681b Claim fails because (i) Ms. Moore does not plausibly allege that Defendants sent the consumer report to Amsher, and (ii) the PAC fails to plausibly allege that Amsher obtained her credit report for an impermissible purpose. (ECF No. 22 at 6–7).

As an initial matter, Section 1681b primarily imposes liability upon users of consumer reports who obtain them for an impermissible purpose, rather than the CRAs who furnish consumer reports. (See § III(A)(3), supra). Here, the Section 1681b Claim against the CRAs fails because the PAC does not allege that Defendants provided Ms. Moore's consumer report to the alleged user, Amsher. With respect to Amsher, the PAC merely alleges that (i) Ms. Moore disputed the accuracy of her debt with Amsher in 2023, (ii) Defendants sent unidentified

"[f]alse and misleading information/statements" to Amsher at an unspecified time, and (iii) Amsher was removed from Ms. Moore's file in March 2023. (ECF No. 18 ¶¶ 8, 12, 14). The PAC does <u>not</u> allege that Defendants provided Ms. Moore's <u>consumer report</u> to Amsher, which is fatal to any claim that Defendants impermissibly shared her report.[6]

[6]   To the extent that the PAC can be read to allege that Amsher requested, procured and/or used Ms. Moore's credit report for an impermissible purpose (<u>see</u> ECF No. 18 at ¶ 20), that claim would fail because Amsher is not a party to this litigation and Ms. Moore does not allege any basis for imputing liability for Amsher's actions to Defendants.

Even if the PAC could be read to allege that Defendants furnished a consumer report to Amsher or that the allegedly "[f]alse and misleading" information (ECF No. 18 ¶ 12) was sufficient to constitute a consumer report, the Section 1681b Claim would still fail because Ms. Moore does not plausibly allege that Amsher sought or used the information for an impermissible purpose or that Defendants "either willfully or negligently fail[ed] to maintain reasonable procedures" to prevent an improper furnishing of information. Pietrafesa, 2007 WL 710197, at *3; see Selvam v. Experian Info. Sols., Inc., No. 13 Civ. 6078 (DLI)(JO), 2015 WL 1034891, at *4 (E.D.N.Y. Mar. 10, 2015) (granting motion to dismiss where plaintiff failed to allege how the CRA acted unreasonably). The statement that "Defendants Experian and TransUnion have done so either negligently and/or willfully" (ECF No. 18 ¶ 23) is conclusory language that simply tracks the statute in a formulaic manner and is insufficient to state a claim. See Selvam, 2015 WL 1034891, at *3 (holding that statements that "Defendants 'willfully failed to comply' and 'negligently failed to comply' with the FCRA ... are conclusory and amount to nothing more than the formulaic recitation of the elements of a cause of action").

**\*7**  Accordingly, I respectfully recommend that the Section 1681b Claim be DISMISSED.

### b. Section 1681i Claims

Ms. Moore claims that Defendants' investigation of her disputes violated Section 1681i. (ECF No. 18 ¶¶ 25-48).[7] Defendants argue that the PAC fails to plausibly allege that (i) the reported information was inaccurate, and (ii) their reinvestigations were unreasonable. (ECF No. 22 at 7–11).

[7]   Specifically, Ms. Moore alleges that both Defendants violated 15 U.S.C. §§ 1681i(a)(2), 1681i(a)(4), and 1681i(a)(5); Experian violated 15 U.S.C. §§ 1681i(a)(6)(b)(iii) and 1681i(a)(7); and TransUnion violated 15 U.S.C. § 1681i(a)(6)(a). (Id.)

### i. Inaccurate Information

A threshold requirement for Ms. Moore's Section 1681i Claims is the inaccuracy of the information in her credit report. (See § III(A)(3), supra). Here, the PAC alleges that Ms. Moore's consumer report in 2021 and 2023 contained "incomplete, inaccurate, and false information." (ECF No. 18 ¶¶ 7–8). Ms. Moore's Letter to TransUnion in 2023 informed TransUnion of her belief that her report contained inaccurate information, specifically with respect to her accounts with Capital One and Victoria Secret. (ECF No. 18-1 at 2–7). In the Letter, Ms. Moore disputed the balance and "fall off dates" on her Capital One and Victoria's Secret accounts. (Id. at 7). In the Affidavit, Ms. Moore informed Experian of her dispute. (ECF No. 18-3 at 2–7). In the Email to counsel for Experian, Ms. Moore also listed purported inaccuracies concerning Capital One in her credit report. (Id. at 2). Finally, Ms. Moore disputed the results of Experian's investigation, as indicated in her handwritten comments on the Investigation Results. (ECF No. 18-4 at 2–3).

While the allegation in the PAC that Ms. Moore's consumer reports contained "incomplete, inaccurate, and false information" (ECF No. 18 ¶¶ 7–8) is conclusory (ECF No. 22 at 9), when considered together with the Letter, the Affidavit, the Email, the Investigation Results, and the other documents attached to the PAC, Ms. Moore has met her minimal burden at the pleading stage to plausibly allege that Defendants reported inaccurate information about her credit. See Perez I, 2021 WL 4784280, at *10 (where plaintiff alleged that "the CRAs reported inaccurate information in his trade lines, including his Capital Bank balance, Verizon Wireless balance, Best Buy balance, as well as other accounts," holding that, "the Court finds that [plaintiff] satisfies the threshold requirement as he has alleged his credit information is not accurate"). Ms. Moore has therefore satisfied the first element of her Section 1681i Claims.

#### ii. Manner of Investigations

Ms. Moore's Section 1681i Claims falter, however, because the PAC does not plausibly allege that Defendants failed to conduct reinvestigations or that those reinvestigations were unreasonable. Indeed, Ms. Moore's chief complaint seems to be that, although she lodged disputes with Defendants as to the accuracy of certain information contained in her consumer reports, Defendants investigated those complaints, but somehow lacked authorization. (See ECF No. 18 ¶¶ 10–17). Ms. Moore's allegations, taken as true, therefore demonstrate that Defendants _did_ conduct an investigation at her request. The gravamen of Ms. Moore's Section 1681i Claims—that Defendants should _not_ have investigated her disputes and that doing so constituted identity theft and fraud—belies her assertion that different or more thorough investigations were required under Section 1681i. Because most of the allegations on the PAC pertain to Ms. Moore's theory that the investigations should not have been initiated in the first place—despite her admission that she lodged the disputes—she has not plausibly alleged facts to support an inference that Defendants' investigations into her disputes violated Section 1681i. The PAC otherwise contains conclusory recitals of the elements of each subsection of Section 1681i (ECF No. 18 ¶¶ 25–48), which is insufficient to state Section 1681i Claims. See Perez I, 2021 WL 4784280, at *10–11 (granting motion to dismiss for lack of allegations plausibly supporting willful or negligent noncompliance with Section 1681i); Nguyen v. Ridgewood Sav. Bank, No. 14 Civ. 1058 (MKB), 2015 WL 2354308, at *11 (E.D.N.Y. May 15, 2015) (granting motion to dismiss where plaintiff failed to allege deficiencies in "the procedures followed or investigations by [the CRAs] in response to [plaintiff's] complaints" and offered only "conclusory and broad allegations of fraud and deceptive practices").

**\*8** Accordingly, I respectfully recommend that the Section 1681i Claims be DISMISSED.

#### 2. Remaining Claims

#### a. Federal Criminal Claims

Ms. Moore claims that Defendants' actions violated federal criminal statutes and constituted mail fraud (18 U.S.C. § 1028), aggravated identity theft (18 U.S.C. § 1028A), and frauds and swindles (18 U.S.C. § 1341). (ECF No. 18 ¶¶

53–66). None of these statutes, however, provides a private right of action. See Pharr v. Evergreen Garden, Inc., 123 F. App'x 420, 422 (2d Cir. 2005) (summary order) (explaining that "[t]he law in this circuit is clear that" 18 U.S.C. § 1341 "does not support any private right of action"); Chance v. Selip & Stylianou, LLP, No. 22 Civ. 3314 (LTS), 2022 WL 1556038, at *4 (S.D.N.Y. May 16, 2022) (explaining that "there is no private right of action authorizing an individual to bring suit under [18 U.S.C. § 1028A]"); Clark v. Student Loan Fin. Corp., No. 18 Civ. 9354 (JPO), 2019 WL 4412571, at *2 (S.D.N.Y. Sept. 16, 2019) (explaining that "[s]ection 1028 also does not supply a private right of action").

Accordingly, I respectfully recommend that the Federal Criminal Claims be DISMISSED.

#### b. Identity Theft Claim

Ms. Moore claims that Defendants' actions constitute identity theft under New York General Business Law § 380-s. (ECF No. 18 ¶¶ 49–52). Defendants argue that the PAC fails to state a _prima facie_ claim for identity theft. (ECF No. 22 at 12).

Sections 380-i and 380-s "create[ ] a cause of action for a victim of identity theft to sue any person who engages in identity theft if the theft results in the transmission of certain information about the consumer to a [CRA]." Abergel v. Santander Bank, No. 19 Civ. 6535 (CM), 2019 WL 4141668, at *3 (S.D.N.Y. Aug. 30, 2019) (citing Galper v. JP Morgan Chase Bank, N.A., 802 F.3d 437, 441 (2d Cir. 2015) (citing N.Y. Gen. Bus. L. §§ 380-i, 380-s)). In this context, identity theft is defined to include "the knowing and intentional fraudulent use of something of value in the name of another person without that person's consent." Prignoli v. Bruczynski, No. 20 Civ. 907 (MKB), 2021 WL 4443895, at *9 (E.D.N.Y. Sept. 28, 2021) (citing Galper, 802 F.3d at 442). New York law "authorizes a civil action only if the identity theft 'resulted in the transmission or provision to a [CRA] of information that would otherwise not have been transmitted or provided.' " Galper, 802 F.3d at 442 (quoting N.Y. Gen. Bus. L. § 380-i).[8]

[8]
The statutes in question provide a right of action against an identity thief whose actions result in the transmission of information to a CRA, see Galper, 802 F.3d at 442, as opposed to a right of action against a CRA. See N.Y. Gen. Bus. L. §§ 380-I,

380-s. The Court therefore doubts whether Sections 380-I and 380-s create a private right of action against CRAs for identity theft.

Here, the PAC does not plausibly allege that Defendants engaged in identity theft. Ms. Moore offers only nonspecific and conclusory allegations, i.e., that "[Defendants] both took part in [i]dentity theft to conduct an unauthorized investigation," and "[t]he identity theft committed also involved mail fraud." (ECF No. 18 ¶¶ 10, 18). These allegations are insufficient to plausibly support that Defendants knowingly and intentionally engaged in fraudulent use of Ms. Moore's credit information. See Prignoli, 2021 WL 4443895, at *9 (granting motion to dismiss because "conclusory allegations that ... Defendants engaged in an 'illegal scheme' to 'misappropriate' Plaintiff's funds and 'participated in identity theft' are insufficient to state a claim under GBL § 380-s"); Abergel, 2019 WL 4141668, at *3 (holding that plaintiff failed to state a claim under Section 380-s because "Plaintiff does not allege that Defendant [ ] or its employees engaged in identity theft"); see also Bisceglia v. Recovery Racing, LLC, No. 654335/2022 (LEF), 2023 WL 2113337, at *2 (Sup. Ct. N.Y. Cnty. Feb. 17, 2023) (dismissing Section 380-s claim where complaint lacked any factual allegations of identity theft).

**\*9** Accordingly, I respectfully recommend that the Identity Theft Claim be DISMISSED.

### c. Defamation

Ms. Moore asserted a Defamation Claim against Defendants in the original Complaint (see ECF No. 1-1), but omitted that claim in the PAC (see ECF No. 18). Therefore, Ms. Moore has abandoned this claim. See Gifford v. United N. Mortg. Bankers, Ltd., No. 18 Civ. 6324 (PAE) (HBP), 2019 WL 2712489, at *3 (S.D.N.Y. July 8, 2019) (finding that pro se plaintiff abandoned certain claims by failing to include them in a proposed amended complaint submitted in lieu of opposition to a motion to dismiss); Leary v. Warnaco, Inc., 251 B.R. 656, 659 (S.D.N.Y. 2000) (finding that, "by omitting [the claim] from the proposed amended complaint, this Court deems it abandoned"). [9]

[9]   The Court would still recommend that the Defamation Claim be dismissed as preempted by the FCRA. See 15 U.S.C. § 1681h(e) ("no consumer may bring any action or proceeding in

the nature of defamation ... with respect to the reporting of information against any [CRA], any user of information, or any person who furnishes information to a [CRA] ..."); see also Macpherson v. JPMorgan Chase Bank, N.A., 665 F.3d 45, 47–48 (2d Cir. 2011) (per curiam). Indeed, Judge Furman dismissed a similar claim brought by Ms. Moore in the Capital One Action. See Moore, 2022 U.S. Dist. LEXIS 123221, at *2 (holding that "common-law defamation claim [was] preempted by the FCRA").

Accordingly, I respectfully recommend that the Defamation Claim be DISMISSED.

### C. Leave to Amend

"Leave to amend should be 'freely give[n] ... when justice so requires.' " Trujillo v. City of N.Y., No. 14 Civ. 8501 (PGG), 2016 WL 10703308, at *21 (quoting Fed. R. Civ. P. 15(a)(2)); see Bloomberg v. N.Y.C. Dep't of Educ., 410 F. Supp. 3d 608, 628 (S.D.N.Y. 2019) (permitting amended complaint after granting motion to dismiss). The Second Circuit recognizes that "the 'liberal spirit' of the Federal Rule of Civil Procedure 15 embodies a 'strong preference for resolving disputes on the merits.' " Davis v. Goodwill Indus. of Greater N.Y. & N.J., Inc., No. 15 Civ. 7710 (ER), 2017 WL 1194686, at *14 (S.D.N.Y. Mar. 30, 2017) (quoting Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190–91 (2d Cir. 2015)). Thus, "[d]istrict courts 'ha[ve] broad discretion in determining whether to grant leave to amend.' " Trujillo, 2016 WL 10703308, at *21 (quoting Gurary v. Winehouse, 235 F.3d 793, 801 (2d Cir. 2000)). Courts "ordinarily recommend that a pro se plaintiff be given leave to amend h[er] complaint to replead all factually insufficient claims." Huggins v. Schriro, No. 14 Civ. 6468 (GBD) (JLC), 2015 WL 7345750, at *9 (S.D.N.Y. Nov. 19, 2015); see Grullon v. City of New Haven, 720 F.3d 133, 140 (2d Cir. 2013) ("[a] pro se complaint generally should not be dismissed without granting the plaintiff leave to amend at least once"). The Court may deny an opportunity to amend "when amendment would be futile." Fulton v. Goord, 591 F.3d 37, 45 (2d Cir. 2009).

Here, Ms. Moore has already had an opportunity amend her claims, with the benefit of having seen Defendants' arguments why her claims were deficient. Because the PAC "gives no indication that [she] has a colorable claim under federal law and [she] has already had one opportunity to amend the complaint[,] any further attempt to amend the complaint would be futile." Selvam, 2015 WL 1034891, at *4 (citing

Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)); see Moore, 2022 U.S. Dist. LEXIS 123221, at *2 (denying Ms. Moore leave to further amend in the Capital One Action where she had previously had an opportunity to amend, and finding that, "[h]ere, leave to amend is not warranted because the problems with Moore's claims are substantive, so better pleading will not cure them"); Ingram v. Premier Bankcard, Inc., No. 15 Civ. 2205 (PGG), 2017 U.S. Dist. LEXIS 112636, at *14–15 (S.D.N.Y. July 18, 2017) (denying pro se plaintiff leave to amend a second time where plaintiff "did not add sufficient factual allegations to demonstrate either a willful or negligent violation of the FCRA," and where "it appears that any further attempt to amend the complaint would be futile").

**\*10** Accordingly, I respectfully recommend that further leave to amend be DENIED.

### IV. CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Defendants' Motions be GRANTED, Ms. Moore's Motion be DENIED, leave to amend be DENIED, and the action be DISMISSED WITH PREJUDICE.

Defendants shall promptly serve a copy of this Report and Recommendation on Ms. Moore, and, by **October 17, 2023**, file proof of service on the docket.

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Engelmayer.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). If Ms. Moore does not have access to cases cited in this Report and Recommendation that are reported on Westlaw, she may request copies from Defendants' counsel. See Loc. Civ. R. 7.2.

**All Citations**

Slip Copy, 2023 WL 7169119

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Moore v. Experian, Slip Copy (2023)**

2023 WL 7166158

2023 WL 7166158
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Erisa MOORE, Plaintiff,

v.

EXPERIAN and TransUnion, Defendants.

23 Civ. 673 (PAE) (SLC)
|
Signed October 30, 2023
|
Filed October 31, 2023

**Attorneys and Law Firms**

Erisa Moore, Bronx, NY, Pro Se.

Victoria Dorfman, Jones Day, Washington, DC, Justin Harris, Jones Day, New York, NY, for Defendant Experian.

Camille Renee Nicodemus, Schuckit & Associates, P.C., Zionsville, IN, for Defendant TransUnion.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

 **\*1** On November 7, 2022, *pro se* plaintiff Erisa Moore commenced this action in New York state court against defendants Experian and TransUnion, claiming "Defamation of Character" through an "Inaccurate Consumer report." Dkt. 1, Ex. 1 ("Complaint") at 2. On January 26, 2023, defendants removed the case to this Court, Dkt. 1. On January 27, 2023, the Court referred this case to the Honorable Sarah L. Cave, United States Magistrate Judge, for general pretrial purposes. Dkt. 5.

On March 6, 2023, defendants moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(c). Dkt. 13. On March 30, 2023, rather than opposing defendants' Motions, Moore filed a Proposed Amended Complaint ("PAC"), which would assert proposed claims under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA"), as well as identity theft and fraud under various federal and state criminal statutes. Dkt. 18. Because Federal Rule of Civil Procedure 15(a)(1) barred Moore from amending without leave of the Court or consent of the parties,

Judge Cave construed the PAC as a motion to amend the Complaint. Dkt. 19.

Before the Court is Judge Cave's October 13, 2023 Report and Recommendation, recommending that the Court grant defendants' motion to dismiss under Rule 12(b)(6), deny Moore's motion to amend under Rule 15, and deny leave to amend. Dkt. 25 ("Report"). Moore has not objected or otherwise responded to the Report. The Court incorporates by reference the summary of the facts provided therein. For the following reasons, the Court adopts this recommendation.

**DISCUSSION**

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "To accept those portions of the report to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Ruiz v. Citibank, N.A.*, No. 10 Civ. 5950 (KPF), 2014 WL 4635575, at \*2 (S.D.N.Y. Aug. 19, 2014) (quoting *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at \*4 (S.D.N.Y. My 8, 2009)); *see also, e.g., Wilds v. United Parcel Serv.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

As no party has submitted objections to the Report, review for clear error is appropriate. Careful review of Judge Cave's thorough and well-reasoned Report reveals no facial error in its conclusions; the Report is therefore adopted in its entirety. Because the Report explicitly states that "failure to object within fourteen (14) days will result in a waiver of objections and will preclude appellate review," Report at 21, the parties' failure to object operates as a waiver of appellate review. *See Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008) (citing *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)).

**CONCLUSION**

For the foregoing reasons, the Court accepts and adopts Judge Cave's Report in its entirety. The Court grants defendants' motion to dismiss under Rule 12(b)(6), denies Moore's motion to amend under Rule 15, and denies leave to amend. The Court dismisses this action with prejudice.

**\*2**  SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 7166158

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 82 of 238

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

2022 WL 1051108
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Samantha D. RAJAPAKSE, Plaintiff,

v.

SEYFARTH SHAW, et al., Defendants.

20-CV-10473 (VEC) (OTW)

|

Signed 02/18/2022

**Attorneys and Law Firms**

Samantha D. Rajapakse, Chatannoga, TN, Pro Se.

Gina Renee Merrill, Lisa Louise Savadjian, Seyfarth Shaw
LLP, New York, NY, for Defendants Seyfarth Shaw, Robert
Szyba, Carla Lanigan.

**REPORT & RECOMMENDATION**

ONA T. WANG, United States Magistrate Judge:

**\*1 To the Honorable VALERIE E. CAPRONI, United
States District Judge:**

Plaintiff Samantha D. Rajapakse, proceeding *pro se*, brings
this action pursuant to the Fair Credit Reporting Act
("FCRA"), 15 U.S.C. § 1681q, against Defendants Seyfarth
Shaw LLP,[1] Robert Szyba, and Carla Lanigan (collectively,
"Defendants"). Plaintiff alleges Defendants violated the
FCRA during settlement discussions in another lawsuit in
the Northern District of Georgia. Defendants have moved to
dismiss Plaintiff's Amended Complaint ("AC"), and Plaintiff
opposed. For the reasons stated below, I recommend that
Defendants' motion be **GRANTED** without leave to amend.
I also recommend granting, in part, Defendants' request for
a filing injunction.

[1]      Seyfarth Shaw LLP was incorrectly pled as
         "Seyfarth Shaw."

**I. Facts**

This case arises out of a lawsuit against Equifax, a
consumer credit reporting agency, in the Northern District of
Georgia (the "Georgia Action"), in which Plaintiff challenged
allegedly erroneous information on her credit report. *See*

*Rajapakse v. Equifax Information, LLC,* 1:20-CV-00080
(TWT) (N.D. Ga.).[2] Judge Thomas W. Thrash, Jr. dismissed
the Georgia Action as frivolous on July 26, 2021, explaining
that "[t]o the extent that the Plaintiff [was] claiming damages
as a result of the 2017 Equifax data breach, the Plaintiff is
a member of the consumer class and those claims have been
settled" and "[t]he remainder of the Plaintiff's claims [were]
outlandish and incomprehensible." *See* Georgia Action, ECF
70 (appeal pending).

[2]
         The Court may take notice of the public records
         on the docket of the Georgia Action. *Swiatkowski
         v. Citibank*, 446 F. App'x 360, 361 (2d Cir. Nov.
         16, 2011) ("[W]here public records that are integral
         to a complaint are not attached to it, the court, in
         considering a Rule 12(b)(6) motion, is permitted to
         take judicial notice of those records.") (cleaned up);
         *Zappin v. Cooper*, No. 16-CV-5985 (KPF), 2018
         WL 708369, at \*7 (S.D.N.Y. Feb. 2, 2018), *aff'd*,
         768 F. App'x 51 (2d Cir. 2019) (collecting cases for
         the proposition that "[i]n the Rule 12(b)(6) context,
         a court may take judicial notice of prior pleadings,
         orders, judgments, and other related documents that
         appear in the court records of prior litigation and
         that relate to the case *sub judice*.").

In this case, Plaintiff is suing Equifax's counsel in the Georgia
Action for alleged misconduct related to their obtaining
and handling her consumer information during settlement
discussions in the Georgia Action. Plaintiff alleges, for
example, that Defendants "intimidate[ed], harass[ed], and
oppress[ed]" Plaintiff by "attempt[ing] to force [Plaintiff to]
agree to an unreasonable settlement by using her credit report
[or misinformation in her file] as leverage." (AC at 19;
*see also* ECF 29 at 1) (describing the AC as alleging that
Defendants "obtained [Plaintiff's] credit reporting account in
an attempt to use the misinformation stated on her account to
be removed by Equifax as part of the settlement agreement").
Plaintiff also suggests that, in the context of settlement
discussions from June through December 2020, Defendants
wrongfully impersonated a credit reporting agency by taking
custody and control of her credit file and insisting that
Plaintiff communicate with them, rather than Equifax directly.
(AC at 3, 18; ECF 29 at 2). Plaintiff claims she was told that
correcting information in her file was part of the settlement
process, but that when Plaintiff refused to settle, Defendants
altered, refused to correct, deactivated, and/or withheld access
to her account. (AC at 8, 14, 29 at 2).

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 83 of 238

### a. Exhibits to Plaintiff's Amended Complaint

**\*2** As exhibits to her Amended Complaint, Plaintiff submitted numerous email chains documenting communications among Plaintiff and Defendants Szyba and Lanigan, as well as representatives of Equifax, between July and December 2020. (ECF 17) (the "Exhibits"). [3] The exhibits are worth describing in detail since they are central to Plaintiff's claims. *See, e.g.*, ECF 29 at 6 (Plaintiff argues that the emails "should leave without question Defendants [sic] ... liability") and ECF 31 at 5 (Defendants argue that the emails "contradict" Plaintiff's allegations and "demonstrate[ ] that there is nothing controversial or nefarious" in their "run-of-the-mill communications with Plaintiff").

[3]  Due to inconsistencies with the labeling of the Exhibits, I refer to page numbers rather than exhibit letters.

First, in an email from July 26, 2020, Lanigan emailed Plaintiff to communicate a settlement offer of $15,000 and reiterate an offer to suppress items on her credit report. (ECF 17 at 6). Lanigan explained that Equifax could suppress items on Plaintiff's report but not guarantee an increase of her credit score and requested further information about issues raised by Plaintiff. *Id.* Their communication continued on August 3, 2020 regarding items Plaintiff wanted suppressed or removed and an incorrect "615" phone number supposedly linked to Plaintiff's account. *Id.* at 7-9. Lanigan also told Plaintiff: "Samantha, we're aware of your communication with Equifax. If you have any additional disputes, you can forward them to us. They have forwarded your recent correspondence to us. It's just easier to keep it all in one place." *Id.* On August 12, 2020, Lanigan confirmed that certain information had been suppressed or removed from Plaintiff's report, sent Plaintiff an updated copy of her credit report, reported that a "615" phone number was not appearing on Plaintiff's report or in her file, and asked Plaintiff for more information regarding the phone number issue so that Lanigan could "look into it a bit more." *Id.* at 10. On August 20, 2020, Plaintiff emailed Lanigan about contacting Equifax regarding additional "serious issues that need[ ] to be removed," and Lanigan responded that "since we are representing Equifax in this matter, all communications should go through me." *Id.* at 11. Lanigan also expressed that she would be "more than happy" to help Plaintiff with issues she was having if provided with more information. *Id.* In response, Plaintiff sent another email regarding the "615" phone number supposedly linked to her account. *Id.* at 12. Though not explicitly stated, emails indicate that Plaintiff was having difficulty accessing

her account because Equifax was attempting to verify her identify with the "615" phone number. *Id.* at 10, 12. [4]

[4]  While Plaintiff's subsequent filings reveal that the Exhibits omit various email communications from at least July and August 2020, the omitted emails show more of the same, *i.e.*, Lanigan requesting additional information from Plaintiff and confirming which items Plaintiff wanted suppressed from her report. (ECF 38 at 19, 25-26).

About a month later, on September 28, 2020, Plaintiff emailed Lanigan saying she was unable to access her report, and Lanigan again said she would be "happy to look into this" and asked follow-up questions regarding Plaintiff's access issue. *Id.* at 14-15. Nearly two months later, Plaintiff sent an email stating, *inter alia*: "For 2 months I have been unable to review my credit report from [sic] Equifax website. I have sent you emails and screenshots of the issues which has [sic] been unresolved and you have informed your client not to speak to me regarding issues and access with my credit." *Id.* at 17. In response, Lanigan clarified that "any matters related to this litigation should be directed to myself and not Equifax. You are always free to call or write Equifax with any unrelated disputes. I have, as a courtesy, assisted in relaying disputes for you that were unrelated ... and those were investigated and you received a response, as is required." *Id.* at 16. Lanigan also stated that she confirmed with Equifax that there were no holds preventing Plaintiff from accessing her account, offered to verify that information on Plaintiff's account was correct while she further looked into Plaintiff's access issue, and asked Plaintiff further questions to try to ascertain why Plaintiff was unable to access her online account. *Id.*

**\*3** On December 3, 2020, Plaintiff emailed Lanigan and Szyba asking for a copy of her credit report and for a "direct point of contract" to assist with her "online and credit reporting issue." *Id.* at 25. After Szyba provided a number to reach Equifax, Plaintiff responded that she was told by "Ritzy" that her account was "with a specialist" in "the office of consumer affairs" and that she was not permitted to speak with a supervisor. *Id.* at 23-25. Plaintiff and Szyba also discussed two additional items that Plaintiff wanted adjusted on her credit report. *Id.* On December 14, 2020, after receiving another email from Plaintiff about being unable to access her account, Szyba told Plaintiff that they were going to ask someone form Equifax to reach out to her directly, and, on December 18, 2020, Equifax Consumer Customer Care Team wrote Plaintiff that "the login issue you experienced has

**Rajapakse v. Seyfarth Shaw**, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

been resolved." *Id.* at 20-22. On December 28 and 29, 2020, Plaintiff emailed with an Equifax Supervisor, Darren Howard, because she was "back to not being able to get into [her] credit report online." *Id.* 18-19.

## II. Procedural History

Plaintiff filed an initial complaint on December 9, 2020 (ECF 2), and received permission to proceed *in forma pauperis* on December 29, 2020. (ECF 7). On January 5, 2021, Judge Stanton *sua sponte* dismissed the case pursuant to Federal Rule of Civil Procedure 8 because Plaintiff's complaint failed to allege any facts and appeared incomplete. (ECF 8 at 3). Plaintiff was allowed 60 days to file an amended complaint. *Id.* Plaintiff filed the operative Amended Complaint ("AC") on January 27, 2021, [5] alleging violations of the FCRA, 15 U.S.C. § 1681q, and various New York criminal statutes. (ECF 9). On February 8, 2021, Plaintiff filed a motion to compel discovery and for appointment of counsel. (ECF 10). The case was reassigned to Judge Caproni on March 12, 2021. On March 15, 2021, Judge Caproni dismissed the criminal claims asserted by Plaintiff for failure to state a claim, denied without prejudice Plaintiff's request for counsel, and denied as premature Plaintiff's motion to compel discovery. (ECF 13).

[5]      The Exhibits were separately filed on March 31, 2021. (ECF 17). Although the Exhibits were not timely filed, Defendants accept them as incorporated by reference into the AC. (ECF 26 n. 3).

The case was referred to the undersigned for general pretrial purposes and dispositive motions on March 15, 2021. (ECF 12). Defendants filed a motion to dismiss the AC on May 18, 2021. (ECF 25-26). Plaintiff filed an opposition on May 24, 2021 (ECF 29), and Defendants filed a reply on May 28, 2021 (ECF 31). On June 1, 2021, Plaintiff filed a motion entitled "motion showing related damages amend complaint," seeking to amend or supplement her complaint with additional information regarding her damages. (ECF 34).

A telephonic Initial Pretrial Conference in accordance with Fed. R. Civ. P. 16(b) was originally scheduled for May 18, 2021 and then adjourned *sua sponte* to June 8, 2021. (ECF 16, 24). Following numerous filings detailing the parties' failed attempts to work together on a proposed case management plan (ECF 30, 32-33, 35-36), Plaintiff failed to appear for the June 8 [th] conference. (ECF 42). [6] After having Defendants' counsel describe their efforts to make

sure Plaintiff understood her obligation to appear for the conference and then provide a brief summary of the case, I stayed discovery pending decision on Defendants' motion to dismiss and stated that the Court did not currently require briefing responsive to ECF 34. The conference transcript was served on Plaintiff via email and regular mail on June 17, 2021. (ECF 41).

[6]      Plaintiff later informed the Court that she missed the conference because her medical issues caused her to "lose track of days." Plaintiff explained that she is a type 2 diabetic and was experiencing elevated sugar levels on June 8, 2021. (ECF 39 at 1; 44 at 2).

During the next three weeks, Plaintiff made several filings seeking to elaborate on her medical condition and damages, moving for summary judgment, and reiterating her central allegation that Defendants illegally accessed, obtained, modified, and/or deleted her credit report. (ECF 38-40, 44-46, 48-49). On June 28, 2021, I issued an order reiterating that discovery was stayed pending decision on Defendants' motion to dismiss and restating that the Court did not currently require responsive briefing to Plaintiff's motions. (ECF 50). [7]

[7]      On July 27, 2021, Defendants filed a letter informing the Court of the previous day's order of dismissal in the Georgia Action. (ECF 51).

 **\*4**  From September through November, Plaintiff made a multitude of additional filings, asking the Court to, *inter alia*, notify the Secret Service that Defendants are guilty of computer crimes under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, lift the stay of discovery, and grant summary judgment in Plaintiff's favor or default judgment against Defendants. (ECF 52, 55-60, 62). On December 1, 2021, Judge Caproni denied Plaintiff's request to lift the stay and denied without prejudice Plaintiff's remaining motions (including her motions to amend her complaint, for summary judgment, and for default judgment) filed after Defendants' motion to dismiss. (ECF 63). Judge Caproni also ordered that Plaintiff "must obtain leave from [the undersigned] before filing any additional motions during the pendency of the discovery stay." [8] *Id.*

[8]      Pursuant to Judge Caproni's order, any request for leave: "(i) must be titled 'Request for Leave to File a Motion;' (ii) it may not exceed one page in length,

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

and (iii) it should explain why Plaintiff should be permitted to file the motion, notwithstanding the discovery stay that is in effect. Any failure to adhere to this requirement may result in an order to show cause why sanctions, including dismissal of this case, should not be imposed against Plaintiff." *Id.*

Following Judge Caproni's December 1st Order, Plaintiff filed motions, addressed to Chief Judge Swain, asking for the recusal of Judge Caproni and the undersigned from this matter, as well as seeking the intervention of the FBI. (ECF 64-65). In December 2021, Judge Caproni and I each denied Plaintiff's motion(s) for recusal on the grounds that, *inter alia*, prior adverse rulings are not evidence of bias. (ECF 66, 67). We both also reminded Plaintiff of her obligation to seek leave from the undersigned before filing any additional motions during the course of the discovery stay. I subsequently denied a motion for leave to amend filed by Plaintiff, as well as other motions that, in substance, asked Chief Judge Swain to overturn the interlocutory orders of the undersigned and Judge Caproni. (ECF 68-72). On December 16, 2021, Plaintiff filed a letter mailed to the Judicial Conference of the United States that detailed her alleged mistreatment in this case and the Georgia Action, and described cases filed by Plaintiff in other district courts. (ECF 73).

### III. Discussion

#### a. Legal Standard

When presented with a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all non-conclusory factual allegations in the complaint, together with the contents of documents integral to the complaint and any matters of which courts may take judicial notice, and draw all reasonable inferences in favor of the plaintiff. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim

is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, the non-conclusory factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. More specifically, Plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [the] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

**\*5** As relevant here, a court is "obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010); *accord Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Thus, when considering Plaintiff's submissions, the Court must interpret them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks omitted). Nevertheless, "to survive a motion to dismiss, a *pro se* plaintiff must still plead sufficient facts to state a claim that is plausible on its face." *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 450 (S.D.N.Y. 2012) (internal citations omitted); *see, e.g.*, *Green v. McLaughlin*, 480 F. App'x 44, 46 (2d Cir. 2012) (summary order) ("[P]ro se complaints must contain sufficient factual allegations to meet the plausibility standard."); *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (emphasizing that, even in *pro se* cases, courts "cannot invent factual allegations").

#### b. The FCRA

"The FCRA is a federal consumer protection statute enacted by Congress to ensure that consumer reporting agencies adopt reasonable procedures to protect the accuracy and confidentiality of consumer credit information." *Stonehart v. Rosenthal*, No. 01-CV-651 (SAS), 2001 WL 910771, at *3 (S.D.N.Y. Aug. 13, 2001); 15 U.S.C. § 1681(b). As relevant here, the FCRA defines a "consumer reporting agency" to be "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages ... in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." *Id.* 1681a(f). Additionally, a "consumer report" is defined as "communication of any information by a consumer reporting agency bearing on a consumer[ ] ... which is used or expected to be used or collected ... for the purpose of serving as a factor in establishing the consumer's eligibility for" credit,

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

employment, or another permissible purpose. 15 U.S.C. § 1681a(d).

While the FRCA mainly regulates credit reporting agencies, Section 1681b also protects consumers from third parties who willfully or negligently "use or obtain" a consumer report for an impermissible purpose. *See* 15 U.S.C. §§ 1681b (enumerating permissible purposes and prohibiting using or obtaining reports for other purposes); 1681n (providing liability for willful noncompliance); 1681*o* (providing civil liability for negligent noncompliance). Additionally, Section 1681q imposes criminal liability on those who "knowingly and willfully obtain[ ] information on a consumer from a consumer reporting agency under false pretenses." *Balter v. Altschul*, No. 17-CV-6605 (BMC)(RML), 2018 WL 3118271, at *3 (E.D.N.Y. June 25, 2018) ("[Section 1681q] criminalizes a particular form of consumer fraud, where a defendant obtains a report to which he would not otherwise be entitled.").

Courts have recognized that an implied cause of action under Section 1681q—the provision relied on by Plaintiff—must be read in conjunction with the impermissible purpose prohibition in 1681b, meaning that 1681q only "provides for civil liability when a credit report user willfully and knowingly obtains a credit report under false pretenses *for an impermissible purpose.*" *Stonehart*, WL 910771, at *3 (emphasis added). Accordingly, "[t]o determine [S]ection 1681q liability, the courts first look to section 1981b to see if the purpose of the request was permissible. If it was, then there is no section 1681q liability." *Balter*, 2018 WL 3118271, at *3; *Trikas v. Universal Card Servs. Corp.*, 351 F. Supp. 2d 37, 43 (E.D.N.Y. 2005) ("[S]ince the court finds that [defendant] did not act with an impermissible purpose [under § 1681b] this precludes liability under § 1681q as a matter of law.").[9]

[9]    *See also Stonehart*, WL 910771, at *3 ("If a user requests information from a consumer reporting agency for a purpose not permitted by section 1681b, while representing to the agency that the report will be used for a permissible purpose, the user may be subject to civil liability for obtaining information under false pretenses. Conversely, where a permissible purpose for obtaining a credit report is demonstrated, then, as a matter of law, the information cannot have been obtained under false pretenses.").

**\*6** Here, Defendants argue that Plaintiff cannot state a FCRA claim (under Section 1681b or 1681q) because they did not obtain Plaintiff's consumer report as a third party and did not obtain or use it for an impermissible purpose or under false pretenses. For the reasons state below, I agree.

### i. Defendants are not Third Parties under the FCRA.

Defendants correctly argue that Plaintiff's FLSA claim fails because they did not obtain Plaintiff's consumer information as "third parties," but rather as agents of Equifax representing them in litigation. While the FCRA regulates the disclosure of consumer information to third parties, such regulation does not extend to communications between a consumer reporting agency and its agents, including its lawyers. *See, e.g.*, *Norman v. Lyons*, No. 3:12-CV-4294-B, 2013 WL 655058, *2-3 (N.D. Tex. Feb. 22, 2013).

In *Norman v. Lyons*, for example, the Northern District of Texas dismissed a FCRA suit against Experian's attorneys for obtaining the plaintiff's credit file in the course of defending Experian in another case. *Id.* More specifically, the *Norman* court found that the plaintiff could not establish the existence of a "consumer report" under the FCRA because (a) "one cannot prove the existence of a 'consumer report' unless the report was furnished to a third party" and (b) since a party's counsel is the legal agent of the client, "when the FCRA refers to 'third parties,' that term does not include counsel hired to represent the consumer reporting agency." *Id.*[10] Other courts have reached analogous holdings. *See Mostofi v. Experian Info. Sols., Inc.*, No. 13-CV-2828 (DKC), 2014 WL 3571804, at *2 (D. Md. July 18, 2014) ("[B]ecause an attorney representing a CRA in defense of litigation concerning the contents of a credit report is not a 'third party,' a CRA sharing the consumer's credit file with that counsel does not turn the file into a 'consumer report' within 15 U.S.C. § 1681b, and Plaintiff does not have a viable claim."); *Goracke v. Atchison Hosp. Ass'n*, No. 17-CV-2664 (JAR), 2019 WL 2005881, at *12 (D. Kan. May 7, 2019) ("[I]t is well-established that an attorney is an agent of their client when acting on behalf of their client. Accordingly, the Court finds that [counsel] was acting as the attorney-agent of the [defendant] when conducting her internal investigation."); *Mattiaccio v. DHA Grp., Inc.*, 21 F. Supp. 3d 15, 23 (D.D.C. 2014) (dismissing FCRA suit against counsel and finding counsel was not a third party for purposes of the FCRA, noting "there is nothing in the FCRA that would require the imposition of independent FCRA obligations on an attorney-

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

agent to the detriment of the attorney-client relationship");
*Hartman v. Lisle Park Dist.*, 158 F.Supp.2d 869, 876-77
(N.D. Ill. 2001) (dismissing FCRA suit against counsel for
allegedly creating a consumer report about employee-plaintiff
while conducting a workplace investigation because, due to
the fiduciary and agency relationship between attorney and
client, "[w]hen an attorney conducts for an employer/client
an investigation of an employee's dealings with the employer,
he is acting *as* the client," not as a third party for purposes of
the FCRA). [11]

[10]    In *Norman*, the court emphasized that a contrary
        interpretation of the FCRA would lead to the
        conclusion that "a credit reporting agency sued
        over inaccurate information in a credit report
        would not be allowed to provide the disputed
        credit report to its own attorneys without violating
        the FCRA. The [c]ourt has found no support for
        [that] interpretation of the FCRA." *Id.* *3. This
        interpretation is especially untenable given that
        companies "may appear in the federal courts only
        through licensed counsel." *Rowland v. Cal. Men's
        Colony*, 506 U.S. 194, 201–02 (1993).

[11]    *See also, e.g., Veal v. Geraci*, 23 F.3d 722, 725 (2d
        Cir. 1994) ("The relationship between an attorney
        and the client he or she represents in a lawsuit is one
        of agent and principal."); *Chevron Corp. v. Salazar*,
        275 F.R.D. 422, 426 (S.D.N.Y. 2011) ("Lawyers are
        agents for their clients.").

 **\*7** It is undisputed that Equifax retained Defendants as
counsel in the Georgia Action and that Defendants obtained
Plaintiff's credit information from Equifax in the context of
defending against and pursuing settlement discussions in the
Georgia Action. As Equifax's litigation counsel, Defendants
were acting as Equifax's agents and not as third parties
for FCRA purposes when obtaining and handling Plaintiff's
credit information, such as when communicating with
Plaintiff about her credit disputes and report. [12] Accordingly,
no consumer report was furnished to Defendants under the
FCRA. Thus, for the same reasons stated by *Norman* and
the other above-cited cases, Plaintiff does not have a cognizable
FCRA claim against Defendants.

[12]    Though Plaintiff's opposition brief alternatively
        suggests that Defendants should be treated as a
        credit reporting agency under the FCRA, neither
        the statutory definition of credit reporting agencies

in Section 1681a(f) nor the above-cited case law
involving FCRA claims against counsel support
such an argument. *See alsoKidd v. Thomson
Reuters Corp.*, 25 F.3d 99, 104–05 (2d Cir. 2019)
(dismissing FCRA claim where defendant did not
specifically intend to furnish consumer reports
and thus did not qualify as a consumer reporting
agency); *Hunt v. Conroy*, No. 1:13-CV-1493, 2014
WL 1513871, at *6 (N.D.N.Y. Apr. 16, 2014)
(rejecting argument that defendant law firm was
a consumer reporting agency under the FCRA);
*Wright v. Zabarkes*, No. 7-CV-7913 (DC), 2008
WL 872296, at *3 (S.D.N.Y. Apr. 2, 2008) (same),
*aff'd*, 347 F. App'x 670 (2d Cir. 2009).

### c. Defendants did not Access Plaintiff's Credit Information for an Impermissible Purpose or Under False Pretenses.

Still, even assuming Equifax did furnish Plaintiff's consumer
report to Defendants as third parties within the meaning of the
FCRA (which they did not), Plaintiff fails to plausibly allege
that Defendants obtained or used Plaintiff's consumer for an
impermissible purpose or under false pretenses, let alone that
their conduct was negligent or willful.

As initial matter, Plaintiff's conclusory statements that
Defendants had an impermissible purpose and acted
negligently or willfully are insufficient to state a claim. *See,
e.g., Campbell v. Conserve Accts. Receivable Mgmt.*, No.
16-CV-02072 (AMD) (MDG), 2016 WL 3212084, at *2
(E.D.N.Y. June 8, 2016) (holding that plaintiff's "conclusory
allegation" without "any specific facts that could support
that assertion" was "insufficient, as a matter of law, to state
a claim that the defendant pulled her credit report for an
impermissible purpose"); *Braun v. United Recovery Sys.*, LP,
14 F. Supp. 3d 159, 167 (S.D.N.Y. 2014) (collecting cases for
the proposition that plaintiff must "allege specific facts as to
defendant's mental state when defendant accessed plaintiff's
credit report" and may not rely on conclusory statements).
Thus, Plaintiff's vague accusations that Defendants obtained
and used her credit report to intimidate and harass her and
force her into an unreasonable settlement need not be credited,
particularly where the Exhibits only illustrate benign, good
faith discussions between Plaintiff and Defendants.

Moreover, the allegations in the AC and the Exhibits suggest
that Defendants obtained Plaintiff's consumer information
for a permissible purpose: Defendants' representation of
Equifax in the Georgia Action. The FCRA explicitly permits

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

consumer reporting agencies to provide consumer reports to third parties they have reason to believe have a "legitimate business need for the information." 15 U.S.C. 1681b(a)(3) (F). Where a litigant affirmatively puts a consumer report at issue, courts find that opposing parties and their counsel have a legitimate business need, and thus permissible purpose, for obtaining the report. *See, e.g., Daniel v. DTE Energy*, No. 11–13141, 2013 WL 4502151, at *3 (E.D. Mich. Aug. 22, 2013) ("Plaintiff's lawsuit alleging improper reporting of the debt provided defendant with a legitimate need for plaintiff's credit report to defend against plaintiff's claims."); *Redmond v. Elizabethtown Motors*, Inc., No. 3:10-CV-10-S, 2011 WL 2174310, at *2-3 (W.D. Ky. June 2, 2011) ("The very subject of this case is the credit report which was obtained by [defendant]. [Defendant] was clearly within its right to provide its counsel the purportedly offending item and for counsel to seek relevant information concerning the document."). [13] Since Plaintiff put her credit report at issue by suing Equifax in the Georgia Action, Defendants had a legitimate business need to obtain and use Plaintiff's credit file to defend against and/or try to settle that action. Thus, Plaintiff fails to sufficiently allege that Defendants obtained her credit report for impermissible purposes or under false pretenses, let alone that they acted negligently or willfully.

[13]     *See also Hill v. Ocwen Loan Servicing*, LLC, 369 F. Supp. 3d 1324, 1342-43 (N.D. Ga. 2019) ("Several courts have held that a creditor can properly access a consumer report where it is sued or threatened with litigation related to the credit reporting.... Drawing on the reasoning of the cases summarized above, obtaining a credit report after being notified of reporting errors is a permissible purpose under the circumstances."); *Mostofi*, WL 3571804, at *3 ("[I]t was necessary for defense counsel to obtain a current copy of the report to examine the veracity of Plaintiff's claims.").

## IV. Leave to Amend

 *8  Under Federal Rule of Civil Procedure 15(a)(2), "[l]eave to amend is to be freely given when justice requires." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 140 (2d Cir. 2013). It is within the Court's discretion to grant or deny leave to amend. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Still, a *pro se* plaintiff should be afforded leave to amend "at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Courts will deny leave to amend in cases of, among

other things, "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and/or] futility of amendment." *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal citation omitted); *see Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.") (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993)).

I recommend that Plaintiff be denied leave to amend. Plaintiff has already been granted one opportunity to amend her complaint and "even the most liberal reading of Plaintiff's allegations cannot give rise to a cause of action against Defendants under the FCRA," at the very least because Defendants do not constitute third parties under the statute, and also because they permissibly obtained Plaintiff's report in the context of defending against the Georgia Action. *Norman*, 2013 WL 655058, at *3; *see Balter*, 2018 WL 3118271, at *3 (E.D.N.Y. June 25, 2018) (dismissing Section 1681q claim where defendant had permissible purpose of obtaining credit report on behalf of client and denying leave to amend because "[t]he problem with plaintiff's complaint is substantive and cannot be cured by better pleading"). Moreover, the Exhibits suggest only ordinary, benign interactions between Plaintiff and Defendants, and my review of Plaintiff's numerous subsequent filings requesting, *inter alia*, summary judgment in her favor and leave to amend her complaint reaffirm that allowing Plaintiff leave to amend would be futile; Plaintiff's filings show that though Plaintiff is dissatisfied with the handling of her credit report and the outcome of the Georgia Action and may subjectively believe she has been wronged, she does not have a cause of action against Defendants. [14]

[14]     Plaintiff raises several additional potential claims in her subsequent filings, but none have merit. For example, though Plaintiff states that Defendants abused their authority as officers of the court in violation of 42 U.S.C. § 1983 (ECF 38 at 5), Plaintiff cannot state a Section 1983 claim against Defendants because "a private attorney is not a state actor." *Caldwell v. Cohen*, No. 21-CV-5039 (LTS), 2021 WL 3193030, at *4 (S.D.N.Y. July 26, 2021) (quoting *Sklodowska-Grezak v. Stein*, 236 F. Supp. 3d 805, 809 (S.D.N.Y. 2017)). Plaintiff also cannot state a claim under the Computer Fraud and Abuse

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 89 of 238

2022 WL 1051108

Act ("CFAA"), 18 U.S.C. § 1030, which prohibits an enumerated list of computer crimes and creates a private cause of action in certain situations where a defendant intentionally accesses (or hacks) a computer without, or in excess of, authorization; Plaintiff, however, has not suggested Defendants obtained her credit report through unauthorized access into any device or that Plaintiff sustained damage to her computer. (ECF 52). *United States v. Valle*, 807 F.3d 508, 511, 528 (2d Cir. 2015) (holding that a defendant exceeds authorized access "only when he obtains or alters information that he does not have authorization to access for any purpose which is located on a computer that he is otherwise authorized to access"); *see, e.g.,Deutsch v. Hum. Res. Mgmt., Inc.*, No. 19-CV-5305 (VEC), 2020 WL 1877671, at *3-5 (S.D.N.Y. Apr. 15, 2020) (surveying case law and emphasizing that CFAA addresses hacking, not allegations of misuse of access, and only narrowly provides for damages related to assessing impairment of and resecuring plaintiff's computer); *Nanobeak Biotech Inc. v. Barbera*, No. 20-CV-07080 (LLS), 2021 WL 1393457, at *4 (S.D.N.Y. Apr. 13, 2021) (same). Lastly, Plaintiff's allegations do not state a claim for common law fraud because, *inter alia*, Plaintiff has not suggested she actually relied on any false representations by Defendants or provided facts, "beyond speculation and conclusory allegations, that give rise to a strong inference of fraudulent intent." (ECF 34 at 8); *Grayson v. Equifax Credit Info. Servs.*, No. 18-CV-6977 (MKB), 2021 WL 2010398, at *10 (E.D.N.Y. Jan. 29, 2021).

**V. Pleading Injunction**

 **\*9** In addition to recommending that the Court grant Defendants' motion to dismiss Plaintiff's AC without leave to amend, I also recommend that the Court enjoin Plaintiff from commencing any new civil actions in this Court related to Defendants' representation of Equifax in the Georgia Action. [15]

[15]     Defendants request a filing injunction in their motion to dismiss briefing. (ECF 26 at 14-17).

The issuance of a filing injunction "is a serious matter, for access to the Courts is one of the cherished freedoms of our system of government." *Raffe v. Doe*, 619 F. Supp. 891, 898 (S.D.N.Y. 1985) (internal citations omitted). Still,

it is well-established that "in exceptional circumstances ... a district court possesses the authority to enjoin a litigant [who abuses the judicial process] from further vexatious litigation." *Brady v. John Goldman, Esq.*, No. 16-CV-2287 (GBD) (SN), 2016 WL 8201788, at *8 (S.D.N.Y. Dec. 5, 2016) (internal citations omitted), *report and recommendation adopted*, 2017 WL 111749 (S.D.N.Y. Jan. 11, 2017), *aff'd*, 714 F. App'x 63 (2d Cir. 2018); *seeIn re Sassower*, 20 F.3d 42, 44 (2d Cir. 1994) ("With respect to civil litigation, courts have recognized that the normal opportunity to initiate lawsuits may be limited once a litigant has demonstrated a clear pattern of abusing the litigation process by filing vexatious and frivolous complaints.").

The Second Circuit has instructed district courts to consider the following factors in determining whether to impose a filing injunction:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*Iwachiw v. New York State Dep't of Motor Vehicles*, 396 F.3d 525, 528 (2d Cir. 2005) (quoting *Safir v. United States Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986)). "Ultimately," the Second Circuit summarized, "the question the [district] court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir*, 792 F.2d 19, 24.

The first factor weighs heavily in favor of granting a filing injunction. Plaintiff has a history of vexatious, harassing litigation that has been recognized by, and led to filing injunctions in, other courts. *See Rajapakse v. Equifax Information, LLC,* 1:20-CV-00080 (TWT) (N.D. Ga. July

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

26, 2021) (ECF 69) (enjoining Plaintiff from making further motions without permission in light of Plaintiff's "history of asserting frivolous claims, including filing a barrage of documents that have impugned the integrity of the courts and individual judges"); *Rajapakse v. Wells Enter.*, No. C20-4002 (LTS), 2020 WL 364124, at *1-2 (N.D. Iowa Jan. 21, 2020) (observing that "Plaintiff has a history of filing vexatious litigation in other federal courts" and a "documented history of abusing judicial processes"); *Rajapakse v. Credit Acceptance Corp.*, No. 17-CV-12970, 2019 WL 948767, at *3 (E.D. Mich. Feb. 27, 2019) (certifying that appeal from motion to dismiss decision could not be taken in good faith, emphasizing Plaintiff's history of making "incomprehensible" filings and "lobbing baseless attacks on the ethics and impartiality" against numerous federal judicial officers), *aff'd* No. 19-1192, 2021 WL 3059755 (6th Cir. Mar. 5, 2021); *Rajapakse v. Wells Fargo Home Mortg.*, et al., No. 2:15-CV-02216 (JTF) (CGC) (W.D. Tenn. Aug. 14, 2015) (ECF 52) (granting filing injunction because Plaintiff continued filing "documents containing unsupported and unfounded allegations" after the Court ruled that Plaintiff's filings were "incomprehensible" and "completely a function of poor pleading and lack of merit"); *Reed v. State of Tenn.*, No. 2:06-CV-02756 (HMP) (TMP), (W.D. Tenn. Oct. 13, 2008) (ECF 46) (enjoining Plaintiff, who filed suit under her maiden name, from filing further documents in that case or bringing additional cases related to a mortgage loan and recognizing that "Plaintiff's conduct in bringing this action demonstrates a marked propensity to abuse the judicial system in an attempt to harass the defendants as well as the Court"). Plaintiff's abusive tactics have continued in this case, as Plaintiff has made more than twenty lengthy, often incomprehensible, motions since the Court stayed discovery pending decision on Defendants' motion to dismiss on June 8, 2021. These motions include, *inter alia*, repeated motions for summary judgment, requests for the intervention and notification of the FBI and United States Secret Service, and other motions making baseless attacks against Judge Caproni and the undersigned.

**\*10** The remaining factors also support granting a filing injunction. Plaintiff has certainly burdened the Court and its personnel with numerous lengthy, confusing, and unnecessary filings. Moreover, in light of the docket in the Georgia Action, which features multiple motions where Plaintiff makes the same or similar allegations against Defendants (ECF 43, 46-50, 52, 62, 65), it is questionable whether Plaintiff initiated this action in good faith rather than as an attempt to (further) harass Defendants or obtain quicker,

more favorable results in a different forum. Moreover, it is at least unlikely that Plaintiff maintained an objective good faith expectation of prevailing after her motions were uniformly denied in the Georgia Action and her claims against Equifax were dismissed as frivolous on July 26, 2021. Additionally, while Plaintiff is proceeding *pro se*, a court's special solicitude towards *pro se* litigants does not extend to the willful, obstinate refusal to play by the basic rules of the system upon whose very power the plaintiff is calling to vindicate [her] rights." *Lipin v. Hunt*, 573 F. Supp. 2d 836, 845 (S.D.N.Y. 2008) (internal citations omitted); *see also Edwards v. Barclays Servs. Corp.*, No. 19-CV-9326 (GBD) (GWG), 2020 WL 2087749, at *8 (S.D.N.Y. May 1, 2020) ("[Plaintiff] is not represented by counsel and thus must bear full responsibility for bringing the suits in question."), *report and recommendation adopted*, 2020 WL 3446870 (S.D.N.Y. June 24, 2020). Lastly, Plaintiff's demonstrated history of vexatious, harassing lawsuits and abusive, duplicative filings in this case and the Georgia Action suggest that Plaintiff will continue to file lawsuits in the absence of an injunction.[16]

[16]    Indeed, ECF 63 already required Plaintiff to obtain leave from the undersigned before filing additional motions during the pendency of the discovery stay in this action, and Plaintiff filed at least four additional motions without requesting leave. (ECF 64, 65, 70, 71).

With the understanding that "injunctions should be narrowly tailored to the specific circumstance," *Carrington v. Graden*, No. 18-CV-4609 (KPF), 2020 WL 5503537, at *6 n.2 (S.D.N.Y. Sept. 11, 2020), I recommend that Plaintiff be enjoined from filing any new civil actions in this Court related to Defendants' representation of Equifax in the Georgia Action. This filing injunction would not prevent Plaintiff from appealing any decision in this case.

## VI. Conclusion

For the foregoing reasons, I recommend that Defendants' motion to dismiss (ECF 25) be **GRANTED** and Plaintiff be **DENIED** leave to file a second amended complaint.[17] I also recommend enjoining Plaintiff from filing any new civil actions in this Court related to Defendants' representation of Equifax in the Georgia Action.

[17]    Because Plaintiff's AC does not survive dismissal under Fed. R. Civ. P. 12(b)(6) and amendment would be futile, the Court need not address

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 91 of 238

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)

2022 WL 1051108

Defendants' alternative argument that the AC fails to conform to the pleading requirements of Fed. R. Civ. P. 8. *See* *Maack v. Wyckoff Heights Med. Ctr.*, No. 15-CV-3951 (ER), 2016 WL 3509338, at *18 n. 25 (S.D.N.Y. June 21, 2016); *Middleton v. United States*, No. CV 10-6057 (JFB) (ETB), 2011 WL 7164452, at *4 (E.D.N.Y. June 28, 2011), *report and recommendation adopted*, 2012 WL 394559 (E.D.N.Y. Feb. 7, 2012).

## VII. Objections

**\*11** In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have **fourteen (14)** days (including weekends and holidays) from receipt of this Report to file written objections. *See* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within **fourteen (14) days** after being served. Objections, and any responses to objections, shall be addressed to the Hon. Valerie E. Caproni. Any requests for an extension of time for filing objections must be directed to Judge Caproni. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Plaintiff wishes to review, but does not have access to, cases cited herein that are reported on Westlaw, she should request copies from Defendants. *See* *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

## All Citations

Not Reported in Fed. Supp., 2022 WL 1051108

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)**

2022 WL 855870

2022 WL 855870
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Samantha D. RAJAPAKSE, Plaintiff,

v.

SEYFARTH SHAW; Robert Szyba, Partner;
Carla Lanigan, Counsel, Defendants.

20-CV-10473 (VEC)
|
Signed 03/23/2022

**Attorneys and Law Firms**

Samantha D. Rajapakse, Chatannoga, TN, Pro Se.

Gina Renee Merrill, Lisa Louise Savadjian, Seyfarth Shaw
LLP, New York, NY, for Defendants Seyfarth Shaw, Robert
Szyba, Carla Lanigan.

ORDER ADOPTING REPORT& RECOMMENDATION

VALERIE CAPRONI, United States District Judge:

**\*1** WHEREAS on December 9, 2020, Plaintiff Samantha
Rajapakse, proceeding *pro se*, filed a complaint against the
law firm Seyfarth Shaw (incorrectly pled as Sey Farth Shaw),
Dkt. 1;

WHEREAS on January 27, 2021, Plaintiff filed an amended
complaint, naming Seyfarth Shaw as well as Robert Szyba
and Carla Lanigan, two attorneys employed by the law firm,
as Defendants, Dkt. 9;

WHEREAS Plaintiff asserted causes of action under the Fair
Credit Reporting Act, 15 U.S.C. § 1681q, and various New
York criminal statutes, related to Defendants' representation
of Equifax in *Rajapakse v. Equifax Information, LLC*, 20-
CV-00080 (N.D. Ga. July 26, 2021), *id.*;

WHEREAS on March 15, 2021, the Court dismissed
Plaintiff's claims based on New York criminal statutes for
failure to state a claim, Dkt. 13;

WHEREAS on March 15, 2021, the Court referred this case
to Magistrate Judge Wang for general pretrial management

and for the preparation of reports and recommendations
("R&Rs") on any dispositive motions, Dkt. 12;

WHEREAS on May 18, 2021, Defendants moved to dismiss
the complaint for failure to state a claim under Fed. R. Civ. P.
12(b)(6), *see* Dkt. 26, and for "sanctions on Plaintiff to curtail
her from filing future pleadings (including motions) in this
District without prior permission," *id.* at 14;

WHEREAS on May 24, 2021, Plaintiff responded in
opposition to the motion, Dkt. 29, and on May 28, 2021,
Defendants replied in support of their motion, Dkt. 31;

WHEREAS on February 18, 2022, Judge Wang entered
an R&R, recommending that the Court grant Defendants'
motion to dismiss, that Plaintiff be denied leave to file a
second amended complaint, and that Plaintiff be enjoined
from filing any new civil actions in this Court related
to Defendants' representation of Equifax in *Rajapakse v.
Equifax Information, LLC*, 20-CV-00080 (N.D. Ga. July 26,
2021), Dkt. 74 at 21–22;

WHEREAS in the R&R, Judge Wang notified the parties that,
pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b),
they had fourteen days to file written objections to the R&R's
findings, *id.* at 22 (using bold font);

WHEREAS Judge Wang further noted that failure to file
objections would result in both the waiver of objections and
the preclusion of appellate review, *id.*;

WHEREAS on February 18, 2022 at 5:14 P.M., the R&R was
sent to the *pro se* Plaintiff via electronic notification at the
email address she provided to the Court; [1]

[1]  On December 9, 2020, Plaintiff consented to
electronic service of notices and documents in this
case, affirming that she has "regular access to
[her] email account and to the internet and will
check regularly for Notices of Electronic filing;"
that she has "established a PACER account;"
that she understands she "will no longer receive
paper copies of case filings, including motions,
decisions, orders, and other documents;" that she
will "promptly notify the Court if there is any
change in [her] personal data, such as name,
address, or e-mail address" or if she wishes "to
cancel this consent to electronic service;" and that
she "must regularly review the docket sheet of

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 93 of 238

**Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)**

2022 WL 855870

[her] case so that [she does] not miss a filing." *See* Consent to Electronic Service, Dkt. 3 at 1.

**\*2** WHEREAS on February 23, 2022, the R&R was also mailed to the *pro se* Plaintiff;

WHEREAS the parties' deadline to file objections was March 4, 2022;

WHEREAS no objections were filed by either party by the deadline;

WHEREAS on March 9, 2022, the *pro se* Plaintiff filed a letter claiming that she had called the Clerk's office and had been informed that Judge Wang had submitted an R&R and that her response deadline was March 4, 2022, Dkt. 75;

WHEREAS in the same letter, Plaintiff denied having previously received a copy of the R&R and asked for an extension so she could file "an answer to the report" after she received it, *id.*;

WHEREAS on March 10, 2022, the Court extended Plaintiff's deadline to file objections to the R&R to March 18, 2022, Dkt. 76; [2]

[2] In its endorsement, the Court stated: "Any objections to the R&R must be uploaded to the docket by Friday, March 18, 2022. The Court reminds Plaintiff that if she is mailing her objections to the *pro se* office for them to upload on the docket, she must account for those few days in submitting her objections; the objections must be on the docket by March 18, 2022. Any responses by Defendants to any objections are due no later than Friday, March 25, 2022. The Court will not extend either of those deadlines further." *See* Endorsement, Dkt. 76.

WHEREAS on March 10, 2022 at 11:53 A.M., Chambers emailed the R&R and the Court's endorsement extending the objections deadline to the *pro se* Plaintiff;

WHEREAS on March 10, 2022, the Clerk of Court mailed the R&R and the Court's endorsement extending the objections deadlines to the *pro se* Plaintiff via certified mail; [3]

[3] According to the tracking information (*see* tracking number 7019 1120 0000 8895 2427), on March 14,

2022, the mailing arrived at the address Plaintiff previously provided the Court.

WHEREAS no objections were received by the March 18, 2022 deadline, nor have any objections been received to date;

WHEREAS in reviewing an R&R, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge," 28 U.S.C. § 636(b)(1)(C);

WHEREAS when, as here, no party objects to the R&R, the Court may accept the R&R provided that "there is no clear error on the face of the record," *Heredia v. Doe*, 473 F. Supp. 2d 462, 463 (S.D.N.Y. 2007) (quoting *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)); *see also* Fed. R. Civ. P. 72(b) advisory committee's note;

WHEREAS an error is clear when the reviewing court is left with a "definite and firm conviction that a mistake has been committed," *see Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002) (quoting *McAllister v. United States*, 348 U.S. 19, 20 (1954)); and

WHEREAS careful review of the R&R reveals that there is no clear error;

IT IS HEREBY ORDERED that the R&R is adopted in full, Defendants' motion to dismiss is GRANTED, and Plaintiff's claims are DISMISSED with prejudice. Plaintiff is DENIED leave to file a second amended complaint for the reasons discussed in the R&R.

IT IS FURTHER ORDERED that, for the reasons discussed in the R&R, Plaintiff is enjoined from filing any new civil actions in this Court related to Defendants' representation of Equifax in *Rajapakse v. Equifax Information, LLC*, 20-CV-00080 (N.D. Ga. July 26, 2021).

**\*3** IT IS FURTHER ORDERED that, because the R&R gave the parties adequate warning, *see* R & R, Dkt. 74 at 22 (using bold font and capital letters), the failure to file any objections to the R & R precludes appellate review of this decision. *See Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.").

Rajapakse v. Seyfarth Shaw, Not Reported in Fed. Supp. (2022)
2022 WL 855870

IT IS FURTHER ORDERED that because appellate review is precluded, the Court certifies pursuant to 28 U.S.C. § 1915(a) (3) that any appeal from this Order would not be taken in good faith, and, therefore, permission to proceed *in forma pauperis* for purposes of appeal is denied.

The Clerk of Court is respectfully directed to terminate the open motion at docket entry 25 and to close this case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 855870

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 95 of 238

Pietrafesa v. First American Real Estate Information..., Not Reported in...

2007 WL 710197

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Ritchie v. Northern Leasing Systems, Inc.,  S.D.N.Y.,
March 28, 2016

2007 WL 710197
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony J. PIETRAFESA, Plaintiff

v.

FIRST AMERICAN REAL ESTATE
INFORMATION SERVICES, INC., d/b/a First
American Credco, Aegis Lending Corporation,
Aegis Mortgage Corporation, "SCOTT DOE,"
being a person whose real name is unknown to
plaintiff now, Jointly and Severally, Defendants.

No. 1:05-CV-1450.
|
March 6, 2007.

**Attorneys and Law Firms**

Anthony J. Pietrafesa, Albany, NY, pro se.

Bartlett, Pontiff, Stewart & Rhodes, P.C., Glens Falls, NY,
Eileen M. Haynes, Esq., for Defendant Credco.

### *MEMORANDUM-DECISION AND ORDER*

LAWRENCE E. KAHN, United States District Judge.

**\*1** Plaintiff Anthony Pietrafesa ("Plaintiff") commenced
the instant action against Defendants alleging violations of
federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §
1681, *et seq.,* the New York Fair Credit Reporting Act
("NYFCRA"), N.Y. Gen. Bus. Law § 380*et seq.,* and the New
York Consumer Protection Act, N.Y. Gen. Bus. Law § 349.
Plaintiff alleges that Defendants obtained a copy of his credit
report for an improper purpose. Presently before the Court is
Defendant Credco's Motion, and Plaintiff's Cross-Motion, for
summary judgment pursuant to FED. R. CIV. P. 56. Dkt. Nos.
8, 11.

**I. FACTS**

Credco is an entity engaged in the business of furnishing
credit information from the three major credit bureaus.
Credco does not maintain credit history information on
individual consumers. Rather, at the request of its clients,
Credco compiles credit scores from the three credit bureaus
into a single, merged report.

Prior to offering services to its clients, Credco requires
its clients to sign an agreement and certification providing
that the client will not seek credit reports for an improper
purpose and only in connection with a "credit transaction
involving the consumer on whom the information is to
be furnished and involving the extension of credit to, or
review or collections of an account of the consumer ." In
approximately 1999, Defendant Aegis applied to Credco to
receive the merged reports. As part of the application, Aegis
supplied Credco with its business address, identified itself
as a wholesale lender, listed the number of employees and
its annual revenue, named its officers, and supplied three
references. Credco checked the references, ensured that Aegis
was in good standing with the Office of the Comptroller
in the State of Texas (where Aegis is located), interviewed
one of Aegis's senior vice presidents, conducted a physical
inspection of Aegis's offices to ensure that it was a bona fide
lending institution, and, as a result, determined that Aegis was
authorized to obtain credit reports and requested such reports
for a legitimate purpose.

Up through August 2005, Aegis had requested that Credco
provide "thousands of credit reports." Def.'s Stmnt. of Mat.
Facts at ¶ 12. From 1999 through August 2005, Credco had
been obtaining credit reports for Aegis for approximately
six years and "had received no information that Aegis was
requesting reports for improper purposes." *Id.* at ¶ 13. On or
about August 26, 2005, Aegis requested that Credco provide
a merged report on Plaintiff. Credco provided the report.

On or about September 9, 2005, Credco received a notice
from Aegis that it improperly requested Plaintiff's credit
report. Aegis asked that the inquiry be removed from all
credit reporting bureaus. Credco investigated Aegis's request.
Credco then wrote to each of the three credit bureaus and
requested that they remove the inquiry from Plaintiff's credit
report. Credco also received notice from Plaintiff that he did
not authorize the release of his credit information. Although
Credco had already asked the three credit bureaus to remove
the inquiry from Plaintiff's credit report, Credco responded to
Plaintiff that he should address the matter directly with Aegis.

Pietrafesa v. First American Real Estate Information..., Not Reported in...

2007 WL 710197

**\*2** Plaintiff then commenced the instant action alleging that Credco violated the FCRA, the NYFCRA, and the New York Consumer Protection Laws by obtaining his credit report from the three bureaus, providing that information to Aegis, and failing to provide adequate notice to Plaintiff. Presently before the Court is Credco's Motion for summary judgment pursuant to FED.R.CIV.P. 56 seeking dismissal of the Complaint in its entirety and Plaintiff's Cross-Motion seeking a determination of liability as a matter of law. Dkt. Nos. 8, 11.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In applying this standard, courts must " 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001) (quoting *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001)). Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted). Rather, the nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown,* 257 F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

## III. DISCUSSION

### a. *FCRA*

Credco contends that it is entitled to summary judgment because the undisputed facts demonstrate that, as a consumer reporting agency, it complied with the applicable provisions of the FCRA. Plaintiff responds that he is entitled to summary judgment because Credco is not a "consumer reporting agency," but a "user" of credit reports that obtained a report for an improper purpose. Thus, the initial inquiry is whether Credco is a user of credit reports or a consumer reporting agency.

> The phrase "consumer reporting agency" is statutorily defined to mean any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

**\*3** 15 U.S.C. § 1681a(f). As it is ordinarily used, the term "assemble" means "to bring together; to gather into one place." The Random House Dictionary of the English Language, 1979, at p. 89; *see also* Oxford English Dict. (2d Ed.1989) ("To bring together (things) into one place or mass, to collect."). The nature of Credco's business is gathering credit information

> maintained by the three credit bureaus and providing that information in a single merged report to its clients. As such, its conduct constitutes "assembling." *See Morrissey v. TRW Credit Data,* 434 F. Supp 1107, 1108 (E.D.N.Y.1977). Credco also qualifies as a "reseller" of consumer reports. *See Credit Chequers Info, Servs., Inc. v. CBA, Inc.,* NO. 98 CIV. 3868(RPP), 1999 WL 253600, at \*2 (S.D.N.Y. Apr. 29, 1999) (an entity that provides merged credit reports identical to the reports provided by Credco here is a "reseller of credit reporting services."). The FCRA defines the terms "reseller" to mean "a consumer reporting agency that (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party ...; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced." 15 U.S.C. § 1681 a(u). Thus, to be a reseller, one must be: (1) a consumer reporting agency, *see Poore v. Sterling Testing Sys.,*

Pietrafesa v. First American Real Estate Information..., Not Reported in...

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 97 of 238

2007 WL 710197

*Inc.,* 410 F.Supp.2d 557, 566-67 (E.D.Ky.2006), (2) that assembles and merges information maintained in the databases of other consumer reporting agencies, and (3) that does not maintain its own databases of consumer information. 15 U.S.C. § 1681 e(e),

As a consumer reporting agency, Credco is obligated to comply with, among other things, the requirements of 15 U.S.C. §§ 1681 b and 1681e(a)-(d). As is relevant hereto, § 1681 b(a)(3) permits a consumer report to be furnished only "[t]o a person which it has reason to believe-(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." Section 1681 e requires consumer reporting agencies to "maintain reasonable procedures designed to avoid violations of section 1681c of this title and to limit the furnishing of consumer reports to the purposes listed under section 1681 b of this title." 15 U.S.C. § 1681e(a). These reasonable procedures must include a requirement that the prospective users of information: (1) identify themselves; (2) certify the purposes for which the information is sought; and (3) certify that the information will be used for no other purpose. *Id.* Consumer reporting agencies also are required to "make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report." *Id.* Consumer reporting agencies are prohibited from furnishing a report "to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681 b...." *Id.* Civil liability can be imposed upon someone who is negligent in failing to comply with the requirements of the FCRA. 15 U.S.C. § 1681*o.* "The fact that a consumer report is furnished for an impermissible purpose ... does not result in automatic liability. Liability is imposed only when the consumer reporting agency either willfully or negligently fails to maintain reasonable procedures to avoid violations of, i.e., § 1681 b." *Dobson v. Holloway,* 828 F.Supp. 975, 977 (M.D.Ga.1993) (internal citations omitted).

*\*4* The undisputed evidence before the Court demonstrates that Credco complied with all of these requirements. Before accepting Aegis as a client, Credco verified Aegis's identity by requiring a completed application, verifying its status with the Office of the Comptroller of the State of Texas, checking into its line of business, conducting a physical inspection of Aegis's business, and checking Aegis's references. Credco learned that Aegis was a real estate loan company. These

actions by Credco constitute reasonable efforts to verify Aegis's identity and the use for which Aegis intended to use the consumer reports. The evidence in the record further demonstrates that Credco complied with § 1681 e by requiring Aegis to: identify itself, certify the purpose for which the information was sought, and certify that the information would be used for no other purpose. Plaintiff offers no evidence upon which it reasonably can be concluded that Credco had reason to believe that Aegis would obtain a consumer report for an improper purpose. To the contrary, the record evidence demonstrates that Credco had supplied Aegis with thousands of credit reports over an approximately six (6) year period without incident. Thus, Credco had no reason to believe that Aegis sought a credit report for a improper purpose.

Plaintiff has failed to identify any deviations from the standard of care to be used by credit reporting agencies in maintaining reasonable procedures to comply with §§ 1681 b and 1681c. *See* 15 U.S.C. § 1681*o*; *Dobson,* 828 F.Supp. at 977 ("To determine whether the consumer reporting agency maintained reasonable procedures, the standard of conduct is what a reasonably prudent person would do under the circumstances."); see also *Obabueki v. Int'l Bus. Machines Corp.,* 145 F.Supp.2d 371, 395-96 (S.D.N.Y.2001) (liability may be imposed upon a credit reporting agency for failing to act reasonably in complying with the FCRA). It would be unreasonable to require credit reporting agencies processing a high number of requests to independently investigate each and every request to determine its legitimacy. See *Boothe v. TRW Credit Data,* 557 F.Supp. 66, 71 (S.D.N.Y.1982).

Because Credco also qualifies as a reseller of consumer reports, it had additional obligations imposed upon it pursuant to § 1681 e(e). Under § 1681 e(e)(1), Credco was required to disclose to the "consumer reporting agency that originally furnish[ed] the report-(A) the identity of the end-user of the report (or information); and (B) each permissible purpose under section 1681 b of this title for which the report is furnished to the end-user of the report." Section 1681 e(e)(2) further required Credco to:

(A) establish and comply with reasonable procedures designed to ensure that the report (or information) is resold by the person only for a purpose for which the report may be furnished under section 1681 b of this title, including by requiring that each person to which the report (or information) is resold and that resells or provides the report (or information) to any other person-

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 98 of 238

Pietrafesa v. First American Real Estate Information..., Not Reported in...

2007 WL 710197

**\*5**  (I) identifies each end user of the resold report (or information);

(ii) certifies each purpose for which the report (or information) will be used; and

(iii) certifies that the report (or information) will be used for no other purpose; and

(B) before reselling the report, make reasonable efforts to verify the identifications and certifications made under subparagraph (A).

The evidence discussed above concerning Credco's compliance with § 1681 b equally applies to demonstrate Credco's compliance with § 1681e(e)(2). As noted, Credco had a reasonable procedure to ensure that Aegis was using credit reports for a proper purpose and had information that Aegis was the end user of the resold report. Moreover, Aegis, as the end user, certified the purpose for which the report was used, and certified that the report would not be used for any other purpose.

There is, however, an absence of evidence in the record concerning whether Credco complied with § 1681e(1)(B). It is unknown whether Credco informed the three credit bureaus from which it obtained the credit information concerning Plaintiff of "each permissible purpose under section 1681 b of this title for which the report is furnished to the end-user of the report." *See*15 U.S .C. § 1681 e(e)(1)(B). Accordingly, the Court cannot determine on the present record whether: (1) Credco negligently failed to comply with § 1681e(e)(1)(B); and, if so, (2) Plaintiff sustained any actual damages as a result of the failure. *See*15 U.S.C. § 1681 o(a). Credco's Motion for summary judgment on the FCRA claim must, therefore, be denied.

**b. *NYFCRA***

The Court will now turn to Plaintiff's claims under N.Y. Gen. Bus. Law Art. 25. As is relevant hereto, the requirements of Article 25 are substantially similar to those under the FCRA. *See Scott v. Real Estate Fin. Group,* 183 F.3d 97, 100 (2d Cir.1999). There is a difference between the two statutes, however, insofar as Article 25 does not contain additional requirements applicable to resellers as does the FCRA. For the reasons previously discussed with respect to Credco's compliance with §§ 1681 b and 1681e(a)-(d) of the FCRA, because Credco maintained "reasonable procedures to designed to avoid violations of sections three hundred eighty-

b and three hundred eighty-j of this article and to limit the furnishing of consumer reports to the purposes listed under said section three hundred eighty-b," the claims under N.Y. Gen. Bus. Law §§ 380-b(a), 380-k must be dismissed.

N.Y. Gen. Bus. Law § 380-b(b) further provides that:

> No person shall request a consumer report ... in connection with an application ... for credit, ... unless the applicant is first informed in writing or in the same manner in which the application is made that (I) a consumer report may be requested in connection with such application, and (ii) the applicant upon request will be informed whether or not a consumer report was requested, and if such report was requested, informed of the name and address of the consumer reporting agency that furnished the report.

**\*6** N.Y. Gen. Bus. Law § 380-b(b). There is no evidence in the record that Credco complied with this requirement. Indeed, looking at the evidence in the light most favorable to the nonmovant, it appears that Credco did not inform Plaintiff that it intended to request a consumer report.

That being said, the Court concludes that § 380-b(b) is inapplicable here. By its plain terms, § 380-b(b) applies to requests for a consumer report "in connection with an application ... for credit." When such a request is made, notice must be given to "the applicant" that a consumer report may be requested "in connection with such application." It is arguable that Aegis's request for a consumer report was "in connection with an application for credit." After all, this was the purported basis for Aegis's request for the credit report. Nevertheless, as Plaintiff states, he "did not initiate any business transaction, *or apply for credit* ... by or through Credco" or any other Defendant. Pl.'s Stmnt. of Mat. Facts at ¶¶ 11-12 (emphasis added); Compl. at ¶ 8. As such, strictly adhering to the text of the statute, Plaintiff cannot be an "applicant" to whom notice is required to be given. *See*N.Y. STAT. LAWW § 73 ("A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all of the problems and complications which

might arise in the course of its administration; and no matter what disastrous consequences may result from following the expressed intent of the Legislature, the Judiciary cannot avoid its duty.... Under the foregoing principle ... courts may not ... change the scope of a legislative enactment"); N.Y. STAT. LAWW § 94 ("The Legislature is presumed to mean what it says.... In the construction of statutes, each word in the statute must be given its appropriate meaning.... Words will not be expanded so as to enlarge their meaning to something which the Legislature could easily have expressed but did not...."); N.Y. STAT. LAWW § 230 ("[E]ach word or phrase in the enactment must be given its appropriate meaning.).

The conclusion that § 380-b(b) does not apply to the situation where, as here, there is no actual application is supported by comparing § 380-b(b) (requiring notice for consumer reports) with §§ 380-c(a) and 380-c(b) (requiring notice for investigative consumer reports). Section 380-c(b) specifically refers to providing notice to the "applicant," whereas § 380-c(a) requires that notice be given to "the consumer." It must be assumed that when enacting Article 25, the legislature intentionally used two different terms in the two different sections. N.Y. STAT. LAWW § 98 ("[T]he court must assume that the Legislature did not deliberately place in the statute a phrase intended to serve no purpose, but must read each word and give to it a distinct and consistent meaning."); N.Y. STAT. LAWW § 97 ("Statutory words must be read in their context, and words ... of a statutory section should be interpreted with reference to the scheme of the entire section.... The different parts of the same act, though contained in difference sections, are to be construed together as if they were all in the same section.").

**\*7** Furthermore, § 380-c(b) expressly contemplates the type of notice to be provided in the situation where no application is made. That section provides that "[t]he notice required by this section shall be in writing *if a written application is made by the consumer,* or may be in writing or orally *in all other circumstances.*" § 380-c(b)(emphases added). By contrast, § 380-b(b) does not provide for situations where there is no application. In light of the fact that the Legislature expressly considered the situation where there is no application with respect to investigative consumer reports, the failure to include a similar provision in § 380-b(b) cannot be considered a legislative oversight, but, rather must be presumed to be an intentional omission. *See* N.Y. STAT. LAWW § 74 ("[W]hen from the language of an act and circumstances surrounding its enactment it appears that the Legislature has specified the cases to which it shall apply, the failure to specify a particular

case indicates that the Legislature did not intend the act to cover such a case...."). This conclusion is even more forceful considering that, under the NYFCRA, the term "consumer" is a statutorily defined term, *see* § 380-a(b), that is purposefully and intentionally used throughout Article 25, but was not used in § 380-b(b). Because Plaintiff was not an "applicant," he was not entitled to notice under § 380-b(b).

Furthermore, the Court finds that § 380-b(b) was not intended to apply to every person or entity involved in the process of obtaining a consumer report. See *Scott v. Real Estate Fin. Group,* 956 F.Supp. 375, 385 (E.D.N.Y.1997) ( "[T]he Court finds that the language contained in the statute does not require notice from everyone involved in obtaining the consumer report."), *aff'd in part, rev'd in part,* 183 F.3d 97 (2d Cir.1999). Without question, the end-user of the consumer report is subject to § 380-b(b)'s requirements. The purpose of § 380-b(b) is to require the end-user (that is, those who intend to use the credit report for making determinations concerning employment, the extension of credit, the provision of insurance, or the rental or leasing of a residence) to inform the applicant that end-user may request a consumer report as part of the decision-making process. It is the end-user who ordinarily has a direct relationship with the consumer and, therefore, is in a position to provide notice concerning the intention to obtain a consumer report. By requiring the end-user to provide this information at the time of the application for credit, employment, insurance, or the rental or lease of an apartment, the consumer is in a position to determine whether to proceed with the application. This would appear to satisfy the policy reasons behind the notice provision-to enable consumers to know under what situations consumer reports concerning them will be obtained and to permit the consumer to discontinue the application process if they do not want their consumer report to be disclosed. Taking into consideration these purposes of § 380-b(b), the question is whether § 380-b(b) also was intended to apply to require resellers (those who obtain the consumer report from another consumer reporting agency or multiple consumer reporting agencies) to provide notice to the consumer where the end-user seeks to obtain a consumer report through that reseller.

**\*8** It is common practice for the end-users of consumer reports to obtain the reports through a middleman or reseller. As previously discussed, the FCRA expressly contemplates this situation. By the time a request for a consumer report is made to a reseller, the requirements of § 380-b(b) already should have been complied with by the end-user. Under such circumstances, it makes little sense to require the middleman,

Pietrafesa v. First American Real Estate Information..., Not Reported in...

2007 WL 710197

or reseller, to also provide notice to the consumer before obtaining the report that has already been requested by the end-user. Such notice would be superfluous. It also would be extremely onerous on resellers to require that they notify every consumer about whom they receive a request to obtain a consumer report.

Most significantly, perhaps, the statute prohibits requesting a consumer report "unless the applicant is first informed" that a consumer report may be requested. § 380-b(b). The required notice informs the "applicant" that "a consumer report *may* be requested in connection with such application." § 380-b(b) (emphasis added). By the time the matter gets to a reseller, a consumer report already *has* been requested (at least by the end-user) and, thus, any notice provided by the reseller would be after the time contemplated by the statute. Notice provided by a reseller would not fulfill the above-discussed policy reasons of affording the applicant an opportunity to discontinue the application process and preventing the request and/or disclosure of his or her consumer report. For these reasons, the Court finds that § 380-b(b) is inapplicable here. The NYFCRA claims are, therefore, dismissed.

### c. *New York Consumer Protection Law*

Plaintiff also asserts a claim under N.Y. Gen. Bus Law § 349, which makes it unlawful to engage in deceptive acts or practices in the conduct of any business or in the furnishing of any service in New York state. See N.Y. GEN. BUS LAW § 349 To recover under this section, Plaintiff must demonstrate that he suffered actual injury as a result of a practice that was objectively misleading or deceptive. *Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 n. 4 (2d Cir.2005). As the New York Court of Appeals has stated, "[a] plaintiff under section 349 must prove three elements: first, that the

challenged act or practice was consumer oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered actual injury as a result of the deceptive act." *Stutman v. Chemical* Bank, 95 N.Y.2d 24, 29 (2000).

Defendant moves for summary judgment on the ground that there is no evidence that it engaged in any materially misleading or deceptive acts. In response, Plaintiff merely contends that a violation of the NYFCRA or FCRA can sustain a claim under § 349. While certain acts may constitute a violation of both the FCRA and § 349, *see, e.g., Wegmans Food Markets Inc. v. Scrimphsher (In re Scrimpsher),* 17 B.R. 999 (Bankr.N.D.N.Y.1982), here, Plaintiff has failed to identify any consumer oriented, misleading acts by Credco. Accordingly, the § 349 claim must be dismissed.

### IV. CONCLUSION

**\*9** Accordingly, it is hereby

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 8) is **GRANTED IN PART** and **DENIED IN PART.** Defendants' Motion is **GRANTED** insofar as all of Plaintiff's claims are **DISMISSED** with the exception of the claim under § 1681 e(1)(B) of the FCRA; and it is further

**ORDERED,** that Plaintiff's Cross-Motion for summary judgment (Dkt. No. 11) is **DENIED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties by regular mail. **IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2007 WL 710197

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2841909

2022 WL 2841909
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Duane A. HINES, on behalf of himself
and all others similarly situated, Plaintiff,

v.

EQUIFAX INFORMATION
SERVICES, LLC, Defendant.

No. 19-CV-6701 (RPK) (RER)
|
Signed July 16, 2022

**Attorneys and Law Firms**

James A. Francis, Pro Hac Vice, John Soumilas, Pro Hac Vice, Jordan M. Sartell, Pro Hac Vice, Francis Mailman Soumilas P.C., Philadelphia, PA, Micah S. Adkins, Pro Hac Vice, The Adkins Firm, P.C., Dallas, TX, Robert S. Sola, Pro Hac Vice, Robert S. Sola, P.C., Portland, OR, Kevin Christopher Mallon, Mallon Consumer Law Group, PLLC, New York, NY, for Plaintiff.

Edward Bedard, Pro Hac Vice, Robbins Alloy Belinfante Littlefield LLC, Atlanta, GA, Zachary A. McEntyre, Pro Hac Vice, Billie Pritchard, Pro Hac Vice, Carley Hawkins Thompson, Pro Hac Vice, King & Spalding LLP, Atlanta, GA, Jessica Kristen Shook, King & Spalding, New York, NY, for Defendant.

**REPORT & RECOMMENDATION**

RAMON E. REYES, JR., UNITED STATES MAGISTRATE JUDGE:

*1

**TO THE HONORABLE RACHEL P. KOVNER
UNITED STATES DISTRICT JUDGE**

Duane A. Hines ("Hines" or "Plaintiff") brings this action on behalf of himself and similarly situated consumers against Equifax Information Services, LLC ("Equifax" or "Defendant"), a Georgia-based consumer reporting agency, seeking monetary, injunctive, and declaratory relief for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x, and the New York Fair Credit Reporting Act ("NYFCRA"), N.Y. Gen. Bus. Law §§

380–380-v. (ECF No. 1 ("Compl.")). Plaintiff has moved pursuant to Rule 23 of the Federal Rules of Civil Procedure to certify a nationwide FCRA class and three claim-based subclasses as described in further detail below. (ECF No. 43 ("Mot. for Class Cert."); ECF No. 42-2 SEALED ("Pl.'s Mem.") at 3–4). Your Honor has referred the motion to me for a report and recommendation. (Order dated 03/22/2022).

For the reasons set forth below, I respectfully recommend that the motion be granted in part and denied in part. The Court should (1) grant Plaintiff's request for certification of the New York Subclass and the Capital One Subclass under Rule 23(b)(3); (2) deny Plaintiff's request for certification of the nationwide FCRA Class for failure to satisfy the superiority requirement of Rule 23(b)(3), or alternatively order further briefing from the parties on the issue of whether a stay, consolidation, or transfer of proceedings is warranted in light of the pending *Rivera* Action; (3) deny Plaintiff's request for certification of the Post-Dispute Publication Subclass for failure to satisfy the predominance requirement of Rule 23(b)(3); (4) deny Plaintiff's request for certification under Rule 23(b)(2) with respect to the New York Subclass; (5) appoint Plaintiff as the class representative and Francis Mailman Soumilas, P.C., Robert S. Sola, P.C., Skaar & Feagle, LLP, The Adkins Firm, P.C. as class counsel; and, (6) direct the parties to submit to the Court within thirty days proposed forms and schedules for providing notice to the certified classes.

**BACKGROUND**

**I.** Consumer Reporting Agencies, the Fair Credit Reporting Act, and the NYFCRA

As "one of the 'Big Three' [consumer] reporting agencies," Equifax "compiles personal and financial information about individual consumers to create consumer reports" and "sells those consumer reports [also known as credit reports] for use by entities such as banks, landlords, and car dealerships [*i.e.*, Equifax's customers] that request information about the creditworthiness of individual consumers." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2201 (2021); *see also* (Compl. ¶ 7 (explaining that "Equifax prepares consumer report[s] (commonly called 'credit report[s]' )")). Consumer reports may include up to two years' worth of "inquiry information," which is comprised of notations on the consumer's credit file that identify the entities or individuals who requested information about the consumer from the reporting agency and the date such information was delivered. (Compl. ¶¶ 7–8;

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 102 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

Pl.'s Mem. at 1; ECF No. 42-3 SEALED ("Def's Opp.") at 4 (citing ECF No. 42-24 SEALED) ("Gobin Depo. Excerpts") 30:24–31:1; 16 C.F.R. § 660.2(c)); *see also* ECF No. 42-25 SEALED ("Gobin Decl.") ¶ 3).

**\*2** An inquiry may be considered either "soft" or "hard." An inquiry is "soft" when it is made as part of an ongoing relationship between the inquirer and the consumer, relates to employment screening, or will otherwise leave the consumer's credit score unaffected. Conversely, an inquiry is "hard" when it is associated with a consumer-initiated application for credit and may therefore impact the consumer's credit score. (*See* Pl.'s Mem. at 1; ECF No. 42-22 SEALED) ("Hendricks Expert Rep.") at 1 n.1 [Redacted]; *id.* at 1 [Redacted]; ECF No. 42-32 SEALED ("Hines Depo. Exhibits") at 15 [Redacted] Compl. ¶ 9 ("Inquiries have a negative impact on a consumers credit score because scoring programs view each inquiry as an application for credit[.]"); ECF No. 42-34 SEALED ("Turner Expert Rep.") ¶ 2 n.1 (describing difference between hard and soft inquiries); ECF No. 42-5 SEALED ("Gobin Depo. Tr.") at 12:7–20, 17:2–11 (same); Equifax Knowledge Ctr., *Understanding Hard Inquiries on Your Credit Report*, EQUIFAX (last visited May 24, 2022) (indicating that hard inquiries "tell a lender that you are currently shopping for new credit[;]" "may be meaningful to a potential lender when assessing your creditworthiness[;]" and "usually impact credit scores."). [1] *But see* (Def's Opp. at 8–9) ("Inquiries have varying impacts on individual consumers —if they have any impact at all—depending on factors that are unique to each consumer and each credit score ... [Redacted] (citing Turner Expert Rep. ¶¶ 27–45; ECF No. 45-2 ("Hendricks Depo. Tr.") at 63:5–17, 66:22–69:4)").

[1]   https://www.equifax.com/personal/education/credit/report/understanding-hard-inquiries-on-your-credit-report/.

"[T]o promote 'fair and accurate credit reporting' and to protect consumer privacy," the FCRA "regulates the consumer reporting agencies that compile and disseminate personal information about consumers" and " 'imposes a host of requirements concerning the creation and use of consumer reports.' " *Ramirez*, 141 S. Ct. at 2200 (first quoting 15 U.S.C. § 1681(a), then quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 335 (2016)). As relevant here, the Act requires that consumer reporting agencies: (1) properly reinvestigate or remove incomplete or inaccurate information contained in a consumer's file upon direct notice of a dispute from the consumer, 15 U.S.C. § 1681i(a); (2) "maintain

reasonable procedures designed ... to limit the furnishing of consumer reports to the [permissible] purposes" specifically enumerated in the Act, 15 U.S.C. §§ 1681b, 1681e(a); and (3) refrain from furnishing records of non-consumer-initiated inquiries to third parties, 15 U.S.C. § 1681b(c)(3). "The Act creates a cause of action for consumers to sue and recover damages for certain violations," including actual, statutory, or punitive damages for willful noncompliance with its requirements, and actual damages for negligent noncompliance." *Ramirez*, 141 S. Ct. at 2201; 15 U.S.C. §§ 1681n(a), 1681o.

The NYFCRA deals with the same subject matter and contains substantively similar provisions to the FCRA. Like its federal counterpart, the NYFCRA directs consumer reporting agencies to reinvestigate information that is directly disputed by a consumer, requires that they adopt procedures to limit the furnishing of consumer reports to a set of enumerated permissible purposes, and provides for civil liability for negligent or willful noncompliance with its provisions. N.Y. Gen. Bus. Law §§ 380-f(a), 380-k, 380-m, 380-l. Because of these substantial similarities, the provisions of the FCRA and the NYFCRA are generally "construed in the same way." *Scott v. Real Estate Fin. Grp.*, 183 F.3d 97, 100 (2d Cir. 1999); *see also Abdallah v. LexisNexis Risk Sols. FL Inc.*, No. 19-CV-3609 (MKB), 2021 WL 6197060, at *6 (E.D.N.Y. Dec. 30, 2021); *Grayson v. Equifax Credit Info. Servs.*, No. 18-CV-6977 (MKB), 2021 WL 2010398, at *7 (E.D.N.Y. Jan. 29, 2021).

## II. Hines' Hard Inquiry Dispute

Equifax reported a November 27, 2018 "hard" inquiry by Capital One Bank USA N.A. on Hines' consumer report (the "Capital One Inquiry") in connection with a transaction that Hines claims he did not initiate or authorize. (Compl. ¶¶ 30–31; *see also* Pl.'s Mem. at 4; ECF No. 42-7 SEALED ("12/7/2018 Consumer Report") at 8; ECF No. 44-2 ("Hines Depo. Tr.") at 12:14–18; 33:10–21; Gobin Depo. Tr. at 18:19–19:3). Concerned that it would negatively impact his credit score, Hines disputed the Capital One Inquiry to Equifax twice through a Consumer Financial Protection Bureau ("CFPB") complaint portal in early December 2018. (Compl. ¶ 32; *see also* Hines Depo. Tr. at 12:14–18, 33:10–21; Hines Depo. Exhibits at 2–9 (CFPB Complaint 181204-3669026); *id.* at 10–12 (CFPB Complaint 181204-3669303); ECF No. 42-33 SEALED ("Pl.'s Resps. to Def's First Interrogs.") at 9–10 (listing CFPB complaints)). [2]

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 103 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

2

The FCRA specifically contemplates the submission of complaints to consumer reporting agencies through the CFPB. *See* 15 U.S.C. § 1681i(e).

**\*3** On December 7, 2018, Equifax responded to Hines' complaints with a form letter [Redacted] (ECF No. 42-8 SEALED ("Dec. 7, 2018 Equifax Resp. Ltr.") at 2). In this letter, Equifax explained that [Redacted]. (*Id.*). Equifax reported the formal "results of [its] reinvestigation" into the Capital One Inquiry as follows: "Inquiries are a factual record of file access. If you believe this was unauthorized, please contact the creditor. If you have additional questions about this item please contact [Capital One]." (*Id.* at 5–6; *see also* Pl.'s Mem. at 4).

In July 2019, Hines submitted a third complaint through the CFPB portal—this time directed at Capital One—disputing the Capital One Inquiry as unauthorized, and demanding either an affidavit from a bank representative affirming its accuracy or the removal of the inquiry from his credit file. (Hines Depo. Exhibits at 13–14 (CFPB Complaint 190724-4249764)). Capital One responded the following month, noting that it "was unable to locate any previous disputes using [Plaintiff's] information" and had "received an application for credit using [Plaintiff's] information" on November 17, 2018, but that after reviewing his complaint, it "made a business decision to ask the Consumer Reporting Agencies" to remove the inquiry. (Hines Depo. Exhibits at 15–16). In light of that business decision, Capital One reported that on August 5, 2019, it "sent a request to the Consumer Reporting Agencies (CRAs) asking them to remove the hard inquiry." (Compl. ¶ 34; Hines Depo. Exhibits at 15–16). In its letter, Capital One indicated that those agencies would ultimately determine how the change would be reflected in his credit file, that the inquiry could be changed to a soft inquiry, and that it could take up to sixty days for the agency to update its records. (Hines Depo. Exhibits at 15–16).

In September 2019, Hines submitted a fourth complaint through the CFPB portal to Equifax, arguing that Capital One's reported inability to locate previous disputes of the inquiry demonstrated that Equifax never performed a reasonable reinvestigation in response to his initial disputes and expressing dissatisfaction that Equifax had not yet complied with the bank's request to delete the Capital One Inquiry from his consumer report. (Hines Depo. Exhibits at 17–21, 32–37 (CFPB Complaint 190908-4376677); *see also* Pl.'s Mem. at 5). Days later, Equifax responded with the same formulaic response as in December 2018: "Inquiries

are a factual record of file access. If you believe this was unauthorized, please contact the creditor." (Compl. ¶ 42; Hines Depo. Exhibits at 22–25, 38–73). In October 2019, Hines submitted a fifth complaint to Equifax directly via certified mail, and received the same form response three weeks later. (Compl ¶¶ 36–39, 42; Hines Depo. Exhibits at 27–31).

Hines alleges that, despite his repeated complaints, Equifax included the disputed Capital One Inquiry in certain reports to his potential and existing creditors. (Pl.'s Mem. at 8–9; *see also* Compl. ¶ 44 ("Notwithstanding ample notice that Hines had not initiated nor authorized [the] Capital One inquiry, Equifax reported it to Hines' potential and existing creditors on numerous occasions, including to Digital Federal Credit Union on December 10, 2018 and March 30, 2019, to Factual Data on December 31, 2018."); Hines Depo. Tr. at 14:17–16:10 (alleging that Digital Credit Union and Paypal were provided with Hines' consumer information, including the disputed Capital One Inquiry); ECF No. 42-17 SEALED ("Leslie Depo. Tr.") at 50:13–51:3, 57:7–58:7 (discussing post-dispute June 2019 inquiry by Synchrony Bank/Paypal)).

**\*4** Ultimately, Equifax removed the Capital One Inquiry approximately four months after receiving Capital One's request and shortly after this suit was filed in November 2019. (*See* Gobin Depo. Tr. at 20:17–21:5, 48:13–52:4; *see also* Hines Depo. Tr. at 18:1–5). Nevertheless, Hines alleges that as a result of Equifax's failure to adequately reinvestigate his disputes and its delay in removing the Capital One Inquiry, he has been subjected to a number of injuries, including: a reduced credit score; "deprivation of the information that Equifax had not reinvestigated his dispute or contacted Capital One which, at a minimum, would have armed him with additional information concerning his creditworthiness; [t]he invasion of his privacy when Equifax provided a consumer report about him to Capital One without a permissible purpose; [d]istress from getting the run around from Equifax concerning his disputes and what Equifax would actually do to investigate them; and [l]ost time and resources in association with making multiple ignored disputes[.]" (Compl. ¶ 45; *see also* Hines Depo. Tr. at 62:2–15, 118:19–119:1).

### III. Equifax Policies and Class Members' Disputes
The nature of Hines' hard inquiry dispute is not uncommon, and similar complaints are contemplated by Equifax's standardized policies and procedures. According to Equifax, [Redacted] (Gobin Decl. ¶ 20). In general, Equifax [Redacted]

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 104 of 238

(Gobin Decl. ¶¶ 3, 5). Nevertheless, Equifax maintains that [Redacted] (Gobin Decl. ¶¶ 5, 6, 9). In such cases, [Redacted] (Gobin Decl. ¶ 9). The form letter that consumers receive in these circumstances, and which Hines received here, is known internally at Equifax as "[Redacted]." (Gobin Depo. Tr. at 28:19–29:11, 39:18–22; ECF No. 42-13 SEALED ("Equifax Dispute Policy Manual v. 17") at 37; ECF No. 42-14 SEALED ("Equifax Dispute Policy Manual v.22") at 35; ECF No. 42-20 SEALED ("Equifax Training & QA") at 3; Pl.'s Mem. at 6). [Redacted]. (ECF No. 42-15 SEALED ("Def's Resps. to Pl.'s First Set of Interrogs.") at 6). According to the agency, [Redacted] (Id. at 8).

In the two years preceding Hines' class action complaint, Equifax received hard inquiry disputes from, and sent [Redacted] to, [Redacted] consumers nationwide, and [Redacted] consumers in New York. (ECF No. 42-19 SEALED ("Def's Suppl. Resps. to Interrog. Nos. 1 and 8") at 3; Leslie Depo. Tr. at 42:12–18, 48:4–8); (Pl.'s Mem. at 11). Further, while [Redacted] (Gobin Decl. ¶ 22), the agency has identified records indicating that, for [Redacted] of the New York consumers, Equifax delivered some information about the consumer to a third party after it had received a hard inquiry dispute from the consumer. (ECF No. 42-35 SEALED ("Def's Suppl. Resp. to Pl.'s Interrog. No. 6") at 2; Leslie Depo. Tr. at 47:3, 59:9–19, 64:1–15, 82:14–83:3). These records—internally known as "Log F" or "MDB records"—contain a "snapshot" of the consumer's credit file at the time that a product containing information about that consumer was delivered to an Equifax customer. (Leslie Depo. Tr. at 17:19–24, 19:19–25, 20:3–6). These [Redacted] consumers' files contained a combined [Redacted] disputed hard inquiries. (Pl.'s Mem. at 8 n.5 (citing Leslie Depo. Tr. at 59:17–61:3); see also Def's Suppl. Resp. to Pl.'s Interrog. No. 6 at 2). However, some Equifax products contain only a subset of the information included on a consumer's full credit file, and because of the nature of Equifax's record keeping practices, the agency cannot specifically determine whether the products sold regarding these [Redacted] individuals included a disputed hard inquiry or contained disputed information. (Def's Opp. at 20 n.12; Def's Suppl. Resp. to Pl.'s Interrog. No. 6 at 3; Leslie Depo. Tr. at 67:19–69:1, 82:14–83:24).

Equifax has also produced letters from [Redacted] consumers disputing hard inquiry information, approximately [Redacted] contain the phrase "Capital One." (ECF No. 42-21 SEALED) ("Sartell Decl." ¶¶ 3–5). In addition to these letters, Equifax has reproduced [Redacted] similar letters containing disputes of hard inquiries which were provided to the named plaintiffs in a substantially similar class action currently pending in the Northern District of Georgia, *Rivera v. Equifax Info. Servs., LLC*, No. 1:18-CV-4639 (AT) (CCB) (the "*Rivera* Action"). (*See* ECF No. 42-26 SEALED ("Pritchard Decl.") ¶ 2). Among the [Redacted] total letters produced in both actions, Equifax has identified [Redacted] "exemplars" which it argues [Redacted] and [Redacted] rather than directly from the consumers themselves. (*Id.* ¶ 2; *see also* ECF Nos. 42-27–42-31 SEALED ("Def's Exemplar Dispute Letters")).

## IV. Procedural History

**\*5** Plaintiff filed his class action complaint on November 27, 2019. (Compl.). Early in the case, the parties agreed to bifurcate the proceedings, such that "[a]ny dispositive motion practice may be filed only after the court's ruling on class certification." (ECF No. 22 ¶ 11). After a number of discovery disputes, court interventions, and concomitant deadline extensions (ECF Nos. 26–28, 30–35, Minute Entry dated 12/03/2020; Orders dated 01/26/2021, 02/04/2021, 03/18/2021, 04/12/2021), Plaintiff filed the motion for class certification on January 26, 2022. (*See* ECF No. 43–46). Your Honor referred the motion to me on March 22, 2022. (Order dated 03/22/2022). Shortly after the motion was referred, Plaintiff filed a notice directing the Court's attention to an order recently issued in the *Rivera* Action, which certified a nationwide class that overlaps with the nationwide FCRA class sought in this case. (ECF No. 47); *Rivera v. Equifax Info. Servs., LLC*, No. 1:18-CV-4639 (AT) (CCB), 2022 WL 986443, at \*5 (N.D. Ga. Mar. 30, 2022).

## V. Proposed Nationwide Class and Subclasses

Plaintiff seeks to certify one nationwide class and three claim-based subclasses. With respect to his "reinvestigation claims" under 15 U.S.C. § 1681i, Plaintiff seeks to certify a nationwide "FCRA Class," defined as:

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the U.S. and its Territories to whom Equifax sent a document containing [Redacted] (*i.e.*, a letter that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries).

(Pl.'s Mem. at 3). [3] Plaintiff also seeks to certify three claim-based subclasses: a "New York Subclass" with respect to

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 105 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)
2022 WL 2841909

claims under the NYFCRA, N.Y. Gen. Bus. Law §§ 380 *et seq.*:

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the State of New York to whom Equifax sent a document containing [Redacted] (i.e., a letter that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries).

(*Id.*); a "Capital One Subclass" with respect to "unreasonable procedures" and "permissible purpose" claims under 15 U.S.C. § 1681e(a):

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the U.S. and its Territories (1) to whom Equifax sent a document containing [Redacted] (i.e., a letter that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries), which (2) corresponds to the consumer's dispute of a hard inquiry associated with Capital One.

(*Id.*); and a "Post-Dispute Publication Subclass" with respect to "improper furnishing" claims under 15 U.S.C. § 1681b(c)(3):

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the U.S. and its Territories (1) to whom Equifax sent correspondence containing [Redacted] (i.e., a letter

> that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries) and (2) about whom Equifax has a "MDB record" (e.g., a "Log F" or "Frozen Scan") that postdates the [Redacted] correspondence and contains the disputed hard inquiry.

(*Id.* at 4). [4]

[3]    As noted above, a similar and overlapping nationwide class definition was proposed and recently certified in the *Rivera* action. *See Rivera v. Equifax Info. Servs., LLC*, No. 1:18-CV-4639-AT-CCB, 2022 WL 986443, at \*5 (N.D. Ga. Mar. 30, 2022) ("During the period beginning two years prior to the filing of this action [on October 4, 2018] and *through the time of class notice*, all persons residing in the U.S. and its Territories to whom Equifax sent a document containing [Redacted] (i.e., a statement that 'inquiries are a factual record of file access') in response to a written dispute of one or more hard inquiries.") (emphasis added), *leave to appeal denied*, (11th Cir. June 14, 2022). This definition is substantially identical to the class definition that was certified in a similar case against TransUnion in the Eastern District of Pennsylvania. *See Norman v. TransUnion, LLC*, 479 F. Supp. 3d 98 (E.D. Pa. 2020), *leave to appeal denied*, 2020 WL 6393900 (3d Cir. Sept. 15, 2020). As a result of the overlapping class definitions, Hines is a member of the nationwide class certified in the *Rivera* action. Notably, the *Rivera* plaintiffs are also represented by Hines' attorneys. (*See* ECF No. 27 at 2 n.2) ("Counsel for Plaintiff and Defendant in this matter and the *Rivera* matter are the same.").

[4]    The classes sought in Plaintiff's motion are different from those described in the complaint. (*Compare* Compl. ¶¶ 51–53 *with* ECF No. 43-2 ("Proposed Order") at 1–2).

### **DISCUSSION**

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 106 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

## I. Standing

**\*6** As a threshold matter, the Court must determine whether Hines has standing to pursue his claims on his own behalf and on behalf of absent class members. Equifax argues that a class may not be certified because Hines has not demonstrated that absent class members have standing. (Def's Opp. at 11–12). Specifically, it argues that "Hines has not identified any concrete harms suffered by the class members beyond alleged technical violations of the FCRA and the NYFCRA, let alone that he could prove any such harms with common evidence." (*Id.* at 12). For the reasons explained below, Hines has standing to pursue damages on his own behalf and on behalf of absent class members for each claim.

### A. Standing in the Class Action Context

Article III standing is a "threshold question in every federal case" that "determine[s] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)). In the class action context in particular, "[s]tanding to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made. Without standing, one cannot represent a class[.]" *Cassese v. Washington Mut., Inc.*, 262 F.R.D. 179, 183 (E.D.N.Y. 2009) (quoting *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 694 (E.D. Pa. 1973)). Contrary to Equifax's position, courts in the class action context focus on the class representative's standing, rather than that of the absent class members. "To establish Article III standing in a class action for every named defendant there must be *at least one named plaintiff* who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) (alterations omitted) (emphasis added) (quoting *Cent. States*, 504 F.3d at 241).

Where a class opponent challenges a named plaintiff's standing to bring claims on behalf of absent class members, courts engage in a "bifurcated inquiry." *Gold v. Eva Nats., Inc.*, No. 21-CV-2842 (GRB) (AYS), 2022 WL 566230, at \*1 (E.D.N.Y. Feb. 16, 2022) (quoting *Petrosino v. Stearn's Prod., Inc.*, No. 16 Civ. 7735 (NSR), 2018 WL 1614349, at \*5 (S.D.N.Y. Mar. 30, 2018)). "First, the representative plaintiff must establish that she has Article III standing.... Second, the plaintiff must establish that she has 'class standing.' " *Gold*, 2022 WL 566230, at \*1. This requires that the plaintiff show "(1) that he 'personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (alteration in original) (first quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982), then quoting *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)).

While Equifax's assertion that plaintiff's failure to demonstrate absent class members' standing precludes class certification is incorrect, its objection underscores the importance of the Court's "independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Accordingly, I will examine whether Hines has demonstrated Article III standing on each of his claims and for each form of relief sought, and whether he has satisfied the *NECA-IBEW* test for class standing.

### B. Hines Has Article III Standing to Pursue Monetary Relief

#### 1. Article III Standing — Legal Standard

**\*7** To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Ramirez*, 141 S. Ct. at 2203 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561; *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), *holding modified by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record. And it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

judicial resolution of the dispute.") (internal quotation marks and citations omitted). "At the class certification stage, a named plaintiff must prove standing by a preponderance of the evidence." *Pryce v. Progressive Corp.*, No. 19-CV-1467 (RJD) (RER), 2022 WL 1085489, at *13 (E.D.N.Y. Feb. 17, 2022) (citing *Calvo v. City of New York*, No. 14 Civ. 7246 (VEC), 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017)), *adopted as modified by* 2022 WL 969740 (Mar. 31, 2022); *see also Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists.") (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Ramirez*, 141 S. Ct. at 2208 (citing *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008); *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). "[W]hen evaluating standing, courts 'must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, that a decision on the merits would be favorable and that the requested relief would be granted.' " *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 7584728, at *14 (E.D.N.Y. Nov. 20, 2019) (quoting *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015)).

With respect to the injury-in-fact requirement, the Supreme Court has recently emphasized in cases involving the FCRA that "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court," *Ramirez*, 141 S. Ct. at 2205 (emphasis in original), and that a plaintiff "cannot satisfy the demands of Article III by alleging a bare procedural violation," since "[a] violation of one of the [statute's] procedural requirements may result in no harm." *Spokeo*, 578 U.S. at 342. Accordingly, where Congress has created "a statutory prohibition or obligation and a cause of action," as it has in the case of the FCRA, a Court must "independently decide whether a plaintiff has suffered a concrete harm under Article III." *Ramirez*, 141 S. Ct. at 2205. This may be a "traditional tangible harm" such as physical or monetary damage, or an "intangible harm" that bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits," such as reputational damage, the disclosure of private information, or intrusion upon seclusion. *Id.* at 2204.

In *Ramirez*, a class representative brought suit under the FCRA on behalf of more than eight thousand consumers who had been flagged by TransUnion as potential matches to individuals identified on a list of terrorists and serious criminals maintained by the Treasury Department, based solely on their shared names. *Id.* at 2201–02. The class representative alleged that the agency failed to use reasonable procedures as required by § 1681e(b) to assure that class members' credit reports would not inaccurately label them as potential criminals, and failed to adhere to specific requirements under the Act when providing those consumers with a copy of their credit file that confirmed the error. *Id.* at 2207. Of the eight thousand-plus class members, "the parties stipulated that TransUnion did not provide [more than six thousand class members'] credit information to any potential creditors during the class period." *Id.* at 2209.

**\*8** The *Ramirez* Court held that, for the minority of class members whose credit reports were shared, the dissemination of a credit report bearing misleading information to a third party constituted an injury in fact under Article III because the harm exacted by the publication of such misleading statements "bears a sufficiently close relationship to the harm from a false and defamatory statement." *Id.* at 2209. However, likening inaccurate but undisclosed notations of a potential terrorist match on a consumer's credit file to a "defamatory letter ... stored ... in [a] desk drawer," the Court determined that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 2210. Accordingly, the Court found that the remaining majority of class members whose files were not disseminated lacked standing to sue for damages on the reasonable procedures claim. *Id.* The Court also found that the risk of future harm, without some demonstration that exposure to such risk caused an independent harm (such as emotional or psychological distress), or that the harm itself materialized, is insufficient to confer standing to pursue retrospective damages. *See id.* at 2211–13. With respect to the remaining claims, the Court held that TransUnion's conduct—mailing one copy of the consumer credit file upon request that omitted the alert, and mailing a second, corrected copy to the consumer without attaching a statutorily required summary-of-rights—caused no traditionally recognized harm to any class members, such as confusion, distress, or reliance on the improperly formatted information, such that plaintiffs demonstrated only " 'bare procedural violations, divorced from any concrete harm.' ... [t]hat [did] not suffice for Article III standing." *Id.* at 2213 (quoting *Spokeo*, 578 U.S. at 341).

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 108 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

In interpreting *Ramirez*, the Second Circuit has reiterated that "plaintiffs must show that the statutory violation caused them a concrete harm, regardless of whether the statutory rights violated were substantive or procedural." *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 n.2 (2d Cir. 2021). Accordingly, courts in this District have held in FCRA cases that "[w]here a plaintiff claims that an improper notation on his credit report resulted in a credit score reduction that could cause him reputational and financial harm, the absence of allegations of dissemination to third parties requires dismissal" for lack of standing. *Zlotnick v. Equifax Info. Servs., LLC*, No. 21-CV-7089 (GRB) (JMW), 2022 WL 351996, at *3 (E.D.N.Y. Feb. 3, 2022) (citing *Grauman v. Equifax Informational Services, LLC*, 549 F. Supp. 3d 285, 291–92 (E.D.N.Y. July 16, 2021); *Cohen v. Experian Information Solutions, Inc.*, No. 20-CV-3678 (BMC), 2021 WL 413494, at *2 (E.D.N.Y. Feb. 4, 2021)).

2. Reinvestigation Claims

With respect to his reinvestigation claims under § 1681i and its New York analogue, Hines contends that Equifax fails to reinvestigate consumer disputes regarding unauthorized inquiries as a matter of course, and that their failure to do so results in "lost time and money submitting a doomed dispute, the deprivation of the results of a reasonable reinvestigation, and the diminution of [his] credit score[.]" (Pl.'s Reply at 2). Hines' argument that a plaintiff's loss of the "benefit of the reasonable reinvestigation into the accuracy of her credit report to which he was statutorily entitled [was] an actual, concrete injury which is particularized to Plaintiff" (*Id.*) (quoting *Jones v. Experian Info. Sols., Inc.*, 982 F. Supp. 2d 268, 272 (S.D.N.Y. 2013)) is unavailing in light of *Spokeo* and *Ramirez*, which caution that an agency's failure to adhere to the procedural obligations imposed by the FCRA is, in and of itself, insufficient to establish an injury in fact. *See Spokeo*, 578 U.S. at 342; *Ramirez*, 141 S. Ct. at 2213.

However, courts in other circuits "have routinely found that wasted time resulting from a defendant's FCRA violation is a sufficiently concrete and particularized injury to establish standing." *Healy v. Milliman, Inc.*, No. C20-1473 (JCC), 2022 WL 1061921, at *3 (W.D. Wash. Apr. 8, 2022) (citing *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021); *Nelson v. Experian Info. Sols., Inc.*, 21-CV-894 (CLM), 2022 WL 193010, at *2–3 (N.D. Ala. Jan. 10, 2022)). For example, in *Nelson*, a court in the Northern District of Alabama found

that the lost time and money spent sending successive dispute letters to an agency that unlawfully failed to conduct a reasonable reinvestigation after an initial request constituted an injury in fact sufficient to confer standing. *Nelson*, 2022 WL 193010, at *3. Here, Hines has similarly demonstrated that he made multiple futile attempts via the CFPB portal and via certified mail to dispute and obtain a reasonable reinvestigation of the unauthorized inquiry. (*See, e.g.*, Hines Depo. Exhibits 2–37; Pl.'s Resps. to Def's First Interrogs. at 9–10). This wasted time and expense is a traditional monetary harm that is fairly traceable to Equifax's policy of summarily categorizing and handling such disputes without a thorough investigation and without contacting the creditor responsible for the inquiry (Gobin Decl. ¶ 9; Gobin Depo. Tr. at 29:5–22), and is redressable by judicial relief.

**\*9** Further, although without dissemination "neither an incorrect notation on plaintiff's credit report nor the diminution in his credit score are sufficient to confer standing," *Zlotnick*, 2022 WL 351996 at *3; *cf. Shimon v. Equifax Info. Servs. LLC*, 431 F. Supp. 3d 115, 122 (E.D.N.Y. 2020) (dismissing reinvestigation claims under § 1681i on the merits where disputed information was disseminated but was ultimately confirmed to be accurate), *aff'd*, 994 F.3d 88 (2d Cir. 2021), Hines' Capital One Inquiry was, in fact, shared with at least one third party creditor in June 2019—after it was disputed but before it was removed from his credit file. (*See* Hines Depo. Tr. at 14:17–16:10; Leslie Depo. Tr. at 50:13–51:3, 57:7–58:7). [5] As recognized in *Ramirez* and its progeny, sharing inaccurate or misleading information about a consumer may cause traditionally recognized reputational harm that is actionable at law. *See, e.g., Ramirez*, 141 S. Ct. at 2209; *Maddox*, 19 F.4th at 65; *Grauman*, 549 F. Supp. 3d at 291–92. Assuming that Hines is correct on the merits of his claim, *see Barry's Cut Rate Stores*, 2019 WL 7584728, at *14, such harm would not have occurred had Equifax performed a reasonable reinvestigation into the inquiry pursuant to its statutory obligations. Accordingly, Hines has sufficiently demonstrated a second concrete harm that is fairly traceable to Equifax's alleged violations of § 1681i and N.Y. Gen. Bus. Law § 380-f, which is sufficient to confer Article III standing to pursue damages.

5      Although the nature of Equifax's products and record-keeping practices preclude a finding with certainty at this time that the Capital One Inquiry was, in fact, shared with any third-party creditors, the Court finds that the post-dispute inquiries by Synchrony Bank evidenced by MDB

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 109 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

records generated after he disputed the inquiry are sufficient to demonstrate by a preponderance of the evidence that such a harm likely occurred.

### 3. Reasonable Procedures and Permissible Purpose Claims

In connection with his § 1681e(a) and related state claims, Hines alleges that Equifax failed to adopt reasonable procedures to assure that consumer information is furnished only for the permissible purposes defined on the exhaustive list in § 1681b of the statute. Specifically, he alleges that, because the Capital One Inquiry represents an inquiry made in connection with a transaction that he did not initiate, disclosure of the inquiry was prohibited by the "permissible purpose" provision of § 1681b(c)(3). Further, he argues that the high volume of disputes regarding inquiries by Capital One should have put Equifax on notice that the bank was routinely acquiring reports for impermissible purposes. (Pl.'s Reply at 10). In his complaint, he alleges that "Equifax's procedures are clearly broken," as "[t]hey fail to limit the disclosure of sensitive personal and financial information about millions of consumers to FCRA and NYFCRA permissible purposes and fail to reign [sic] in repeat offenders who illegally obtain sensitive personal and financial consumer information without authorization." (Compl. ¶ 29). Although not specifically articulated by Plaintiff, the injuries caused by violations of these provisions bear a close relationship to two of the "traditionally recognized" harms identified by the *Ramirez* Court: "reputational harm" and "intrusion on seclusion." *Ramirez*, 141 S. Ct. at 2204 (citing *Meese v. Keene*, 481 U.S. 465, 473 (1987); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)).

Because New York does not recognize a common-law right to privacy, courts sitting in this District look to traditional tort concepts and to the Restatement of Torts to carry out the historical common law analysis contemplated by *Spokeo* and *Ramirez*. *See, e.g., Devitt v. Portfolio Recovery Assocs., LLC*, No. 21-CV-5657 (ARR) (ARL), 2022 WL 1460278, at *6 (E.D.N.Y. May 9, 2022). The Restatement recognizes as a "general principle" that "one who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." Restatement (Second) of Torts § 652A. "The traditional tort comprises four separate privacy causes of action: public disclosure of private facts, false light, intrusion upon seclusion, and appropriation of likeness." *Devitt*, 2022 WL 1460278, at *6. (quoting Restatement (Second) of Torts § 652A). Under the Restatement, a defendant may be liable for intrusion

on seclusion where he "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. Such intrusion "may be by some ... form of investigation or examination into his private concerns," and it is "[t]he intrusion itself [that] makes the defendant subject to liability, even though there is no publication or other use of any kind of the ... information outlined." *Id.* cmt. b. "The defendant is subject to liability under the rule ... only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *Id.* cmt. c. In line with these common law principles, the Supreme Court has recognized that "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763–64 (1989).

**\*10** Legislative history indicates that the FCRA was adopted to vindicate these general rights to privacy, and to protect the public from harms similar to those redressable by common law claims for intrusion on seclusion. According to the "[c]ongressional findings and statement of purpose" section of the FCRA, the Act was in part adopted "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a *respect for the consumer's right to privacy*." 15 U.S.C. § 1681(a)(4) (emphasis added). Courts across the country have therefore interpreted the FCRA in general, and the permissible purposes section in particular, as protecting the public from intrusions upon seclusion and from invasions upon the right to privacy. *See, e.g., Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 489–93 (9th Cir. 2019) (comparing the harm attending a violation of the permissible purposes section of the FCRA as "closely related to—if not the same as—a harm that had traditionally been regarded as providing a basis for a lawsuit: intrusion upon seclusion."); *Browner v. Am. Eagle Bank*, 355 F. Supp. 3d 731, 737 (N.D. Ill. 2019) ("The claim here is ... simple[ ]: unauthorized access for no permissible purpose. The clear intent of Congress to preclude such access, taken in connection with the long legal history of protecting the privacy of confidential information, makes clear that the complaint alleges enough to carry the plaintiff's burden of alleging standing, including injury in fact."); *Gambles v. Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510, 522 (S.D.N.Y. 2017) (finding standing under FCRA and noting that "it has long been the case that an unauthorized dissemination of one's personal information, even without a showing of actual

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 110 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

damages, is an invasion of one's privacy that constitutes a concrete injury sufficient to confer standing to sue.") (quoting *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 636 (E.D. Va. 2016)); *Gillison v. Lead Express, Inc.*, No. 3:16-CV-41, 2017 WL 1197821, at \*5 (E.D. Va. Mar. 30, 2017) (denying motion to dismiss permissible purpose claims for lack of standing, noting that "not only has Congress defined the invasion of one's privacy as an injury in fact, but courts traditionally have recognized statutory violations rooted in privacy invasions as a basis for suit").

Section 1681b of the FCRA in particular illustrates Congress' judgment that the collection and dissemination of certain personal information for certain purposes violates a consumer's right to privacy. As relevant here, Section 1681b(c)(3) prohibits a credit reporting agency from furnishing "to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer." 15 U.S.C. § 1681b(c)(3). This section implicitly acknowledges some limitations on the right to privacy by permitting agencies to collect and disclose certain personal information for specified purposes, but ensures that when an agency permissibly intrudes upon a consumer's seclusion by disclosing his personal information in response to an unsolicited request, additional damage to the consumer's privacy and reputational interests is not done by disseminating a record of that intrusion to other third parties. In tandem, Section 1681b and Section 1681e(a) mandate that agencies adopt reasonable procedures to prevent such disclosures; define as a matter of public policy the scope of an individual's right to privacy to credit-related information; and, with Sections 1681n and 1681o, make actionable any willful and negligent invasions upon that right which bear a close relationship to harms traditionally recognized at common law.

Here, Hines reportedly opted out of receiving prescreened offers of credit with the expectation that doing so would prevent his personal information from being disseminated without his authorization. (Hines Depo. Tr. at 32:17–23). Voicing his preference to be free from unsolicited offers of credit can be viewed as an attempt to "throw [a private seclusion] about his affairs," and Equifax's initial unauthorized disclosure of his information, if considered "highly offensive," could itself be an actionable intrusion at common law. Restatement (Second) of Torts § 652B cmt. c. Even if Equifax's initial intrusion upon Hines' seclusion in disclosing his information in connection with a transaction that he did not initiate was permissible, reporting the inquiry constitutes a second, impermissible intrusion and allegedly caused reputational harm. (*See* Hines Depo. Tr. at 14:17–16:10; Leslie Depo. Tr. at 50:13–51:3, 57:7–58:7). At this stage, Hines has sufficiently demonstrated a likelihood that Equifax's failure to adopt reasonable procedures to prevent the furnishing of the Capital One Inquiry resulted in invasions upon his right to privacy and caused reputational harm. Both harms bear a sufficient relationship to harms traditionally recognized at common law, such that he has Article III standing to pursue damages on his § 1681e(a) and § 1681b claims.

### 4. Post-Dispute Publication Claims

**\*11** With respect to his Post-Dispute Publication claims under § 1681b(c), Hines argues that the distribution of disputed hard inquiry information to creditors caused reputational injuries sufficient to confer standing independently. (Pl.'s Reply at 3). As noted above, Hines alleges, and Equifax has confirmed, that his credit information was disseminated to at least one third party in June 2019, after the Capital One Inquiry was disputed but before it was removed from his credit file. (*See* Hines Depo. Tr. at 14:17–16:10; Leslie Depo. Tr. at 50:13–51:3, 57:7–58:7). The reputational harm that results from the disclosure of inaccurate or misleading credit information to third parties, as alleged here, has clearly been recognized as sufficient to confer standing. *See, e.g.*, *Ramirez*, 141 S. Ct. at 2210; *Grauman*, 549 F. Supp. 3d at 292. Such harms are fairly traceable to Equifax's conduct and are redressable by monetary relief. Hines has therefore sufficiently demonstrated standing to pursue his § 1681b(c) claims.

### 5. Injunctive and Declaratory Relief

"[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *Ramirez*, 141 S. Ct. at 2208. Accordingly, Hines must independently demonstrate Article III standing to obtain injunctive and declaratory relief. (*See* Compl. at 16–17 (seeking orders declaring that Defendant's actions are in violation of the FCRA and NYFCRA and orders enjoining Equifax to comply with the relevant provisions of the NYFCRA)).

"Although past injuries may provide a basis to seek money damages, they do not confer standing to seek injunctive

relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Pryce,* 2022 WL 1085489, at *7 (quoting *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 239 (2d Cir. 2016)); *see also Pres. at Connetquot Homeowners Ass'n, Inc. v. Costco Wholesale Corp.,* No. 17-CV-7050 (JFB) (AYS), 2019 WL 337093, at *5 (E.D.N.Y. Jan. 28, 2019) ("When standing is premised on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that it will be wronged in a similar way.' ") (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111–12 (1982)); *Barry's Cut Rate Store Inc.,* 2019 WL 7584728, at *19 (E.D.N.Y. Nov. 20, 2019) ("In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future— otherwise there is no remedial benefit that he can derive from such judicial decree.' ") (quoting *Leder v. Am. Traffic Sols., Inc.,* 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd,* 630 F. App'x 61 (2d Cir. 2015)); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 800 (2d Cir. 2015) ("The Supreme Court has 'repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.' ") (emphasis in original) (quoting *Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013)).

Setting aside his concession that "[i]t is less than clear that injunctive relief is available under the FCRA," [6] Plaintiff argues injunctive relief is appropriate under the NYFCRA "because Equifax engaged in a standardized, common course of conduct," (Pl.'s Mem. at 18) and because the agency "has not changed its uniform policy concerning disputes of hard inquiry information." (Pl.'s Reply at 3). However, " 'the existence of an official policy, on its own, is not sufficient to confer standing to sue for injunctive and declaratory relief on any individual who had previously been subjected to that policy,' unless the individual can also show a sufficient likelihood of future harm." *Dorce v. City of New York,* 2 F.4th 82, 95 (2d Cir. 2021) (quoting *Shain v. Ellison,* 356 F.3d 211, 216 (2d Cir. 2004) (alterations omitted)). While Hines has alleged past injuries, and alleges that Equifax continues to willfully violate the requirements outlined by FCRA and NYFCRA (Compl ¶¶ 46–49), he has neither alleged nor demonstrated any facts that suggest he is personally subject to ongoing harm or is likely to suffer the same harm again in the future if injunctive relief is not granted. The theoretical possibility that Equifax's improper reinvestigation practices will be applied to Hines detriment again at some unknown point in the future is insufficient to give him standing to sue for injunctive relief. [7]

[6] Equifax argues that injunctive relief is not expressly authorized by either the FCRA or the NYFCRA, and is therefore unavailable. (Def's Opp. at 24). While it is well-settled that "injunctive relief is unavailable in suits brought by private parties" under the FCRA, *Grauman,* 549 F. Supp. 3d at 292 n.4 (citing *Ramirez,* 141 S. Ct. at 2197; *George v. Equifax Mortg. Servs.,* No. 06-CV-971 (DLI) (LB), 2010 WL 3937308, at *3 (E.D.N.Y. Oct. 5, 2010); *White v. First Am. Registry, Inc.,* 378 F. Supp. 2d 419, 424 (S.D.N.Y. 2005)); *see also Owoyemi v. Credit Corp Sols. Inc.,* No. 21 Civ. 8021 (GHW) (RWL), 2022 WL 993011, at *4 (S.D.N.Y. Mar. 31, 2022) ("The FCRA ... does not provide for injunctive relief to consumers."), the availability of injunctive relief under the NYFCRA is less clear, *compare Owoyemi,* 2022 WL 993011, at *6 (dismissing claim for injunctive relief with prejudice because such relief "is not available under either the FCRA or the NYFCRA") *and Sloan v. TransUnion, LLC,* No. 21-CV-769 (MAD) (ML), 2022 WL 2237639, at *3 (N.D.N.Y. June 16, 2022) (denying default judgment seeking injunctive relief pursuant to the FCRA and NYFCRA) *with White,* 378 F. Supp. 2d at 425 (noting that "while the NYFCRA expressly authorizes monetary damages, the absence of any mention of injunctive relief or an affirmative grant of power to seek injunctive relief does not necessarily and inescapably lead to the conclusion that the Legislature meant to preclude such relief for private plaintiffs"). Because there are independent grounds for denying injunctive relief, the Court need not determine whether such relief is available under the NYFCRA at this time.

[7] Equifax also notes that the injunctive relief Plaintiff seeks would impermissibly amount to an order that Equifax "obey the law." (Def's Opp. at 24). Plaintiff responds that a more detailed injunctive order would be available upon further merits discovery and is unnecessary at this time. (Pl.'s Reply 14). On this score, Plaintiff is correct. While Equifax is correct that an "obey the law" order similar to that described in the generalized prayer for relief of Hines' complaint would be invalid, *see S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 240 (2d Cir. 2001), should Hines prevail on the

Case 5:24-cv-00188-DNH-MJK  Document 4  Filed 02/14/24  Page 112 of 238
Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

merits and should the Court find that he is entitled to injunctive relief, he would "have the opportunity to submit a proposed order of injunction for the Court's review." *See, e.g., Kaganovich v. McDonough,* 547 F. Supp. 3d 248, 279 (E.D.N.Y. 2021) (citing *Equal Emp. Opportunity Comm'n v. AZ Metro Distributors, LLC,* No. 15-CV-5370 (ENV) (PK), No. 15-CV-5370 (ENV) (PK), 2020 WL 7404432, at *14 (E.D.N.Y. Dec. 16, 2020)).

**\*12** Plaintiff similarly has not established standing to pursue declaratory relief. Under the Declaratory Judgment Act: "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "A court will generally decline to exercise its discretion to entertain a request for declaratory relief where such relief would serve 'no useful purpose.' " *Pryce,* 2022 WL 1085489, at *8 (quoting *Intellectual Capital Partner v. Inst. Credit Partners LLC,* No. 08 Civ. 10580, 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009)). "Declaratory relief serves 'no useful purpose' where 'legal issues will be resolved by litigation' of the underlying claims." *Id.* (quoting *Intellectual Capital Partner,* 2009 WL 1974392, at *6); *see also Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC,* No. 16-CV-6370 (SJF) (AYS), 2017 WL 6729854, at *12 (E.D.N.Y. Oct. 31, 2017), *aff'd* 736 F. App'x 274 (2d Cir. 2018) (same).

Here, Plaintiff seeks "[a]n order declaring that Defendant's actions are in violation of the FCRA" and "[a]n order declaring that Defendant's Actions are in violation of the NYFCRA." (Compl. at 16). The legal issues implicated by these requests will be resolved through litigation on the underlying claims, such that declaratory relief is unnecessary. Further, relief under the Declaratory Judgment Act is "intended to operate prospectively." *Guan v. Mayorkas,* 530 F. Supp. 3d 237, 255 (E.D.N.Y. 2021) (quoting *Storms v. United States,* No. 13-CV-811 (MKB), 2015 WL 1196592, at *21 (E.D.N.Y. Mar. 16, 2015)). As noted above, Plaintiff has not alleged or established that Equifax's policy will likely be enforced against him again in the future such that prospective relief is appropriate.

Given the adequacy of remedies at law and Plaintiff's failure to allege prospective harm, the Court finds that Plaintiff has not established standing to seek injunctive or declaratory relief.

## C. Hines Has Class Standing

A named plaintiff in a putative class action has "class standing" to pursue claims on behalf of absent class members "if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW,* 693 F.3d at 162 (internal quotation marks and citations omitted). "When this standard is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon,* 775 F.3d 154, 161 (2d Cir. 2014).

The application of the *NECA-IBEW* test is straightforward here. As explained above, Hines has adequately demonstrated that he has personally suffered actual injuries as a result of Equifax's putatively illegal conduct; namely, Hines lost time and money in pursing doomed disputes of unauthorized hard inquiries, and suffered harms to his privacy and reputational interests as a result of Equifax's failure to adopt reasonable procedures to prevent the disclosure of personal information for impermissible purposes. Equifax's uniform conduct with respect to disputes of unauthorized inquiries is alleged to have caused the same injuries to absent class members and implicates the same set of concerns. Thus, Hines' litigation incentives are sufficiently aligned with the absent class members, and he may pursue claims on their behalf.

## II. Personal Jurisdiction

**\*13** As a second threshold issue, the Court must determine whether it has personal jurisdiction over the defendant and over out-of-state claims. Equifax correctly notes that the Court lacks general personal jurisdiction to adjudicate claims brought against it, since Equifax is a Georgia LLC with a principal place of business in Georgia, and therefore is not "at home" in New York. (*See* Def's Opp. at 25); *see also Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 924 (2011). Equifax also argues that the Court lacks specific personal jurisdiction to hear the claims of putative class members that arose outside of New York, because they lack a sufficient connection to the forum. (Def's Opp. at 25) (citing *Bristol-Myers Squibb Co. v. Superior Court of California,* 137 S. Ct. 1773, 1780–81 (2017)). I disagree.

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

In *Bristol-Myers*, the Supreme Court held that a California court lacked specific personal jurisdiction over non-California residents' mass tort claims in a consolidated products liability action because the conduct giving rise to their claims did not occur in the state. *Bristol-Myers*, 137 S. Ct. at 1781–82. However, that case "involved a state-court consolidated mass action, not a class action in federal court," *Cox v. Spirit Airlines, Inc.*, No. 17-CV-5172(EK) (VMS), 2022 WL 939732, at \*18 (E.D.N.Y. Mar. 22, 2022), and thus was more limited in its holding than Equifax argues. Indeed, both the majority and the dissenting opinions explicitly acknowledged the limited nature of the Court's ruling. *See Bristol-Myers*, 137 S. Ct. at 1783–84 ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."); *see also id.* at 1789 n.4 (Sotomayor, J., dissenting) ("The Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there.").

"In the wake of the *Bristol-Myers* decision, lower federal courts have split on whether its rationale applies to federal nationwide class action under Rule 23 of the Federal Rules of Civil Procedure." *Mason v. Lumber Liquidators, Inc.*, No. 17-CV-4780 (MKB), 2019 WL 2088609, at \*5 (E.D.N.Y. May 13, 2019), *adopted by* 2019 WL 3940846 (Aug. 19, 2019) (collecting cases). Only two circuit courts have directly addressed the applicability of *Bristol-Myers* to federal class actions—both held that it does not apply. *See Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1126 (2021); *Lyngaas v. Ag*, 992 F.3d 412, 435 (6th Cir. 2021).

In *Mussat*, the Seventh Circuit explained that "absent class members are not full parties to the case for many purposes," such as determining whether diversity jurisdiction exists or whether venue is proper, and found "no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Mussat*, 953 F.3d at 447; *see also Devlin v. Scardelletti*, 536 U.S. 1, 9–10 (2002) ("Nonnamed class members ... may be parties for some purposes and not for others."). The court also noted

that the superiority requirement of Rule 23(b)(3) and its corresponding committee notes advise courts considering whether to certify a class to consider " 'the desirability or undesirability of concentrating the litigation of the claims in the particular forum,' " in recognition of the fact that "a class action may extend beyond the boundaries of the state where the lead plaintiff brings the case." *Mussat*, 953 F3d at 448 (quoting Fed. R. Civ. P. 23(b)(3)). Accordingly, the *Mussat* court held that in a class action, "the absentees are more like nonparties, and thus there is no need to locate each and every one of them and conduct a separate personal-jurisdiction analysis of their claims." *Id.* at 448.

**\*14**  In *Lyngaas*, the Sixth Circuit "follow[ed] their lead in holding that *Bristol-Myers Squibb* does not extend to federal class actions" for the same reasons. *Lyngaas*, 992 F.3d at 435. Succinctly distinguishing mass actions where *Bristol-Myers Squibb* clearly applies from class actions where it does not, the Sixth Circuit explained that in the class action context

> [t]he defendant is presented with a unitary, coherent claim to which it need respond only with a unitary, coherent defense. In this sense, the only suit before the court is the one brought by the named plaintiff. Thus, when the court considers whether the suit arises out of or relates to the defendant's contacts with the forum, the court need analyze only the claims raised by the named plaintiff, who in turn represents the absent class members.

*Id.* at 435 (internal quotation marks and citations omitted).

The Second Circuit has not specifically taken up the issue, but other courts in this Circuit have followed this majority rule and found that *Bristol-Myers* does not apply to federal class actions. *See Cox*, 2022 WL 939732, at \*18 (granting motion for class certification over defendant's personal jurisdiction objections, adopting the reasoning in *Mussat* and *Lyngaas*); *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 317 (N.D.N.Y. 2019) ("This Court therefore does not believe that *Bristol-Myers Squibb* stands for the point of law that all putative class members in a class action must meet the requirements of personal jurisdiction imposed on

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 114 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

plaintiffs in ordinary (non-class action) cases."); *see also Bank v. CreditGuard of Am.*, No. 18-CV-1311 (PKC) (RLM), 2019 WL 1316966, at *12 n.11 (E.D.N.Y. Mar. 22, 2019) (noting that "most district court decisions have held that *Bristol-Myers* does not apply to federal class actions" and collecting cases, but declining to decide the issue before class certification was sought). *But see In re Dental Supplies Antitrust Litig.*, No. 16-CV-696 (BMC) (GRB), 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017) (holding that *Bristol-Myers* applies to class actions in federal court and dismissing plaintiff's claims for lack of personal jurisdiction); *Spratley v. FCA US LLC*, No. 17-CV-0062, 2017 WL 4023348, at *6–7 (N.D.N.Y. Sept. 12, 2017) (same).

I agree with the majority of district courts that have addressed the issue, and with the Sixth and Seventh Circuits, and find that *Bristol-Myers* does not apply to federal class actions. Because absent class members are non-parties for jurisdictional purposes—including as explained above for the purposes of determining standing to litigate—there is no reason to treat them as parties for the purposes of determining personal jurisdiction. Rather, the Court can be satisfied that personal jurisdiction exists by examining only the claims of the named plaintiff, who represents the absent class members. In this case, it is enough that the Court unquestionably has personal jurisdiction over the claims of named plaintiff, a resident of Brooklyn, New York, which arise out of or relate to Equifax's conduct in and contacts with New York. (Compl. ¶ 4; Hines Depo. Tr. at 10:4–10). The Court's foregoing examination of the requirements of Rule 23 will ensure that absent class members' claims are sufficiently similar to Hines' such that concentrating the litigation in this forum is appropriate.

### III. Class Action Certification Requirements

 **\*15** Having determined that Plaintiff has sufficiently established standing and personal jurisdiction to pursue claims against Equifax, the Court now decides whether it is appropriate to certify the Plaintiff's proposed class and subclasses.

#### A. Legal Standards

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). As a result, the party seeking class certification must affirmatively demonstrate compliance with

the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 11 (E.D.N.Y. 2020). In the Second Circuit, a party seeking class certification must also satisfy an implied requirement of ascertainability which requires that "a proposed class is defined using objective criteria that establish a membership with definite boundaries" and does not permit certification where "a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). In addition to the Rule 23(a) requirements and the implied requirement of ascertainability, a party seeking class certification "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp.*, 569 U.S. at 33. "[T]o certify a class pursuant to Rule 23(b)(3), a plaintiff must establish (1) predominance—'that the questions of law or fact common to class members predominate over any questions affecting only individual members'; and (2) superiority—'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)). [8]

[8]    Although Plaintiff's class action complaint contains conclusions of law that repeat the requirements of Rule 23(b)(1) (Compl. ¶ 59), his memorandum of law in support of class certification addresses only certification of an injunctive relief class under Rule 23(b)(2) and certification of a class under the predominance and superiority requirements of Rule 23(b)(3). (Pl.'s Mem. at 15–18). Further, as described above, Plaintiff has not demonstrated Article III standing to pursue injunctive relief. "Courts cannot permit injunctive relief ... when plaintiffs would otherwise lack standing to seek such relief under Article III. Where there is no likelihood of future harm, there is no standing to seek an injunction, and so no possibility of being certified as a Rule 23(b)(2) class." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 148–49 (2d Cir. 2020) (collecting cases); *see also Allegra v. Luxottica Retail N. Am.*, No. 17-CV-5216 (PKC) (RLM), 2022 WL 42867, at *18 (E.D.N.Y. Jan. 5, 2022) ("[T]he Second Circuit has made clear that there is no equitable or policy exception to the Article III standing requirements that would allow past purchasers like Plaintiffs to nonetheless maintain an injunctive class under Rule 23(b)(2).").

2022 WL 2841909

Accordingly, the Court will focus exclusively on the requirements of Rule 23(b)(3).

**\*16** "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Id.; see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir. 2008) ("Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."). Importantly here, the same requirements and burden apply to the certification of subclasses. *See B & R Supermarket, Inc. v. MasterCard Int'l Inc.,* No. 17-CV-02738 (MKB), 2018 WL 1335355, at \*3 n.7 (E.D.N.Y. Mar. 14, 2018) ("When establishing subclasses, each subclass must meet the Rule 23 class certification requirements.... The movant bears the burden of constructing the subclasses based on the requirements of Rule 23.") (citations omitted).

"Rule 23 should be construed 'liberally rather than restrictively' " and "[t]he 'general preference' of the Court of Appeals for the Second Circuit is 'granting rather than denying class certification.' " *Belfiore v. Procter & Gamble Co.,* 311 F.R.D. 29, 60 (E.D.N.Y. 2015) (quoting *Gortat v. Capala Bros.,* 257 F.R.D. 353, 361–62 (E.D.N.Y. 2009)). Nevertheless, "[a] court may certify a class action only if it concludes, after a 'rigorous analysis,' that the proposed class meets the requirements of Rule 23(a) and (b)." *In re Restasis,* 335 F.R.D. at 11 (quoting *Comcast Corp.* 569 U.S. at 33–34). This rigorous "analysis may 'entail some overlap with the merits of the plaintiff's claim' .... [b]ut courts may decide merits issues at class certification 'only to the extent they are relevant to' the application of Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011), then quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 466 (2013)).

### B. Rule 23(a) Requirements and Ascertainability

#### 1. Ascertainability

Although not an enumerated requirement under Rule 23, courts in the Second Circuit must find that "a proposed class is defined using objective criteria that establish a membership with definite boundaries" and will not certify the class where "a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Sec.,* 862 F.3d 250, 269 (2d Cir. 2017). This is not meant to be a demanding standard; rather, "it is designed only to prevent certification of classes whose membership is actually indeterminable." *Harte v. Ocwen Fin. Corp.,* No. 13-CV-5410 (MKB) (RER), 2018 WL 1830811, at \*31 (E.D.N.Y. Feb. 8, 2018) (citing *Gomez v. Lace Enters., Inc.,* No. 15 Civ. 3326 (CM), 2017 WL 129130, at \*8 (S.D.N.Y. Nov. 24, 2015)), *adopted in part by* 2018 WL 1559766 (E.D.N.Y. Mar. 30, 2018). While "membership of the class must be ascertainable 'at some point in the case,' it does not necessarily have to be determined prior to class certification." *Id.* (quoting *Sykes v. Mel Harris & Assocs., LLC,* 285 F.R.D. 279, 287 (S.D.N.Y. 2012)).

Here, Equifax raises no objections to the ascertainability of Hines' proposed class and subclasses. As they are described above, Hines' proposed class and subclass definitions use clear, objective criteria and establish class membership with definite temporal and geospatial boundaries such that class membership can be readily determined. Indeed, membership in the nationwide FCRA Class, New York Subclass, and Capital One Subclass can be ascertained simply by examining records of dispute correspondence, and the Post-Dispute Publication Subclass can be identified by examining a combination of dispute correspondence and the "Log F" or "MDB records" of consumer credit files created when Equifax distributed its products. [9] Accordingly, the Court finds that the ascertainability requirement is satisfied as to the nationwide FCRA Class and as to each of the three subclasses.

[9]     Although Equifax has raised no direct objections to this factor, its objections to the Post-Dispute Publication Subclass may bear on ascertainability. Specifically, Equifax argues there is no way to determine whether it disseminated a consumer report about a putative class member that included a disputed inquiry because Equifax does not maintain a copy of the reports it issues or a record reflecting the contents of those reports. (Def's Opp. at 20 (citing Def's Suppl. Resp. to Interrog. No. 6; Leslie Depo. Tr 65:19–66:7; Gobin Decl. ¶ 22)). While Equifax does not retain copies of the reports it provides to its customers, MDB records provide a snapshot of the consumers' credit file at the moment an Equifax product containing their personal information is delivered, and Equifax's billing records describe the product that a customer ordered, the data that was included in the product, and the date the product was delivered. (Leslie Depo. Tr. at 15:18–17:24, 19:19–20:6). Cross referencing these documents could

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 116 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

accordingly identify those individuals who suffered the harm alleged. Further, as the subclass is defined, membership is ascertainable by examining only correspondence and MDB records; it is liability, rather than class membership, that hinges on additional evidence proving that disputed hard inquiry information stemming from a non-consumer initiated transaction was disseminated to a third party.

### 2. Numerosity

**\*17** Rule 23(a)(1) requires a finding that the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In the Second Circuit, numerosity is presumed for classes of [forty] or more." *In re Restasis,* 335 F.R.D. at 11 (citing *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995)); *see also Shahriar v. Smith & Wollensky Rest. Grp., Inc.,* 659 F.3d 234, 252 (2d Cir. 2011) (same). "[I]n assessing numerosity a court may make common sense assumptions without the need for precise quantification of the class." *Chime v. Peak Sec. Plus, Inc.* 137 F. Supp. 3d 183, 207 (E.D.N.Y. 2015) (internal quotation marks and citations omitted). "There is no requirement to specify an exact class size in order to demonstrate numerosity," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 293 F.R.D. 287, 300 (E.D.N.Y. 2013), and "numerosity may be fulfilled by extrapolating from a sample," *Harte,* 2018 WL 1830811 at \*27. "However, if 'the plaintiff's assertion of numerosity is pure speculation or bare allegations, the motion for class certification fails.' " *Pryce,* 2022 WL 1085489, at \*13 (quoting *Edge v. C. Tech Collections, Inc.,* 203 F.R.D. 85, 89 (E.D.N.Y. 2001)).

According to interrogatories produced by Equifax and the testimony of Equifax representatives, [Redacted] consumers nationwide received [Redacted], including [Redacted] consumers in New York. (Def's Suppl. Resps. to Interrog. Nos. 1 and 8 at 3; Leslie Depo. Tr. at 42:12–18, 48:4–8). This is more than sufficient to satisfy the numerosity requirement for the nationwide FCRA Class and the New York Subclass. With respect to the Capital One Subclass, Equifax has produced [Redacted] hard inquiry dispute letters that mention "Capital One," (Sartell Decl. ¶¶ 3–5), which gives rise to a common sense assumption that at least forty class members, if not the full [Redacted], disputed a hard inquiry associated with Capital One. Those class members would have received [Redacted] pursuant to Equifax's internal policies. (Gobin Decl. ¶ 20). Finally, with respect to the

Post-Dispute Publication Subclass, MDB records indicate that for New York consumers alone, Equifax delivered information regarding more than [Redacted] of the New York consumers to third parties after it had already received a hard inquiry dispute from the consumer. (Def's Suppl. Resp. to Pl.'s Interrog. No. 6 at 2; Leslie Depo. Tr. at 47:3, 59:9–19, 64:1–15, 82:14–83:3). Extrapolating from this sample, it is reasonable to assume that an even greater number of consumers received similar treatment nationwide, and that Equifax disseminated disputed hard inquiry information stemming from a non-consumer initiated transaction to a third party in more than forty of those cases. Accordingly, the court finds that the numerosity requirement is satisfied for the nationwide FCRA Class and for each of the three subclasses.

### 3. Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single common question will do." *Dukes,* 564 U.S. at 359 (alterations and citations omitted). To show commonality, a movant must demonstrate that the class claims "depend upon a common contention" that "is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "[W]hat matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (internal quotation marks and citations omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson,* 780 F.3d at 137–38 (quoting *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 756 (7th Cir. 2014)).

**\*18** Hines asserts that commonality is satisfied here because the nationwide FCRA class and the subclasses raise common factual and legal questions with respect to Equifax's "standard policies and practices" for processing and reinvestigating hard inquiry disputes, for preventing its customers, including Capital One, from obtaining consumer reports for impermissible purposes without authorization, and for preventing disputed hard inquiries from being disseminated in subsequent consumer reports. (Pl.'s Mem. at 12–13). Equifax generally raises concerns regarding predominance that are more adequately evaluated under the

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 117 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

framework of Rule 23(b), but briefly notes that Hines' common questions "all reduce to the same inquiry: Did Equifax violate the FCRA and NYFCRA?" which "does little to advance the resolution of this case" and renders the commonality requirement unsatisfied. (Def's Opp. at 12–13, 13 n.9). I disagree. Because common factual questions regarding the uniform application of Equifax's policies and practices and common legal questions regarding the reasonableness of those policies and practices sit at the core of this action and apply to all class and subclass members, the Court finds that Plaintiff has sufficiently demonstrated compliance with Rule 23's commonality requirements.

### 4. Typicality

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." In re Frontier Ins. Grp., Inc. Sec. Litig., 172 F.R.D. 31, 40 (E.D.N.Y. 1997). Typicality is found "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Jensen v. Cablevision Sys. Corp., 372 F. Supp. 3d 95, 121 (E.D.N.Y. 2019) (quoting Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)); see also Karvaly v. eBay, Inc., 245 F.R.D. 71, 82 (E.D.N.Y. 2007) ("The typicality requirement is generally satisfied 'as long as plaintiffs assert that defendants committed the same wrongful acts in the same manner against all members of the class.'") (quoting In re Medical X-ray Film Antitrust Litigation, No. 93-CV-5904, 1997 WL 33320580 at *4 (E.D.N.Y. Dec. 26, 1997)). "Minor variations in the fact patterns underlying individual claims" will not preclude typicality. Robidoux, 987 F.2d at 936–37. But while "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990), abrogated on other grounds by Microsoft Corp. v. Baker, 137 S. Ct. 1702 (2017)).

Hines asserts that his "claims are typical of those of other class members." (Pl.'s Mem. at 13). In particular, he contends that he and all other nationwide FCRA class members disputed a hard inquiry in writing and received Equifax's [Redacted] form response pursuant to Equifax's inadequate reinvestigation policy (Pl.'s Mem. at 13). He contends that his claims are typical of the New York Subclass members as he is a New York resident who suffered the same injury from the same course of conduct as other New York resident subclass members (Pl.'s Mem. at 14), that his claims are typical of the Capital One Subclass because he and all other subclass members disputed the unauthorized dissemination of private information to Capital One (Pl.'s Mem. at 14), and that his claims are typical of the Post-Dispute Publication subclass because he suffered the same harm from the same course of conduct when Equifax included a disputed, unauthorized hard inquiry in credit products that it disseminated to customers (Pl.'s Mem. 14). Equifax does not oppose class certification on typicality grounds, and has identified no defenses which uniquely apply to Hines' claims that threaten to become a focus of the litigation. Because each class and subclass member's claim depends on the same legal arguments and the same underlying course of conduct by Equifax, and because no unique defenses applicable only to Hines are apparent from the record, the Court finds that the typicality requirement of Rule 23(a)(3) is satisfied.

### 5. Adequacy of Representation

**\*19** Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing adequacy of representation, courts consider "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) [whether] plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, 502 F.3d 91, 99 (2d Cir. 2007) (quoting Baffa, 222 F.3d at 60). "This process 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" Id. (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997)). "Courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." Bayne, 2021 WL 4822426, at *7 (quoting In re Pfizer Inc. Sec. Litig.,

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 118 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

282 F.R.D. 38, 51 (S.D.N.Y. 2012)). Indeed, "the requirement that the class representative have knowledge of the facts of the case is a 'modest one.' " *Vergara v. Apple REIT Nine, Inc.*, No. 19-CV-2027 (DLI) (RML), 2021 WL 1103348, at *3 (E.D.N.Y. Feb. 5, 2021) (quoting *Decastro v. City of New York*, No. 16 Civ. 3850, 2019 WL 4509027, at *12 (S.D.N.Y. Sept. 19, 2019)).

Defendant here does not challenge the adequacy of Plaintiff or his chosen counsel. Plaintiff contends that he holds no conflicts of interest, and Defendant has not uncovered any such conflicts in deposing him. (Pl.'s Mem. at 14–15; Hines Depo. Tr. at 119:16–124:15). Further, Hines has demonstrated sufficient familiarity with the suit, his claims, and his role as class representative to meet the "modest" requirements of Rule 23(a)(4). (Pl.'s Mem. at 14; *see also* Hines Depo. Tr. at 117:9–23, 119:2–123:23). With respect to counsel: Hines is represented by five law firms, four of which have demonstrated experience in pursuing complex FCRA and consumer protection claims in individual representations and in the class action context. (Pl.'s Mem. at 14 n.10 (discussing the experience of Francis Mailman Soumilas, P.C., Skaar & Feagle, LLP, Robert Sola, P.C., and The Adkins Firm, P.C.); *see also* ECF Nos 44-23–44-26 (collectively, "Firm Bios") (same)). Indeed, these same four firms are counsel of record in the *Rivera* Action. (ECF No. 27 at 2 n.2). [10] Because Defendant has not challenged the adequacy of the Plaintiff or his chosen counsel, because Plaintiff's interests are not antagonistic to the class, and because his counsel have sufficient qualifications to represent the class, the Court concludes that the Plaintiff has satisfied his burden of establishing adequacy under Rule 23(a)(4).

[10]     The omission of the Mallon Consumer Law Group, PLLC is discussed further below. *See infra* Section III.D.

### C. Rule 23(b)(3) Requirements—Predominance and Superiority

Having found that Plaintiff satisfies Rule 23(a)'s requirements, the Court must consider whether he has satisfied the requirements of Rule 23(b)(3). A court may only certify a class under Rule 23(b)(3) if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Predominance

In the Second Circuit, "[p]redominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.' " *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir. 2013)); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *14 (S.D.N.Y. Aug. 13, 2020) ("Common questions are not just 'more substantial' than individual ones — they form the crux of the class claims.") (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)).

**\*20** Evaluating predominance requires a " 'more demanding' " inquiry than that required to find commonality under Rule 23(a), in which courts examine whether "common issues can profitably be tried on a class-wide basis, or whether they will be overwhelmed by individual issues." *Johnson*, 780 F.3d at 138 (quoting *Comcast Corp.*, 569 U.S. at 34); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." (internal quotation marks and citations omitted)). As a result, courts must "give careful scrutiny to the relation between common and individual questions in a case." *Bouaphakeo*, 577 U.S. at 453. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.' " *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)).

In undertaking the predominance inquiry, courts typically begin by considering the elements of the underlying causes of action. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 WL 7882100, at *35 (E.D.N.Y. Oct. 15, 2014) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011)), *adopted by* 2015 WL 5093503 (July 10, 2015). However, the rule "does not require a plaintiff seeking class certification to prove

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 119 of 238
Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)
2022 WL 2841909

that each element of [his] claim is susceptible to class wide proof," but requires that he "show that 'questions common to the class predominate, and not that those questions will be answered, on the merits, in the favor of the class.' " *Hasemann v. Gerber Prod. Co.,* 331 F.R.D. 239, 273 (E.D.N.Y. 2019) (quoting *Amgen,* 568 U.S. at 459, 468). "Typically, common issues predominate when liability is determinable on a class-wide basis, even where class members have individualized damages." *Id.* (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24 (2d Cir. 2006)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' " *Bouaphakeo,* 577 U.S. at 453–454 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)). [11]

[11] Equifax argues, in part, that the Court cannot certify a class where individual questions regarding damages will predominate. (Def's Opp. at 20–23). However, as noted above, individualized issues with respect to damages do not necessarily preclude a finding that common issues predominate. Indeed, "it is well-established in this Circuit that 'individualized damages determinations alone cannot preclude certification under Rule 23(b)(3),' and proponents of class certification need not 'rely upon a class-wide damages model to demonstrate predominance.' " *Pryce,* 2022 WL 1085489, at *19 n.8 (citing *Roach,* 778 F.3d at 408–09). Further, as Hines notes, since statutory and punitive damages are sought here for each class member, rather than actual damages, no such individualized inquiry is required. (Pl.'s Mem. at 16).

a. Section 1681i — Reinvestigation Class Claims [12]

[12] Violations of the reinvestigation provisions of the NYFCRA are evaluated in an identical manner to those brought under Section 1681i. *See, e.g., Ogbon v. Beneficial Credit Servs., Inc.,* No. 10 Civ. 3760 (PAE), 2013 WL 1430467, at *9 n.7 (S.D.N.Y. Apr. 8, 2013) ("[T]he Court construes

[N.Y. Gen. Bus. Law § 380-f(a)] in the same way as its similar federal analogue."); *Abdallah v. LexisNexis Risk Sols. FL Inc.,* No. 19-CV-3609 (RRM) (VMS), 2021 WL 1209419, at *8 (E.D.N.Y. Mar. 30, 2021), *reconsideration denied,* 2021 WL 6197060 (E.D.N.Y. Dec. 30, 2021).

**\*21** Section 1681i requires that "if a consumer notifies a consumer reporting agency—either directly or indirectly [through a reseller]—of a dispute as to the accuracy of any item of information contained in his file, within thirty days of notification, the consumer reporting agency 'shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate.' " *Khan v. Equifax Info. Servs., LLC,* No. 18-CV-6367 (MKB), 2019 WL 2492762, at *3 (E.D.N.Y. June 14, 2019) (quoting 15 U.S.C. § 1681i(a)(1)(A); *Jones,* 982 F. Supp. 2d at 272 (S.D.N.Y. 2013)). "What constitutes a 'reasonable' reinvestigation depends on the circumstances of the allegations." *Id.* (citing *Jones,* 982 F. Supp. 2d at 272). However, in undertaking a reinvestigation, the agency must at a minimum "review and consider all relevant information submitted by the consumer ... with respect to such disputed information," and must forward such relevant information to "any person who provided any item of information in dispute." 15 U.S.C. §§ 1681i(a)(2), (4). Importantly, "the statutory responsibility imposed on the credit report agency 'must consist of something more than merely parroting information received from other sources.' " *Jones,* 982 F. Supp. 2d at 273 (quoting *Gorman v. Experian Info. Solutions, Inc.,* No. 07 Civ. 1846 (RPP), 2008 WL 4934047, at *5 (S.D.N.Y. Nov. 19, 2008)). If an agency reasonably determines that the consumer's dispute is "frivolous or irrelevant"—for example, where the consumer fails to provide sufficient information to conduct a reinvestigation—it may terminate its reinvestigation of a consumer's dispute, provided that it provides the consumer with notice within five days of making that determination, explaining the agency's reasoning and identifying any information that it would need to actually investigate the dispute. 15 U.S.C. § 1681i(a)(3). "Ultimately, it is up to the trier of fact to weigh [various] considerations in determining whether the CRA conducted a reasonable reinvestigation" under the circumstances. *Jones,* 982 F. Supp. 2d at 273 (citing *Cushman v. TransUnion Corp.,* 115 F.3d 220, 226 (3d Cir. 1997)).

Unless the dispute is made through a reseller, a consumer must directly dispute an alleged inaccuracy in order to trigger the duty to reinvestigate. 15 U.S.C. § 1681i(a)(1)(A); *see also Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 104 (2d

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

Cir. 1997) ("[T]he statutory duty [to reinvestigate] is triggered only by direct requests from *consumers*, and ... no claim could have arisen here until [plaintiff] himself communicated with TransUnion to dispute his credit record."). "A consumer has not 'directly' contacted a credit reporting agency when ... she merely signs up for a credit repair service and then has no further involvement with, or even knowledge of, the disputes submitted putatively on her behalf." *Cohen v. Equifax Info. Servs., LLC*, No. 18 Civ. 6210 (JSR), 2019 WL 5200759, at *6 (S.D.N.Y. Sept. 13, 2019). *But see Milbauer v. TRW, Inc.*, 707 F. Supp. 92, 95 (E.D.N.Y. 1989) (holding that "consumer reporting agencies ... are not privileged to ignore a consumer's dispute simply because that dispute is submitted by a third party," and noting that such third party submissions "do[ ] not constitute a complete defense" to reinvestigation claims).

Additionally, to succeed on a Section 1681i claim, a plaintiff "must demonstrate that the disputed information is inaccurate." *Khan*, 2019 WL 2492762, at *3 (quoting *Gestetner v. Equifax Info. Servs. LLC*, No. 18 Civ. 5665 (JFK), 2019 WL 1172283, at *2 (S.D.N.Y. Mar. 13, 2019)); *see also Cohen v. Equifax Info. Servs., LLC*, 827 F. App'x 14, 16 (2d Cir. 2020) (summary order) ("The parties agree that a plaintiff must demonstrate that her credit report contained inaccurate information in order to prevail on a claim under § 1681e(b) or § 1681i."); *Artemov v. TransUnion, LLC*, No. 20-CV-1892 (BMC), 2020 WL 5211068, at *2 (E.D.N.Y. Sept. 1, 2020) ("In considering a challenge under § 1681e(b) or § 1681i, the 'threshold question' is whether the disputed credit information is accurate; if the information is accurate, 'no further inquiry into the reasonableness of the consumer reporting agency's procedure is necessary.' ") (quoting *Whelan v. TransUnion Credit Reporting Agency*, 862 F. Supp. 824, 829 (E.D.N.Y. 1994)); *Jones*, 982 F. Supp. 2d at 272–73 (S.D.N.Y. 2013) ("[A] 'plaintiff asserting claims under § 1681i must demonstrate that the disputed information is inaccurate in order to prevail on allegations that a consumer reporting agency had failed to reasonably reinvestigate a disputed item.' ") (quoting *Fashakin v. Nextel Commc'ns.*, No. 05-CV-3080 (RRM), 2009 WL 790350, at *11 (E.D.N.Y. Mar. 25, 2009)). "Although the Second Circuit has yet to address the issue, 'the overwhelming weight of authority holds that a credit report is inaccurate either when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect on credit decisions.' " *Abdallah*, 2021 WL 6197060, at *7 (quoting *Gross v. Priv. Nat'l Mortg. Acceptance Co., LLC*, 512 F. Supp. 3d 423, 426 (E.D.N.Y. 2021)). If disputed information is found to be inaccurate or incomplete, or if it

cannot be verified pursuant to a reinvestigation, it must be deleted from the consumer's credit report. *See* 15 U.S.C. § 1681i(a)(5)(A)(i); *see also Okocha v. TransUnion LLC*, No. 08-CV-3107, 2011 WL 2837594, at *7 (E.D.N.Y. Mar. 31, 2011), *aff'd* 488 F. App'x 535 (2d Cir. 2012).

**\*22** Plaintiff maintains that with respect to his Section 1681i claims, Equifax's transmission of [Redacted] to all nationwide FCRA class members and New York Subclass members in response to hard inquiry disputes, and the legal sufficiency of that transmission to satisfy Section 1681i's reinvestigation requirements are common factual and legal issues that predominate over any individual issues. (Pl.'s Mem. at 15). However, as described in more detail below, Equifax argues that "overwhelmingly individualized evidence" rather than "common proof" must be presented to show that each disputed hard inquiry was in fact "inaccurate" and to show that each hard inquiry was disputed "directly" by the individual consumer class member, such that the predominance requirement is not satisfied and class certification is unwarranted. (Def's Opp. at 13–18).

With respect to "inaccuracy," Equifax argues that its policy of categorizing disputes as "Miscellaneous/Not Mine" cannot be relied upon to determine whether an inquiry was, in fact, unauthorized and therefore inaccurate, particularly since certain dispute letters produced in this case were sorted into that category but do not clearly articulate the reason for the dispute, or otherwise indicate that the inquiry may have been disputed for different reasons. (Def's Opp. at 5–6, 14). For example, Equifax argues that produced dispute letters sorted into the "Miscellaneous/Not Mine" category reveal instances where consumers disputed an inquiry because Equifax failed to comply with the "permissible purpose" provisions of the FCRA or because the inquiry was otherwise "false" without further explanation. (Def's Opp. at 5–6; *see also* Pritchard Decl. ¶¶ 6–7). Further, Equifax argues that consumers may have disputed an accurate inquiry as "unauthorized" because they forgot that they engaged in the transaction that resulted in the inquiry, did not recognize the name of the creditor as it appeared on their credit report, did not expect a known transaction to result in an inquiry, or falsely disputed the inquiry in an attempt to improve their credit score. (Def's Opp. at 5; *see also* Gobin Decl. ¶ 12; Hendricks Depo. Tr. at 54:4–18; Turner Expert Rep. ¶ 18).

According to Equifax, determining whether an inquiry was "unauthorized" and "inaccurate" will therefore require a direct review of each consumer's individual dispute

2022 WL 2841909

correspondence, review of other relevant documents, and testimony from consumers and from the representatives of data inquirers to determine whether each disputed inquiry was actually authorized, or whether the data inquirer believed they had some other permissible purpose to obtain the information. (Def's Opp. at 14–16). As a result, Equifax maintains that individual issues of fact predominate and will demand thousands of mini-trials to determine whether each class member has a valid claim. Indeed, Equifax argues that adjudicating Hines' individual claims will require a review of documentation and testimony from Hines and from Capital One to determine whether he applied for credit and authorized the Capital One Inquiry, and that the same process must be followed "for each putative class member" showing "consumer-specific evidence proving that the inquiries about them should not have occurred." (Def's Opp. at 15) (citing *Mazzei v. Money Store,* 829 F.3d 260, 232–73 (2d Cir. 2016)).

Plaintiff responds that class-wide proof can demonstrate, and indeed has demonstrated, that upon notification of a presumptively bona fide dispute from a consumer regarding a hard inquiry, [13] Equifax uniformly responds by sending [Redacted] without further investigating the circumstances of the inquiry, and therefore uniformly fails to satisfy its obligations under Section 1681i to delete disputed information, reinvestigate disputed information, or decline to reinvestigate for cause upon proper notice to the consumer. (Pl.'s Reply at 5–9). According to Hines, Equifax should have conducted individualized inquiries into the accuracy of disputed information, reviewed documentary evidence, and considered statements from complaining consumers and relevant data inquirers regarding whether the inquiry was authorized or otherwise inaccurate within the thirty day window for reinvestigation established by § 1681i, or alternatively should have notified the complaining consumer at that time that he or she did not provide sufficient information to conduct such an inquiry. (Pl.'s Reply at 4). Put differently, Hines argues that Equifax "cannot now claim ... that had it reinvestigated it would have come up with results that showed that some of the inquiries were accurate." (Pl.'s Reply at 6). Rather, their failure to reinvestigate constitutes a violation of § 1681i, and "[t]o require more of a disputing consumer now, as Equifax suggests, when the agency neither reinvestigates nor deletes the disputed information, places consumers in an untenable Catch 22." (Pl.'s Reply at 8). Further, Hines argues that to the extent merits discovery exposes evidence indicating that Equifax shared consumer data for permissible purposes, or that Equifax properly declined to investigate, the relevant individuals can be identified using representative or statistical methods and can be administratively removed from the class. (Pl.'s Reply at 4 n.3).

13    According to the Federal Trade Commission, "[a] CRA must assume a consumer's dispute is bona fide, unless there is evidence to the contrary. Such evidence may constitute receipt of letters from consumers disputing all information in their files without providing any allegations concerning the specific items in the files, or of several letters in similar format that indicate that a particular third party (e.g., a 'credit repair' operator) is counseling consumers to dispute all items in their files, regardless of whether the information is known to be accurate." Fed. Trade Comm'n, *40 Years of Experience With the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations,* 2011 WL 3020575, at \*69 (July 2011) (citing 1990 Commentary on the Fair Credit Reporting Act, Appendix to Part 600, comment 611-11).

**\*23** With respect to "directness," Equifax argues that determining whether a consumer class member directly disputed his or her inquiry will similarly require reviewing individual dispute correspondence "for indicia that the dispute was made by a [credit repair organization] or other third party"—such as [Redacted]—and would require the assessment of further evidence related to the class member's participation in generating and submitting the dispute to make an affirmative determination that he or she "directly" disputed the alleged inaccuracy. (Def's Opp. at 17–18; *see also* Gobin Decl. ¶ 14). To support this argument, Equifax points to [Redacted] dispute letters which contain such indicia of indirectness. (Def's Opp. at 18; *see also* Pritchard Decl. ¶¶ 3–5). Hines argues that these alleged indicia of indirectness are based in speculation and are supported by cherry-picked evidence, and that to the extent "indirect disputes" exist and preclude recovery, the relevant class members can be identified and administratively removed from the class. (Pl.'s Reply at 9–10).

Although Equifax raises legitimate concerns regarding the feasibility of evaluating individualized issues of inaccuracy and directness, the crux of the class claim here is whether treating disputed hard inquiries as accurate without any further investigation, sending [Redacted], and shifting the burden to consumers to investigate allegedly unauthorized inquiries by contacting their customers satisfies Equifax's reinvestigation obligations under § 1681i. Hines has

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

demonstrated that Equifax's common course of conduct in response to hard inquiry disputes is susceptible to class-wide proof, (*see, e.g.*, Equifax Dispute Policy Manual v.17 at 37; Equifax Dispute Policy Manual v.22 at 35; Equifax Training & QA at 3; Gobin Decl ¶¶ 9, 18, 20), and the legal sufficiency of Equifax's reinvestigation practices may therefore be evaluated on a class-wide basis. While inaccuracy and directness are "important matter[s]" bearing on individual class members' ability to recover that may "have to be tried separately," *Bouaphakeo*, 577 U.S. at 453–54, or may require developing a method of administratively removing individuals from the class, issues regarding the legal sufficiency of Equifax's common course of conduct predominate over these individualized issues. Accordingly, these individualized issues do not defeat predominance.

Therefore, despite Equifax's legitimate concerns regarding individualized accuracy and directness issues, I find that common legal questions susceptible to class-wide proof predominate such that Plaintiff's claims under § 1681i and N.Y. Gen. Bus. Law § 380-f are amenable to class resolution.

### b. Section 1681e(a) — Capital One Subclass Claims

Because the statutes reference one another, the Court considers the Reasonable Procedures claims brought on behalf of the Capital One Subclass under sections 1681e(a) and 1681b together. Section 1681e(a) requires that consumer reporting agencies "maintain reasonable procedures designed ... to limit the furnishing of consumer reports to the purposes listed under section 1681b .... These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." 15 U.S.C. § 1681e(a); *see also Pietrafesa v. First Am. Real Est. Info. Servs., Inc.*, No. 05-CV-1450, 2007 WL 710197, at *3 (N.D.N.Y. Mar. 6, 2007) ("These reasonable procedures must include a requirement that the prospective users of information: (1) identify themselves; (2) certify the purposes for which the information is sought; and (3) certify that the information will be used for no other purpose."). Under this section, "no consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b[.]" 15 U.S.C. § 1681e(a). "To determine whether the consumer reporting agency maintained reasonable procedures, the standard of

conduct is what a reasonably prudent person would do under the circumstances." *Pietrafesa*, 2007 WL 710197, at *3 (quoting *Dobson v. Holloway*, 828 F. Supp. 975, 977 (M.D. Ga. 1993)); *see also Obabueki v. Int'l Bus. Machines Corp.*, 145 F. Supp. 2d 371, 395–96 (S.D.N.Y. 2001) (liability may be imposed upon a credit reporting agency for failing to act reasonably in complying with the FCRA), *aff'd* 319 F.3d 87 (2d Cir. 2003). [14]

[14]  Notably, only one court in this Circuit has evaluated claims brought specifically for violations of § 1681e(a). *See Pietrafesa*, 2007 WL 710197, at *4 (finding on summary judgment that defendant agency complied with the requirements enumerated in § 1681e and that plaintiff "failed to identify any deviations from the standard of care to be used by credit reporting agencies in maintaining reasonable procedures to comply with §§ 1681b and 1681c").

**\*24** In turn, "[t]o prove a violation of section 1681b, a plaintiff must show that credit information was obtained for an impermissible purpose." *Ogbon*, 2013 WL 1430467, at *10 (quoting *Stonehart v. Rosenthal*, No. 01 Civ. 651 (SAS), 2001 WL 910771, at *3 (S.D.N.Y. Aug. 13, 2001); citing *Perl v. Am. Express*, 12 Civ. 4380 (ER), 2012 WL 2711270, at *2 (S.D.N.Y. July 9, 2012)). "Conversely, a showing of a permissible purpose is a complete defense." *Stonehart*, 2001 WL 910771, at *3 (citing *Advanced Conservation Sys. Inc. v. Long Island Lighting Co.*, 934 F. Supp. 53, 54 (E.D.N.Y. 1996)). Further, "[t]he fact that a consumer report is furnished for an impermissible purpose does not result in automatic liability. Liability is imposed only when the consumer reporting agency either willfully or negligently fails to maintain reasonable procedures to avoid violations of, *i.e.,* § 1681b." *Pietrafesa*, 2007 WL 710197, at *3 (internal quotation marks and alterations omitted); *see also Betz v. Matte*, No. 12-CV-5946 (SJF) (ETB), 2013 WL 5603846, at *2 (E.D.N.Y. Oct. 10, 2013) ("To state a claim based on Section 1[6]81b of the FCRA, 'a plaintiff must allege both that the defendant used or obtained the plaintiff's credit report for an impermissible purpose, and that the violation was willful or negligent.' ") (quoting *Perl*, 2012 WL 2711270, at *2).

In connection with the § 1681e(a) claims of the Capital One Subclass, Plaintiff argues that in addition to common factual questions regarding the procedures used by Equifax to prevent unauthorized disclosures to its customers

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 123 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

generally and to Capital One in particular, common legal questions regarding the reasonableness of those procedures predominate over any individualized issues. (Pl.'s Mem. at 16; *see also* Pl.'s Reply at 10–11). Equifax argues that even assuming class members' disputed Capital One inquiries correspond with truly unauthorized transactions, there are other permissible purposes for obtaining consumer information that Capital One may have had, such that "to adjudicate the class members' [claims], the factfinder would have to delve even more deeply into the class member-specific facts to determine if Capital One had *any* permissible purpose to obtain their consumer report," and would need to prove that Equifax had a "reason to believe" that Capital One would not use the data for a permissible purpose. (Def's Opp. at 19).

Although individual questions concerning whether Capital One had a permissible purpose to obtain consumer information are relevant here, such questions are secondary to and outweighed by common questions concerning the reasonableness of Equifax's standardized procedures. Specifically, the Court is satisfied that questions of law concerning whether Equifax's procedures meet the minimum requirements established by § 1681e(a) and were objectively reasonable as applied to its transactions with Capital One, are susceptible to common proof and predominate over those individualized issues that can be adjudicated separately. Indeed, even if showing a permissible purpose as to certain class members would serve as a complete defense, the fact that such a defense "may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *In re Visa Check,* 280 F.3d at 138 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray,* 208 F.3d 288. 296 (1st Cir. 2000)). "[T]he question for purposes of determining predominance is not whether a defense exists, but whether the common issues will predominate over the individual questions raised by that defense." *Id.* Here again, Equifax's common course of conduct and generally applicable procedures are the predominant concern, rather than their application to each class member's disputed inquiry. Further, while Equifax argues that liability requires a finding that Equifax had a "reason to believe" that Capital One acted improperly in each instance (Def's Opp. at 19), the high volume of Capital One-related dispute letters suggests that representative or statistical proof may be used to evaluate whether, under the circumstances, Equifax should have known Capital One was improperly using consumer data. (*See* Pl.'s Reply at 10; *see also* Sartell Decl. ¶¶ 3–5).

### c. Section 1681b(c)(3) — Post Dispute Publication Subclass

**\*25** Under Section 1681b(c)(3), "a consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer." 15 U.S.C. § 1681b(c)(3). As Equifax notes, there is a scarcity of case law evaluating claims brought under this section. (*See* Def's Opp. at 11 n.8). Nevertheless, the application of the provision is straightforward—an agency violates this provision by furnishing to any person a record of an inquiry that corresponds with a credit or insurance transaction that the consumer did not initiate.

Plaintiff contends that the Post-Dispute Publication Subclass claims raise "predominating factual issue[s]" regarding whether a consumer disputed a hard inquiry with Equifax and "whether Equifax prepared a credit report about that consumer for one of its customers after the dispute that included the disputed hard inquiry[,]" which "implicate[ ] the legal issue of whether such conduct violates" the provisions of § 1681b(c)(3). (Pl.'s Mem. at 15–16). Equifax argues that in addition to proving that each class member's disputed inquiry was, in fact, "unauthorized," these claims require proving that each class member's disputed hard inquiry was shared with a third party, and that there is no common evidence available to establish that element of the claim since Equifax does not retain copies of the consumer reports it transmits to its customers. (Def's Opp. at 20) (citing Pl.'s Mem. at 8; Def's Suppl. Resp. to Pl.'s Interrog. No. 6; Leslie Depo. Tr. at 65:19–66:7, 83:4–20; Gobin Decl. ¶ 22). Hines replies that the MDB records reflecting the sale of credit reports to third parties should suffice as common evidence to prove these claims, and further contends that certification should not be defeated simply because Equifax—a data broker—maintains unreliable records. (Pl.'s Reply at 11–12).

In general, "[c]ommon issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria, thus rendering unnecessary an evidentiary hearing on each claim." *Shady Grove,* 293 F.R.D. at 306 (quoting *Smilow v. Sw. Bell Mobile Sys's., Inc.,* 323 F.3d 32, 40 (1st Cir. 2003)). Here, using computer records and objective criteria, Equifax has been able to identify and aggregate those New Yorkers who received [Redacted] and about whom information was transmitted after a hard inquiry dispute was made (Def's Suppl. Resp. to Pl.'s Interrog. No. 6 at 2), and has suggested

**Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)**

2022 WL 2841909

that Log F and MDB records generated at the time of delivery can be cross referenced against Equifax's billing records to determine whether the product delivered included the disputed hard inquiry information (Leslie Depo. Tr. at 15:18–17:24).

Importantly, though, these computer records are not able to determine whether the consumer initiated the transaction that caused the hard inquiry. And unlike the FCRA Class claims, which focus predominantly upon the propriety of Equifax's uniform reinvestigation practices in response to hard inquiry disputes, and the Capital One Subclass claims, which predominantly turn on the reasonableness of its standardized procedures in preventing the disclosure of consumer data for impermissible purposes, the Post-Dispute Publication Subclass claims turn entirely on the individualized, non-consumer-initiated nature of the inquiry. Put differently, the Post-Dispute Publication Subclass claims do not rely on a uniform or standardized practice adhered to by Equifax, but hinge on whether the individual consumer initiated the underlying transaction. Thus, while aggregate proof may be available to administratively manage certain aspects of the Post-Dispute Publication claims, assessing Equifax's conduct raises predominantly individualized questions and is not suitable to class adjudication.

**\*26** Because the predominance requirement is not satisfied with respect to these claims, I respectfully recommend that Your Honor deny class certification with respect to the Post-Dispute Publication Subclass.

### 2. Superiority

*Rule 23(b)(3)* requires a plaintiff establish "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Fed. R. Civ. P. 23(b)(3)*. In assessing superiority, *Rule 23* advises that courts might consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; and (D) the likely difficulties in managing a class action." *Fed. R. Civ. P. 23(b)(3)(A)–(D)*. "*Rule 23(b)(3)* class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, *729 F.3d at 130*;

*see also Amchem Prods., Inc.*, *521 U.S. at 617* ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (quoting *Mace v. Van Ru Credit Corp.*, *109 F.3d 338, 344 (7th Cir. 1997)*).

Plaintiff argues that the "consumer claims" here are "particularly appropriate for class resolution," where "Equifax has violated the rights of [sic] large number of geographically dispersed persons to such an extent that the cost of pursuing individual litigation to seek recovery against a well-financed adversary is not feasible," and where "the alternatives to a class action are either no recourse for tens of thousands of consumers, or ... a multiplicity of thousands of scattered suits resulting in the inefficient administration of litigation." (Pl.'s Mem. at 17). Equifax does not contest whether the superiority requirement has been satisfied. The Court agrees that the class action mechanism typically offers a more efficient method of redressing harms caused by FCRA violations. *See, e.g.*, *7 Newberg on Class Actions § 21:4 (5th ed. 2021)* ("FCRA matters remain good candidates for class actions—they tend to involve a large number of harmed individuals with small claims, often disbursed throughout the country. Absent a class suit, many FCRA violations would remain un-remedied."). However, the nature and extent of the *Rivera* Action gives me pause with respect to nationwide FCRA Class.

Hines specifically brought the *Rivera* Action to the Court's attention to stand for the proposition that certification in *Rivera* "directly supports his position that class certification in this matter is warranted and should be granted in this case." (ECF No. 47). While "a multiplicity of class-action filings is not necessarily 'needless,' " and "may aid a district court in determining, early on, whether class treatment is warranted," *China Agritech, Inc. v. Resh*, *138 S. Ct. 1800, 1811 (2018)*, the maturity of this first-filed, [15] duplicative litigation that "has already begun by ... class members" militates against certifying an overlapping nationwide FCRA class here. *Fed. R. Civ. P. 23(b)(3)(B)*.

[15] "The first-filed rule is a well-established Second Circuit doctrine, based on the principle that 'where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 125 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

priority to the second.' " *Thomas v. Apple-Metro, Inc.,* No. 14 Civ. 4120 (VEC), 2015 WL 505384, at *2 (S.D.N.Y. Feb. 5, 2015) (quoting *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir. 1989)). This rule "embodies considerations of judicial administration and conservation of resources by avoiding duplicative litigation and honoring the plaintiff's choice of forum." *Travis v. Navient Corp.,* 284 F. Supp. 3d 335, 348 (E.D.N.Y. 2018) (quoting *Emp'rs Ins. of Wausau v. Fox Entm't Grp., Inc.,* 522 F.3d 271, 274–75 (2d Cir. 2008)). *See also, e.g., Baduria v. Sealift Holdings, Inc.,* 451 F. Supp. 3d 248, 257 (E.D.N.Y. 2020) (transferring a putative class action to the Western District of Louisiana under the "first filed" rule). *But see Shimon v. Equifax Info. Servs. LLC,* No. 18-CV-2959 (BMC), 2018 WL 4906245, at *3 (E.D.N.Y. Oct. 9, 2018) (finding that the first-filed rule should not be applied to stay or dismiss claims where putative class actions do not entirely overlap), *aff'd,* 994 F.3d 88 (2d Cir. 2021).

**\*27** In general, parallel and overlapping class actions create problems related to duplicative litigation and fees, risk disparate verdicts, and undermine the goals of judicial economy that the class action device was meant to advance. *See, e.g., Galvan v. Mnuchin,* No. 20-CV-4511, 2020 WL 8259110, at *3 (N.D. Ill. Oct. 15, 2020) ("Considerable authority counsels against certifying a redundant class.") (collecting authorities); 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1798.1 (3d ed. 2022) ("[C]ompeting and duplicative actions not only generate unnecessary litigation and duplicative fees, but also they may result in delay, pose complicated problems of judicial coordination in some instances, increase the risk of disparate verdicts raising serious questions of fairness, and, in situations in which there are limited funds available as compensation, result in the unequal distribution of those funds."); Rhonda Wasserman, *Dueling Class Actions,* 80 B.U. L. Rev. 461, 542 (2000) ("Whenever two or more class actions are filed on behalf of the same class, seeking the same relief for the same wrong, numerous problems result: (1) scarce resources are wasted, (2) counsel are subject to intense pressure to settle, (3) class counsel, class members and the court all are compelled to make important decisions without complete information, and (4) courts are required to grapple with complex and difficult preclusion questions. These problems seriously undermine the utility of the class action vehicle.").

In addition to sharing the same class members and the same reinvestigation claims brought under the FCRA, the sharing of discovery with the *Rivera* Action further demonstrates the potential for such concerns. As has been noted, Hines has secured the reproduction of substantial evidence from the *Rivera* Action to demonstrate that Rule 23's requirements are satisfied here. (Pritchard Decl. ¶ 2 (noting that [Redacted] dispute letters produced in *Rivera* were reproduced here); *see also* ECF No. 27). On one hand, coordinating discovery among the two actions enables certain efficiencies by preventing duplication of effort in the fact gathering process; on the other, the efficiencies that result are likely outweighed by the inefficiencies of having multiple lawyers from multiple firms duplicating efforts to review the same materials on behalf of the same class members but on behalf of different named class representatives in different fora, thereby increasing attorneys' fees, reducing the amount of compensation available to the class upon recovery, and increasing the risk that inconsistent decisions will be made based on the same proffered evidence.

Beyond issues regarding the nature and extent of the *Rivera* Action, the remaining Rule 23(b)(3) superiority factors do not weigh heavily toward class certification. Indeed, the existence of an overlapping action concerning the same claims and class members indicates that there is no strong interest in individual control of litigation and no particular desirability in concentrating litigation in this forum. Finally, the likely difficulties of managing a class action would likely be exacerbated in managing multiple, overlapping class actions, notwithstanding the presence of shared class counsel. Accordingly, with all due respect to the certification decision of the Northern District of Georgia, [16] I respectfully recommend that the Court deny certification of the nationwide FCRA class in order to avoid the concerns created by overlapping class actions. Alternatively, I recommend that the Court order further briefing from the parties on the issue of whether a stay, consolidation, or transfer of proceedings is warranted under the circumstances. *See, e.g., China Agritech,* 138 S. Ct. at 1811 (noting that "district courts have ample tools at their disposal to manage [overlapping class] suits, including the ability to stay, consolidate, or transfer proceedings.").

---

[16]  *Smith v. Bayer Corp.,* 564 U.S. 299, 317 (2011) (noting that federal courts are expected "to apply principles of comity to each other's class certification decisions when addressing a common dispute"); *see also Mast, Foos, & Co. v. Stover*

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 126 of 238

Hines v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2841909

*Mfg. Co.*, 177 U.S. 485, 488 (1900) ("Comity is not a rule of law, but one of practice, convenience, and expediency. It is something more than mere courtesy, which implies only deference to the opinion of others, since it has substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question.").

**\*28** Despite this recommendation, I find that the Rule 23(b)(3) superiority factors weigh in favor of certifying the New York Subclass and Capital One Subclass. With respect to those subclasses, the likely cost of litigation as compared with the potential recovery indicates that class members have no strong interest in individually controlling the prosecution or defense of separate actions. Those subclasses also contemplate separate claims not covered by the *Rivera* action, such that the extent and nature of that litigation is not relevant to the decision. Further, the concentration of litigation of NYFCRA class claims in this forum is particularly desirable, as this Court is well equipped to apply New York law. Finally, there are no particular manageability concerns implicated by these subclass claims.

Accordingly, because the Rule 23(a) and Rule 23(b)(3) factors are satisfied, I respectfully recommend that Your Honor grant Plaintiff's motion for class certification with respect to the New York Subclass and the Capital One Subclass.

### D. Rule 23(g)—Class Counsel

Rule 23(g) requires that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). The Rule requires that the court consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). Defendant raises no objections to Plaintiff's proposed class counsel.

Although Plaintiff is represented by five firms, the proposed order submitted in connection with his motion for class certification lists only four firms. (*See* Proposed Order at 3, 5

(omitting Mallon Consumer Law Group, PLLC)). For those four firms, Plaintiff has submitted exhibits demonstrating the experience, knowledge, and resources of those four listed firms that satisfy the factors outlined in Rule 23 (g). (*See* Firm Bios). Without documentation to consider the credentials of the Mallon Consumer Law Group, PLLC or a request that such firm be appointed class counsel, however, the Court finds that it would be inappropriate to include Mallon Consumer Law Group, PLLC in an order appointing class counsel. Accordingly, I respectfully recommend that Your Honor appoint Francis Mailman Soumilas, P.C., Robert S. Sola, P.C., Skaar & Feagle, LLP, The Adkins Firm, P.C. as class counsel.

### CONCLUSION

For the reasons set forth above, I respectfully recommend that Your Honor (1) grant Plaintiff's request for certification of the New York Subclass, and Capital One Subclass under Rule 23(b)(3); (2) deny Plaintiff's request for certification of the nationwide FCRA Class under Rule 23(b)(3), or alternatively order further briefing from the parties on the issue of whether a stay, consolidation, or transfer of proceedings is warranted in light of the pending *Rivera* Action; (3) deny Plaintiff's request for certification of the Post-Dispute Publication Subclass under Rule 23(b)(3); (4) deny Plaintiff's request for certification under Rule 23(b)(2) with respect to the New York Subclass; (5) appoint Plaintiff as the class representative and Francis Mailman Soumilas, P.C., Robert S. Sola, P.C., Skaar & Feagle, LLP, The Adkins Firm, P.C. as class counsel; and, (6) direct the parties to submit to the Court within thirty days proposed forms and schedules for providing notice to the certified classes.

Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Rachel P. Kovner within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

### All Citations

Not Reported in Fed. Supp., 2022 WL 2841909

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Selvam v. Experian Information Solutions, Inc., Not Reported in F.Supp.3d (2015)

2015 WL 1034891

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Haynes v. TransUnion, LLC,   E.D.N.Y.,   February 4, 2021

2015 WL 1034891

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Kamaladoss V. SELVAM, pro se, Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS,

INC. and Rubin & Rothman, LLC, Defendants.

No. 13–CV–6078 (DLI)(JO).

|

Signed March 10, 2015.

**Attorneys and Law Firms**

Kamaladoss V. Selvam, Ridgewood, NY, pro se.

Andrew Steven Kleinfeld, Jones Day, New York, NY, Joseph Latona, Rubin & Rothman, Islandia, NY, for Defendants.

*MEMORANDUM AND ORDER*

DORA L. IRIZARRY, District Judge.

**\*1** Plaintiff Kamaladoss V. Selvam (the "Plaintiff") filed the instant action against Defendants Experian Information Solutions, Inc. and Rubin & Rothman, LLC (collectively the "Defendants"), alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"). Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. Plaintiff opposes this motion. For the reasons stated below, the action is dismissed for failure to state a claim upon which relief may be granted.

**BACKGROUND**

On November 20, 2013, Plaintiff filed an Amended Complaint alleging that, in May 2012, Defendant Rubin & Rothman, LLC made an impermissible "hard pull" credit inquiry and obtained Plaintiff's consumer credit report from Defendant Experian, which is a consumer credit reporting agency. (Amended Compl. ¶ 3; Dkt. Entry No. 9.) Plaintiff alleges that, in doing so, Defendants willfully and negligently failed to comply with the requirements of section § 1681b of the FCRA. (*Id.* ¶¶ 9–10, 19–20.) Plaintiff also alleges that Defendants failed to follow "reasonable procedures to assure maximum possible accuracy of the Plaintiff's credit report" as required under section 1681e of the FCRA. (*Id.* ¶¶ 9, 19.) Plaintiff claims that he is entitled to actual and punitive damages as a result of Defendants' actions because he "has suffered and continues to suffer, and will suffer damages, including denial of credit, lost opportunity to receive credit, damage to reputation, worry, fear, distress, frustration embarrassment, and humiliation." (*Id.* ¶ 11–13, 21–22.) Defendants jointly filed a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Defendants contend that: 1) Plaintiff has failed to allege facts showing that his consumer report was furnished or obtained for an impermissible purpose; 2) Defendants willfully or negligently violated the FCRA; and 3) Defendant Experian failed to follow reasonable procedures to assure maximum possible accuracy of Plaintiff's credit report as required under the FCRA. (*See generally* Defs. Mem. of Law in Support of Defs. Joint Mot. to Dismiss Plaintiff's Amended Compl. ("Defs.Mem."); Dkt. Entry No. 20.)

**DISCUSSION**

**I. Standard of Review**

The Defendants moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) after they had answered the Amended Complaint. A 12(b)(6) motion is proper only before the filing of an answer. *See* FED. R. CIV. P. 12(b). However, as Rule 12(c) serves the same function as the untimely Rule 12(b)(6) motion, the Court will construe the motion as a 12(c) motion for judgment on the pleadings and apply the same standards that are employed for dismissing a complaint for failure to state a claim under Rule 12(b)(6). *See Ad–Hoc Comm. Of the Baruch Clack & Hispanic Alumni Ass'n v. Bernard M. Baruch Coll.,* 835 F.2d 980, 982 (2d Cir.1987); FED. R. CIV. P. 12(c), (h). The Court will exclude all matters outside the pleadings and will not convert this motion into one for summary judgment. *See* FED. R. CIV. P. 12(d).

**\*2** Under these standards, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will be considered

"plausible on its face" "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A pleading that offers only "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* at 678 (internal quotation marks omitted). *Pro se* complaints are held to less stringent standards than pleadings drafted by attorneys and the Court is required to read the Plaintiff's *pro se* complaint liberally and interpret it raising the strongest arguments it suggests. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Sealed Petitioner v. Sealed Defendant # 1,* 537 F.3d 185, 191–93 (2d Cir.2008).

When deciding a motion to dismiss, all factual allegations in the plaintiff's complaint are presumed to be true and viewed in a light most favorable to the plaintiff. *See Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993). Additionally, the Court may only consider "the complaint as well as 'any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference.' " *Alyanaram v. Am. Ass'n of Univ. Professors at the N.Y. Inst. of Tech., Inc.,* 742 F.3d 42 (2d Cir.2014) (quoting *Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001)).

## II. Liability Under the FCRA

"The FCRA creates a private right of action against credit reporting agencies for the negligent or willful violations of any duty imposed under the statute." *Neclerio v. Trans Union, LLC,* 983 F.Supp.2d 199, 208 (D.Conn.2013). Section 1681b of the FCRA outlines the permissible purposes for which a consumer credit reporting agency may furnish a consumer's credit report, one of which is if the person requesting the report "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A). Section 1681b(f) prohibits a person from using or obtaining a consumer report for any purpose unless "the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section." 15 U.S.C. § 1681b(f). A consumer may collect damages if a person willfully or negligently fails to comply with these sections. *See* 15 U.S.C. § 1681(n)-(o). Therefore, "[t]o state a claim for civil liability based on section 1681b, a plaintiff must allege both that the defendant used or obtained the plaintiff's credit report

for an impermissible purpose, and that the violation was willful or negligent." *Perl v. Am. Express,* 2012 WL 2711270, at *2 (S.D.N.Y. July 9, 2012). "[V]arious courts have held that, in order to survive a motion to dismiss, the plaintiff's complaint must allege specific facts as to the defendant's mental state when the defendant accessed the plaintiff's credit report. Merely stating that the violation was 'willful' or 'negligent' is insufficient." *Braun v. United Recovery Systems,* 14 F.Supp.3d 159, 167 (S.D.N.Y.2014) (citing *Perl,* 2012 WL 2711270, at *2).

**\*3** Section 1681e(b) of the FCRA states that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). "To succeed on a claim under this section, a plaintiff must establish that: (1) the consumer reporting agency was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury." *Whelan v. Trans Union Credit Reporting Agency,* 862 F.Supp. 824, 829 (E.D.N.Y.1994).

### A. Defendants' Assertion that the Inquiry was Permissible

Defendants first argue that the action should be dismissed because Defendant Experian furnished the consumer report to Defendant Rubin & Rothman in connection with a debt collection and Defendant Experian is "authorized to furnish, and entities such as [Defendant Rubin & Rothman] are authorized to obtain, consumer reports for collection purposes under the FCRA." (Defs. Mem. at 1, 5–7.) Therefore, Defendants contend, Plaintiff's credit report was furnished for a permissible purpose. However, Plaintiff does not make any assertions regarding Defendant Rubin & Rothman's status as a debt collector or the purpose for which the credit report was furnished in his Amended Complaint. Plaintiff alleges only that Defendant Rubin & Rothman "did not have a reasonable purpose to receive it." (Amended Compl. ¶¶ 3, 10, 20.) Such conclusory language, that only tracks the statute in a formulaic manner, fails to state a claim upon which relief can be granted.

### B. Plaintiff's Claims that Defendants Willfully or Negligently Violated the FCRA

Defendants next argue that Plaintiff's Amended Complaint fails to assert facts showing that Defendants willfully or negligently violated the FCRA. Instead, Defendants argue that the facts in Plaintiff's Amended Complaint "are conclusory and completely lack the specificity required by *Iqbal* and *Twombly*." (Defs. Mem at 8–9.)

The Court agrees with Defendants' categorization of the facts in Plaintiff's Amended Complaint. The only facts Plaintiff sets forth in his Amended Complaint are that Defendant Experian furnished his consumer report to Defendant Rubin & Rothman. Plaintiff does not assert any facts showing how Defendants acted willfully or negligently in so doing, but only states that Defendants "willfully failed to comply" and "negligently failed to comply" with the FCRA. (Amended Compl. ¶¶ 9–10 & 19–20.) These statements are conclusory and amount to nothing more than the formulaic recitation of the elements of a cause of action. Therefore, the Court finds that Plaintiff has failed to show that Defendants acted willfully or negligently in violating section 1681b of the FCRA.

## C. Plaintiff's Claims that Defendant Experian Did Not Act Reasonably to Assure the Accuracy of Plaintiff's Credit Report

**\*4** Defendants argue that Plaintiff has also failed to state a claim under section 1681e of the FCRA because Plaintiff failed to allege that Defendant Experian furnished inaccurate information in Plaintiff's credit report and Plaintiff failed to set forth facts supporting his allegation that Defendant Experian acted unreasonably.

The Court concurs with Defendants. The Amended Complaint fails to assert that the information on the credit report was inaccurate. The Amended Complaint also does not set forth how Defendant Experian acted unreasonably. Indeed, the Amended Complaint once again merely makes conclusory statements that Defendant Experian failed "to

follow reasonable procedure[s] to assure maximum possibly accuracy of the Plaintiff's credit report." (Amended Compl. ¶ 9, 19.) Therefore, the Court finds that Plaintiff has failed to allege that Defendant Experian did not act reasonably to assure the accuracy of Plaintiff's credit report in violation of section 1681e of the FCRA.

## D. Futility of Amending the Complaint

Generally, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). However, a court may deny an opportunity to amend "when amendment would be futile." *Fulton v. Goord,* 591 F.3d 37, 45 (2d Cir.2009). Here, the complaint gives no indication that Plaintiff has a colorable claim under federal law and Plaintiff has already had one opportunity to amend the complaint. As any further attempt to amend the complaint would be futile, Plaintiff is denied leave to amend the complaint. *See Cuoco,* 222 F.3d at 112.

## CONCLUSION

For the above reasons, Plaintiff's complaint is dismissed for failure to state a claim upon which relief can be granted. The court certifies pursuant to 28 U.S.C. § 19*I*5(a)(3) that any appeal would not be taken in good faith. Therefore, *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1034891

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 760401
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Israel PERL, Plaintiff,

v.

PLAINS COMMERCE BANK, Defendant.

No. 11 Civ. 7972(KBF).
|
This Memorandum and Order also relates to: Nos.
11 Civ. 8521(KBF), 11 Civ. 8887(KBF), 11 Civ.
9007(KBF), 11 Civ. 9066(KBF), 11 Civ. 9092(KBF).
|
March 8, 2012.

MEMORANDUM AND ORDER

KATHERINE B. FORREST, District Judge.

**\*1** Either Israel Perl or Gittel Perl, *pro se* plaintiffs, initiated each of these related actions *in forma pauperis* over a number of months this past fall. [1] As originally plead, each action purported to claim a willful and a negligent violation of the Fair Credit Reporting Act ("FCRA"), alleging that the applicable defendant initiated one or more "hard pull(s)" and/or "soft pull(s)" of the applicable plaintiff's credit report without a permissible purpose.

[1] Plaintiffs have additionally brought eight other related cases, not addressed in this memorandum and order,

On January 19, 2012, the Court *sua sponte* dismissed each of the complaints for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e) (2)(B) ("Dismissal Order"). (*E.g.,* Docket No. 8, *Perl v. Plains Commerce Bank CMPNY/CBSD,* 11 Civ. 7972.) That dismissal was without prejudice and with leave to replead within 30–days of the date of the Court's Order. (*Id.* at 14.) In its Order, the Court explained that

> [i]f plaintiffs choose to replead, to survive dismissal they must allege particular facts that would allow this

Court to draw the reasonable inference that each defendant is liable for the conduct alleged. Put another way, plaintiffs would have to plead facts that would permit the Court to conclude that each defendant's conduct was more likely illegal than legal based on the applicable statute.

(*Id.* at 15.) More specifically, the Court instructed that to state a claim for a willful violation of the FCRA, plaintiffs must allege facts related to defendants' state of mind, particularly facts that allow the Court to draw the reasonable inference that the alleged violations were knowing or reckless. (*Id.* at 5–6.)

Following the Court's Dismissal Order, plaintiffs amended their complaints in each of the instant actions, retaining only the claim for willful violation of the FCRA under 15 U.S.C. § 1681n. Those amended complaints are all substantially similar. While, in response to the Dismissal Order, plaintiffs have supplemented their respective allegations, they have failed to provide any factual content in support of their otherwise conclusory assertions that defendants' violations were willful. Accordingly, the Court DISMISSES plaintiffs' amended complaints for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B).

LEGAL STANDARD

The applicable legal standard is set forth in depth in the Court's Dismissal Order. For present purposes, the Court briefly reiterates that while a *pro se* complaint should be read with "special solicitude" and interpreted to raise the "strongest claims that [it] suggest[s]," *e.g., DiPetto v. U.S. Postal Serv.,* 383 Fed. Appx. 102, 103 (2d Cir.2010); *Johnson v. J.P. Morgan Chase Bank, N.A., et al.,* Wo. 11 Civ. 662(DLC), 2011 WL 497923, at \*1 (S.D.N.Y. Feb. 10, 2011), it still "must plead 'enough facts to state a claim to relief that is plausible on its face,' " *Zapolski v. Fed. Republic of Germany,* 425 Fed. Appx. 5, 6 (2011) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *accord DiPetto,* 383 Fed. Appx. at 103 ("*pro se* complaints must contain sufficient factual allegations to meet the plausibility standard"). Accordingly, a plaintiff must " 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Zapolski,* 425 Fed. Appx. at 6 (quoting

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). A pleading that offers only "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

**\*2** If a *pro se* complaint indicates that a valid claim might be stated, a court should not dismiss without granting leave to amend at least once. *E.g., Shomo v. City of New York,* 579 F.3d 176, 183 (2d Cir.2009); *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795–96 (2d Cir.1999). Where, as here, however, the Court has explained in detail the defects in plaintiffs' original complaints, instructed plaintiffs on how to rectify their claims and afforded them an opportunity to do so in amended complaints, dismissal with prejudice is justified. *See Blakely v. Wells,* 209 Fed. Appx. 18, 20–21 (2d Cir.2006) (indicating that where a court notifies a plaintiff of the defects in his complaint prior to providing an opportunity to amend, dismissal of the amended complaint with prejudice is within the court's discretion).

DISCUSSION

Plaintiffs seek to state a claim for a willful violation of FCRA Section 1681b(f). (*See, e.g.,* Amended Compl. at ¶¶ 13–24, *Plains Commerce Bank,* 11 Civ. 7972.) As the Court explained in the Dismissal Order,

> [t]o state a claim for civil liability based on that Section, a plaintiff must allege *both* that the defendant used or obtained the plaintiff's credit report for an impermissible purpose, *see* 15 U.S.C. § 1681b(f); *see also Stonehart v. Rosenthal,* No. 01 Civ. 651(SAS), 2001 WL 910771, at \*3 (S.D.N.Y. Aug.13, 2001), *and* that the violation was willful or negligent, *see* 15 U.S.C. §§ 1681n, 1681*o*; *see also, e.g., Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 473 (2d Cir.1995).

(Dismissal Order at 5 (emphasis added)); *see also Pietrafesa v. First American Real Estate Info. Servs.,* No. 1:05–CV–1450, 2007 WL 710197, at \*3 (N.D.N.Y. Mar.6, 2007) ("The

fact that a consumer report is furnished for an impermissible purpose does not result in automatic liability. Liability is imposed only when the [defendant] either willfully or negligently fails to maintain reasonable procedures to avoid violations of, i.e., § 1681b." (internal punctuation omitted)); *King v. MTA Bridges and Tunnels,* 933 F.Supp. 220, 224–25 (E.D.N.Y.1996). Like the original complaints in these actions, the amended ones fail adequately to plead the second element for civil liability—willfulness. [2]

> [2] Plaintiffs have abandoned their claims for negligent violations of the FCRA under 15 U.S.C. § 1681*o* in their amended complaints.

While each amended complaint contains sufficient allegations to establish that the applicable defendant lacked a permissible purpose for pulling the plaintiff's credit report (*e.g.* because plaintiff never had business dealings or an account with defendant, made an application for credit or employment or consented to the pull), plaintiff's assertion that defendant's state of mind in doing so was willful is conclusory. (*Compare* Amended Compl. at ¶¶ 18–19, *Plains Commerce Bank, with id.* at ¶ 24.) The amended complaints lack any factual allegations establishing that the defendants *knew* they had no permissible purpose or *recklessly* disregarded their obligation to have a permissible purpose under the law. *See generally Safeco Ins. Co. America v. Burr,* 551 U.S. 47, 56–60, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007) (holding that willfulness as used in Section 1681n of the FCRA means knowledge or recklessness). That is, it is just as possible, based on the factual allegations, that the defendant in each case made an innocent mistake. Thus, because the plaintiffs' "well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct," the amended complaints "ha[ve] alleged—but ... not 'shown'-'that the pleader is entitled to relief.' " *Id.* (quoting Fed.R.Civ.P. 8(a)(2)); *see also id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

**\*3** Plaintiffs were on notice of the kinds of factual allegations that suffice to state a claim for a willful violation of the FCRA. In its Dismissal Order, the Court discussed why plaintiffs' willful violation claims in two of their other actions survived dismissal-namely, because they each contained an additional factual allegation that the applicable defendant repeatedly informed the applicable plaintiff that it could not find any record of an account belonging to him or her.

(*Dismissal Order;* Compl. ¶ 12, *Perl v. American Express,* 11 Civ. 7437; Compl. ¶ 11, *Perl v. Credit Bureau Services, Inc.,* 11 Civ. 8165.) Notably, plaintiffs have made no such (or similar) allegation in the amended complaints at issue here.

## CONCLUSION

For the foregoing reasons, plaintiffs' amended complaints are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.

The Clerk of the Court is directed to close 11 Civ. 7972, 11 Civ. 8521, 11 Civ. 8887, 11 Civ. 9007, 11 Civ. 9066 and 11 Civ. 9092, and terminate the pending motion at Docket Number 10 in 11 Civ. 8887.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 760401

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 178333

KeyCite Yellow Flag - Negative Treatment
Distinguished by Braun v. United Recovery Systems, LP, S.D.N.Y.,
March 28, 2014

2012 WL 178333
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Israel PERL, Plaintiff,
v.
AMERICAN EXPRESS, Defendant.

No. 11 Civ. 7374(KBF).
|
This Memorandum and Order also relates
to: 11 Civ. 6899(KBF), 11 Civ. 7972(KBF),
11 Civ. 7767(KBF), 11 Civ. 8165(KBF),
11 Civ. 8521(KBF), 11 Civ. 8529(KBF), 11
Civ. 8705(KBF), 11 Civ. 8887(KBF), 11 Civ.
9007(KBF), 11 Civ. 9066(KBF), 11 Civ. 9092(KBF).
|
Jan. 19, 2012.

MEMORANDUM AND ORDER

KATHERINE B. FORREST, District Judge.

 *1 *Pro se* plaintiffs Israel Perl and Gittel Perl initiated these
related actions *in forma pauperis* over a number of months
this past fall. Either Mr. Perl or Ms. Perl brings each of
these actions against a single financial institution, purporting
to claim willful and negligent violations of the Fair Credit
Reporting Act ("FCRA"). In support of both claims, each
complaint alleges that the relevant defendant initiated one
or more "hard pull(s)" and/or "soft pull(s)" of the relevant
plaintiff's credit report without a permissible purpose, thereby
reducing his or her credit score. The complaints in *Perl
v. American Express* and *Perl v. Credit Bureau Services
Inc.* ("Credit Bureau") each also allege that the defendant
repeatedly informed the plaintiff that it could not find a record
of his or her account. In addition to the two FCRA causes
of action, the complaint in *Perl v. Arrow Financial Services,
LLC* claims violations of the Fair Debt Collection Practices
Act ("FDCPA") and the General Business Law of the State
of New York, based on allegedly deceptive debt-collection
practices.

The Court now *sua sponte* DISMISSES the complaints
without prejudice for failure to state a claim upon which
relief can be granted, except that the willful FCRA claim in
*American Express* and *Credit Bureau* and the FDCPA claim in
*Arrow Financial Services, LLC* survive dismissal at this time.

DISCUSSION

The Court has the authority to screen *sua sponte* an *in forma
pauperis* complaint at any time pursuant to 28 U.S.C. §
1915(e)(2)(B). The Court may dismiss such a complaint, or
portion thereof, if it fails to state a claim upon which relief
could be granted. § 1915(e)(2)(B)(ii). Even though the law
authorizes dismissal on that ground, courts "remain obligated
to construe *pro se* complaints liberally." *E.g., DiPetto v.
U.S. Postal Serv.,* 383 Fed. Appx. 102, 103 (2d Cir.2010);
*Johnson v. J.P. Morgan Chase Bank, N.A., et al.,* No. 11
Civ. 662(DLC), 2011 WL 497923, at *1 (S.D.N.Y. Feb.10,
2011).* Thus, pro se complaints should be read with "special
solicitude" and should be interpreted to raise the "strongest
claims that they suggest." *E.g., DiPetto,* 383 Fed. Appx. at
103 (internal punctuation omitted); *see also Johnson,* 2011
WL 497923, at *1.

Nonetheless, a *pro se* complaint must still provide a defendant
with fair notice of what the plaintiff's claims are and each of
the grounds upon which they rest. *See Valenzuela v. Riverbay*
Corp., No. 06 Civ. 903(DLC), 2007 WL 414487, at *2
(S.D.N.Y. Jan.31, 2007); *see generally Dura Pharms., Inc. v.
Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577
(2005). A pleading that offers only "labels and conclusions or
a formulaic recitation of the elements of a cause of action will
not do." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949,
173 L.Ed.2d 868 (2009) (internal quotation marks omitted).

"Even though all allegations contained in the complaint are
assumed to be true" on a motion to dismiss, that "tenet
is 'inapplicable to legal conclusions.' " *Zapolski v. Fed.
Republic of Germany,* 425 Fed. Appx. 5, 6 (2011) (quoting
*Iqbal,* 129 S.Ct. at 1949) (affirming *sua sponte* dismissal of
pro se, *in forma pauperis* complaint). Rather, "[t]he complaint
must plead 'enough facts to state a claim to relief that is
plausible on its face.' " *Zapolski,* 425 Fed. Appx. at 6 (quoting
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct.
1955, 167 L.Ed.2d 929 (2007)); *accord DiPetto,* 383 Fed.
Appx. at 103 ("*pro se* complaints must contain sufficient
factual allegations to meet the plausibility standard"). A claim
has " 'facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Zapolski,* 425 Fed. Appx. at 6 (quoting *Iqbal,* 129 S.Ct. at 1949).

*Statute of Limitations*

**\*2** As an initial matter, one of the actions, *Perl v. Bombay CMPNY/CBSD* (*"Bombay"* ), may be dismissed as time-barred. An action alleging liability under the FCRA may be brought in a federal district court no later than the earlier of (1) two years after the plaintiff's discovery of the alleged violation; or (2) five years after the alleged violation occurred. 15 U.S.C. § 1681p. The alleged violation in *Bombay* occurred in July 2006, more than five years before the complaint was filed on October 27, 2011. Thus, regardless of when plaintiff discovered the alleged violation, his action is outside the statute of limitations period and so fails to state a claim upon which relief can be granted.

*Violation of the FCRA*

Plaintiffs' purported FCRA causes of action each rest upon a defendant's alleged violation of Section 1681b(f) of the Act. To state a claim for civil liability based on that Section, a plaintiff must allege both that the defendant used or obtained the plaintiff's credit report for an impermissible purpose, *see* 15 U.S.C. § 1681b(f); *see also Stonehart v. Rosenthal,* No. 01 Civ. 651(SAS), 2001 WL 910771, at \*3 (S.D.N.Y. Aug.13, 2001), and that the violation was willful or negligent, *see* 15 U.S.C. §§ 1681n, 1681*o*; *see also, e.g., Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 473 (2d Cir.1995). In each of the instant cases, the relevant plaintiff adequately alleges that his or her report was "pulled"-i.e. obtained-for an impermissible purpose (*see, e.g.,* Compl. at ¶¶ 10–11, *Perl v. American Express,* No. 11 Civ. 7347) but fails adequately to allege willfulness and/or negligence. Accordingly, plaintiffs' willfulness and negligence claims against Plains Commerce Bank, AT & T Mobility, Nationwide Credit Inc., Webbank/DFS, 121 NCC 1593 via CBC Innovis, AT & T Services, Hudson Valley Federal, Capital One Bank, and Arrow Financial Services, LLC, and their negligence claim against American Express and Credit Bureau Collection Services, Inc., are dismissed with leave to replead.

*Willful Violation*

While the plaintiffs assert that each defendant's FCRA violation was willful, they do so in a conclusory manner in all but two of the complaints. *See generally Iqbal,* 129 S.Ct.

at 1949 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." (internal quotation marks omitted)). Willfulness as used in the relevant provision of the FCRA, Section 1681n, means knowing or recklessness. *See, e.g., Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 56–60, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007); *see generally* 15 U.S.C. § 1681n. Other than in *American Express* and *Credit Bureau,* plaintiffs have failed to allege any facts related to defendants' state of mind when they allegedly initiated the "hard" and/or "soft pull(s)" on plaintiffs' credit reports. Some of the complaints assert a series of "pulls." Such allegations go some of the way toward suggesting knowledge on defendants' part by demonstrating a pattern of conduct. But even those complaints do not provide enough factual content to allow this Court to draw the reasonable inference that the alleged violation was willful. *See Zapolski,* 425 Fed. Appx. at 6. Based on the allegations in the complaints, defendants' conduct could just as likely have been unintentional and so plaintiffs' have failed to state a claim under Section 1681n.

**\*3** In *American Express* and *Credit Bureau,* however, the complaints provide more factual content—each additionally alleging that the relevant defendant repeatedly informed the relevant plaintiff that it could not find any record of an account belonging to him or her. (Compl. at ¶ 12, *American* Express; Compl. at ¶ 11, *Perl v. Credit Bureau Collections Servs., Inc.,* 11 Civ. 8165.) If, as alleged in each of those two actions, the relevant defendant was well aware that the plaintiff had no account, it plausibly follows that the defendant was also aware that it had no permissible purpose for obtaining the plaintiff's credit report. *See generally* 15 U.S.C. § 1681b(a) (setting forth the permissible purposes for obtaining a credit report). Given the liberal pleading standard for *pro se* cases, such allegations permit a reasonable inference that the defendant committed a knowing or reckless violation of the FCRA. Accordingly, Ms. Perl's willful violation claim against American Express and Mr. Perl's equivalent claim against Credit Bureau Collection Services survive *sua sponte* dismissal as currently pled.

*Negligent Violation*

As with the willful noncompliance claim, plaintiffs' claim for negligent violation of the FCRA amounts to no more than a legal conclusion in all cases except *American Express* and *Credit Bureau.* Other than in those two actions, plaintiffs have failed to identify any duty or standard of care owed by the respective defendants. *See generally Clavizzao v. United States,* 706 F.Supp.2d 342, 349–50 (S.D.N.Y.2009) (holding that *pro se* plaintiffs failed to state a negligence claim

where they made only a "conclusory allegation of negligence" and were "woefully non-specific, failing to identify what duty [defendant] owed [p]laintiffs ... and how [defendant] breached that duty"). Allegations stating a violation of the FCRA are insufficient, without more, to establish the element of negligence, which Congress clearly intended to be an extra hurdle to liability under the FCRA. *See* 15 U.S.C. § 1681*o*; *see also Casela,* 56 F.3d at 473; *Pietrafesa v. First American Real Estate Info. Servs.,* No. 1:05–CV–1450, 2007 WL 710197, at *3 (N.D.N.Y. Mar.6, 2007) ("The fact that a consumer report is furnished for an impermissible purpose does not result in automatic liability. Liability is imposed only when the [defendant] either willfully or negligently fails to maintain reasonable procedures to avoid violations of, i.e., § 1681b." (internal punctuation omitted)); *King v. MTA Bridges and Tunnels,* 933 F.Supp. 220, 224–25 (E.D.N.Y.1996) (rejecting potential 1681*o* claim by *pro se* plaintiff despite allegations suggesting a FCRA violation, where plaintiff had put forth no facts to support an inference of negligence).

In *American Express* and *Credit Bureau,* the same factual allegation that plausibly establishes a willful state of mind also does so for a negligent state of mind. There is no question that the defendant in each case acted unreasonably in "pulling" the relevant plaintiff's credit report if it was aware that it had no permissible purpose for doing so. Yet because plaintiffs in these actions have failed adequately to allege another necessary element of the negligence cause of action —actual damage—their claim is nevertheless dismissed. *See Engel v. Scully & Scully, Inc.,* No. 10 Civ. 3167, 2011 WL 4091468, at *5–6 (S.D.N.Y. Sept. 14, 2011) (holding that while plaintiff had stated a willfulness claim under Section 1681n, he did not state a negligence claim under Section 1681*o* because he failed to allege actual damage).

**\*4** Plaintiffs have insufficiently pled actual damage in support of their negligent noncompliance claim. A defendant who negligently violates the FCRA is liable for any actual damage sustained by the plaintiff, 15 U.S.C. § 16B1*o*(a) (1), and Courts have recognized such damage to be an essential element of a Section 1681o claim, *see Engel,* 2011 WL 4091468, at *6 (dismissing Section 1681o claim, where no actual damage was alleged and only statutory damages were demanded); *Agu v. Rhea,* No. 09–CV–4732, 2010 WL 5186839, at *6–7 (E.D.N.Y. Dec. 15, 2010) (*pro se* plaintiff). While the factual allegations in each of the instant complaints state that at least one of the "pulls" reduced the plaintiff's credit score, they contain no facts suggesting that such

reduction proximately caused actual injury to the plaintiff. *See Gorman v. Experlan Info, Solutions Inc.,* No. 07–CV–1846 (RPP), 2008 WL 4934047, at *7 (S.D.N.Y. Nov.18, 2008); *see also Casella,* 56 F.3d at 474–76; *Engel,* 2011 WL 4091468, at *6.

That plaintiffs even believe they were actually damaged is not plain from the complaints. *See generally Dura Pharms.,* 544 U.S. at 346 (holding that defendants must have fair notice of the grounds for plaintiffs' claims); *Valenzuela,* 2007 WL 414487, at *2. Plaintiffs' recitation of the elements of their cause of action in the "Counts" section of each complaint omits a statement of actual damage, despite the obvious care plaintiffs' took in reciting the other elements of their claim. Plaintiffs also demand only statutory, not actual, damages (including on their willful noncompliance claim) in all but the *Bombay* and *Perl v. Plains Commerce Bank* matters. In any event, because in *Bombay* and *Plains Commerce Bank* and all of the other actions, plaintiffs have failed to allege adequate facts in support of actual damage and also—except in *American Express* and *Credit Bureau*—in support of a negligent state of mind, plaintiffs' negligent noncompliance claim against each of the defendants is dismissed with leave to replead.[1]

[1]    Plaintiffs also demand punitive damages for their negligent noncompliance cause of action in a number of the cases, which damages are not available under Section 1681*o* for a negligent violation of the FCRA. *See* 15 U.S.C. § 1681*o*.

*Furnisher of Information*
In both of the FCRA counts in each of the complaints, plaintiffs allege that the applicable defendant is a "furnisher of information within the meaning of the FCRA, 15 U.S.C. § 16S1S–2." The term "furnisher of information" is not defined in the FCRA, but this Court has interpreted it to mean "entities that transmit, to credit reporting agencies, information relating to debts owed by consumers." *Barberan v. Nationpoint,* 706 F.Supp.2d 408, 427 n. 11 (S.D.N.Y.2010) (internal quotation marks omitted). The reference to Section 1681s–2 in the complaints is passing, and plaintiffs do not state a separate cause of action under that section. Thus, to the extent that plaintiffs intended to state such a claim, it is dismissed. Additionally, to the extent that they wish to plead a cause of action under Section 1681s–2(a) in any amended complaint—which section imposes a duty on furnishers of information to provide accurate information about consumers to credit reporting agencies—doing so

would be futile. Section 1681s–2(a) is only enforceable by government officials, not by private plaintiffs. 15 U.S.C. § 1681s–2(d); *accord Barberan,* 706 F.Supp.2d at 427. Thus, any claim for violation of that section would necessarily fail as a matter of law. Accordingly, any claim brought under Section 1681s–2(a) is dismissed with prejudice.

*Perl v. Arrow Financial Services, LLC*

**\*5** This action is different from the others in that it contains two additional counts for violations of Section 1692e of the Fair Debt Collection Practices Act ("FDCPA") and Section 349 of the General Business Law of the State of New York ("GBL"), both based on allegations of deceptive debt-collection practices. Specifically, the plaintiff alleges that he sent a "Debt Validation letter" to Arrow Financial Services ("Arrow"), a debt collection company, presumably requesting that it provide evidence that he had a valid debt. Arrow allegedly responded with a debt collection letter, stating that the "information from the credit agency will be deleted," but subsequently failed to delete that information and never validated the debt. The plaintiff also alleges that he never had "an account" with Arrow, presumably meaning that he did not in fact have any debts on which Arrow was entitled to collect. Reading between the lines of the complaint, the plaintiff seems to allege that Arrow at least implicitly acknowledged that the claimed debt was invalid when it indicated that the information regarding the debt would be erased from plaintiff's credit report, but then never actually erased it and, instead, tried to collect on the debt.

Such factual allegations should be liberally construed and interpreted to raise the strongest claims they suggest. As such, they provide sufficient support to permit the Court to draw a reasonable inference—based on the complaint—that Arrow is liable for the violations of the FDCPA claimed. *See* 15 U.S.C. §§ 1692e(2), (5), (10); *see generally DiPetto,* 383 Fed. Appx. at 103; *Zapolski,* 425 Fed. Appx. at 6. Section 1692e of the FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Whether a debt collection notice violates the FDCPA "is judged by the 'least sophisticated consumer' test," under which the notice is deceptive "if it can be reasonably read to have two or more different meanings, one of which is inaccurate." *See, e.g., Suiqulanda v. Cohen & Shamowitz, LLP,* No. 10 Civ. 5868(PKC), 2011 WL 4344044, at \*4 (S.D.N.Y. Sept.8, 2011) (internal quotation marks omitted). Given those standards, the plaintiff has stated a plausible claim for violation of Section 1692e (and the particular

subsections he identifies) that survives at least *sua sponte* dismissal.

Plaintiff's GBL claim does not fare as well, however. To state a claim under Section 349 of the GBL, a plaintiff must allege that "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *E.g. Spagnola v. Chubb Corp.,* 574 F.3d 64, 73 (2d Cir.2009). Plaintiff fails to provide anything more than a legal conclusion regarding the first element of the claim. While plaintiff alleges that Arrow's acts were "consumer-oriented" and "threaten[ed] the rights of consumers generally," he does not plead particular facts that plausibly demonstrate that Arrow's alleged conduct had "a broader impact on consumers at large" or "potentially affect[ed] similarly-situated consumers." *See S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 636 (2d Cir.1996) (internal punctuation omitted), He does not allege, for instance, that the debt collection letter he received was a form collection letter, *see Rozier v. Fin. Recovery Sys., Inc.,* No. 10–CV–3273(DLI)(JO), 2011 WL 2295116, at \*5 (E.D.N.Y. June 7, 2011) (finding allegation that debt collection letter was a form notice sent to thousands of customers sufficient to meet 'consumer-oriented' requirement of Section 349), or that Arrow has improperly sought to collect on the debts of other consumers in a similar fashion. Thus, because the plaintiff has failed to state adequately a necessary element of his claim, the claim is dismissed. *See generally OK Petroleum v. Travelers Indem. Co.,* 09 Civ. 10273, 2010 WL 2813804, at \*4–5 (S.D.N.Y. July 15, 2010) (dismissing plaintiffs' Section 349 claim where they speculated that others had been treated in a similar fashion but provided no factual support of consumer-oriented conduct); *Cross v. State Farm Ins. Co.,* No, 3:10–CV–1179, 2011 WL 496534, at \*3–4 (N .D.N.Y. Oct. 17, 2011) (same for a *pro se* plaintiff).

CONCLUSION

**\*6** For the foregoing reasons, the following complaints and claims are hereby dismissed without prejudice and with leave to re-plead within 30 days of the date of this Order (except to the extent that they purport to state a claim under FCRA Section 1681s–2(a), which claim is dismissed with prejudice):

- The complaints in their entirety in *Perl v. Bombay CMPNY/CBSD,* 11 Civ. 7767, *Perl v. Plains Commerce Bank,* 11 Civ. 7972, *Perl v. AT & T Mobility,* 11 Civ.

8521, *Perl v. Nationwide Credit Inc.,* 11 Civ. 8529, *Perl v. Webbank/DFS,* 11 Civ. 8705, *Perl v. 121 NCC 1593 via CBC Innovis,* 11 Civ. 8887, *Perl v. AT & T Services,* 11 Civ. 9007, *Perl v. Hudson Valley Federal,* 11 Civ. 9066, and *Perl v. Capital One Bank USA NA,* 11 Civ. 9092.

• Count II of the complaints in *Perl v. American Express,* 11 Civ. 7347, and *Perl v. Credit Bureau Collection Services, Inc. DBA CBCS,* 11 Civ. 8165.

• Counts I–II and IV of the complaint in *Perl v. Arrow Financial Services, LLC,* 11 Civ. 6899.

If plaintiffs choose to replead, to survive dismissal they must allege particular facts that would allow this Court to draw the reasonable inference that each defendant is liable for the conduct alleged. Put another way, plaintiffs would have to plead facts that would permit the Court to conclude that each defendant's conduct was more likely illegal than legal based on the applicable statute. Any amended complaints should also allege, provide facts in support of, and demand actual damage for the defendants' negligent violation of the FCRA. Additionally, while plaintiffs have already pled sufficient facts to support some elements of some of their claims, to the

extent that they know of other facts relevant to the conduct alleged, they would be prudent to add those facts to any amended complaints they file.

If plaintiffs fail to replead any of their dismissed complaints or claims within the 30–day period, those complaints or claims will be dismissed with prejudice. As noted, any claim intended to be brought under Section 1681s–2(a) of the FCRA is already dismissed with prejudice and cannot be resuscitated by repleading.

The non-dismissed claims in *American Express, Credit Bureau* and *Arrow Financial Services* will proceed in their current form. The Court notes that defendant American Express is technically in default, having failed to answer Mr. Perl's original complaint by January 11, 2012 (*see* Docket Entry 8, *Perl v. American Express,* 11 Civ. 7347), and should answer plaintiff's willfulness claim immediately.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 178333

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

2021 WL 326972
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jason WIMBERLY, Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, Defendant.

1:18-cv-6058-MKV
|
Signed 02/01/2021

**Attorneys and Law Firms**

Jason Wimberly, New York, NY, pro se.

Diana Lee Calla, Jones Day, San Francisco, CA, for
Defendant.

OPINION AND ORDER DENYING MOTION FOR
LEAVE TO FILE A SECOND AMENDED COMPLAINT

MARY KAY VYSKOCIL, United States District Judge:

**\*1** Plaintiff Jason Wimberly ("Plaintiff"), proceeding *pro
se*, brings this action against Defendant Experian Information
Solutions ("Defendant"), alleging violations of the Fair Credit
Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x, and
the New York Fair Credit Reporting Act ("NYFCRA"), N.Y.
Gen. Bus. Law §§ 380–380-v. On December 18, 2019, the
Court (Failla, *J.*) granted Defendant's Motion to Dismiss
Plaintiff's Amended Complaint and denied Plaintiff's Motion
for a Preliminary Injunction. (Opinion & Order [ECF No.
65].) *Wimberly v. Experian Info. Sols.*, No. 18 Civ. 6058
(KPF), 2019 WL 6895751 (S.D.N.Y. Dec. 18, 2019). In so
doing, the Court granted Plaintiff leave to file a motion
to further amend his Complaint. (Opinion & Order 26.)
*Wimberly*, 2019 WL 6895751, at \*11.

Before the Court is Plaintiff's Motion for Leave to File a
Second Amended Complaint ("Motion to Further Amend")
(Mot. Further Amend [ECF No. 79]), which he filed with the
Proposed Second Amended Complaint (Second Am. Compl.
("SAC") [ECF No. 79-1]) and a brief in support of the
Motion to Further Amend (Pl.'s Br. [ECF No. 87]). Defendant
opposes Plaintiff's Motion to Further Amend. (Def.'s Opp.
[ECF No. 88].) Having carefully reviewed the Proposed

Second Amended Complaint and the parties' briefs, the Court
DENIES Plaintiff's Motion to Further Amend.

## BACKGROUND

The Court assumes the parties' general familiarity with the
underlying facts and procedural history of the case, which are
set forth in the prior decision of the Court. (Opinion & Order.)
*Wimberly*, 2019 WL 6895751. The Court discusses factual
allegations in the Proposed Second Amended Complaint as
they relate to particular causes of action and the Court's
analysis. It bears emphasizing that Plaintiff first amended
the Complaint after a conference where the parties discussed
particular pleading deficiencies, yet the Amended Complaint
failed to state a claim. (*See* Tr. Conf. Jan. 17, 2019 [ECF No.
37].)

In its prior decision, in recognition of his *pro se* status, the
Court permitted Plaintiff to move for leave to file a Second
Amended Complaint. (Opinion & Order 26.) *Wimberly*, 2019
WL 6895751, at \*11. The Court explained, "Included with
any such motion must be a proposed complaint, which would
have to address, among other issues, the manner in which
Defendant's reports were inaccurate, why any purported
inconsistencies amounted to actionable inaccuracy, and in
what way Defendant failed to follow reasonable procedures in
preparing its reports." (Opinion & Order 26.) *Wimberly*, 2019
WL 6895751, at \*11.

## LEGAL STANDARDS

**I. Leave to Amend Standard**

"When a motion to dismiss is granted, the usual practice is
to grant leave to amend the complaint." *Hayden v. County
of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (citing *Ronzani
v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)). A *pro se*
plaintiff "should be afforded every reasonable opportunity to
demonstrate that he has a valid claim." *Matima v. Celli*, 228
F.3d 68, 81 (2d Cir. 2000) (quoting *Satchell v. Dilworth*, 745
F.2d 781, 785 (2d Cir. 1984)). Thus, "[a] *pro se* complaint
should not be dismissed without the Court granting leave to
amend at least once when a liberal reading of the complaint
gives any indication that a valid claim might be stated."
*Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting
*Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 139 of 238

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

**\*2** However, when there is no indication that a valid claim might be stated, a district court has discretion to deny leave to amend. *Perri v. Bloomberg*, No. 11-CV-2646, 2012 WL 3307013, at \*4 (E.D.N.Y. Aug. 13, 2012) (citing *Chavis*, 618 F.3d at 170). In other words, leave to amend may be denied if an amendment would be futile—that is, "a proposed claim could not withstand a motion to dismiss pursuant to 12(b)(6)." *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). "Determinations of futility are made under the same standards that govern Rule 12(b)(6) motions to dismiss." *Nettis v. Levitt*, 241 F.3d 186, 194 n.4 (2d Cir. 2001), *overruled on other grounds by Slayton v. Am. Express Co.*, 460 F.3d 215 (2d Cir. 2006).

## II. Rule 12(b)(6) Motion to Dismiss Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). While a sufficiently pleaded complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks, alterations, and citations omitted); *see also Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (noting that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955)).

In ruling on a motion to dismiss, the Court must "accept as true all factual allegations," *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen*, 746 F.3d at 62), and "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff," *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (citing *Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007); and *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009)). However, the Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Dane*

*v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188–89 (2d Cir. 2020) (quoting *Nielsen*, 746 F.3d at 62); *see also Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019); *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

A complaint filed by a *pro se* plaintiff "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)); *see also Wilson v. Dalene*, 699 F. Supp. 2d 534, 554 (E.D.N.Y. 2010) (noting that courts are "required to afford [a *pro se* plaintiff] leniency, holding his complaint to 'less stringent standards than formal pleadings drafted by lawyers' " (quoting *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007))). Nevertheless, the complaint must satisfy the *Twombly-Iqbal* plausibility standard. *See Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 80–81 (2d Cir. 2020). "[T]o survive a Rule 12(b)(6) motion, a *pro se* plaintiff must support his claims with 'specific and detailed factual allegations, not stated in wholly conclusory terms.' " *Wightman–Cervantes v. ACLU*, No. 06 Civ. 4708, 2007 WL 1805483, at \*1 (S.D.N.Y. June 25, 2007) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir. 2000)).

**\*3** In deciding a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); and *Hayden*, 180 F.3d at 54), as well as any document "upon which the complaint solely relies and which is integral to the complaint," *Roth*, 489 F.3d at 509 (emphasis and alteration omitted) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)). "A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.' " *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers*, 282 F.3d at 153).

"The Court's obligation to construe *pro se* submissions liberally does not require the Court to accept allegations that are contradicted by documents incorporated by reference in the complaint." *Edwards v. Elmhurst Hosp. Ctr.*, Nos. 11 CV 5348(RRM)(LB), 11 CV 5349(RRM)(LB), 2013 WL 839554, at \* (E.D.N.Y. Feb. 4, 2013) (citing *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005); and *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 399–400 (S.D.N.Y. 2002)). Thus, "[w]hen documents attached to the complaint as

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

exhibits or incorporated by reference in the complaint contain statements that contradict the allegations in the complaint, the documents control and the Court need not accept the allegations as true." *Endemann v. Liberty Ins. Corp.*, 390 F. Supp. 3d 362, 370 (N.D.N.Y. 2019) (collecting cases); *see L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (noting that allegations are "assume[d] to be true unless contradicted by more specific allegations or documentary evidence").

## DISCUSSION

In the Proposed Second Amended Complaint, Plaintiff alleges causes of action for (1) failure to follow procedures to assure maximum possible accuracy under the FCRA and the NYFCRA (Counts I and II) (SAC 11–18); (2) reporting obsolete information under the FCRA and the NYFCRA (Counts III and IV) (SAC 18–21); (3) failure to disclose information in Plaintiff's file under the FCRA and the NYFCRA (Counts V and VI) (SAC 21–26); (4) failure to notify Plaintiff of reinsertion of previously deleted material under the FCRA (Count VII) (SAC 26–27); (5) failure timely to notify furnishers of a dispute under the FCRA (Count VIII) (SAC 27); (6) failure to advise on availability of disclosure of files under the NYFCRA (Count IX) (SAC 27); (7) failure to conduct a reasonable investigation under the FCRA and NYFCRA (Counts X and XI) (SAC 28–29); and (8) mental anguish and suffering, which the Court construes as a claim for intentional infliction of emotional distress (Count XII) (SAC 29–30).

Plaintiff's proposed causes of action fall into three categories: (1) those that reiterate previously dismissed claims; (2) those that were previously rejected but have been amended with new allegations; and (3) those presented for the first time in the Proposed Second Amended Complaint.

## I. Plaintiff's Proposed Causes of Action for Failure To Disclose Information in Plaintiff's File Are Foreclosed by the Court's Prior Ruling (Counts V–VI)

Plaintiff again seeks to assert claims predicated on allegations that Defendant failed to disclose Automated Credit Dispute Verifications ("ACDVs") and Universal Dispute Forms ("UDFs"), in violation of Section 1681g of the FCRA and Section 380-d of the NYFCRA. (SAC 21–26.) In the Proposed Second Amended Complaint, Plaintiff repeats his allegation that several times he requested ACDVs in connection with the accounts at issue only for Defendant to respond that these forms were only available with a subpoena. (SAC 21.)

**\*4** Plaintiff's proposed claims under Section 1681g of the FCRA and Section 380-d of the NYFCRA clearly are foreclosed by the law of case doctrine. The doctrine posits that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, ––– U.S. ––––, 136 S. Ct. 709, 716, 193 L.Ed.2d 639 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506, 131 S.Ct. 1229, 179 L.Ed.2d 196 (2011)). This principle "holds true even where a case has been reassigned to a new judge." *Laurent v. PriceWaterhouseCoopers LLP*, 963 F. Supp. 2d 310, 314 (S.D.N.Y. 2013) (citing *In re "Agent Orange" Prod. Liab. Litig.*, 733 F.2d 10, 13 (2d Cir. 1984)); *see also Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (internal quotation marks omitted) (noting that courts are "reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge or court" (citation omitted)). Departure from a prior ruling is proper only where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

In granting Defendant's Motion to Dismiss, Judge Failla held that "ACDVs and UDFs are not part of a consumer's 'file,' and Plaintiff has therefore failed to state a claim under § 1681g of the FCRA and § 380-d of the NYFCRA." (Opinion & Order 22–23 (footnote omitted).) *Wimberly*, 2019 WL 6895751, at *9 (footnote omitted). Under the law of the case doctrine, that holding controls, and the Court will not revisit it here. *See Schmidt v. Stone*, No. 14 CV 2519 (RJD) (CLP), 2018 WL 4522082, at *1 (E.D.N.Y. Jan. 29, 2018) (recommending denying leave to amend where "[t]he proposed Second Amended Complaint seeks to advance theories the district court has already rejected and which are barred by the law of the case doctrine"); *see also Klaper v. Cypress Hills Cemetery*, No. 10-CV-1811 (NGG)(LB), 2014 WL 1343449, at *4 (E.D.N.Y. Mar. 31, 2014) (noting that courts "may apply the law of the case doctrine to a legal determination made at the motion to dismiss stage" (collecting cases)).

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 141 of 238

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

Plaintiff presents no compelling reason to revisit that holding. Plaintiff offers no new factual allegations and relies on the same cases as at the previous motion to dismiss stage to re-argue that ACDVs and UDFs fall within the scope of Section 1681g(a)(1). (*Compare* SAC 21–22, 21 n.5, 24–25, *with* Pl.'s Opp. 22–28 [ECF No. 45].) *See Marshall v. N.Y. State Pub. High Sch. Athletic Assoc., Inc.*, 374 F. Supp. 3d 276, 295 (W.D.N.Y. Mar. 15, 2019) (applying law of the case doctrine where defendant "failed to assert any reason—let along [sic] a 'cogent' or 'compelling' one—for this Court to depart from its previous decision"); *Frommert v. Becker*, No. 00-CV-6311, 2016 WL 9582834, at *5 (W.D.N.Y. Sept. 16, 2016) (denying motion that was merely "an attempt to reargue what is now the law of the case"). Accordingly, Plaintiff cannot state a claim for failure to disclose ACDVs and UDFs (Counts V–VI).

## II. Plaintiff's New Allegations Fail To Cure Previously Identified Deficiencies

### A. Failure To Follow Procedures To Assure Maximum Possible Accuracy and Failure To Conduct a Reasonable Investigation (Counts I, II, X, and XI)

Plaintiff again alleges that Defendant failed to follow procedures to assure maximum possible accuracy, in violation of Section 1681e(b) of the FCRA and Section 380-j(e) of the NYFCRA (Counts I and II). He also alleges that Defendant failed to conduct a reasonable investigation, in violation of Section 1681i(a)(1)(A) of the FCRA and Section 380-k of the NYFCRA (Counts X and XI). [1] With respect to his claims for failure to follow procedures to assure maximum possible accuracy, Plaintiff alleges that Defendant failed to maintain "a procedure to check the data of the true status of forborne or deferred loans," did no "real investigative work on the disputes," and simply relied on Automated Credit Dispute Verifications ("ACDVs"). (SAC 12.) With respect to his claims for failure to conduct a reasonable investigation, Plaintiff alleges that Defendant "did not review the history of the loans dating back to at least 2009 as previously reported by them during [2016]" and that Defendant's investigations "simply relied on the furnisher's erroneous statements and information." (SAC 28–29.)

[1]   Count X of the Proposed Second Amended Complaint asserts a claim for violation of "15 U.S.C. 1681(a)(1)(A)." (SAC 28.) There is no Section 1681(a)(1)(A) of the FCRA. Given Plaintiff's *pro se* status, the Court liberally

construes this claim as an alleged violation of Section 1681i(a)(1)(A). Defendant has also addressed Plaintiff's alleged cause of action as an attempt to state a claim under Section 1681i(a)(1) (A). (*See* Def.'s Opp. 10 n.6.) Although Plaintiff did not previously assert Counts X and XI, the Court addresses them here because they fail for the same reasons as Counts I and II.

**\*5**  Section 1681e(b) of the FCRA provides, "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Section 1681i outlines "procedures consumer reporting agencies must follow to investigate disputes as to the accuracy of reported information," including "reinvestigating a consumer's record within a reasonable period of time after a consumer 'directly conveys' a dispute as to the 'completeness or accuracy of an item on his credit report' to the consumer reporting agency." *Khan v. Equifax Info. Servs., LLC*, No. 18-CV-6367 (MKB), 2019 WL 2492762, at *2 (E.D.N.Y. June 14, 2019) (first citing 15 U.S.C. § 1681i(b); then quoting *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997)). [2]

[2]   The Court need not separately discuss Sections 380-j(e) and 380-k of the NYFCRA because the NYFCRA's "substantially similar language is construed the same as the FCRA's." *Wenning v. On-Site Manager, Inc.*, No. 14 Civ. 9693 (PAE), 2016 WL 3538379, at *8 n.11 (S.D.N.Y. June 22, 2016) (citing *Ogbon v. Beneficial Credit Servs., Inc.*, No. 10 Civ. 3760 (PAE), 2013 WL 1430467, at *7 n.6 (S.D.N.Y. Apr. 8, 2013)); *see also Trikas v. Universal Card Servs. Corp.*, 351 F. Supp. 2d 37, 46 (E.D.N.Y. 2005) (noting that "courts interpret the FCRA and related New York statute similarly" (quoting *Ali v. Vikar Mgmt. Ltd.*, 994 F. Supp. 492, 498 (S.D.N.Y. 1998))).

To state a claim under Section 1681e(b), a plaintiff must show that:

(1) the consumer reporting agency was negligent or willful in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 142 of 238

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury.

*Khan*, 2019 WL 2492762, at *2. Similarly, a plaintiff asserting a claim under Section 1681i "must demonstrate that the disputed information is inaccurate." *Id.* at *3 (quoting *Gestetner v. Equifax Info. Servs., LLC*, No. 18-CV-5665, 2019 WL 1172283, at *2 (S.D.N.Y. Mar. 13, 2019)).

The threshold question under Sections 1681e(b) and 1681i "is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." *Id.* (alteration in original) (collecting cases). A credit report is inaccurate "either when it is patently incorrect *or* when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Wenning*, 2016 WL 3538379, at *9 (internal quotation marks omitted) (collecting cases). Information provided by a consumer reporting agency is misleading where it is "open to an interpretation that is directly contradictory to the true information." *Id.* (citing *Wagner v. TRW, Inc.*, 139 F.3d 898, 1998 WL 127812, at *1 (5th Cir. 1998) (per curiam)).

Here, Plaintiff cannot state claims under Sections 1681e(b) or 1681i(a)(1)(A) of the FCRA, or the related NYFCRA provisions, because he has not shown that Defendant reported inaccurate information. Judge Failla so ruled with respect to the Section 1681e(b) claim in the First Amended Complaint (Opinion & Order 10–16) *Wimberly*, 2019 WL 6895751, at *5–7, and Plaintiff's new allegations do not cure the identified deficiencies. The Proposed Second Amended Complaint contains only vague and conclusory allegations that Defendant knowingly reported inaccurate information. Plaintiff again pleads no specific *facts* to support his proposed claims that the information Defendant reported was inaccurate. *See Khan*, 2019 WL 2492762, at *4 (dismissing claims under Sections 1681e(b) and 1681i "because [plaintiff] has not alleged facts showing that the information that Defendant reported about him is inaccurate" (citing *Gestetner*, 2019 WL 1172283, at *2)); *Ogbon v. Beneficial Credit Servs., Inc.*, No. 10 CV 03760(GBD), 2011 WL 347222, at *3 (S.D.N.Y. Feb. 1, 2011) (dismissing claims under Sections 1681e(b) and 1681i because the complaint, *inter alia*, "does not identify the

inaccurate information reported by each [consumer reporting agency] Defendant, or when the information was reported or to whom").

**\*6** Plaintiff's proposed claims appear to center on his view that Defendant reported Plaintiff's student loans beyond the statutory periods in the FCRA and NYFCRA. But as discussed below, despite his amended allegations, Plaintiff has not alleged facts to support such a claim. *See infra* Discussion, Section II.B. Because Plaintiff has not made a threshold showing of inaccurate or misleading information on his credit reports, his purported claims under Sections 1681e(b) (Count I) and 1681i (Count X) of the FCRA and Sections 380-j(e) (Count II) and 380-k (Count XI) of the NYFCRA fail. *See Khan*, 2019 WL 2492762, at *4 (collecting cases).

**B. Reporting Obsolete Information (Counts III and IV)**

Plaintiff again claims that Defendant reported obsolete information, in violation of Section 1681c(a)(4) of the FCRA and Section 380-j(f)(1)(iv). (SAC 18–21.) With respect to the FCRA claim, Plaintiff alleges that:

> Defendant reported the 3 disbursements with open dates ranging from 2001-2003 because these loans dates [sic] of first delinquency actually occurred as early as 2004 and as late as 2009. Therefore, these loans should have "aged off" or been purged from its reports as early as 2011 and as late as 2016.

(SAC 18.) Plaintiff further alleges that "the loans originating between the years of 2001–2003 ... had been delinquent well before June of 2012." (SAC 11.) He claims that "delinquencies occurred on these particular loans in, 2003, 2004, 2005, and ... up [until] 2010." (SAC 12.)

With respect to his NYFCRA claim, Plaintiff alleges that "around July of 2017 he paid off all of the loans at issue and thus triggered the protections of the NYFCRA." (SAC 19.) He also alleges that "the loans originating between 2001-2003 were first placed for collection in 2004" and that "that the

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 143 of 238
Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)
2021 WL 326972

loans originating in 2011 were placed collection [sic] in June of 2012." (SAC 20.)

Section 1681c(a) of the FCRA provides that no consumer reporting agency may produce a consumer report containing "[a]ccounts placed for collection or charged to profit and loss that antedate the report by more than seven years." 15 U.S.C. § 1681c(a)(4). The seven-year period

> shall begin, with respect to any delinquent account that is placed for collection ..., charged to profit and loss, or subjected to any similar action, upon the expiration of the 180-day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity, charge to profit and loss, or similar action.

*Id.* § 1681c(c)(1). Generally, "[t]he seven year period begins to run 180 days from the date of the first delinquency on an account." *Mierek v. Bank of Am. Corp.*, No. 7:07-400-HMH-BHH, 2008 WL 746981, at *6 n.4 (D.S.C. Mar. 18, 2008). But where a delinquency on an account is resolved—for example, the account is made current or placed in forbearance—then the account later becomes delinquent a second time and is then referred to collection, the seven-year reporting window accrues with the second, later delinquency. *See Beseke v. Equifax Info. Servs., LLC*, 420 F. Supp. 3d 885, 898 (D. Minn. 2019) (noting that "where a consumer brings his or her delinquent account current and defaults again, a [consumer reporting agency] should use the new default date as the date to determine when to purge the entire account").

Section 380-j(f)(1)(iv) of the NYFCRA provides that no consumer reporting agency may produce a consumer report containing "accounts placed for collection or charged to profit and loss which antedate the report by more than seven years; or accounts placed for collection or charged to profit and loss, which have been paid and which antedate the report by more than five years." N.Y. Gen. Bus. Law § 380-j(f)(1)(iv). The NYFCRA differs from the FCRA in that "the time period begins running when the account was placed for collection or charged to profit and loss." (Opinion & Order 8.) *Wimberly*, 2019 WL 6895751, at *4.

**\*7** Judge Failla previously ruled that Plaintiff failed to show that Defendant reported his accounts beyond the FCRA and NYFCRA statutory periods. (Opinion & Order 8–10.) *Wimberly*, 2019 WL 6895751, at *4. Nothing in the Proposed Second Amended Complaint alters that conclusion. Plaintiff alleges that "the loans throughout their history were intermittently deferred or put into forbearance by the Department of Education" (SAC 11) and when his enrollment at NYU ended in December 2011 or January 2012, the loans entered an automatic deferment until June 2012 (SAC 20 (noting that the loans "thereafter were [p]laced for collection in June of 2012")). Plaintiff contends that the standard for the date of first delinquency is not impacted by deferments or forbearances (SAC 11) and, therefore, making an account current "does not create a new date of first delinquency" (Pl.'s Br. 11).

Contrary to Plaintiff's allegations—which are *not* factual allegations but erroneous conclusions of law—the FCRA's seven-year reporting period began anew in June 2012 with Plaintiff's defaulting on his payments after the deferment period ended. *See Beseke*, 420 F. Supp. 3d at 898; *see also Hasan v. Navient Sols., Inc.*, No. 14-14196-LTS, 2016 WL 6832682, at *4 (D. Mass. Mar. 11, 2016) (holding that the seven-year period began with plaintiff's failure to make payments after the deferment period ended as a result of the plaintiff not attending school full-time). The seven-year period therefore closed in or about December 2019—more than three years after Plaintiff began disputing the loans and more than one year after Plaintiff commenced this action. (Opinion & Order 10.) *Wimberly*, 2019 WL 6895751, at *4. Plaintiff offers no support for his argument that "June 2012 is not the date of first delinquency for all of the accounts at issue in this case." (SAC 20.) Accordingly, Plaintiff cannot maintain a claim under Section 1681c(a)(4) of the FCRA (Count III). *Cf. Rosenberg v. Equifax Info. Servs., LLC*, No. 3:19-cv-00042-FLW-ZNQ, 2020 WL 4253063, at *2 (D.N.J. July 16, 2020) (granting summary judgment where report was issued within seven-year period of plaintiff's account becoming delinquent).

As Judge Failla previously found, Plaintiff also has not stated a claim under Section 380-j(f)(1)(iv) of the NYFCRA. His allegations regarding when his loans were placed for collection are directly contradicted by documentary evidence and therefore need not be credited. (*See* Opinion & Order 9–10.) *Wimberly*, 2019 WL 6895751, at *4. Plaintiff's allegation in the Proposed Second Amended Complaint that the loans originating between 2001 and 2003 were placed for collection

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 144 of 238

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

in 2004 (SAC 20) is inconsistent with his allegations that "the first day he missed a payment ... was likely in 2004 or 2005" (SAC 15) and that "the loans from 2001-2003[ ] had been consolidated in 2004 or 2005 [and] the new loan in 2004 or 2005 paid off the 3 of the previous loan disbursements at issue in this case from 2001-2003" (SAC 17). It is also inconsistent with and contradicted by the documentary evidence. For instance, the 2007 Equifax Report that Plaintiff filed in support of the Motion to Further Amend shows that Equifax, Experian, and TransUnion reported his loans originating in 2001 as delinquent and not in collections. (*See* Equifax, 3-in-1 Credit Report as of August 15, 2017 (filed under seal).) In addition, the National Student Loan Data System ("NSLDS") printouts filed by Plaintiff at the motion to dismiss stage show that the loans originating between 2001 and 2003 were not placed for collection in 2004, were in repayment or forbearance between 2003 and 2012, and were not declared in default until 2013. (Mot. Seal Ex. 2, at 5–6, 8–9, 11–12 [ECF No. 44-2].) [3] Moreover, Plaintiff's allegation that the loans originating in 2011 were placed for collection in June 2012 (SAC 20) is contracted by the NSLDS printouts, which show that these loans were in forbearance in April 2012, in repayment until May 2012, and declared in default in July 2013 (Mot. Seal Ex. 2, at 23–24, 26–27).

[3]     The Court may consider the NSLDS reports because it is apparent that Plaintiff relied on these documents in preparing the Proposed Second Amended Complaint. *See Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) (noting that courts may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit" (citing *Cortec Indus.*, 949 F.2d at 47–48)). Indeed, Plaintiff references the NSLDS printouts in his brief in support of the Motion to Further Amend. (*See* Pl.'s Br. 9, 12, 24.)

**\*8** Where, as here, "document[s] relied on in the complaint contradict[ ] allegations in the complaint, the document[s], not the allegations, control, and the court need not accept the allegations in the complaint as true." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592–93 (S.D.N.Y. 2013) (quoting *Poindexter v. EMI Record Grp. Inc.*, No. 11 Civ. 559(LTS), 2012 WL 1027639, at \*2 (S.D.N.Y. Mar. 27, 2012)); *see L-7 Designs*, 647 F.3d at 422. The Court thus declines to credit Plaintiff's allegations that his loans were placed for collection in 2004 and 2011, rendering the reported information obsolete within the meaning of Section 380-j(f)(1)(iv) of the NYFCRA. As Judge Failla recognized, the

earliest any of the disputed accounts entered collection was in January 2014 and therefore "the earliest of these loans would not have expired until January 2019, almost three years after Plaintiff began disputing these loans and five months after Plaintiff brought this action." (Opinion & Order 10.) *Wimberly*, 2019 WL 6895751, at \*4. Accordingly, Plaintiff fails to state a claim under Section 380-j(f)(1)(iv) of the NYFCRA (Count IV).

## III. Plaintiff's Newly Proposed Causes of Action Each Fail To State a Claim

### A. Failure To Notify Plaintiff of Reinsertion of Previously Deleted Material (Count VII)

Plaintiff's Proposed Second Amended Complaint alleges that Defendant failed to notify him of the reinsertion of previously deleted material into his "disclosures" in violation of Section 1681i(a)(5)(B)(ii) of the FCRA. (SAC 26–27.) Plaintiff alleges that "in 2005 or 2006 the Defendant reinserted the 3 loan disbursements originating between 2001 or 2002 into the Plaintiff's disclosures." (SAC 26.) More specifically, Plaintiff alleges that "each time that information reappeared on a report, after having previously been deleted he should have been notified." (SAC 26.)

Section 1681i(a)(5)(A) of the FCRA requires that a consumer reporting agency delete information disputed by a consumer from the consumer's file if that information cannot be verified pursuant to a "reinvestigation under paragraph (1)." 15 U.S.C. § 1681i(a)(5)(A)(i); *see id.* § 1681i(a)(1). Section 1681i(a)(5)(B) provides, "If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate." *Id.* § 1681i(a)(5)(B)(i). And if a consumer reporting agency reinserts any previously deleted information, it must "notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion." *Id.* § 1681i(a)(5)(B)(ii); *see Phipps v. Experian*, No. 20-CV-3368 (LLS), 2020 WL 3268488, at \*2 (S.D.N.Y. June 15, 2020) (describing FCRA reinsertion procedure). Accordingly, to state a valid claim for failure to notify under Section 1681i(a)(5)(B), "the re-reported information must have been deleted pursuant to a § 1681i(a)(1) reinvestigation." *Miller v. Wells Fargo & Co.*, No. 3:05-CV-42-S, 2008 WL 793163, at \*6 (W.D. Ky. Mar. 24, 2008); *see also Smith v. Specialized Loan Servicing, LLC*, No. 1:17-CV-02940-LMM-RGV, 2017 WL 8222347, at \*4 (N.D. Ga. Nov. 28, 2017) (noting that "15 U.S.C. § 1681i(a)

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

(5)(B)(ii) is limited to situations where a consumer reporting agency ... removes information from a consumer's credit file after reinvestigation under 15 U.S.C. § 1681i(a)(1)").

Plaintiff's proposed reinsertion claim fails for two reasons. First, Plaintiff does not allege that the reinserted loan disbursements were deleted pursuant to a reinvestigation. Indeed, Plaintiff does not even allege that he disputed the loan disbursements to prompt a reinvestigation. To the contrary, Plaintiff alleges that the loans from 2001 to 2003 were deleted in 2004 or 2005 after they were consolidated but then reappeared on his credit report sometime between 2007 and 2010. (SAC 17.) [4] Because the loan disbursements were not deleted from Plaintiff's file pursuant to a reinvestigation, any alleged reinsertion did not trigger the notice requirement. Therefore, Defendant cannot be liable for failure to notify. *See Miller*, 2008 WL 793683, at *6 (holding that defendant could not be liable under Section 1681i(a)(5)(B) because the reinserted information was not deleted pursuant to a reinvestigation).

[4]  Plaintiff vaguely states in his brief that he "believes he has disputed these loans and they were previously removed prior to late 2010." (Pl.'s Br. 17.) As Judge Failla recognized, "courts are permitted to consider allegations presented by *pro se* litigants for the first time in their opposition papers, as long as such allegations are consistent with the complaint." (Opinion and Order 2 n.1.) *Wimberly*, 2019 WL 6895751, at *1 n.1. The Court does not consider this allegation because it is inconsistent with the allegation in the Proposed Second Amended Complaint that the loans were deleted after they were consolidated. (SAC 17.) Even if the Court were to consider it, the Court could not reasonably infer that such disputes prompted a reinvestigation because the allegation is so lacking in factual content. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

**\*9**  Second, even if the alleged reinsertion did trigger the notice requirement, Plaintiff's claim would be time-barred. Claims under the FCRA must be filed either "2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability" or "5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p. Plaintiff argues that although the loan disbursements were reinserted between 2005 and 2006, the reinsertion claim

is timely because "each time that information reappeared on a report, after having previously been deleted [Plaintiff] should have been notified." (SAC 26–27.) This interpretation is inconsistent with the text of the statute. By its plain terms, Section 1681i(a)(5)(B)(ii) mandates that a consumer reporting agency provide notice when previously deleted information is reinserted in the consumer's credit *file*, not the consumer's credit *report*. *See* 15 U.S.C. § 1681i(a)(5)(B)(ii). *Cf. Hammer v. Equifax Info. Servs., L.L.C.*, 974 F.3d 564, 569 (5th Cir. 2020) (finding that notice under Section 1681i(a)(5)(B)(ii) is not required when a consumer reporting agency reinserts previously deleted information into a consumer's credit *report*, as opposed to a consumer's credit *file*). Accordingly, even if the alleged reinsertion of the loan disbursements in 2005 or 2006 triggered the notice requirement, any claim for failure to notify would be time-barred. As such, Plaintiff fails to state a claim under Section 1681i(a)(5)(B)(ii) of the FCRA (Count VII).

### B. Failure Timely To Notify Furnishers of a Dispute (Count VIII)

Plaintiff proposes to bring a claim under Section 1681i(a)(2)(A) of the FCRA for failure to notify furnishers of his disputes. (SAC 27.) Plaintiff alleges that "Defendant failed to notify the relevant furnishers within 5 business days from the time it received the disputes." (SAC 27.)

Section 1681i(a)(2)(A) of the FCRA provides:

> Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller ..., the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.

15 U.S.C. § 1681i(a)(2)(A).

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 146 of 238

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

The Proposed Second Amended Complaint is devoid of any factual details that would enable the Court to draw the reasonable inference that Defendant is liable for violating this statute. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Plaintiff simply provides a "formulaic recitation of the elements of [the] cause of action," which is insufficient to state a claim. *Id.* Accordingly, Plaintiff's claim under Section 1681i(a)(2)(A) of the FCRA (Count VIII) fails.

### C. Failure To Advise on the Availability of Disclosure of Files (Count IX)

Plaintiff alleges that "[a]t all relevant times Defendant failed to promptly advise the Plaintiff of it's [sic] obligation to provide disclosure of the files in person, by mail or by telephone to Plaintiff." (SAC 27.) He alleges that this failure violates Section 380-d of the NYFCRA. (SAC 27.)

Section 380-d outlines items a consumer reporting agency must clearly and accurately disclose to any consumer upon request and proper identification. *See* N.Y. Gen. Bus. Law § 380-d(a). The statute provides further that:

> every consumer reporting agency, upon contact by a consumer by phone, mail or in person regarding information which may be contained in the agency's files which has been or may be used for the purpose of providing a consumer report regarding that consumer, shall promptly advise the consumer of the obligation of the agency to provide disclosure of the files in person, by mail or by telephone pursuant to this section.... The disclosure shall be provided in the manner selected by the consumer.

*Id.* § 380-d(c).

Plaintiff's claim that Defendant failed to advise him of Defendant's disclosure obligations is insufficient to state a claim. Plaintiff provides no factual detail regarding Defendant's purported failure to advise Plaintiff of Defendant's obligation under Section 380-d(c), specifically when Plaintiff contacted Defendant, by what means, and

for what purpose. The plain language of the statute says that Defendant's obligation is triggered "upon contact by a consumer" and "regarding information which may be contained in the agency's files which has been or may be used for the purpose of providing a consumer report." N.Y. Gen. Bus. Law § 380-d(c). The Proposed Second Amended Complaint contains no specific factual allegations describing particular instances when Plaintiff contacted Defendant about information contained in Defendant's files and no specific allegations that Defendant failed to fulfill its obligation. Plaintiff's general claim that Defendant failed to fulfill its obligations "[a]t all relevant times" is too conclusory to state a claim. *See* Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 146 (2d Cir. 2011) (noting that courts "need not 'credit a complaint's conclusory statements without reference to its factual context' " (quoting *Iqbal*, 556 U.S. at 686, 129 S.Ct. 1937)).

**\*10** While the specifics of the proposed claim are far from clear, the Court rejects Defendant's attempt to characterize Plaintiff's claim as a violation of Sections 380-d(a) and 380-e(b). (Def.'s Opp. 18.) This newly proposed cause of action in Count IX does not allege a failure to disclose Plaintiff's credit file; it alleges that Defendant failed to advise Plaintiff of Defendant's obligation to disclose the file if the consumer so requests. (SAC 27.) *See* N.Y. Gen. Bus. Law § 380-d(c).

Plaintiff's claim is, however, also deficient with respect to damages, as Defendant argues. (Def.'s Opp. 18.) The NYFCRA provides only for actual (and punitive) damages in the event of a consumer reporting agency's noncompliance. *See* N.Y. Gen. Bus. Law §§ 380-l, 380-m; Ritchie v. N. Leasing Sys., Inc., No. 12-cv-4992 (KBF), 2016 WL 1241531, at \*9 (S.D.N.Y. Mar. 28, 2016). Plaintiff fails entirely to allege any actual damages caused by Defendant's alleged failure to advise him of Defendant's purported disclosure obligations, even if the Court could infer from Plaintiff's allegations that those obligations were triggered. In fact, Plaintiff does not allege that he was unaware of his right to obtain files from Defendant or that he refrained from seeking disclosure because Defendant failed to advise him that he could do so. *See* Menton v. Experian Corp., No. 02 Civ. 4687(NRB), 2003 WL 941388, at \*3 (S.D.N.Y. Mar. 6, 2003) (dismissing claim under N.Y. Gen. Bus. Law § 380-d because the plaintiff suffered no actual damages from the delay in receiving his credit report); *see also* Casella v. Equifax Credit Info. Servs., 56 F.3d 469, 474–75 (2d Cir. 1995) (affirming grant of summary judgment where plaintiff failed to show causation between the harm alleged and defendants' alleged

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 147 of 238

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 326972

FCRA violations). Accordingly, Plaintiff's proposed claim under Section 380-d (Count IX) fails.

**D. "Mental Anguish and Suffering," or Intentional Infliction of Emotional Distress (Count XII)**

Plaintiff proposes to assert a claim for "mental anguish and suffering" (SAC 29–30), which the Court construes as a claim for intentional infliction of emotional distress. Plaintiff alleges that Defendant's reporting cost him housing opportunities, which led to his hospitalization. (SAC 10.)

To state a claim for intentional infliction of emotional distress under New York law, a plaintiff must satisfy four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). To qualify as extreme and outrageous, "[t]he conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Coggins v. County of Nassau*, 254 F. Supp. 3d 500, 523 (E.D.N.Y. 2017) (quoting *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985)).

Here, the alleged conduct is hardly extreme or outrageous and certainly does not rise to the level necessary to state a claim for intentional infliction of emotional distress. *See Cohen v. Equifax Info. Servs., LLC*, No. 18-CV-6210 (JSR) (KHP), 2019 WL 2451293, at *2 (S.D.N.Y. Apr. 17, 2019) (noting that courts have dismissed claims for intentional infliction of emotional distress where plaintiffs alleged conduct was worse than inaccurate reporting of credit information (citations omitted)); *Ogbon*, 2013 WL 1430467, at *11 (dismissing intentional infliction of emotional distress claim in part because "defendants acted reasonably in compiling credit information that they received from reliable Furnishers"); *Evans v. Credit Bureau*, 904 F. Supp. 123, 127 (W.D.N.Y. 1995) (finding that the "fail[ure] to correct the alleged inaccuracies in [plaintiff's] credit report ... does not constitute 'extreme and outrageous conduct' which would support the claim for intentional infliction of emotional distress"). Accordingly, Plaintiff's proposed claim for intentional infliction of emotional distress fails as a matter of law.

## CONCLUSION

**\*11** Based on the foregoing, the Court DENIES Plaintiff's Motion for Leave to File a Second Amended Complaint. Since each proposed count fails to state a claim upon which relief can be granted, the proposed amendments would be futile. Accordingly, IT IS HEREBY ORDERED that the case is DISMISSED with prejudice.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 326972

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 148 of 238
Khan v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2019)
2019 WL 2492762

2019 WL 2492762
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Zahed KHAN, Plaintiff,
v.
EQUIFAX INFORMATION
SERVICES, LLC, Defendant.

18-CV-6367 (MKB)
|
Signed 06/14/2019

**Attorneys and Law Firms**

Subhan Tariq, The Tariq Law Firm, PLLC, Long Island City, NY, for Plaintiff.

Boris Brownstein, Clark Hill PLC, Princeton, NJ, Jonathan Daniel Klein, Clark Hill PLC, New York, NY, for Defendant.

## MEMORANDUM & ORDER

MARGO K. BRODIE, United States District Judge:

**\*1** Plaintiff Zahed Khan commenced the above-captioned on October 18, 2018, against Defendants Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union, LLC, in New York City Civil Court, County of Queens, alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"). (Compl., annexed to Notice of Removal as Ex. B, Docket Entry No. 1-2.) Plaintiff alleges that Defendants failed to assure maximum possible accuracy of the credit information they reported about him and failed to conduct a reasonable investigation as to the accuracy of this information. (Id. ¶¶ 8, 19.) On November 8, 2018, Trans Union, LLC filed a notice of removal removing the action from New York City Civil Court to this Court. (Notice of Removal, Docket Entry No. 1.) Plaintiff subsequently settled his claims against Experian Information Solutions, Inc., (Notice of Settlement, Docket Entry No. 27), and dismissed his claims against Trans Union, LLC, (Stip. Of Dismissal, Docket Entry No. 28).

Currently before the Court is Defendant Equifax Information Services, LLC's ("Defendant") motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Def. Mot. to Dismiss ("Def. Mot."), Docket

Entry No. 42.) For the reasons set forth below, the Court grants Defendant's motion and dismisses the Complaint, but grants Plaintiff leave to file an amended complaint within thirty (30) days of the date of this Memorandum and Order.

## I. Background

On an unspecified date in 2017, Plaintiff settled a Telephone Consumer Protection Act ("TCPA") lawsuit against Citibank (the "Citibank Settlement"). [1] (Compl. ¶ 11.) In the Citibank Settlement, "Citibank agreed to remove and/or delete [a] negative trade line made or reported in relation to [a] debt" (the "Citibank Tradeline"). (Id.)

[1]    The Court assumes the truth of the factual allegations in the Complaint for the purposes of this Memorandum and Order.

In April of 2018, Plaintiff became aware that "his credit was still being adversely affected by [the Citibank Tradeline] due to [Defendant] including the trade line in [its] reports on his credit." (Id. ¶ 12.) Defendant continued to report the Citibank Tradeline "as paid and/or charged off." (Id.) On April 27, 2018, Plaintiff "informed [Defendant] of this fact in writing and requested in writing that [it] remove the Citibank account from his credit report." (Id. ¶ 13.) Defendant did not respond. (Id. ¶ 15.) On June 22, 2018, "Plaintiff ran his Equifax credit report ... and noticed that [Defendant] was still reporting the Citibank account on his credit report." (Id.) Plaintiff alleges that Defendant "continued to report inaccurate information on Plaintiff after receiving his disputes, violating the FCRA by failing to conduct a reasonable reinvestigation and by continuing to report inaccurate information about Plaintiff's credit." (Id. ¶ 17.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 149 of 238
Khan v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2492762

that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)*. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### b. Because Plaintiff has not alleged that the information Defendant reported about him is inaccurate, he fails to state a claim under sections 1681e(b) and 1681i of the FCRA

**\*2** Defendant argues that the Court should dismiss Plaintiff's section 1681e(b) claim because (1) it did not have reason to doubt "the reliability of [Citibank,] a reputable source," and therefore acted reasonably in relying upon it for information, and (2) Plaintiff did not plead any facts showing that Defendant "furnished a consumer report about him to an identifiable third party for the purpose of establishing his eligibility for credit, employment, insurance, or the like." (Def. Mot. 6–7.) In addition, Defendant argues that the Court should dismiss Plaintiff's section 1681i claim because (1) he does not allege that the Citibank Tradeline is inaccurate, and (2) Defendant was not obligated to verify the validity of the Citibank Tradeline. (*Id.* at 8.)

Plaintiff argues that the Court should deny Defendant's motion to dismiss his section 1681e(b) claim because (1) Defendant had reason to doubt the reliability of the credit information supplied by Citibank after Plaintiff contacted Defendant to notify it of the inaccuracy, and (2) "even without evidence that a particular third party was supplied with ... a consumer report, failing to take reasonable measures to assure the accuracy of such credit information constitutes an injury in fact." (Pl. Opp'n to Def. Mot. ("Pl. Opp'n") 2–3, Docket Entry No. 22.) In addition, Plaintiff argues that the Court should dismiss the motion as to his section 1681i claim because he has "proven" that, *inter alia*, his credit file contained inaccurate information, he notified Defendant that the information was inaccurate, and Defendant failed to conduct a reasonable reinvestigation. (*Id.* at 3.) Plaintiff also argues that "the validity of the [Citibank Tradeline] is not in dispute here," rather, the relevant question is whether Defendant failed to pursue a reasonable reinvestigation into

the accuracy of the information on Plaintiff's credit report. (*Id.* at 5.)

### i. Section 1681e(b)

Section 1681e(b) of the FCRA imposes a duty on consumer reporting agencies "to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b); *see also Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 104 (2d Cir. 1997) (quoting same); *Gorman v. Experian Info. Sols., Inc.*, No. 07-CV-1846, 2008 WL 4934047, at \*4 (S.D.N.Y. Nov. 19, 2008) ("[T]he FCRA requires that consumer reporting agencies ... 'follow reasonable procedures to assure maximum possible accuracy of the information' contained in the consumer report." (quoting 15 U.S.C. § 1681e(b))). In order to succeed on a claim under section 1681e(b), a plaintiff must show that:

> (1) the consumer reporting agency was negligent or willful in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury.

*Gestetner v. Equifax Info. Servs., LLC*, No. 18-CV-5665, 2019 WL 1172283, at \*2 (S.D.N.Y. Mar. 13, 2019) (quoting *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 330 (D. Conn. 2009)); *see also Wenning v. On-Site Manager, Inc.*, No. 14-CV-9693, 2016 WL 3538379, at \*8 (S.D.N.Y. June 22, 2016) (same); *Selvam v. Experian Info. Sols., Inc.*, No. 13-CV-6078, 2015 WL 1034891, at \*3 (E.D.N.Y. Mar. 10, 2015) (same); *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*5 (E.D.N.Y. Dec. 15, 2010) (same) (quoting *Gaft v. Mitsubishi Motor Credit of Am.*, No. 07-CV-527, 2009 WL 3148764, at \*9 (E.D.N.Y. Sept. 29, 2009)).

"[T]he threshold question is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." *Neclerio v. Trans*

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 150 of 238

Khan v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2492762

*Union, LLC*, 983 F. Supp. 2d 199, 209 (D. Conn. 2013) (quoting *Collins v. Experian Credit Reporting Serv.*, 494 F. Supp. 2d 127, 134–35 (D. Conn. 2007)); *see also Adams*, 620 F. Supp. 2d at 330 (same) (quoting *Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989)); *Gorman*, 2008 WL 4934047, at *4 (same); *Collins*, 494 F. Supp. 2d at 135 ("Every circuit to consider the question has agreed that this threshold showing [of inaccuracy] is fundamental to the success of a claim under § 1681e(b)." (collecting cases)).

 **\*3** Although the Second Circuit has yet to address the issue, "[t]he overwhelming weight of authority holds that a credit report is inaccurate ... either 'when it is patently incorrect *or* when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect.' " *Wenning*, 2016 WL 3538379, at *9 (quoting *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001)); *see also Kilpakis v. JPMorgan Chase Fin. Co., LLC*, 229 F. Supp. 3d 133, 141–42 (E.D.N.Y. 2017) ("[T]his Court finds that the more flexible approach mandated by the materially misleading standard is appropriate, and provides a method of evaluating compliance with the FCRA that is more closely aligned than its rigid counterpart with the statute's purpose of addressing the serious problem in the credit reporting industry ... of inaccurate or *misleading* information." (citation and internal quotation marks omitted)); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 902 (3d Cir. 2011) ("A report is inaccurate when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." (internal alterations, citation, and quotation marks omitted)); *Saunders v. Branch Banking & Tr. Co.*, 526 F.3d 142, 148 (4th Cir. 2008) ("[A] consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression.").

### ii. Section 1681i

Section 1681i sets out procedures consumer reporting agencies must follow to investigate disputes as to the accuracy of reported information. *See* 15 U.S.C. § 1681i. These procedures include reinvestigating a consumer's record within a reasonable period of time after a consumer "directly conveys" a dispute as to the "completeness or accuracy of an item on his credit report" to the consumer reporting agency. *Podell*, 112 F.3d at 101 (citing 15 U.S.C. § 1681i(a)); *see also Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151

(2d Cir. 2012) ("If a dispute is filed with the agency, both the agency and the furnisher of that information have a duty to reasonably investigate and verify that the information is accurate." (citing 15 U.S.C. §§ 1681i(a)(1)(A), 1681s–2(b))). Section 1681i states, in relevant part, that if a consumer notifies a consumer reporting agency — either directly or indirectly — of a dispute as to the accuracy of any item of information contained in his file, within thirty days of notification, the consumer reporting agency "shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A); *see Jones v. Experian Info. Solutions, Inc.*, 982 F. Supp. 2d 268, 272 (S.D.N.Y. 2013) (quoting same). What constitutes a "reasonable" reinvestigation depends on the circumstances of the allegations. *Id.* (citing *Cortez v. Trans Union, LLC*, 617 F.3d 688, 713 (3d Cir. 2010)). "Prior to being notified by a consumer, a credit reporting agency generally has no duty to reinvestigate credit information." *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995).

Similar to a section 1981e(b) plaintiff, "a plaintiff asserting claims under § 1681i must demonstrate that the disputed information is inaccurate." *Gestetner*, 2019 WL 1172283, at *2 (quoting *Jones*, 982 F. Supp. 2d at 272–73); *see also Neclerio*, 983 F. Supp. 2d at 218 (same); *Jones*, 982 F. Supp. 2d at 272–73 ("Courts evaluating whether a [credit reporting agency] failed to conduct a reasonable reinvestigation look to whether there were in fact inaccuracies in the credit report."); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010) ("Although ...15 U.S.C. § 1681i ... does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim, many courts ... have imposed such a requirement."); *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 67 (1st Cir. 2008) ("[T]he weight of authority in other circuits indicates that without a showing that the reported information was in fact inaccurate, a claim brought under § 1681i must fail."); *Crump v. Carrington Mortg. Serv., LLC*, No. 18-CV-2302, 2019 WL 118490, at *3 (N.D. Ill. Jan. 7, 2019) ("To state a claim under § 1681e(b) or § 1681i(a), [a plaintiff] must allege that her consumer report included inaccurate information."); *Fillmore v. Equifax Info. Servs., LLC*, No. 16-CV-1042, 2017 WL 4276542, at *2 (W.D. Tex. Sept. 26, 2017) (stating that section 1681i(a) "require[s] [a p]laintiff to prove, as a threshold matter, that an account is inaccurately reporting"). "This rule is based on both the purpose of the FCRA, 'to protect consumers against the compilation and dissemination of *inaccurate* credit information,' and the fact that 'it is difficult to see how a plaintiff could prevail on a claim for damages under § 1681i without a showing[ ] that

Khan v. Equifax Information Services, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2492762

the disputed information disclosed by the credit agency was, in fact, inaccurate.' " *Neclerio*, 983 F. Supp. 2d at 218.

### iii. Plaintiff fails to allege that the information Defendant reported about him is inaccurate

**\*4** Plaintiff fails to state a claim pursuant to sections 1681e(b) and 1681i because he has not alleged facts showing that the information that Defendant reported about him is inaccurate. *Gestetner*, 2019 WL 1172283, at \*2 (explaining that under both section 1681e(b) and section 1681i, a plaintiff must allege that the disputed information is inaccurate). Plaintiff alleges that Defendant "prepared and issued credit reports concerning Plaintiff which include inaccurate information." (Compl. ¶ 10.) He states that "Citibank agreed to remove and/or delete the [Citibank Tradeline]," (*id.* ¶ 11), that Defendant reported the Citibank Tradeline as "paid and/or charged off," (*id.* ¶ 12), and continued to do so even after he informed Defendant of the Citibank Settlement, (*id.* ¶¶ 13, 15). However, Plaintiff does not state facts demonstrating that Defendant's report about Plaintiff was inaccurate, either because it is patently incorrect or because it is misleading in such a way and to such an extent that it can be expected to have an adverse effect. *Wenning*, 2016 WL 3538379, at \*9 (stating that "[t]he overwhelming weight of authority holds that a credit report is inaccurate ... either 'when it is patently incorrect *or* when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect.' " (quoting *Dalton*, 257 F.3d at 415)). Plaintiff does not explain how or why the Citibank Settlement rendered Defendant's report — which indicates that the Citibank Tradeline is "paid and/or charged off" — inaccurate. (Compl. ¶ 12.) Accordingly, the Court dismisses Plaintiff's FCRA claims. *See Henry v. Flagstar Bank, FSB*, No. 16-CV-1504, 2019 WL 1471267, at \*2 (E.D.N.Y. Mar. 31, 2019) (dismissing FCRA claim because the plaintiffs' allegation that the defendant "intentionally ... reported false, negative information" about the plaintiffs was a "formulaic recitation of the elements of a cause of action" and insufficient to state a claim because the plaintiff did not allege "what information [the defendant] allegedly reported, to whom, why it was allegedly false, or any other information that could support such a claim"); *Gestetner*, 2019 WL 1172283, at \*2 (dismissing section 1681e(b) and section 1681i claims

because "[a]bsent from the complaint ... [were] any factual allegations explaining why having multiple delinquency dates listed ... necessarily makes the first two false" and that plaintiff's "conclusory statements" as to inaccuracies could "not survive a motion to dismiss" because the complaint lacked "factual enhancement"); *Tom Chen v. Vertical Screen, Inc.*, No. 17-CV-0938, 2019 WL 3704836, at \*3 (W.D. Wash. Aug. 28, 2017) (dismissing the complaint because allegation that "the report was inaccurate because it stated that [the plaintiff's] charges were 'dismissed' instead of stating that they were 'dismissed with prejudice' " was "insufficient to give rise to an inference that the report was 'patently incorrect' or 'materially misleading' "); *see also Gauci v. Citi Mortg.*, No. 11-CV-1387, 2012 WL 1535654 (C.D. Ca. Apr. 30, 2012) ("[U]nder the FCRA, a credit reporting agency's job is to correctly report information furnished by the creditor, and credit reporting agencies are not supposed to adjudicate a consumer-creditor dispute in order to issue credit reports. When a credit reporting agency correctly reports the information furnished by the creditor, the credit report is considered as 'accurate' within the meaning of the FCRA, even when there is an ongoing dispute as to the validity of the debt."); *Molton v. Experian Info. Sols., Inc.*, No. 02-CV-7972, 2004 WL 161494, at \*6 (N.D. Ill. Jan. 21, 2004) (finding that the plaintiff could not establish a section 1681i claim as "no reasonable investigation on the part of [defendant] could have uncovered any inaccuracy in [the plaintiff's credit] report because there was never any factual deficiency in the report" — even though the plaintiff "settled the account with a collection agency," the statement on her credit report was "accurate").

### III. Conclusion

For the foregoing reasons, the Court grants Defendant's motion and dismisses the Complaint, but grants Plaintiff leave to file an amended complaint with thirty (30) days of the date of this Memorandum and Order.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 2492762

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 152 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

2016 WL 11483839
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jacob FRYDMAN, Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC., et al., Defendants.

14cv9013-PAC-FM
|
Signed 08/11/2016

**Attorneys and Law Firms**

Neal Brickman, The Law Office of Neal Brickman, New York, NY, for Plaintiff.

Joshua Alan Weiner, Pro Hac Vice, New York City Law Department, Sarah Jean Fox, Andrew Steven Kleinfeld, Jones Day, New York, NY, Robert Hoyland, Tracy Lee Klingler, King & Spalding, LLP, Atlanta, GA, Andrew M. Lehmann, Camille Renee Nicodemus, Schuckit & Associates, P.C., Zionsville, IN, for Defendants.

**REPORT AND RECOMMENDATION TO
THE HONORABLE PAUL A. CROTTY**

FRANK MAAS, United States Magistrate Judge

**\*1** Prose plaintiff Jacob Frydman ("Frydman") brings this action under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 etseq., against Experian Information Solutions, Inc. ("Experian"), Equifax Information Services LLC ("Equifax"), and Trans Union, LLC ("Trans Union") (collectively, the "Defendants").[1] Frydman alleges that the Defendants are liable under the FCRA and New York state law because they failed to prevent the inclusion of certain inaccurate items in his credit file, causing him, among other things, to be denied credit or offered unfavorable terms on several large bank loans. For these alleged wrongs, he seeks actual as well as punitive damages. (See ECF No. 29 ("Amended Complaint" or "Am. Compl.") ).

[1] Although Frydman initially named Equifax Inc. as a defendant, the parties subsequently stipulated to the substitution of the correct entity. (See ECF No. 49). Additionally, counsel appearing in this

matter on behalf of Trans Union has indicated that Frydman incorrectly named Transunion Risk and Alternative Data Solutions, Inc., a separate entity. (See ECF No. 43 at 55). The Amended Complaint therefore should probably be deemed further amended to substitute Trans Union for this entity.

Following the close of discovery, the Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 95). The parties also have filed five motions to strike. (ECF Nos. 126, 129, 135, 139, 142). For the reasons set forth below, the Defendants' motion for summary judgment should be granted in part and denied in part, and the parties' motions to strike should be denied.

I. Relevant Facts [2]

[2] The factual recitation in this Report and Recommendation is derived from the following: ECF No. 97 (Defs.' Joint Rule 56.1 Stmt. ("Defs.' 56.1 Stmt.") ); ECF No. 98 (Decl. of Camille R. Nicodemus, Esq., dated Jan. 4, 2016 ("Nicodemus Decl.") ), Ex. A (excerpts from Tr. of Pl.'s Dep., dated July 23, Sept. 10 and 11, 2015 ("Frydman Tr.") ); ECF No. 99 (Aff. of Elizabeth Wilson, sworn to on Jan. 4, 2016 ("Wilson Aff.") ); ECF No. 102 (Decl. of Jason Scott, dated Jan. 4, 2016 ("Scott Decl.") ); ECF No. 109 (Decl. of Margaret Leslie, dated Jan. 4, 2016 ("Leslie Decl.") ); ECF No. 110 (Decl. of Pamela Smith, dated Jan. 4, 2016 ("Smith Decl.") ); ECF No. 118 (Pl.'s Corrected Resp. to Defs.' 56.1 Stmt. ("Pl.'s 56.1 Resp.") ); ECF No. 119 (Corrected Decl. of Jacob Frydman, dated Jan. 25, 2016 ("Frydman Decl.") ).
Frydman and the Defendants each have designated portions of their motion papers as "Confidential" pursuant to a protective order entered on April 10, 2015. (ECF No. 18). The last paragraph of the protective order expressly cautions that "[n]othing set forth herein binds the Court." (Id. ¶ 15). I do not consider any of the information in this Report and Recommendation sufficiently personal or proprietary to warrant redaction. Accordingly, I am publicly filing this entire Report and Recommendation.

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Frydman.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 153 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

A. The Parties

**\*2** As an individual, Frydman is a "consumer" within the meaning of the FCRA. 15 U.S.C. § 1681a(c). Frydman describes himself as a "real estate developer and investor for more than 35 years," and also as an inactive member of the Ohio bar. (Frydman Decl. ¶ 5). Among the positions he has held over the years, Frydman was once the chief executive officer and chairman of the board of United Realty Trust, Inc., a public real estate investment trust with more than one thousand shareholders. (Id.; Defs.' 56.1 Stmt. ¶ 19).

The Defendants are consumer reporting agencies ("CRAs"). [3] (Wilson Aff. ¶ 2; Scott Decl. ¶ 3; Leslie Decl. ¶ 5). In the course of their work, the Defendants gather information from creditors and other sources in order to maintain credit files on more than 200 million consumers in the United States. (Wilson Aff. ¶¶ 4, 6; Scott Decl. ¶¶ 3-4; Leslie Decl. ¶¶ 6-7). They then provide "credit reports" to third parties, such as insurers or employers, engaged in credit-related transactions, as well as "consumer disclosures" to consumers regarding their own credit files. (Wilson Aff. ¶ 20; Scott Decl. ¶ 3; Smith Decl. ¶¶ 6-8).

[3]   Under the FCRA, a CRA is defined as "any person which, for monetary fees, ... regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and ... uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

B. Frydman's Disputes

On September 11, 2014, Frydman obtained his consumer disclosures from each of the Defendants. (Frydman Decl. ¶ 15; id., Ex. B ("September 11 Disclosures") ). [4] On September 22, Frydman sent separate letters to the designated post office boxes of each of the Defendants ("September 22 Letters") disputing the accuracy of five items in the September 11 Disclosures: (1) a civil judgment entered on July 1, 2014, (2) a Porsche Financial Services ("Porsche Financial") account; (3) a Chase Auto account; (4) a Capital One Auto account opened in 2005; and (5) a Capital One Auto account opened in 2006. (Wilson Aff. ¶¶ 44-45; Scott Decl. ¶ 19; Smith Decl. ¶¶ 33-34; Frydman Decl. ¶ 33; see also

Wilson Aff., Ex. A (letter to Trans Union); Scott Decl., Ex. A (letter to Experian); Smith Decl., Ex. A (letter to Equifax) ). [5]

[4]   Frydman's exhibit lettering system and references thereto are at times difficult to decipher. To ensure consistency, I have used the exhibit letters listed at the end of his declaration. (See Frydman Decl. at 30-31).

[5]   In all three letters, Frydman cited the details of the five disputed items as reported by Trans Union, although Experian's and Equifax's reporting actually differed somewhat. The letters consequently were identical in all relevant respects, and I have cited to them collectively.

1. Civil Judgment

On or about April 24, 2013, Atlantic Concrete Foundation, Inc. ("Atlantic Concrete") commenced a lawsuit in Supreme Court, Ulster County, against Frydman, his wife, and two business entities that Frydman managed. (Defs.' 56.1 Stmt. ¶ 3; Pl.'s 56.1 Resp. ¶ 3). The action arose out of an alleged failure to pay for labor and materials furnished in connection with certain real property improvements. (Id.). On July 1, 2014, the court entered a default judgment in the amount of $100,374 against Frydman and his co-defendants in that suit ("Atlantic Concrete Judgment"). (Defs.' 56.1 Stmt. ¶ 4).

**\*3** On August 29, 2014, Ulster County Justice Christopher E. Cahill signed an order directing that the Atlantic Concrete Judgment be vacated. (Id. ¶ 5; Wilson Aff., Ex. A at 5-6 ("August 29 Order") ). The August 29 Order bears an "Index No." of 13-1406 and an "RJI No." of 55-14-00739. (See August 29 Order). Several days later, on September 5, the Ulster County Clerk stamped the August 29 Order as having been "entered." (Defs.' 56.1 Stmt. ¶ 6; Frydman Tr. 545-47). [6]

[6]   Frydman testified at his deposition that he never previously had seen a copy with the September 5 clerk's stamp, (see Frydman Tr. 544-45), but nonetheless admits that the August 29 Order was filed on September 5, (see Pl.'s 56.1 Resp. ¶ 12).

Despite the vacatur, in the September 11 Disclosures, the Defendants each reported a civil judgment in favor of Atlantic Concrete, dated July 1, 2014, with an entirely different "Reference No." of 20145467. (September 11 Disclosures

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 154 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

at 5). The remaining details, however, differed somewhat: Experian reported a judgment of $100,374 in "Tompkins Cnty Supreme;" [7] Equifax, a judgment of $100,000 in "Ulster Cty;" and Trans Union, a judgment of $100,374 in "Circuit Court." (Id.). In the September 22 Letters, Frydman stated that the Atlantic Concrete Judgment had been vacated; in support, he attached a copy of the August 29 Order, without the September 5 clerk's stamp. (September 22 Letters at 1; see also Wilson Aff. ¶ 45; Scott Decl. ¶ 19; Smith Decl. ¶ 36; Pl.'s 56.1 Resp. ¶¶ 11-12; Frydman Decl. ¶ 35).

[7]    In a separate credit report produced for Frydman, Experian listed a street address for Tompkins Supreme in Kingston, New York, which, of course, is in Ulster County. (See Scott Decl., Ex. D).

### 2. Porsche Financial Account

Frydman also disputed a Porsche Financial account that the Defendants each had reported as "charged off." (September 22 Letters at 2; see also Wilson Aff. ¶ 45; Scott Decl. ¶ 22; Smith Decl. ¶¶ 42-43; September 11 Disclosures at 17). In the September 22 Letters, Frydman informed the Defendants that this account "was a one-time up front lease payment and there was no charge off of any amount," but enclosed no additional documentation. (September 22 Letters at 2).

Frydman maintains that he subsequently sent the Defendants copies of a letter from Porsche Financial, dated September 24, 2014. (Pl.'s 56.1 Resp. ¶¶ 13-14). This letter, addressed to Frydman and signed by Jackie Williams of Customer Remarketing, thanked Frydman for "alerting Porsche Financial ... of an inaccuracy on [his] credit report(s)," indicated that Frydman's account was "in good standing and reflecting as paid/closed, full termination/obligation satisfied," and assured him that "the charge off ha[d] been removed from [Porsche Financial's] system." (Nicodemus Decl., Ex. B ("Porsche Financial Letter") ). The letter further noted that, while Porsche Financial had "requested Equifax, TransUnion and/or Experian to correct their records, these companies are independent of [Porsche Financial], and [Porsche Financial] cannot require them to make the correction in a timely manner." (Id.).

Frydman's letters enclosing the Porsche Financial Letter were dated October 20 (Equifax), and 22 (Trans Union and Experian), 2014, respectively. (See Scott Decl., Ex. K (letter to Equifax); Smith Decl., Ex. B (letter to Experian); Frydman

Decl., Ex. D (letter to Trans Union) ). Frydman addressed these letters to the Defendants' legal officers, not the post office boxes to which he sent the September 22 Letters. (Wilson Aff. ¶ 52; Scott Decl. ¶ 29; Smith Decl. ¶¶ 55-56; Pl.'s 56.1 Resp. ¶¶ 13-14). [8]

[8]    These letters also enclosed drafts of the complaints Frydman intended to file in this Court absent a satisfactory resolution of the discrepancies.

### 3. Additional Accounts

**\*4** Finally, Frydman disputed three additional automobile financing accounts that the Defendants each had reported as thirty days past due: (a) a Chase Auto account; (b) a Capital One Auto account opened in 2005; and (c) a Capital One Auto account opened in 2006. (September 22 Letters at 2-3; see also Defs.' 56.1 Stmt. ¶¶ 8-9; Smith Decl. ¶¶ 46, 49, 53; September 11 Disclosures at 15, 17). Frydman denied that any of these accounts ever were thirty days past due, but provided no additional documentation. (See September 22 Letters).

### C. Defendants' Reinvestigations

Each of the Defendants addressed Frydman's disputes in accordance with its own standard procedures. (Wilson Aff. ¶¶ 46-49; Scott Decl. ¶ 19; Smith Decl. ¶ 35). Those procedures included contacting creditors Porsche Financial, Chase Auto, and Capital One Auto, (Wilson Aff. ¶¶ 47-49; Scott Decl. ¶¶ 22-23; Smith Decl. ¶¶ 44, 47, 50), as well as the Defendants' contracted public records vendor, LexisNexis Risk Data Services LLC ("LexisNexis"), (Wilson Aff. ¶ 46; Scott Decl. ¶ 21; Smith Decl. ¶ 39; see also Leslie Decl. ¶¶ 8-11). Communications between the Defendants and these entities generally are made using an electronic form called an Automated Consumer Dispute Verification ("ACDV"), which allows the use of pre-defined codes and phrases as well as optional customized narratives to describe the matter in dispute. (Smith Decl. ¶¶ 24-26, 28).

### 1. Trans Union

Trans Union maintains that the August 29 Order could not be used to modify Frydman's credit file because it was not court-stamped. (Wilson Aff. ¶ 46). Trans Union consequently contacted LexisNexis regarding the Atlantic Concrete Judgment. (Id.). In its response, LexisNexis did not

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 155 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

indicate that the judgment had been vacated. (Id. ¶ 46 & Ex. B). Accordingly, Trans Union made no change at that time. Trans Union maintains that it ultimately removed the Atlantic Concrete Judgment from Frydman's credit file on December 2, 2014. (Id. ¶ 55). For his part, Frydman concedes only that the judgment was removed some time before March 16, 2015. (See Pl.'s 56.1 Resp. ¶ 74).

Trans Union also sent an ACDV to Porsche Financial. (Wilson Aff. ¶ 49). When Porsche Financial did not respond within thirty days, Trans Union removed the account from Frydman's credit file. (Id.).[9] Finally, Trans Union sent ACDVs to Chase Auto and Capital One Auto. (Id. ¶¶ 47-48 & Exs. C-E). Both creditors verified that the late payment reports were accurate. (Id.). On October 22, 2014, Trans Union sent Frydman a copy of its reinvestigation results. (Id. ¶ 50 & Ex. F). Notwithstanding Chase Auto's response, Trans Union indicated in its results that the Chase Auto account subsequently had been updated to report as current. (Id., Ex. F at 5).

[9]     Trans Union denies receiving the Porsche Financial Letter at the time because it was sent to an entity other than Trans Union. (Id. ¶¶ 52-54).

### 2. Experian

Experian maintains that it could not use the August 29 Order to modify Frydman's credit file because it contained a different case number, was filed in a different court, and did not have an official seal or stamp. (Scott Decl. ¶ 20). Accordingly, Experian sent an ACDV to LexisNexis. LexisNexis responded, but did not indicate that the Atlantic Concrete Judgment had been vacated. (Id. ¶ 21 & Ex. C). Eventually, however, Experian removed the Atlantic Concrete Judgment from Frydman's credit file on November 25, 2014. (Id. ¶ 27).

Experian also sent ACDVs to Porsche Financial and Chase Auto. (Id. ¶¶ 22-23 & Exs. E-F). Porsche Financial responded, but did not indicate that any changes should be made. (Id. ¶ 22 & Ex. E).[10] Chase Auto requested that Experian update its credit file to indicate that Frydman's account was current, which Experian did. (Id. ¶ 23 & Ex. F). Finally, Experian determined that Frydman previously had disputed – and Experian previously had reinvestigated – both Capital One Auto accounts. (Id. ¶ 25 & Exs. I-J). Accordingly, Experian sent Frydman a letter, dated October 1, 2014, which

stated that, "unless [Frydman] sen[t] [Experian] relevant information to support [his] claim, [Experian] w[ould] not investigate this information again." (Id., Ex. G at 3; see also id. ¶ 24). Despite the October 1 letter, Frydman did not provide Experian any additional information regarding the Capital One accounts before this lawsuit was filed. (See Pl.'s 56.1 Resp. ¶ 184). On October 14, 2014, Experian informed Frydman of its reinvestigation results. (Scott Decl. ¶¶ 21-23 & Ex. D).

[10]     Experian denies receiving the Porsche Financial Letter prior to the commencement of this action, (id. ¶ 29), but removed the account from Frydman's credit file on April 23, 2015, (id. ¶ 28).

### 3. Equifax

**\*5** Equifax maintains that it could not use the August 29 Order to modify Frydman's credit file because it contained a different reference number. (Smith Decl. ¶ 38). Like Trans Union and Experian, Equifax sent an ACDV to LexisNexis, which responded, but failed to indicate that the Atlantic Concrete Judgment had been vacated. (Id. ¶ 40).[11]

[11]     LexisNexis did indicate that Equifax should change the amount of the Atlantic Concrete Judgment from $100,000 to $100,374. (Id.).

Equifax also sent ACDVs to Porsche Financial, Chase Auto, and Capital One Auto. (Id. ¶¶ 44, 47, 50). Porsche Financial responded, but did not indicate that any changes should be made. (Id. ¶ 44).[12] Chase Auto requested that Equifax update Frydman's credit file to indicate that the account was "paid as agreed," and Equifax complied. (Id. ¶ 48). Capital One also responded, but did not indicate that any changes should be made to the account opened in 2006. (Id. ¶ 51). Equifax did not reinvestigate the Capital One account opened in 2005 because it did not report it in the September 11 Disclosures. (Id. ¶ 53). On October 15, 2014, Equifax informed Frydman of its reinvestigation results. (Id. ¶¶ 35, 41, 45, 48, 52, 54).

[12]     Equifax maintains that it did not process the Porsche Financial Letter in accordance with its standard reinvestigation procedures because it was sent to the incorrect department. At a later date, however, Equifax updated the account to read "paid as agreed." (Id. ¶¶ 57-58).

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 156 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

## D. Damages

Most of the damages Frydman seeks arise out of four bank loans that were modified or denied between September 2014 and April 2015. [13] He also seeks nominal damages related to two personal credit accounts. He alleges that the Defendants' reporting of inaccurate information in his credit file proximately caused these damages.

[13] The Defendants have moved to strike many of the documents Frydman likely would rely upon at trial to prove these alleged damages. (See ECF Nos. 126-27). For purposes of this Report and Recommendation, I have disregarded the significant evidentiary hurdles he would face, not the least of which is the hearsay rule.

### 1. Failed Purchase of SDC Properties

Frydman first contends that the National Bank of Cambridge denied him a $1 million loan in September or October 2014 because his credit score did not meet its minimum standards. (Defs.' 56.1 Stmt. ¶ 21; Frydman Tr. 147-51). According to Frydman, he intended to transfer this $1 million to a shell entity and use it to purchase the National Bank of Cambridge's participation interest in a loan to Sojourner-Douglass College ("SDC"). (Defs.' 56.1 Stmt. ¶¶ 22, 24; Frydman Tr. 152-54). Frydman then planned to combine the income from that participation interest with a larger multi-million dollar loan from a second institution, American Bank, in order to acquire, through shell entities, two commercial properties SDC owned in Baltimore, Maryland. (Defs.' 56.1 Stmt. ¶¶ 25, 27-28; Frydman Tr. 154-59). Frydman maintains that the American Bank loan, for which he expected to be the guarantor, did not close as planned in October 2014 because the National Bank of Cambridge loan was denied. (Defs.' 56.1 Stmt. ¶ 26; Frydman Tr. 159-61; Pl.'s 56.1 Resp. ¶ 25). Frydman consequently was unable to purchase the SDC properties. (Frydman Tr. 161-62).

Frydman alleges that his damages resulting from his inability to purchase the SDC properties include: (a) $380,000 in "management and asset management fees" that would have been paid to him by the various shell entities, (Defs.' 56.1 Stmt. ¶¶ 35-36; Frydman Tr. 162-64); (b) $169 million in "lost rental stream" he would have earned from leasing the properties back to SDC after the purchase, (Defs.' 56.1 Stmt. ¶ 37; Frydman Tr. 81-83); and (c) $10 million of alleged "spread" between the acquisition price and the value of the SDC properties. (Defs.' 56.1 Stmt. ¶ 38; Frydman Tr. 83-84).

### 2. Modified Loans

**\*6** Frydman also seeks damages on the theory that two additional bank loans were unfavorably modified.

First, Frydman alleges that, in December 2014, UBS Bank ("UBS") reduced a $6.5 million loan to $5.5 million and required an additional $940,000 in up-front cash because of "a problem with credit," forcing him to secure a separate mezzanine loan to complete the transaction as planned. (Frydman Tr. 517-25; Pl.'s 56.1 Resp. ¶¶ 39, 42; Frydman Decl. ¶ 43). The UBS loan was made to a limited liability company controlled by Frydman and used to purchase a corporate headquarters in New Jersey. (Defs.' 56.1 Stmt. ¶¶ 39-40; Frydman Tr. 517, 529; Pl.'s 56.1 Resp. ¶ 40).

In addition, Frydman alleges that, in April 2015, the Bank of Princeton modified the terms of a second $6.5 million loan, requiring him to place $1 million in escrow until his credit score improved. (Defs.' 56.1 Stmt. ¶¶ 43, 46; Frydman Tr. 169-73; Pl.'s 56.1 Resp. ¶ 43). This loan also was made to a shell entity and used to purchase the corporate headquarters of a healthcare company in New Jersey. (Defs.' 56.1 Stmt. ¶¶ 43-44; Frydman Tr. 169-71; Pl.'s 56.1 Resp. ¶¶ 43-44).

### 3. Personal Accounts

Finally, Frydman claims modest damages related to two personal accounts. He alleges that, in March 2015, Mazda increased the payments on a vehicle he leased for his housekeeper by $20 per month over a 36-month term. (Defs.' 56.1 Stmt. ¶¶ 51-52; Frydman Tr. 180-82, 547-48). He also alleges that, in May 2015, Bank of America did not renew an expired credit card in his name, which caused him to forfeit reward points. (Defs.' 56.1 Stmt. ¶¶ 54-55; Frydman Tr. 184-85).

## II. Procedural Background

On November 12, 2014, Frydman filed separate actions against Experian, Equifax, and Trans Union, alleging FCRA violations. (See ECF No. 1; Frydman v. Equifax Inc., 14cv9015-PAC-FM, ECF No. 1; Frydman v. Transunion Risk and Alternative Data Sols., Inc., 14cv9016-PAC-FM, ECF

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 157 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

No. 1). On April 21, 2015, the three cases were consolidated for all purposes under this docket number. (ECF No. 20).

On May 11, 2015, at the Court's direction, Frydman filed the Amended Complaint. (Am. Compl.). In addition to his FCRA claims, Frydman asserted New York state law claims against the Defendants for negligent misrepresentation, defamation, defamation _per se_, negligence, and injurious falsehood. (See id. ¶¶ 70-101, 106-37, 142-73). The Amended Complaint seeks "not less than" $5 million in actual damages and $25 million in punitive damages from each of the Defendants. (Id. at 34).

On January 4, 2016, the Defendants filed a joint motion for summary judgment. (ECF No. 95). Frydman filed opposition papers on January 25 and 27, 2016, (ECF Nos. 112-19), and on February 8, the Defendants each filed reply papers, (ECF Nos. 122-24). The motion consequently is fully submitted.

On February 8, 2016, the Defendants filed a joint motion to strike portions of Frydman's declaration in opposition to their summary judgment motion. (ECF No. 126). On February 22, Frydman filed opposition papers, (ECF Nos. 132-34), and on March 3, the Defendants filed a joint reply, (ECF No. 145). In addition, between February 22 and 29, Frydman filed four separate motions to strike portions of three declarations and an affidavit submitted by the Defendants in support of their summary judgment motion. (ECF Nos. 129, 135, 139, 142). The Defendants responded individually, (ECF Nos. 146, 148, 152), and Frydman then filed three separate replies, (ECF Nos. 153-55). [14] The five motions to strike consequently also are fully submitted.

[14]     As the Defendants correctly note, (see ECF No. 145 at 2; ECF No. 146 at 5; ECF No. 152 at 2), Frydman has repeatedly attempted to supplement his summary judgment opposition papers through his briefing on the motions to strike. This is improper, especially in light of my previous denial of his request to extend the summary judgment briefing schedule. (See ECF No. 93). For that reason, I have not considered any such supplemental arguments in this Report and Recommendation.

## III. Standard of Review

 **\*7**  Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact"

based on supporting materials in the record. Fed. R. Civ. P. 56. "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.' " Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002). To defeat a motion for summary judgment, the nonmoving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256.

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997); see also Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." Fischl, 128 F.3d at 55.

Although the same summary judgment rules apply to a party proceeding _pro se_, special latitude is ordinarily appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded. See McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (pleadings should be read liberally and interpreted to "raise the strongest arguments that they suggest") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) ). Here, however, Frydman is a law school graduate, so these concerns are somewhat alleviated. See Harbulak v. Suffolk Cty., 654 F.2d 194, 198 (2d Cir. 1981) (noting that the plaintiff was a lawyer and therefore could not "claim the special consideration which the courts customarily grant to _pro se_ parties").

## IV. Relevant Law

The FCRA has as its central purpose ensuring the "confidentiality, accuracy, relevancy, and proper utilization of [consumers' credit] information." 15 U.S.C. § 1681b(b). In

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 158 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

pursuit of this goal, the statute "creates a private right of action against [CRAs] for the negligent or willful violation of any duty imposed under th[e] statute." Casella v. Equifax Credit Info. Servs., 56 F.3d 469, 473 (2d Cir. 1995) (citing 15 U.S.C. §§ 1681*o* (negligent violations), 1681n (willful violations) ) (emphasis added). In his Amended Complaint, Frydman relies upon the Defendants' duties under two separate provisions of the FCRA: 15 U.S.C. §§ 1681e(b) ("Section 1681e(b)") and 1681i(a)(1)(A) ("Section 1681i(a) (1)(A)"). (See Am. Compl. ¶¶ 67-68, 103-04, 139-40).

### A. Section 1681e(b)

Section 1681e(b) provides that "[w]henever a [CRA] prepares a [credit] report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). To prevail on a claim for the negligent violation of this provision, a plaintiff must establish that: (1) the CRA's credit report contained inaccurate information; (2) the CRA negligently failed to follow reasonable procedures to assure the accuracy of the report; (3) the plaintiff was injured; and (4) the CRA's negligence was the proximate cause of the plaintiff's injury. Gorman v. Experian Info. Sols., Inc., No. 07 Civ. 1846 (RPP), 2008 WL 4934047, at *4 (S.D.N.Y. Nov. 19, 2008). To prevail on a claim for willful violation, a plaintiff must show only "(1) inaccuracy and (2) a failure to follow reasonable procedures that is (3) knowing or reckless." Wenning v. On-Site Manager, Inc., No. 14 Civ. 9693 (PAE), 2016 WL 3538379, at *8 (S.D.N.Y. June 22, 2016). For both negligent and willful violations of Section 1681e(b), "the threshold question is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the [CRA]'s procedures is necessary." Gorman, 2008 WL 4934047, at *4 (quoting Houston v. TRW Info. Servs., Inc., 707 F. Supp. 689, 691 (S.D.N.Y. 1989) ).

### B. Section 1681i(a)(1)(A)

**\*8** Section 1681i(a)(1)(A) provides that "if the completeness or accuracy of any item of information contained in a consumer's file at a [CRA] is disputed by the consumer and the consumer notifies the [CRA] ... of such dispute, the [CRA] shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file" within thirty days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(1)(A). As with Section 1681e(b), "[a] plaintiff asserting claims under [Section] 1681i

must demonstrate that the disputed information is inaccurate in order to prevail on allegations that a [CRA] had failed to reasonably reinvestigate a disputed item." Fashakin v. Nextel Commc'ns, No. 05 Civ. 3080 (RRM), 2009 WL 790350, at *11 (E.D.N.Y. Mar. 25, 2009) (citing DeAndrade v. Trans Union LLC, 523 F.3d 61, 67 (1st Cir. 2008) ) (noting that a majority of federal appellate courts have adopted this rule).

### C. Damages

A plaintiff successful on a claim for the negligent violation of duties under either Section 1681e(b) or 1681i(a)(1)(A) is entitled to recover only actual damages. See 15 U.S.C. § 1681*o*. The plaintiff bears the burden of showing that inaccurate information in his credit file proximately caused those damages. Gorman, 2008 WL 4934047, at *6. For willful violations, a plaintiff may recover (1) either actual damages or statutory damages between $100 and $1,000, and (2) punitive damages. See 15 U.S.C. § 1681n. Indeed, "punitive damages may be available even where a plaintiff has suffered no actual damages." Casella, 56 F.3d at 476.

## V. Discussion

### A. Inaccuracy

As a threshold matter, to assert a successful claim under either Section 1681e(b) or Section 1681i(a)(1)(A), Frydman must establish that the September 11 Disclosures contained inaccurate information. See Gorman, 2008 WL 4934047, at *4; Fashakin, 2009 WL 790350, at *11.

It is undisputed that on July 1, 2014, a state court default judgment in the amount of $100,374 was entered in Ulster County against Frydman and in favor of Atlantic Concrete. (Defs.' 56.1 Stmt. ¶ 4). [15] It similarly is undisputed that on August 29, 2014, Justice Cahill signed an order directing that the Atlantic Concrete Judgment be vacated, (id. ¶ 5), and that the Ulster County Clerk stamped the August 29 Order as "entered" on September 5, (id. ¶ 6; Frydman Tr. 545-47). Nonetheless, in the September 11 Disclosures, the Defendants each reported a civil judgment, dated July 1, 2014, in favor of Atlantic Concrete, for an amount in excess of $100,000. (See September 11 Disclosures at 5). Even more curiously, after completing their reinvestigations between October 14 and 22, the Defendants each continued to report the Atlantic Concrete Judgment. (See Wilson Aff., Ex. F; Scott Decl., Ex. D; Smith Decl. ¶¶ 40-41). Accordingly, even though there may have been discrepancies between the August 29 Order and the September 11 Disclosures with

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 159 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

regard to the reference number and the jurisdiction where the judgment was entered, a jury reasonably could conclude that the Defendants inaccurately reported the Atlantic Concrete Judgment after it had been vacated.

15    Although the Defendants refrain from admitting that the Atlantic Concrete Judgment was entered in Ulster County, this fact cannot seriously be disputed. (See August 29 Order).

Similarly, a reasonable jury could conclude that the Defendants inaccurately reported the Porsche Financial account as charged off. (See September 11 Disclosures at 17). Frydman has produced a letter from Porsche Financial, dated September 24, 2014, which stated that Frydman's account was "in good standing and reflecting as paid/closed, full termination/obligation satisfied," and that "the charge off ha[d] been removed from [Porsche Financial's] system." (Porsche Financial Letter). As Trans Union suggests, this language could be read to indicate that the charge off was accurate as of the September 11 Disclosures, but that Frydman subsequently satisfied his indebtedness. (See ECF No. 122 ("Trans Union Reply") at 5). Nonetheless, it could also be read to indicate that the Defendants inaccurately reported the Porsche Financial account as charged off prior to September 24. Indeed, Frydman states that the underlying transaction involved a single-payment lease, which by definition could not have been in arrears. (See Frydman Decl. ¶ 14). 16 Although Trans Union deleted the account after Porsche Financial failed to respond, (Wilson Aff. ¶ 49), Experian and Equifax continued to report the account as charged off even after completing their reinvestigations, (Scott Decl., Ex. D; Smith Decl. ¶¶ 44-45).

16    Although the Defendants deny receiving the Porsche Financial Letter around September 24, (see Wilson Aff. ¶ 54; Scott Decl. ¶ 29; Smith Decl. ¶ 57), it is probative of inaccuracy regardless of when it was received. The Defendants also challenge the letter based on Frydman's failure to authenticate it properly as a "record of regularly conducted activity" pursuant to Federal Rule of Evidence 803(6). (See ECF No. 127 at 3). This, of course, is a defect that Frydman could easily cure prior to trial. Since he is proceeding prose, and the Defendants do not seriously dispute the letter's authenticity, it would be a miscarriage of justice to grant summary judgment on this ground. Indeed, Frydman's own

sworn statement is sufficient to create a factual issue as to whether the Porsche Financial account was in arrears.

**\*9**  Finally, Frydman does not assert willful violation claims with regard to the three remaining automobile financing accounts, (see ECF No. 117 (Pl.'s Corrected Mem. of Law in Opp. to Mot. for Summ. J. ("Pl.'s Mem.") ) at 17-18; Frydman Decl. ¶ 31), and his negligent violation claims regarding these accounts all fail for reasons set forth in the following section of this Report and Recommendation. The Court therefore need not resolve whether Frydman's own statement that these accounts were never thirty days past due, unaccompanied by any supporting evidence, is sufficient proof of inaccuracy.

B. Negligent Violations

A consumer seeking damages for the negligent violation of Section 1681e(b) or 1681i(a)(1)(A) may recover only his actual damages. See 15 U.S.C. § 1681o. Here, however, Frydman has not proffered any evidence from which a reasonable jury could conclude that he suffered any actual damages cognizable under the FCRA. Accordingly, even if the Court were to assume that the Defendants negligently violated their duties to assure reasonable accuracy and to conduct a reasonable reinvestigation, Frydman's claims for the negligent violation of these duties could not survive summary judgment. See Selvam v. Experian Info. Sols., Inc., —— F. App'x ——, 2016 WL 3180140, at *2 (2d Cir. June 7, 2016) (affirming grant of summary judgment because plaintiff failed to "allege any way in which he was damaged by the alleged inaccuracy" and, therefore, did "not plausibly allege he suffered any actual damages") (citing Casella, 56 F.3d at 475).

1. Business Damages

Frydman claims millions of dollars in damages as a result of the denial or modification of four bank loans. (See Defs.' 56.1 Stmt. ¶¶ 21-22, 24-28, 35-40, 43-44, 46; Frydman Tr. 81-84, 147-64, 169-73, 517-21, 529). Although the structure of the underlying real estate transactions was complex, he apparently intended to use the proceeds of these loans to purchase commercial properties in New Jersey and Maryland through separate shell entities. (Id.). Frydman argues that he is entitled to damages because his ability to obtain these loans was adversely affected by "[the] Defendants' wrongful[ ] disseminati[on of] inaccurate information regarding [his] credit file to prospective credit grantors." (Pl.'s 56.1 Resp.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 160 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

¶ 40). What Frydman overlooks, however, is that the FCRA does not apply to consumers' business transactions. See, e.g., George v. Equifax Mortg. Servs., No. 06 Civ. 971 (DLI) (LB), 2010 WL 3937308, at *2 (E.D.N.Y. Oct. 5, 2010) ("[I]t is well established that the FCRA does not apply to business or commercial transactions, even when a consumer's credit report impacts such transactions."); Lucchesi v. Experian Info. Sols., Inc., 226 F.R.D. 172, 174 (S.D.N.Y. 2005) (credit report "issued in connection with a business operated by the consumer" could not "form the basis of liability under the FCRA"); Frost v. Experian, No. 98 Civ. 2106 (JGK) (JCP), 1999 WL 287373, at *5 (S.D.N.Y. May 6, 1999) ("The FCRA applies only to reports that relate to the consumer's applications for personal credit, not to his business transactions."); Podell v. Citicorp Diners Club, Inc., 914 F. Supp. 1025, 1036 (S.D.N.Y. 1996), aff'd, 112 F.3d 98 (2d Cir. 1997) ("[I]t is clear from its legislative history that the [FCRA] was intended to apply only to reports which relate to the consumer's eligibility for personal credit or other commercial benefits as a consumer, and not to the consumer's business transactions.") (second alteration in original) (quoting Boothe v. TRW Credit Data, 523 F. Supp. 631, 633 (S.D.N.Y. 1981) ).

 *10  Since there is no dispute that all four of the loans at issue were intended "for business purposes," Frydman's damages, if any, were unquestionably "business-related." (See Pl.'s 56.1 Resp. ¶¶ 29, 35, 37-38, 40, 45). Indeed, the "los[s] of an opportunity to participate in a real estate investment venture" is "a quintessential example of a business transaction" and, therefore, "not cognizable under the FCRA." Podell, 914 F. Supp. at 1036 (rejecting damages claim based on potential business partner's decision to abandon joint venture after receiving plaintiff's personal credit report). In an effort to avoid this conclusion, Frydman maintains that "developing" case law somehow suggests that business damages are fair game as long as the credit reports in question are used for a "permissible purpose" under the FCRA. (See Pl.'s Mem. at 18-19). Interestingly, much of the "developing" case law that Frydman cites is more than twenty years old. More importantly, even those cases expressly indicate that credit reports about individuals issued for commercial, business, or professional purposes are outside the scope of the FCRA. See, e.g., Ippolito v. WNS, Inc., 864 F.2d 440, 449-52 (7th Cir. 1988); Zeller v. Samia, 758 F. Supp. 775, 780 (D. Mass. 1991).

Frydman also appears to argue that his business damages should be considered recoverable consumer damages because the economic benefit derived from the shell entities "flows

up" to him. (Pl.'s Mem. at 2). He further notes that "[n]one of the entities established for these transactions had any assets or any activity prior to the anticipated closing of the transactions, these loans were all made or rejected based on [his] personal credit worthiness ..., and he was to be the borrower, the co-borrower and/or the guarantor." (Pl.'s 56.1 Resp. ¶ 27). What is at issue, however, is the nature of the transaction being financed. Regardless of Frydman's financial exposure, the loans clearly were sought so that Frydman could enter into business transactions. As a matter of law, therefore, the loans cannot form the basis for consumer damages. See Tilley v. Glob. Payments, Inc., 603 F. Supp. 1314, 1328-29 (D. Kan. 2009) ("Because the FCRA only protects individual consumers, losses to [p]laintiff's limited liability compan[y] are not recoverable under the FCRA.") (alterations in original) (quoting Johnson v. Wells Fargo Home Mortg., Inc., 558 F. Supp. 2d 1114, 1132 (D. Nev. 2008) ); Natale v. TRW, Inc., No. 97 Civ. 3661 (CRB), 1999 WL 179678, at *4 (N.D. Cal. Mar. 30, 1999) ("The form of ownership, however, is immaterial; ... the FCRA does not apply to transactions related primarily to businesses operated by the consumer.").

Accordingly, even if the Court were to assume Frydman could establish that his business damages were proximately caused by the Defendants' violation of one or more of their duties under the FCRA, he would not be entitled to compensation.

### 2. Consumer Damages

Frydman also claims modest consumer damages in the form of (a) higher payments on a Mazda vehicle lease for his housekeeper, and (b) reward points that he lost when his Bank of America credit card was not renewed. (Defs.' 56.1 Stmt. ¶¶ 51-52, 54-55; Frydman Tr. 180-82, 184-85, 547-48). Frydman, however, has failed to present any admissible evidence that these adverse actions were causally connected to any inaccurate information provided to Mazda or Bank of America by the Defendants. This is fatal to these claims. See Burns v. Bank of Am., 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008), aff'd, 360 F. App'x 255 (2d Cir. 2010) ("To obtain an award of actual damages under the [FCRA], [a p]laintiff[ ] must present evidence of a causal relation between the violation of the statute and the loss of credit, or some other harm.") (first alteration in original).

#### a. Mazda Lease

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 161 of 238
Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 11483839

Frydman testified at his deposition that, when he went to the dealership after he had agreed to the terms of a car lease over the phone, "[t]he [Mazda] finance manager, ... said that based on [his] credit report they needed to charge [him] a higher rate of interest." (Frydman Tr. 181). According to Frydman, this resulted in his monthly payment increasing by $20. (Id. at 180, 547-48).

**\*11** A plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (internal citations omitted); see also Fashakin, 2009 WL 790350, at \*6 n.10 ("While the Supreme Court has recognized that a nonmoving party need not produce evidence in opposition to summary judgment in a 'form' admissible at trial, the nonmoving party nonetheless must give the Court some assurance that such evidence will be in admissible form by the time of trial.") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ); McNamara v. Guazzoni, No. 98 Civ. 4085 (HB), 1999 WL 322648, at \*3 (S.D.N.Y. May 20, 1999) (plaintiff's hearsay statement insufficient to establish causation absent showing of forthcoming admissible evidence).

Frydman has not made the requisite showing in this case. Although he testified that he would "find someone from Mazda of Poughkeepsie," (Frydman Tr. 549), he has proffered no evidence of the alleged payment increase, or the reasons therefor, other than his own self-serving and wholly speculative hearsay testimony, (see Pl.'s 56.1 Resp. ¶ 52). A "non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or ... through 'mere speculation or conjecture.' " Podell, 914 F. Supp. at 1031 (first ellipsis in original) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) ). Frydman has failed to present admissible evidence from which a reasonable jury could conclude that Mazda increased his interest rate because of inaccurate information provided by the Defendants. He therefore has failed to meet his burden of establishing the causation element of this claim. See Burns, 655 F. Supp. 2d at 250-51 ("[D]eposition testimony that [plaintiffs] applied for and were denied loans ... based upon the alleged inaccurate information in their credit reports is unsubstantiated, speculative, and conclusory, and insufficient to avoid summary judgment on an issue as to which [they] bear the ultimate burden of proof.") (internal quotation marks omitted).

### b. Bank of America Credit Card

In May 2015, Bank of America sent Frydman a letter regarding a credit card in his name, which stated in relevant part: "This account has expired or will be expiring soon. We won't automatically renew your account." (Frydman Tr. 185). Tellingly, this language suggests that the account might have remained open had Frydman asked that it be renewed. In any event, even if Bank of America was canceling the card, there is no evidence that this was based on Frydman's credit rating. During his deposition, Frydman testified that, "based on [his] general knowledge and understanding," "banks generally don't close credit card accounts unless they've obtained deleterious information from [CRAs]," (id.), but this obviously is sheer speculation, (see Pl.'s 56.1 Resp. ¶ 56 (conceding that Frydman is relying exclusively on the text of the letter and "his speculation") ). Accordingly, in the absence of any admissible evidence regarding Bank of America's alleged policy, Frydman has failed to carry his burden with respect to the causation element of this claim.

The Defendants are therefore entitled to summary judgment with regard to all of Frydman's claimed consumer damages.

### 3. Emotional Damages

Actual damages "may include humiliation and mental distress, even in the absence of out-of-pocket expenses." Casella, 56 F.3d at 474. "A plaintiff's emotional damages must, however, be demonstrable, as otherwise there is a risk that claims for emotional distress will be fictitious and trivial." Wenning, 2016 WL 3538379, at \*20 (internal quotation marks omitted). "The case law further reflects that a plaintiff's emotional injury claim is more likely to survive summary judgment where it is detailed, objective, and corroborated," rather than conclusory, unsupported, or subjective. Id. (collecting cases). Thus, "[p]laintiffs who rely on their own testimony must explain their injury in reasonable detail and not rely on conclusory statements." Id. (internal quotation marks omitted).

**\*12** Frydman neither alleged in his Amended Complaint that he suffered emotional distress as a result of the Defendants' actions, (see Am. Compl.), nor made reference to such damages in his memorandum or declaration in opposition to the Defendants' summary judgment motion, (see Pl.'s Mem.;

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 162 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

Frydman Decl.). Although Frydman does refer in passing to suffering "embarrassment and humiliation" elsewhere in his opposition papers, he concedes that he did not suffer mental or emotional distress. (See, e.g., Pl.'s 56.1 Resp. ¶¶ 76, 154; ECF No. 115 (Pl.'s Resp. to Equifax's Suppl. Rule 56.1 Stmt. ("Pl.'s Equifax 56.1 Resp.") ), ¶¶ 74-75). He also does not elaborate on his symptoms or their cause, and admits that he never sought medical treatment. (See Pl.'s 56.1 Resp. ¶ 77; Pl.'s Equifax 56.1 Resp. ¶ 75; see also Nicodemus Decl., Ex. D at 25-26; ECF No. 101 (Decl. of Joshua B. Weiner, Esq., dated Jan. 4, 2016), Ex. B at 32; ECF No. 111 (Decl. of Tracy Klingler, Esq., dated Jan. 4, 2016), Ex. A at 17 (Frydman's discovery responses) ). It follows that his statements regarding embarrassment and humiliation are entirely conclusory. Moreover, Frydman has adduced no evidence tending to connect any embarrassment or humiliation he may have suffered to the Defendants' violation of any duty under the FCRA. Accordingly, Frydman has not produced evidence sufficient for a reasonable jury to award emotional damages in this case.

## C. Willful Violations

As noted above, Frydman's negligent violation claims fail because no reasonable juror could conclude that he suffered any actual damages cognizable under the FCRA. However, "[e]ven if [a p]laintiff is not entitled to actual damages, he may still be entitled to punitive damages based on sufficient proof that [a CRA] willfully violated various provisions of the FCRA." Gorman, 2008 WL 4934047, at *8 (internal quotation marks omitted); see also 15 U.S.C. § 1681n(a) (punitive damages available for "willful[ ] fail[ure] to comply" with duties).

In his opposition papers, Frydman argues that the Defendants acted "willfully" by "ignoring" the August 29 Order and the Porsche Financial Letter. (See Pl.'s Mem. at 17-18; Frydman Decl. ¶ 31). In doing so, Frydman apparently concedes that he cannot establish willful violation claims with respect to the Chase Auto or Capital One Auto accounts. Indeed, he does not discuss these accounts at all in his memorandum in opposition, (see Pl.'s Mem.), and mentions them only in passing in his declaration, (see Frydman Decl. ¶ 36). The sole remaining issues under the FCRA are therefore whether, with regard to the Atlantic Concrete Judgment and the Porsche Financial account, Frydman is able to show that (1) the Defendants failed either to follow reasonable procedures to assure the accuracy of the information they originally reported or to conduct a reasonable reinvestigation and, if so, (2) the violation was willful.

### 1. Section 1681e(b)

"Under the statutory scheme, a [CRA] is not strictly liable for inaccuracies in a credit report." Podell, 914 F. Supp. at 1032. Rather, to establish liability pursuant to Section 1681e(b), "the consumer must show that the [CRA] failed to follow reasonable procedures in generating the inaccurate report.... The standard for evaluating the reasonableness of a[ ] [CRA]'s procedures is what a reasonably prudent person would do under the circumstances." Wenning, 2016 WL 3538379, at *16 (quoting Whelan v. Trans Union Credit Reporting Agency, 862 F. Supp. 824, 829, 831 (E.D.N.Y. 1994) ) (internal quotation marks omitted). Accordingly, a plaintiff "cannot rest on a showing of mere inaccuracy ... [and has the] burden to prove that the [CRA] acted unreasonably in the circumstances." Podell, 914 F. Supp. at 1032.

A jury reasonably could conclude that the Defendants reported inaccurately with respect to the Atlantic Concrete Judgment (after it had been vacated) and the Porsche Financial account (which was described as charged off). Courts have consistently held, however, that a CRA does not violate its duty to assure reasonable accuracy pursuant to Section 1681e(b) simply by reporting an inaccurate debt or judgment, absent prior reason to believe that its source was unreliable. See, e.g., Wright v. Experian Info. Sols., Inc., 805 F.3d 1232, 1240 (10th Cir. 2015) (CRAs did not err by relying on LexisNexis to collect information from county recorder's website, because the erroneously reported tax lien was "not inaccurate on its face, inconsistent with information the CRAs already had on file, or obtained from a source that was known to be unreliable."); Sarver v. Experian Info. Sols., 390 F.3d 969, 972 (7th Cir. 2004) (The FCRA "does not hold a [CRA] responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the [CRA] receives notice of systemic problems with its procedures."); Ogbon v. Beneficial Credit Servs., Inc., No. 10 Civ. 3760 (PAE), 2013 WL 1430467, at *7 (S.D.N.Y. Apr. 8, 2013) (no liability absent a "basis on which a jury could find that the defendants had a basis to question the accuracy of the reports ... that [the plaintiff] herself had incurred the debts in question").

**\*13** Courts similarly have rejected the contention that CRAs are required to conduct manual reviews of all the items that they receive before including them in a consumer's credit file. See, e.g., Henson v. CSC Credit Servs., 29 F.3d 280, 285-86

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

(7th Cir. 1994) ("Requiring [CRAs] to look beyond the face of every court document to find the rare case when a document incorrectly reports the result of the underlying action would be unduly burdensome and inefficient."); Wright, 805 F.3d at 1241 (CRAs not required to "employ individuals trained in American tax law" to examine every tax lien before including it in a credit report); Wenning, 2016 WL 3538379, at *18 (noting that in cases "involv[ing] the sort of unfortunate mix-ups that are endemic to a largely automated and computerized credit reporting system processing millions of updates every day," courts "were rightly concerned about construing the FCRA to compel CRAs to undertake onerous human review of presumptively trustworthy documents, such as court records").

Each of the Defendants has provided a knowledgeable representative's statement setting forth its standard procedures for assuring the accuracy of information in consumers' credit files. These submissions confirm that LexisNexis, Porsche Financial, Chase Auto, and Capital One Auto are generally reliable sources of consumer credit information, and that the Defendants had no notice of systemic problems with the information these companies provided. (See Wilson Aff. ¶¶ 2-43; Scott Decl. ¶¶ 3-18; Leslie Decl. ¶¶ 7-25; Smith Decl. ¶¶ 15-32). Frydman has adduced no evidence to the contrary, beyond his repeated mantra that the vast majority of the Defendants' representatives' statements are "Lies." (See, e.g., ECF Nos. 130, 137, 140, 143).[17] Frydman also has cited no legal support for his suggestion that merely because LexisNexis is not a "furnisher" as defined by FCRA, it has no duty to itself assure the accuracy of its information and, thus, may never be relied upon by CRAs. (See, e.g., Pl.'s 56.1 Resp. ¶ 61). Indeed, in the agreement between LexisNexis and Trans Union, LexisNexis represents and warrants that it has the requisite experience and ability and will perform its work in a "professional, competent and timely manner." (Frydman Decl., Ex. L at 11). Frydman has not adduced any evidence that it was unreasonable for the Defendants to rely on such undertakings in the first instance.[18]

[17]    Affidavits and declarations submitted in support of summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The information contained in the Defendants' submissions professes to be based

upon personal knowledge, (see Wilson Aff. ¶ 1; Scott Decl. ¶ 1; Leslie Decl. ¶ 3; Smith Decl. ¶ 3), and Frydman has identified no admissibility issues. Although Frydman also argues that the Defendants' representatives' statements should be stricken because they contradict other evidence, such as their deposition testimony, or that they should be barred from opining about matters they did not discuss at their depositions, these arguments are unavailing. Even assuming that contradictions exist, "[i]n the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness, or where the contradictions presented are not 'real, unequivocal, and inescapable,' the general rule remains that 'a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.' " In re Fosamax Prods. Liab. Litig., 707 F.3d 189, 194 n.4 (2d Cir. 2013) (quoting Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) ). Accordingly, Frydman's motions to strike should be denied.

[18]    Frydman also argues that LexisNexis had no duty to assure the accuracy of its reporting by virtue of an indemnification provision in its agreements. (See, e.g., Pl.'s 56.1 Resp. ¶ 61). Suffice it to say, the mere existence of such provisions does not suggest that the vendors have no obligation to report information accurately, or that it was unreasonable for the Defendants to rely on them. In fact, at least one Judge in this District has recently referred to LexisNexis as an "established, reputable vendor" with a "concededly excellent reputation." Wenning, 2016 WL 3538379, at *18.

*14    Accordingly, it is clear that, prior to the September 22 Letters, the Defendants did not fail to follow reasonable procedures to assure accuracy merely by including the disputed information in Frydman's credit file. See, e.g., Henson, 29 F.3d at 285 (A CRA is not liable "for reporting inaccurate information obtained from a court's Judgment Docket, absent prior notice from the consumer that the information may be inaccurate."); Ogbon, 2013 WL 1430467, at *7 (no genuine issue as to whether CRAs followed reasonable procedures where they "provided detailed explanations of the procedures they utilize to [as]sure the accuracy of their credit reports" and the plaintiff

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 164 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

"identified no basis ... to question the accuracy of the reports it had received"); Podell, 914 F. Supp. at 1035 (CRA "entitled to report [inaccurate debt], at least until it heard from [the] plaintiff directly."). Frydman consequently is unable to establish that the Defendants violated their duties pursuant to Section 1681e(b) – much less that any such violation was willful – and summary judgment should be granted with respect to his claims relating to the Defendants initial reporting.

### 2. Section 1681i(a)(1)(A)

In his papers, Frydman appears to take issue primarily with the Defendants' alleged violation of their duty to conduct a reasonable reinvestigation pursuant to Section 1681i(a)(1) (A). According to Frydman, the Defendants' failure to do more than simply reconfirm the disputed items of information in his credit file with the original sources of that information is proof of a "systemic problem" within the credit reporting industry. (See, e.g., Pl.'s 56.1 Resp. ¶¶ 61, 87-89, 113, 168).

Judge Colleen McMahon considered the extent of a CRA's duty to go beyond the original source of disputed information in Jones v. Experian Info. Sols., Inc., 982 F. Supp. 2d 268 (S.D.N.Y. 2013). There, the plaintiff disputed several items in her credit file, alleging they were the result of identity theft. Id. at 270. Recognizing that "[t]he Second Circuit has not directly addressed what constitutes a reasonable reinvestigation under [S]ection 1681i," Judge McMahon relied on decisions from the Third, Fifth, and Seventh Circuits, stating as follows:

> These courts have held that "the reinvestigation required by [S]ection 1681i(a) demands more than (a) forwarding the dispute information onto the furnisher of information and (b) relying on the furnisher of information's response."Gorman, 2008 WL 4934047, at *5 (citing Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3rd Cir. 1997); Henson, 29 F.3d at 287; Stevenson v. TRW Inc., 987 F.2d 288, 293 (5th Cir. 1993) ). "The statutory responsibility imposed on the [CRA] 'must consist of something more than merely parroting information received from other sources.' " Gorman, 2008 WL 4934047, at *5 (quoting Cushman, 115 F.3d at 225).

> "In order to fulfill its obligation under [Section] 1681i(a) a [CRA] may be required, in certain circumstances, to verify the accuracy of its initial source of information." Cushman, 115 F.3d at 225 (quoting Henson, 29 F.3d at

287). Courts have noted that a number of factors will determine the extent of the CRA's reinvestigation: "One of these factors is whether the consumer has alerted the [CRA] to the possibility that the source may be unreliable or the [CRA] itself knows or should know that the source is unreliable. A second factor is the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." Id. (quoting Henson, 29 F.3d at 287). Ultimately, it is up to the trier of fact to weigh these considerations in determining whether the CRA conducted a reasonable reinvestigation under [S]ection 1681i. Id.

Id. at 273 (brackets and parentheticals in original omitted). Although the plaintiff in Jones did not provide documentation of the purported identity theft, Judge McMahon nonetheless denied summary judgment on the issue of reasonableness because Experian had failed to do more than reconfirm the disputed items with its original sources, despite being advised of obvious discrepancies in the documentation concerning birth dates, names, and addresses. Id. at 274-75. [19]

[19]   None of the Defendants cite Jones in their moving papers despite its clear relevance. (See ECF No. 96 ("Trans Union Mem.") ); ECF No. 100 ("Experian/ Equifax Mem."). Instead, they rely primarily on older decisions from other districts. (See ECF No. 124 at 7-8; Trans Union Reply at 7-9 (citing George, 2010 WL 3937308; Spector v. Experian Info. Sols., 321 F. Supp. 2d 348 (D. Conn. 2004) ) ).

**\*15**  Judged by the Jones standard, the Defendants' decision in this case to recontact their original information sources, but do nothing more, arguably may not have satisfied their statutory duty to conduct a reasonable reinvestigation. SeeFrost, 1998 WL 765178, at *3 ("Even if the defendants' initial reliance on court records was reasonable, a failure to reinvestigate in the face of [the plaintiff's] protestations and his representation that the records had been corrected may not have been reasonable.") (citing Cushman, 115 F.3d at 223-26; Henson, 29 F.3d at 286-87); Gorman, 2008 WL 4934047, at *6 ("Given the standard articulated in Cushman and Experian's claimed sole reliance on the information it received [from the furnisher], a jury could conclude that Experian did not reinvestigate [the p]laintiff's dispute in accordance with the requirements of [Section] 1681."). As the Third Circuit has observed, "the parameters of a reasonable investigation will ... depend on the circumstances of a particular dispute." Cortez v. Trans Union, LLC, 617 F.3d 688, 713 (3d Cir. 2010).

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 165 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

a. Atlantic Concrete Judgment

Turning first to the reasonableness of the Defendants' reinvestigation of the Atlantic Concrete Judgment, the August 29 Order stated, in relevant part:

Accordingly, defendants' motion [to vacate the default judgment] is granted. ...

This shall constitute the decision and order of the Court. The original decision and order and all other papers are being delivered to the Supreme Court Clerk for transmission to the Ulster County Clerk for filing. The signing of this decision and order shall not constitute entry or filing under CPLR 2220. Counsel is not relieved from the applicable provisions of that rule regarding notice of entry.

(August 29 Order). Although the parties agree that the August 29 Order was not stamped as "entered" by the Ulster County Clerk until September 5, (see Pl.'s 56.1 Resp. ¶ 12), a reasonable jury nonetheless could conclude that the unstamped copy Frydman included with the September 22 Letters sufficed to alert the Defendants that the Atlantic Concrete Judgment might no longer be valid and counsel further reinvestigation. [20] The amount of the judgment also clearly weighed in favor of further reinvestigation. See Jones, 982 F. Supp. 2d at 273.

[20]    This is true even though the Defendants maintain they could not use the August 29 Order to update Frydman's credit file themselves because it was not court stamped and the reference numbers did not match. (See Wilson Aff. ¶ 46; Scott Decl. ¶ 20; Smith Decl. ¶ 38). What they overlook is that certain of the errors should have been easily discoverable. For example, Experian evidently was perplexed by the reference to "Tompkins Cnty Supreme," even though the address for that court which was supplied to it was in Kingston, New York. (See Scott Decl., Ex. D). Similarly, it is not unreasonable to expect that a CRA or its vendor would recognize that an RJI number is different than an index number. Given the clear similarities between the judgment referenced in the August 29 Order and the one that appeared in the September 11 Disclosures, a reasonable jury could conclude that, despite the confusion about numbering and

the lack of a court stamp, the August 29 Order necessitated further reinvestigation.

The Defendants, however, have provided no evidence that they did anything more than send ACDVs to LexisNexis identifying Frydman's dispute, pursuant to their standard reinvestigation procedures. Moreover, they have neither provided evidence that LexisNexis recontacted Ulster County as part of its verification process, nor identified any reason why they could not have done so themselves. This is particularly troubling in light of the fact that it is at least possible, if not likely, that further direct contact with Ulster County would have successfully resolved Frydman's dispute. See, e.g., Cornock v. Trans Union LLC, 638 F. Supp. 2d 158, 167 (D.N.H. 2009) ("The crucial difference between [this] case and Cushman is that, there, investigating beyond the creditor's verification could have turned up information casting doubt on the validity of the debt while, here, that exercise would have turned up no more than an arbitration award affirming the validity of the debt."); Peterson v. Am. Express, No. 14 Civ. 2056 (PHX) (GMS), 2016 WL 1158881, at *5 (D. Ariz. Mar. 23, 2016) ("[I]n light of the fact that [the furnisher] continued to verify that the disputed account should remain on [the plaintiff]'s credit report despite the undisputed fact that an arbitrator found [him] not personally liable for it, a jury could find that the CRAs needed to undergo more than just their normal ACDV reinvestigation process in this case."). It follows that a jury could reasonably conclude that the Defendants failed to conduct a reasonable reinvestigation concerning the Atlantic Concrete Judgment.

b. Porsche Financial Account

**16** Turning to the Porsche Financial account, Frydman admits that he enclosed no additional documentation with the September 22 Letters, and did not forward the Porsche Financial Letter to the Defendants' legal officers until late October 2014. (See September 22 Letters; Pl.'s 56.1 Resp. ¶¶ 13-14). Frydman's eventual production of the Porsche Financial Letter, however, arguably triggered the need for yet another reinvestigation. [21] Although Experian and Equifax deny receiving the Porsche Financial Letter promptly, (see Scott Decl. ¶ 29; Smith Decl. ¶ 57), Frydman expressly referred to the Porsche Financial Letter in his original complaints, dated November 14, 2014, (see ECF No. 1, ¶ 16; 14cv9015-PAC-FM, ECF No. 1, ¶ 16). Accordingly, a jury could reasonably conclude that, by October or November 2014, Experian and Equifax should have initiated a second

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 166 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 11483839

reinvestigation regarding the Porsche Financial account, which they did not. Although the comparatively small size of the debt, the ambiguity of language in the letter, and the fact that Porsche Financial was the creditor and not a third party may ultimately persuade a jury that Experian and Equifax acted reasonably, this is a matter for the jury, not the Court, to decide. [22]

[21]    The FCRA allows CRAs to refuse to reinvestigate a successive dispute as frivolous, but requires notice to the consumer of the decision not to reinvestigate. See 15 U.S.C. § 1681i(a)(3). There is no such notice in this case.

[22]    Frydman may not recover any damages from Trans Union relating to the Porsche Financial account because Trans Union deleted the item from his credit file before the expiration of the original thirty-day reinvestigation period. (See Wilson Aff. ¶ 49).

### c. Willfulness

Finally, the Court must consider whether the Defendants willfully violated Section 1681i(a)(1)(A) as to the Atlantic Concrete Judgment and the Porsche Financial account. The Supreme Court has held that the requirement of willfulness in this context can be satisfied by evidence of "reckless disregard" for statutory duties. Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 56-57 (2007). To constitute reckless disregard, however, a CRA's interpretation of its statutory duties must be "objectively unreasonable," not merely "erroneous." Id. at 69.

The Defendants in effect argue that they could not have willfully violated Section 1681i(a)(1)(A) because they followed their standard reinvestigation procedures by sending ACDVs to LexisNexis and Porsche Financial. (See Trans Union Mem. at 21-22, 25-27; Experian/Equifax Mem. at 15-17). As Judge McMahon has noted, however, it is not objectively reasonable for a CRA to insist that its duty is satisfied merely by transmitting an ACDV to a source of information and relaying the source's response to the consumer. See Jones, 982 F. Supp. 2d at 276 ("Since [Experian] has introduced no evidence of what its investigation consisted [of] other than sending a[n ACDV] to the furnisher, a reasonable jury could conclude [Experian] recklessly disregarded its statutory duty to conduct a reasonable investigation – especially in light of the

discrepancies between [the p]laintiff's information and the information provided by the furnishers.").

None of the Defendants in this action are newcomers to this field, and they all were or should have been on notice that their duty to reinvestigate might, in some circumstances, be heightened. See id. at 273 (noting that Experian had unsuccessfully attempted to rely on its standard reinvestigation procedures several years earlier in Gorman). Accordingly, in light of the standard set forth in Jones, a jury could reasonably conclude that the Defendants' violation of their duties pursuant to Section 1681i(a)(1)(A) was willful. [23] The Defendants' motion for summary judgment should consequently be denied as to Frydman's claims for the willful violation of Section 1681i(a)(1)(A) with respect to (a) the Atlantic Concrete Judgment as against all of the Defendants, and (b) the Porsche Financial account as against Experian and Equifax only.

[23]    Although Trans Union additionally contends that Frydman must demonstrate that information included in Frydman's credit file as a result of the Defendants' willful violations was disclosed to third parties, (see Trans Union Mem. at 12), this argument was clearly rejected in Jones, see 982 F. Supp. 2d at 276 (finding the "contention that [the p]laintiff has no cause of action under the FCRA since the disputed credit items were not provided to a third party ... without merit").

### D. State Law Claims

**\*17**  Frydman also asserts New York state law claims sounding in negligent misrepresentation, defamation, defamation per se, negligence, and injurious falsehood. (See Am. Compl. ¶¶ 70-101, 106-37, 142-73). The Defendants argue that the FCRA preempts all of these claims.

Insofar as relevant, Section 1681h(e) of the FCRA provides that:

> Except as provided in [S]ections 1681n and 1681o ..., no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any [CRA] ... except as to false

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 167 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11483839

information furnished with malice or
willful intent to injure such consumer.

15 U.S.C. § 1681h(e) (emphasis added). This provision
essentially affords the Defendants qualified immunity against
the types of state law claims asserted by Frydman unless he
can establish that they acted "with malice or willful intent
to injure" him. See Ogbon, 2013 WL 1430467, at *10; see
also Ross v. F.D.I.C., 625 F.3d 808, 814 (4th Cir. 2010)
("Congress intended this section's general bar ... to be the
quid pro quo for providing full disclosure under the FCRA.
The only exception to this bar is a narrow one.") (internal
citation omitted).

Although the Second Circuit has yet to opine, other Circuits
have indicated that a showing of "malice or willful intent
to injure" requires something more than the "willful failure
to comply" with statutory duties that is the prerequisite
to an award of punitive damages under Section 1681n.
See Thornton v. Equifax, Inc., 619 F.2d 700, 705 (8th Cir.
1980) ("The same standard of proof as required in [S]ection
1681h(e) ... is not required for allegations of noncompliance
with the provisions and requirements of the Act."); Cushman,
115 F.3d at 229 ("The parties have assumed that a showing
of 'malice or willful intent to injure' pursuant to [Section]
1681h(e) is identical to proof of willfulness under [Section]
1681n. This is contrary to the holding of the ... Eighth Circuit
in Thornton."); Pinner v. Schmidt, 805 F.2d 1258, 1263 (5th
Cir. 1986) ("Punitive damage awards are permitted even
without malice or evil motive."). District courts around the
country also have reached the same conclusion. See, e.g.,
Serfess v. Equifax Credit Info. Servs., No. 13 Civ. 406 (RBK)
(JS), 2014 WL 4272032, at *9 (D.N.J. Aug. 28, 2014) ("The
statutory requirement of malice or willful intent to injure
contemplated by [Section] 1681h(e) is of a higher degree
than that which supports a claim of statutory or punitive
damages under [Section] 1681n.") (internal quotation marks
omitted); Brown v. Sterling Infosystems, Inc., No. 10 Civ.
697, 2010 WL 3057844, at *5 n.5 (N.D. Ohio Aug. 2,
2010) ("Defendant is correct that [the] plaintiffs' allegation
of willful noncompliance on behalf of [the] defendant does
not rise to level of malice or willful intent to injure required
to avoid [Section] 1681h(e) immunity.") (internal quotation
marks omitted); Reed v. Experian Info. Sols., Inc., 321 F.
Supp. 2d 1109, 1117 (D. Minn 2004) ("The malice or willful
intent to injure contemplated by [Section] 1681h(e) is of a
higher degree than that which supports a claim of statutory
or punitive damages under [Section] 1681n.") (citing Pinner,

805 F.2d at 1263). Indeed, to hold otherwise would conflate
the two standards and "void the effect of the qualified
immunity section of the Act." Thornton, 619 F.2d at 706.

*18 Here, even if Frydman is able to persuade a jury
that the Defendants "willfully failed to comply" with their
duty to conduct a reasonable reinvestigation pursuant to
Section 1681i(a)(1)(A), he clearly intends to do so on a
theory of systemic incompetency and profit-driven behavior,
not malicious intent to injure him personally. (See generally
Pl.'s Mem.; Frydman Decl.). Moreover, he has adduced no
evidence which would allow a reasonable jury to conclude
that the Defendants knew either that the Atlantic Concrete
Judgment had been vacated, or that the Porsche Financial
account had never been charged off. Accordingly, even if
he is able to establish that the Defendants should have
reinvestigated further, this does not rise to the level of
malice or willful intent to injure him. His state law claims
consequently are preempted by the FCRA, and summary
judgment should be entered as to those claims.

### E. Motions to Strike

As noted previously, Frydman's motions to strike should
be denied. See supra, note 17. In addition, except to the
extent discussed in this Report and Recommendation, none
of Frydman's submissions that the Defendants seek to strike
are material to the survival of his few remaining claims.
Accordingly, the Defendants' motion to strike should be
denied as moot.

### VI. Conclusion

For the foregoing reasons, the Defendants' motion for
summary judgment, (ECF No. 95), should be granted in part
and denied in part. Specifically, summary judgment should
be denied with respect to Frydman's claims for the willful
violation of Section 1681i(a)(1)(A) as to all of the Defendants
with regard to the Atlantic Concrete Judgment, and as to
Experian and Equifax with regard to the Porsche Financial
account. Summary judgment should be granted as to all other
claims in the Amended Complaint.

In addition, the Defendants' motion to strike, (ECF No. 126),
should be denied as moot, and Frydman's motions to strike
(ECF Nos. 129, 135, 139, 142), should be denied.

### VII. Notice of Procedure for Filing Objections to this Report and Recommendation

2016 WL 11483839

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11483839

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5661596

2016 WL 5661596
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jacob FRYDMAN, Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, INC.,
Equifax Information Services LLC, and Transunion
Risk and Alternative Data Solutions, Inc., Defendants.

14 Civ. 9013 (PAC) (FM) (HBP)
|
Signed 09/30/2016

**Attorneys and Law Firms**

Jacob Frydman, New York, NY, pro se.

Joshua Alan Weiner, Sarah Jean Fox, Andrew Steven Kleinfeld, Jones Day, New York, NY, Tracy Lee Klingler, King & Spalding, LLP, Atlanta, GA, for Defendants.

**OPINION & ORDER ADOPTING
REPORT AND RECOMMENDATION**

HONORABLE PAUL A. CROTTY, United States District Judge

**\*1** *Pro se* Plaintiff Jacob Frydman ("Frydman") brings an action against Experian Information Solutions, Inc. ("Experian"), Equifax Information Services LLC ("Equifax"), and Trans Union, LLC [1] (collectively, "Defendants") for actual and punitive damages for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* and New York State law. Frydman alleges that Defendants failed to exclude incorrect information from his credit files resulting in, among other things, Frydman being denied credit and being offered unfavorable terms on several loans. Defendants move for summary judgment, and the parties submitted five motions to strike an affidavit and various declarations. Dkt. 95, 126, 129, 135, 139, 142.

---

[1]     The Amended Complaint names Trans Union Risk and Alternative Data Solutions, Inc. as a defendant. Dkt. 29. Counsel appearing in this matter on behalf of Trans Union, LLC has indicated, however, that Trans Union, LLC is the correct entity. Dkt. 43

at 55. The docket will be updated to reflect Trans Union, LLC as the defendant.

On August 11, 2016, Magistrate Judge Frank Maas issued an excellent and thorough, 44-page Report and Recommendation ("R&R") that Defendants' summary judgment motion be granted in part and denied in part. Dkt. 158. Specifically, summary judgment should be granted as to all claims in the amended complaint (including the New York State law claims), except with respect to Frydman's claim for the willful failure to comply with the requirements of § 1681i(a)(1)(A) for all Defendants with regard to the Atlanta Concrete Judgment, and as to Experian and Equifax with regard to the Porsche Financial account. Both parties' motions to strike should be denied. On August 24, 2016, Frydman objected to the R&R, arguing that Magistrate Judge Maas incorrectly recommended dismissal of his New York State law claims. Dkt. 159.

For the reasons stated below, the Court rejects Frydman's objection; agrees with the R&R; and adopts it in full. Defendants' motion for summary judgment is GRANTED in part and DENIED in part; and the motions to strike are DENIED.

**LEGAL STANDARDS**

**I. Review of Objections**

The Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). "To accept those portions of the report to which no timely objections has been made, however, 'a district court need only satisfy itself that there is no clear error on the face of the record.' " *Razzoli v. Fed. Bureau of Prisons,* No. 12 Civ. 3774 (LAP), 2014 WL 2440771, at \*5 (S.D.N.Y. May 30, 2014) (quoting *Wilds v. United Parcel Serv., Inc.,* 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)).

**II. Summary Judgment Standard**

To prevail on a motion for summary judgment, a movant must show "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.' " *Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5661596

motion for summary judgment." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010).

## ANALYSIS [2]

[2]   The relevant facts are set forth in the R&R.

**I. New York State Law Claims**

 *2  Frydman argues that the R&R was incorrect in finding that his New York State law claims (negligent misrepresentation, defamation, defamation *per se,* negligence, and injurious falsehood) are preempted by 15 U.S.C. § 1681h(e). Section 1681h(e) provides:

> Except as provided in sections 1681n and 1681*o* of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency ... *except as to false information furnished with malice or willful intent to injure such consumer.*

15 U.S.C § 1681h(e) (emphasis added).

Frydman contends that because a reasonable jury could conclude Defendants acted with malice, his state law claims survive. The FCRA does not define malice, and Frydman urges the Court to apply the standard for malice articulated by the Supreme Court in the libel context in *New York Times Co. v. Sullivan,* 316 U.S. 254, 280 (1964), under which malice is established where the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." Dkt. 159 at 8. Thus, according to Frydman, just as Defendants may be liable pursuant to § 1681n for recklessly disregarding their statutory duties,[3] they may also be liable under New York State law for recklessly disregarding the truth. *Id.* at 11-12. Magistrate Judge Maas rejected that argument. He recognized that conflating the malice or willful intent to injure standard with the willful failure to comply with statutory duties standard would "void the effect of the qualified immunity section of the Act." R&R at 41-42 (citing *Thornton v. Equifax, Inc.,* 619 F.2d 700, 705

(8th Cir. 1980); *Cushman v. Trans Union Corp.,* 115 F.3d 220, 229 (3d Cir. 1997); *Pinner v. Schmidt,* 805 F.2d 1258, 1263 (5th Cir. 1986)).

[3]   A credit reporting agency is liable pursuant to § 1681n if it "willfully fails to comply with any requirement imposed under [the FCRA]." 15 U.S.C. § 1681n(a).Willful failure to comply with the FCRA can be shown by evidence of " 'reckless disregard' for statutory duties." R&R at 39-40. A credit reporting agency acts with reckless disregard if its interpretation of its statutory duties is "objectively unreasonable." *See id.* As Magistrate Judge Maas properly concluded (and no party objects), a reasonable jury could conclude that Defendants' reinvestigation procedures were objectively unreasonable. *See id.*

We agree with Magistrate Judge Maas "that a showing of 'malice or willful intent to injure' requires something more than the 'willful failure to comply' with statutory duties that is the prerequisite to an award of punitive damages."[4] R&R at 41. We also agree that Frydman has adduced no evidence from which a reasonable jury could conclude that Defendants acted with the "something more" necessary to establish malice or willful intent to injure him. *Id.* at 43.

[4]   Even if Frydman is correct that the *New YorkTimes* standard for malice applies to § 1681h(e), the showing that Frydman would have to make would still need to be something more than a willful failure to comply with statutory duties. To show "reckless disregard" under *New York Times,* Frydman would need to "put forth 'sufficient evidence to permit the conclusion that [Defendants] in fact entertained serious doubts as to the truth of [their] publication[s].' " *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1168 (9th Cir. 2009) (quoting *St. Amant v.Thompson,* 390 U.S. 727, 731 (1968)); *Morris v. Equifax Info. Servs., LLC,* 457 F.3d 460, 471 (5th Cir. 2006). The "theory of systemic incompetency and profit-driven behavior," R&R at 42-43, that Frydman relies on for his claim that Defendants willfully failed to comply with their statutory duties is insufficient to show that Defendants "entertained serious doubts" about their reporting of the Atlantic Concrete Judgment or Porsche Financial account.

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 171 of 238

Frydman v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5661596

## II. Claims under the FCRA

**\*3** The Magistrate Judge found sufficient evidence for Frydman to proceed on his claim that Defendants willfully failed to comply with their statutory duty under 15 U.S.C. § 1681i(a)(1)(A), and so recommends denying summary judgment on that ground. Defendants do not object and, finding no clear error, the Court adopts that recommendation.

Frydman has presented evidence that could lead a reasonable jury to conclude that there were inaccuracies in Defendants' disclosures relating to the Atlantic Concrete Judgment and the Porsche Financial account. *See Gorman v. Experian Info. Solutions, Inc.,* 07 Civ. 1846 (RPP), 2008 WL 4934047, at \*4 (S.D.N.Y. Nov. 19, 2008). A reasonable jury could also conclude that Defendants are liable for willfully failing to comply with their statutory duties under 15 U.S.C. § 1681i(a)(1)(A) in conducting reinvestigations for the Atlantic Concrete Judgment (all Defendants) and the Porsche Financial account (Experian and Equifax). *See Jones v. Experian Info. Solutions, Inc.,* 982 F. Supp. 2d 268, 276 (S.D.N.Y. 2013).

Frydman has not presented evidence, however, from which a reasonable jury could conclude that Defendants willfully failed to comply with their statutory duties under 15 U.S.C. § 1681e(b) in generating any inaccurate reports. *See Ogbon v. Beneficial Credit Servs., Inc.,* 10 Civ. 3760 (PAE), 2013 WL 1430467, at \*7 (S.D.N.Y. Apr. 8, 2013). Frydman's claims for negligent violation of 15 U.S.C. § 1681e(b) and 15 U.S.C. § 1681i(a)(1)(A) fail because a reasonable jury would not be able to conclude that Frydman suffered any actual damages cognizable under the FCRA. *See Selvam v. Experian Info. Solutions, Inc.,* ___ Fed.Appx. ____, 2016 WL 3180140, at \*2 (2d Cir. June 7, 2016). First, Frydman's claims for damages for the denial or modification of bank loans constitute business transactions that are not cognizable under the FCRA. *See Podell v. Citicorp Diners Club, Inc.,* 914 F. Supp. 1025, 1036 (S.D.N.Y. 1996), *aff'd,* 112 F.3d 98 (2d Cir. 1997).

Second, Frydman has not presented admissible evidence that he suffered consumer damages causally connected to any inaccurate information provided by Defendants. *See Burns v. Bank of Am.,* 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008), *aff'd,* 360 Fed.Appx. 255 (2d Cir. 2010). Third, Frydman has not alleged or presented evidence from which a reasonable jury could conclude that he has suffered emotional damages. *See Wenning v. On-Site Manager, Inc.,* 14 Civ. 9693 (PAE), 2016 WL 3538379, at \*20 (S.D.N.Y. June 22, 2016).

## III. Motions to Strike

Frydman's motions to strike are denied because the statements that he seeks to strike are professed to be based on personal knowledge and "the assessment of a witness's credibility is a function reserved for the jury." *In re Fosamax Prods. Liab. Litig.,* 707 F.3d 189, 194 n.4 (2d Cir. 2013). Defendants' motion to strike is denied as moot because Frydman's submissions are not material to the surviving claims.

## CONCLUSION

The Court ADOPTS the R&R. Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The Court DENIES the motions to strike. The Clerk is directed to update the docket to substitute Trans Union, LLC for Transunion Risk and Alternative Data Solutions, Inc. The Clerk is also directed to close the motions at Docket 95, 126, 129, 135, 139, and 142. The reference to the Magistrate Judge is continued.

**\*4** SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2016 WL 5661596

---

**End of Document**                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4934047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert GORMAN, Plaintiff

v.

EXPERIAN INFORMATION SOLUTIONS,
INC., Equifax Information Services, Inc., and
HSBC Mortgage Services, Inc., Defendants.

No. 07 CV 1846(RPP).
|
Nov. 19, 2008.

West KeySummary

1    **Finance, Banking, and
     Credit** 👉 Obligations of furnishers of
     information

A mortgage services company was entitled to
summary judgment on a Fair Credit Reporting
Act (FCRA) claim brought against it. The
mortgagor alleged that based on information
provide by the company to one credit reporting
agency that was different from information
reported to another credit agency he received
less favorable mortgage terms. While it was true
that the mortgage services company provided
different information regarding the loan in
response to dispute requests from two credit
reporting agencies, those differences could be
accounted for by the nature of the dispute
descriptions provided by the two agencies. the
mortgagor provided no evidence that any alleged
violation of the FCRA by the mortgage service
company caused him actual damages. In fact, the
mortgagor offered no evidence that the lenders
denied his mortgage applications based on any
information provided by the company, either
directly or indirectly. Fair Credit Reporting Act,
§ 605, 15 U.S.C.A. § 1681c.

32 Cases that cite this headnote

**Attorneys and Law Firms**

Kevin Christopher Mallon, Fishman & Neil, LLP, New York,
NY, for Plaintiff.

Michael G. Morgan, Jones Day, Los Angeles, CA, for
Experian.

Preston Lee Zarlock, Phillips Lytle LLP, New York, NY, for
HSBC.

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., District Judge.

**\*1** On March 2, 2002, Plaintiff Robert Gorman ("Plaintiff")
initiated this action against Experian Information Solutions,
Inc. ("Experian"), Equifax Information Services, Inc.
("Equifax"), and HSBC Mortgage Services, Inc. ("HSBC")
for actual and punitive damages arising out of alleged
violations of the Fair Credit Reporting Act ("FCRA"), 15
U.S.C. § 1681 et seq., and for defamation.[1] Plaintiff settled
its claims against Equifax, and they were dismissed by
stipulation on February 27, 2008 after the close of discovery
on January 30, 2008. Experian and HSBC (collectively,
"Defendants") now move for summary judgment pursuant
to Federal Rule of Civil Procedure 56. For the reasons that
follow, Experian's motion is granted in part and denied in part.
HSBC's motion is granted in its entirety.

1    Plaintiff consents to dismissal of the defamation
     claims against both parties (Pl.'s Mem. of Law in
     Opp. to Defs.' Mots. for Summ. J. 14). Plaintiff's
     claims under 15 U.S.C. §§ 1681b(f), 1681q
     against HSBC were dismissed with prejudice by
     stipulation on May 14, 2008.

I. BACKGROUND
During November 2000, Plaintiff obtained two mortgages
from HSBC's predecessor-in-interest (hereinafter "HSBC")
in the amounts of $360,000 and $90,000 for a condominium
he purchased in Northern California. (Zarlock Decl., Ex.
J, Def. Ex. C, D). In October 2001, Plaintiff was released
from his job and was unable to make further mortgage
payments after his January 2002 payment. (HSBC's Local
Civ. Rule 56.1 Stmt., ¶¶ 10–12.) As a result of his inability
to make payments, on April 30, 2002, Plaintiff executed a
Grant Deed in Lieu of Foreclosure as well as an estoppel

affidavit for the first loan for the repossession of the property. (Gorman Decl., Ex. A at 5–8.) Plaintiff signed the estoppel affidavit for the second loan on June 6, 2002. (Zarlock Decl., Ex. J, Def. Ex. G at 4–5.) On June 11, 2002, Plaintiff executed a Deed of Reconveyance, which was recorded by the San Francisco County Assessor–Recorder's Office, along with the Grant Deed in Lieu of Foreclosure and the estoppel affidavits, on June 26, 2002.[2] (Gorman Decl., Ex. A.) Plaintiff acknowledges that he did not make mortgage payments or pay rent while residing on the property from January through June 2002. (Pl.'s Resp. to HSBC's Local Civ. Rule 56.1 Stmt. ¶ 18.)

[2]    The record does not reflect when these documents were received by HSBC.

A. The Experian Credit Report

On July 19, 2006, Plaintiff obtained a copy of his credit report from Experian. (Gorman Decl., Ex. B.) The report contained five negative items, including the fact that Plaintiff was 30 days or more delinquent on payment of at least one student loan account in 2002, 2003, 2004, and 2006, and 30 days or more delinquent on payment of an automobile loan in 2000. (Experian's Local Civ. Rule 56.1 Stmt. ¶¶ 17–21). The July 19, 2006 Experian report did not report the $360,000 HSBC loan, only the $90,000 HSBC loan (hereinafter "Mortgage Loan"). The July 19, 2006 Experian report's entry for the Mortgage Loan read:

> Status: Creditor received deed/ Foreclosure proceedings started. $8,702 past due as of Oct 2002. Account history: Creditor received deed as of Oct 2002. Foreclosure proceedings started as of Sep 2002, Aug 2002, June 2002, 120 days as of May 2002, 90 days as of Apr 2002, 30 days as of Mar 2002.

**\*2**  (Gorman Decl., Ex. B.) On August 31, 2006, Plaintiff sent a letter, dispute form, and a copy of the Grant Deed in Lieu of Foreclosure to Experian. (*Id.,* Ex. C.) Plaintiff's letter referenced requirements under the FCPA and requested that Experian examine the attached dispute form and Grant Deed in Lieu of Foreclosure. With regard to the Mortgage Loan, the attached dispute form stated, "Account was

closed by deed transfer on April 2002 (see attached legal document). No foreclosure was done, mortgage fully closed on April 2002, so entries after (and on) that date are wholly incorrect ..." (*Id.*) Experian's investigation results dated September 8, 2006 acknowledged to Plaintiff that Experian had received Plaintiff's dispute information and was "not able to use it," but that it would continue its verification process and respond to Plaintiff within 45 days. (*Id.,* Ex. D.)

Experian uses an automated consumer dispute verification ("ACDV") electronic system to submit verification requests to creditors like HSBC. (HSBC's Local Civ. Rule 56.1 Stmt. ¶ 24.) Credit reporting agencies like Experian and Equifax review the information from a consumer's dispute and send an ACDV to the creditor (here, HSBC) over a system called the E–OSCAR system. (*Id.* ¶ 25.) The documents that credit reporting agencies receive from the consumer are not sent to HSBC. (*Id.* ¶ 26.) The ACDV form contains areas for the credit reporting agencies to provide information describing the consumer's dispute. (*Id.* ¶ 27.)

On September 8, 2006, Experian sent an ACDV to HSBC concerning Plaintiff's dispute of the Mortgage Loan; it did not send Plaintiff's letter or dispute form to HSBC. (Zarlock Decl., Ex. K, Pl.Ex. 29/31, at 3.) The Experian ACDV stated: "Disputes present/previous Account Status, History. Verify accordingly. CONSUMER SENT IN DEED IN LIEU OF FORECLOSURE."[3] (*Id.*) An HSBC investigator, LaQuinta Henning, reviewed the Experian ACDV and reviewed the available account information in light of the ACDV. (*Id.;* Henning Dep. 17:11–23:14.) After receipt of the Experian ACDV, HSBC filled in the form's response on September 11, 2006 to reflect a "closed date" of 5/08/02. (*Id.*)

[3]    The ACDV did not incorporate Plaintiff's statements from his dispute form: "Account was closed by deed transfer on April 2002 ... No foreclosure was done, mortgage fully closed on April 2002, so entries after (and on) that date are wholly incorrect ..." (Gorman Decl. Ex. C.)

On October 6, 2006, Experian issued an updated report, which contained the following entry for the Mortgage Loan:

> Status: Creditor received deed/Past due 180 days. $8,702 past due as of Sep 2006. Account history: Creditor received deed as of Sep 2006, 180 days

as of Sep 2002, Aug 2002, 120 days as of Jun 2002, 90 days as of May 2002, 60 days as of Apr 2002, 30 days as of Mar 2002. This account is scheduled to continue on record until Dec. 2008.

(Gorman Decl., Ex. E.) The updated report did not reflect the closed date of 5/08/02.

### B. The Equifax Credit Report

On July 20, 2006, Plaintiff received a copy of his credit report from Equifax. (Gorman Decl., Ex. F.) The Equifax credit report reflected the HSBC Mortgage Loan as having a "Balance Amount" of $5,980, a "Past Due Amount" of $8,729, and "Date of Last Payment" as 1/2002. It states: "Current Status—Over 120 days past due." (*Id.*) On August 31, 2006, Plaintiff sent a dispute letter to Equifax regarding the reporting of the Mortgage Loan. (Gorman Decl., Ex. G.)

**\*3** On September 8, 2006, Equifax sent an ACDV to HSBC concerning Plaintiff's letter and the Mortgage Loan. (Zarlock Decl., Ex. K, Pl.Ex. 4.) The Equifax ACDV told HSBC that the dispute reason was:

> Disputes current/previous account status/payment history profile/ payment rating, verify payment history profile, account status, and payment rate. Claims account closed. Provide account status, date closed, and payment rating. Consumer states that this was closed on April 30, 2006 [*sic*] when deed was transferred to lender and status incorrect.

(*Id.*)

In response to the Equifax ACDV, HSBC requested that Equifax modify the Mortgage Loan reporting to reflect a $0 balance, delinquency of "90–119 days past due," and "Deed received in lieu of foreclosure on a defaulted mortgage." (*Id.*) When HSBC responded to the Equifax ACDV on September 19, 2006, which was two weeks prior to Experian's issuance of its revised October 6, 2006 credit report, it sent a copy

of the updated information to Experian through E–OSCAR. (Zarlock Decl., Ex. K, Pl.Ex. 29/31 at 4–6.)

### C. Plaintiff's Alleged Damages

Plaintiff alleges that, based on his credit report, three different mortgage companies denied him loans in January 2007, and as a result, he was unable to purchase and move into a house from his apartment. (Gorman Decl. ¶¶ 19, 21.) Plaintiff further alleges that after the filing of this lawsuit, HSBC instructed Experian to remove the alleged erroneous information from his credit report, and he was subsequently able to obtain a mortgage and move his family to a new home in Virginia in August 2007. (*Id.* ¶ 23). Plaintiff alleges that he would have been able to obtain a more favorable home mortgage in January 2007, and that the denial of his mortgage application cost him an estimated $16,000 in less favorable terms. (*Id.*) In addition, Plaintiff alleges emotional and other damages as a result of the mortgage denials, though he has never sought any medical treatment, psychiatric treatment, or counseling. (*Id.* ¶ 22; Gorman Dep. 123:13–124:7.)

## II. STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* Fed.R.Civ.P. 56(e). When determining whether a genuine issue of material fact exists, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Braham v. Clancy,* 425 F.3d 177, 181 (2d Cir.2005) (internal citations omitted). The non-moving party, however, "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (internal quotations omitted). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. Legislative Purpose of the FCRA

**\*4** The purpose of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer ..." 15 U.S.C. § 1681(b). Specifically, the FCRA requires that consumer reporting agencies, such as Experian, "follow reasonable procedures to assure maximum possible accuracy of the information" contained in the consumer report.[4] 15 U.S.C. § 1681e(b). When the accuracy of a report is in dispute, Section 1681i outlines specific procedures that consumer reporting agencies must follow to ensure the proper reinvestigation of disputed information. See 15 U.S.C. § 1681i.

[4]   Experian is a "consumer reporting agency" within the meaning of the FCRA. 15 U.S.C. § 1681a(f). HSBC is a "furnisher of information" within the meaning of the FCRA. 15 U.S.C. § 1681s–2.

Section 1681s–2(b) of the FCRA addresses duties of furnishers of information, such as HSBC, once they receive notice of "a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency." Upon receiving that notice, furnishers of information must conduct an investigation on the disputed information, review all information provided by the consumer reporting agency, and then report any inaccuracies to all consumer reporting agencies to which the furnishers provide information. 15 U.S.C. § 1681s–2(b)(1).

Under the FCRA, the consumer reporting agency or furnisher of information is liable to the consumer for negligent or willful non-compliance in an amount equal to the "actual damages" sustained, the costs of the action and reasonable attorney's fees, as well as punitive damages in the case of willful noncompliance. 15 U.S.C. §§ 1681n, 1681*o*.

B. Claims against Experian
Plaintiff brings claims for both negligent and willful violations of sections 1681e(b) and 1681i of the FCRA. In order to succeed on a claim under section 1681 e(b), a plaintiff must show that:

> (1) the consumer reporting agency was negligent [or willful] in that it failed to follow reasonable procedures to assure the accuracy of its

credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury.

*Whelan v. Trans Union Credit Reporting Agency,* 862 F.Supp. 824, 829 (E.D.N.Y.1994) (citing *Houston v. TRW Info. Servs., Inc.,* 1989 WL 59850 (S.D.N.Y. May 2, 1989), *aff'd,* 896 F.2d 543 (2d Cir.1990)). "[T]he threshold question is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." *Houston v. TRW Info. Servs., Inc.,* 707 F.Supp. 689, 691 (S.D.N.Y.1989); *see also Dalton v. Capital Associated Indus., Inc.,* 257 F.3d 409, 415 (4th Cir.2001). If the information is inaccurate, plaintiff must then present some evidence that the credit reporting agency failed to follow reasonable procedures, as mandated by the statute in sections 1681e(b) and 1681i. *Whelan,* 862 F.Supp. at 829. Whether or not the credit reporting agency followed reasonable procedures "will be a jury question in the overwhelming majority of cases." *Cahlin v. General Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991).

1. Accuracy of Report and Reasonable Procedures
**\*5** It is undisputed that Plaintiff signed the Grant Deed in Lieu of Foreclosure on April 30, 2002 (Gorman Decl., Ex. A.), and the San Francisco County Assessor–Recorder's Office received and stamped the Grant Deed in Lieu of Foreclosure on June 26, 2002. (*Id.*) After receiving the Experian credit report dated July 19, 2006, which contained information about the HSBC Mortgage Loan of $90,000, Plaintiff notified Experian that the credit report was not accurate. (Gorman Decl. Ex. B.) The July 19, 2006 credit report states: (1) "Foreclosure proceedings started"; (2) $8,702 past due as of October 2002; and (3) "Creditor received deed as of October 2002" when the Grant Deed in Lieu of Foreclosure was signed on April 30, 2002 and recorded as of June 26, 2002. (Gorman Decl., Ex. B at 2.)

In response to Plaintiff disputing the accuracy of the report, Experian sent an ACDV to HSBC. HSBC responded to the ACDV on September 11, 2006 by noting that the Mortgage Loan account was closed on May 8, 2002. (Zarlock Decl., Ex.

K, Pl.Ex. 29/31.) Experian used the information it received from HSBC to issue a revised credit report on October 6, 2006, which included the following updated entry for the HSBC Mortgage Loan:

> Status: Creditor received deed/Past due 180 days. $8,702 past due as of Sep. 2006. Account history: Creditor received deed as of Sep 2006, 180 days as of Sep 2002, Aug 2002, 120 days as of Jun 2002, 90 days as of May 2002, 60 days as of Apr 2002, 30 days as of Mar 2002. This account is scheduled to continue on record until Dec. 2008.

(Gorman Decl., Ex. E, at 4.) While the October 6, 2006 credit report omits the previous entry of "foreclosure proceedings," it states $8,702 past due as of September 2006 and that the Creditor received the Grant Deed, not as of April or June 2002, but as of September 2006. Due to the discrepancy between these dates and the dates of the Grant Deed in Lieu of Foreclosure and associated documents, a jury could conclude that on October 6, 2006, Experian reported inaccurate information as to the Mortgage Loan. A jury could also conclude that Experian did not accurately report the information it received from HSBC.

In addition, a genuine issue of material fact exists as to whether Experian failed to follow reasonable procedures as required by sections 1681 e(b) and 1681i. [5] On August 31, 2006, Plaintiff sent a copy of his Grant Deed in Lieu of Foreclosure, as well as a detailed letter explaining the inaccuracies, to Experian in connection with its investigation. (Gorman Decl. ¶ 11; id. Ex. C; Gorman Dep. at 98.) Experian contends that, because they sent an ACDV to HSBC in order to verify the information, and they accurately reported the information they received from HSBC, there is no genuine issue of material fact before the Court. (Experian Reply at 9–10.) Two federal circuits have held, however, that the reinvestigation required by section 1681i(a) demands more than (a) forwarding the dispute information onto the furnisher of information and (b) relying on the furnisher of information's response. See Cushman v. TransUnion Corp., 115 F.3d 220, 225 (3rd Cir.1997) (holding that "in order to fulfill its obligation under section 1681i(a) 'a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information.'

" (quoting Henson v. CSC Credit Servs., 29 F.3d 280, 287 (7th Cir.1994)); see also Stevenson v. TRW Inc., 987 F.2d 288, 293 (5th Cir.1993) ("In a reinvestigation of the accuracy of credit reports [pursuant to § 1681i(a) ], a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers."). The court in Cushman noted that to only require the credit reporting agency to go to the furnisher of information would replicate the requirements of section 1681e(b), and such a reading would render the two sections largely duplicative of each other. Id. Receiving notification of a dispute from a customer shifts the responsibility of reinvestigation onto the credit reporting agency, and the statutory responsibility imposed on the credit report agency "must consist of something more than merely parroting information received from other sources." Id.

[5]
> Experian cites Podell v. Citicorp Diners Club, Inc. to support its claim that Plaintiff has "failed to demonstrate a genuine material question regarding [Experian's] compliance with the reinvestigation procedures of FCRA." 112 F.3d 98, 104 (2d Cir.1997). However, the facts are distinguishable in that the sole issue in Podell was whether notice was sent as required by section 1681i. Id. at 101. As the Court of Appeals for the Third Circuit recognized in Cushman v. TransUnion Corp., "[a]s the consumer in Podell never took issue with the reasonableness of the scope of the consumer reporting agency's reinvestigation, the Court of Appeals for the Second Circuit had no occasion to address this issue." 115 F.3d 220, 224–25 (3rd Cir.1997). Here, whether Experian's procedures were reasonable presents a genuine issue of material fact.

**\*6** Here, an Experian representative stated that Experian does not conduct an independent reinvestigation:

Q: Okay. So Experian essentially relies upon HSBC to reinvestigate this matter and then report those results, correct?

A: That's correct.

Q: Okay. It doesn't conduct is own reinvestigation into this dispute?

A: Well, we do go to the reporting source which is the company who had the relationship with the subscriber, but independent of that and reviewing any information sent

in by the consumer themselves, we don't do any other independent investigations.

(Hughes Dep. at 110–111.)

Given the standard articulated in *Cushman* and Experian's claimed sole reliance on the information it received from HSBC, a jury could conclude that Experian did not reinvestigate Plaintiff's dispute in accordance with the requirements of 15 U.S.C. § 1681.

2. Causation of "Actual Damages"

Although a jury could find that Experian violated its duties under the FCRA, Plaintiff has not presented sufficient evidence of causation of "actual damages" to survive summary judgment. *See Cahlin,* 936 F.2d at 1161 (emphasizing that plaintiff has an affirmative duty to present evidence supporting his claim that the alleged inaccurate report caused him damage). A plaintiff must produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a "substantial factor" that brought about the denial of credit.[6] *See Philbin v. Trans Union Corp.,* 101 F.3d 957, 969 (3d Cir.1996). In short, the inaccuracy in the credit report must proximately cause actual damages to plaintiff. *Whelan,* 862 F.Supp. at 829 (citations omitted).

[6]     Experian cites *Safeco Ins. Co. of America v. Burr* in support of its argument that Plaintiff must show "but-for" causation. 551 U.S. 47, ——, 127 S.Ct. 2201, 2212, 167 L.Ed.2d 1045 (2007). That holding was based on an entirely different provision of the FCRA than the statutes at issue here. *See* 15 U.S.C. § 1681m(a) (requiring that users of consumer reports who take "any adverse action ... based in whole or in part on any information contained in the consumer report" notify the consumer). The Supreme Court's analysis closely followed the language of that provision of the FCRA and found that the plain meaning of "based on" required "but-for" causation. The language of the statute at issue in *Safeco* does not mirror the language of the statutes at issue here. *See* 15 U.S.C. §§ 1681e(b), 1681i, or 1681s–2. However, it is not necessary to decide whether the more stringent "but-for" test expands to the sections of the FCRA at issue in this case because Plaintiff fails to satisfy even the "substantial factor" test.

Plaintiff alleges that the inaccurate information regarding the HSBC mortgage contained on the Experian report caused three lenders to deny his applications for mortgages in January 2007.[7] (Gorman Decl. ¶¶ 19, 20.) However, Plaintiff failed to take discovery from any of the third-party lenders who allegedly denied the loans and has failed to present evidence showing that (1) the lenders relied on the Experian report; and (2) the inaccurate information regarding the HSBC Mortgage Loan was a substantial factor in the lenders' denial of the loans.

[7]     As evidence of actual damages caused by Experian, Plaintiff submits an unsworn expert report which states, in summary, that Plaintiff's damages consist of: (1) $10,964 to $16,446.60 in increased mortgage cost as a result of mortgage loan denials in January 2007; (2) $300,000 due to credit stigma; and (3) additional emotional and/or punitive damages to be determined. (Mallon Decl., Ex. A at 12–13.) However, this expert report is inadmissible for purposes of summary judgment because the report is unsworn. Fed.R.Civ.P. 56(e); *see Berk v. St. Vincent's Hospital and Medical Center,* 380 F.Supp.2d 334, 352 (S.D.N.Y.2005). At oral argument on Defendants' summary judgment motions, Plaintiff informed the Court that the expert had been deposed and that the deposition would support his report. (Transcript of October 2, 2008 Oral Argument at 65:16–66:8.) The Court said it would receive and consider a copy of the deposition (*id.* at 67:24–68:2); however, Plaintiff has not supplied the Court with the transcript despite having adequate time to do so.

The only documents Plaintiff submits in support of this causation allegation lack the foundation to be admissible for the truth of their contents under Rule 56(c) of the Federal Rules of Civil Procedure or Local Rule 56.1. Nevertheless, even if the hearsay documents were admissible, they are not sufficient evidence of causation to survive summary judgment. An examination of each document shows it contains no evidence that Experian's report caused the lenders to deny his applications for a mortgage.

(1) *United Community Bank Mortgage Services Letter to Gorman, dated January 31, 2007.* (Gorman Decl., Ex. J at 1.) This letter states that United Community Bank denies his application for a first mortgage loan because of "Delinquent past or present credit with others." In the disclosure language, the letter states that their decision

was "based in whole or in part on information obtained in a report from the consumer reporting agency listed below." However, no agency is listed. Therefore, nothing on this letter indicates that the lender relied, in part or in whole, on an Experian report, or more specifically on the allegedly inaccurate information contained in the Experian report about the HSBC mortgage loan.

**\*7** (2) *CredStar Notice to Gorman, dated January 12, 2007.* (Gorman Decl., Ex. J at 2–3.) This letter is not a denial of a loan; it is a disclosure of a credit score made in connection with a home loan. The report does list Experian, as well as TransUnion and Equifax, as a credit bureau who may have contributed data for the credit score disclosed in the report. However, because the letter is not a loan denial, it is not evidence that the information about the HSBC loan contained on the Experian report caused a loan denial.

(3) *USAA Federal Savings Bank Statement of Credit Denial to Gorman, dated January 18, 2007.* (Gorman Decl., Ex. J at 4.) This document does appear to be a loan denial, and the principal reason for that loan denial listed in Part I of the letter is "Foreclosure or Repossession." However, in Part II of the credit denial, the lender discloses that its credit decision was "based in whole or in part on information obtained in a report from the consumer reporting agency listed below." The agency listed is CSC Credit Services, an affiliate of Equifax. Therefore, because the loan denial states that its credit decision was based in whole or in part on a credit report provided by a different consumer reporting agency, the information regarding the HSBC loan contained on the Experian report has not been shown to have been a substantial factor in the loan denial.

Experian's motion for summary judgment on Plaintiff's claim for compensatory damages is granted because Plaintiff has failed to meet his burden of showing that the alleged inaccurate information on the Experian report caused actual damages, either in the form of out-of-pocket expenses or emotional distress. [8] *See Whelan,* 862 F.Supp. at 832 (granting defendant consumer reporting agency summary judgment where plaintiffs failed to show that the inaccurate information on defendant's credit report proximately caused damages); *see also Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 664 (7th Cir.2001) ("Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages' ").

Plaintiff's claims for actual damages under sections 1681n and 1681*o* are dismissed.

[8] " '[A]ctual damages' may include humiliation and mental distress, even in the absence of out-of-pocket expenses." *Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 474 (2d Cir.1995).

### 3. Punitive Damages

Even if Plaintiff is not entitled to "actual damages," he may still be entitled to punitive damages based on sufficient proof that Experian willfully violated various provisions of the FCRA. *See* 15 U.S.C. § 1681n(a)(2); *see also Northrop v. Hoffman of Simsbury, Inc.,* 12 Fed. Appx. 44, 50 (2d Cir.2001) ("[a]ctual damages are not a statutory prerequisite to punitive damages" under the FCRA). The Supreme Court recently held that the proper standard for determining whether or not provisions of the FCRA were "willfully" violated under 1681n(a) includes "reckless disregard" for the FCRA requirements. *Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, ——, 127 S.Ct. 2201, 2203, 167 L.Ed.2d 1045 (2007).

**\*8** Given the evidence regarding the accuracy of Experian's report and the reasonableness of their procedures, *see* Section III.B.1, *supra,* a jury could find that Experian showed a reckless disregard for the requirements of sections 1681e(b) and 1681i. Here, in addition to Experian's admission that it failed to conduct any independent investigation of the validity of Plaintiff's Deed in Lieu of Foreclosure, Experian failed to consider an E–OSCAR notification from HSBC that contained updated information regarding the Mortgage Loan. Within seven days of the direct response from HSBC, and prior to issuance of the revised October 6, 2006 credit report, Experian received a copied notification from HSBC through E–OSCAR, which contained updated and corrected information that HSBC provided Equifax. (Hughes Dep. at 72–74.) Experian did not use this information to update its credit report due to an Experian policy not to consider information received within thirty days of a direct response from the furnisher. (*Id.* at 76.) Because of the material differences between the information Experian received within seven days from HSBC about the HSBC mortgage loan, a jury could conclude that Experian recklessly disregarded the new information received from HSBC and that Experian's policy of rejecting information received within thirty days of the direct response it received from the furnisher recklessly disregarded its obligations under the FCPA. Therefore, Experian's motion for summary judgment with respect to

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 179 of 238
Gorman v. Experian Information Solutions, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 4934047

Plaintiff's claim for punitive damages under 15 U.S.C. § 1681n is denied.

### C. Claims against HSBC

Plaintiff brings claims against HSBC for both negligent and willful violations of section 1681s–2(b) of the FCRA. [9] Section 1681s–2(b) provides that when a furnisher of information to a credit reporting agency receives notice of a dispute made by a consumer through the credit reporting agency, the furnisher is required to conduct an investigation with respect to the disputed information. 15 U.S.C. § 1681s–2(b)(1)(A). The furnisher of information is also required to review all relevant information provided by the consumer to the credit reporting agency. 15 U.S.C. § 1681s–2(b)(1)(B). It must then report the results of its investigation to the credit reporting agency. 15 U.S.C. § 1681s–2(b)(1)(C). If the investigation finds that the information is inaccurate or incomplete in any way, it must report those results to all other consumer reporting agencies to which the furnisher provided the information. 15 U.S.C. § 1681s–2(b)(1)(D).

[9]     A consumer has no private right of action under section 1681s–2(a), which requires a furnisher of information to provide accurate information to consumer reporting agencies. *See Elmore v. North Fork Bancorporation, Inc.,* 325 F.Supp.2d 336, 339 (S.D.N.Y.2004) (noting that section 1681s–2(d) limits enforcement of subsection 1681s–2(a) to Federal agencies and state officials). Accordingly, Plaintiff has not claimed a violation of section 1681s–2(a) in the Complaint.

### 1. Investigation Procedures

On September 8, 2006, Experian sent an ACDV to HSBC notifying HSBC that Plaintiff disputed certain information regarding the HSBC Mortgage Loan. The Experian ACDV stated: "Disputes present/previous Account Status, History. Verify accordingly. CONSUMER SENT IN DEED IN LIEU OF FORECLOSURE." (Zarlock Decl., Ex. K, Pl.Ex. 29/31 at 3.) Upon receiving this notice, the HSBC investigator examined the information in the HSBC system and, on September 11, 2006, sent the updated information regarding Plaintiff's HSBC Mortgage Loan account to Experian. (Henning Dep. at 23, 29–30; HSBC's Local Civ. Rule 56.1 Stmt. ¶ 44; Zarlock Decl. Ex. K, Pl.Ex. 29/31 at 3.) The ADVC response reflected a closed date of 5/08/02. (Zarlock Decl., Ex. K, Pl.Ex. 29/31 at 3.) However, this closed date

was not included in Experian's report dated October 6, 2006. (Gorman Decl., Ex. E.)

**\*9**  A different HSBC investigator responded to an ACDV request from Equifax regarding the Mortgage Loan (*see* Gardiner Dep. at 78, 90–91.) and notified Equifax that the Mortgage Loan should reflect a $0 balance, delinquency of 90–119 days past due, and "Deed received in lieu of foreclosure on a defaulted mortgage." (Zarlock Decl., Ex. K, Pl.Ex. 4.) When HSBC responded to the Equifax ACDV on September 19, 2006, they sent a copy of the updated information to Experian through E–OSCAR, as required by section 1681s–2(b)(1)(D). (Zarlock Decl., Ex. K, Pl. 29/31 at 4–6.)

Plaintiff argues that HSBC failed to comply with section 1681s–2(b) because the information it sent to Experian was "wildly different" than the information provided to Equifax. (Pl. Mem. of Law at 11.) While it is true that HSBC provided different information regarding the Mortgage Loan in response to dispute requests from Experian and Equifax, those differences may be accounted for by the nature of the dispute descriptions provided by Experian and Equifax. (*See* Zarlock Decl., Ex. K, Pl.Ex. 4; *id.,* Pl.Ex. 29/31 at 3.) Whether or not HSBC complied with the "Duties of furnishers of information upon notice of dispute" as required by section 1681s–2(b) is therefore an issue of fact to be determined by a jury.

### 2. Causation of "Actual Damages"

Nevertheless, Plaintiff has failed to show that because HSBC's ACDV response to Experian was different from its ACDV response to Equifax, Plaintiff suffered "actual damages." *See* 15 U.S.C. §§ 1681n, 1681*o*. As with the Experian claims discussed *supra,* Plaintiff has provided no evidence that any alleged violation of the FCRA by HSBC caused Plaintiff actual damages, either compensatory or emotional. *See* Section III.B.2 *supra.* In fact, Plaintiff has offered no evidence that the lenders denied his mortgage applications based on any information provided by HSBC, either directly or indirectly. Accordingly, Plaintiff's claims against HSBC for actual damages under sections 1681n and 1681*o* are dismissed.

### 3. Punitive Damages

With respect to claims for punitive damages, Plaintiff has failed to set forth any evidence demonstrating that HSBC showed reckless disregard for the FCRA requirements. *See*

2008 WL 4934047

*Safeco,* 127 S.Ct. at 2203. Therefore, Plaintiff's claims against HSBC for punitive damages under section 1681n are dismissed.

## IV. CONCLUSION

For the foregoing reasons, Experian's motion for summary judgment is granted in part and denied in part, and HSBC's motion for summary judgment is granted in its entirety.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4934047

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Mohnkern v. Equifax Information Services, LLC,
W.D.N.Y.,   November 10, 2021

2016 WL 3538379
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Deborah WENNING and Andres Correa, Plaintiffs,
v.
ON-SITE MANAGER, INC., Defendant.

14 Civ. 9693 (PAE)
|
Signed 06/22/2016

**Attorneys and Law Firms**

James B. Fishman, Susan Karolena Crumiller, Kevin
Christopher Mallon, Fishman & Mallon, LLP, New York, NY,
for Plaintiffs.

Brett A. Scher, Kaufman Dolowich & Voluck LLP,
Woodbury, NY, Adam Matthew Marshall, Cullen and
Dykman, LLP, Garden City, NY, Michael J. Saltz, Jacobson,
Russell, Saltz, Nassim & De La Torre, LLP, Los Angeles, CA,
for Defendant.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge

*1  Plaintiffs Deborah Wenning and Andres Correa each
rented an apartment in New York City until they agreed with
their respective landlords to vacate. Those agreements led to
the entry, in New York City Housing Court, of judgments of
possession in favor of plaintiffs' landlords. Later, defendant
On-Site Manager, Inc. ("On-Site"), which provides tenant
screening reports to landlords, produced reports stating that
Wenning and Correa had each been a defendant in a "Forcible
Entry/Detainer" case ending in a judgment for the landlord.

Plaintiffs now bring this action under the Fair Credit
Reporting Act, 15 U.S.C. § 1681 ("FCRA"), the New York
Fair Credit Reporting Act ("NYFCRA"), and Section 349
of the New York General Business Law ("NYGBL"). They
claim that On-Site did not maintain reasonable procedures to
assure the accuracy of the reports it provided to landlords.

In particular, plaintiffs claim that the term "Forcible Entry/
Detainer" was inaccurate; that On-Site's failure to use a more
accurate term and to provide additional information clarifying
the nature of plaintiffs' Housing Court proceedings was
unreasonable; and that On-Site's dissemination of inaccurate
reports caused plaintiffs emotional distress.

On-Site now moves for summary judgment, and plaintiffs
move for partial summary judgment. For the following
reasons, On-Site's motion is granted and plaintiffs' is denied.

**I. Background**

**A. Facts** [1]

[1]     The following facts are drawn primarily from
the parties' combined Local Rule 56.1 Statement
of Undisputed Facts, Dkt. 85 ("Joint 56.1"),
which includes (a) undisputed facts from the
Joint Statement of Facts, Dkt. 68 ("JSF"); (b)
other undisputed facts; and (c) certain disputed
facts. Citations to a party's Rule 56.1 statement
incorporate by reference the documents cited
therein. Where facts stated in a party's Rule
56.1 statement are supported by testimonial or
documentary evidence, and denied by a conclusory
statement by the other party without citation to
conflicting testimonial or documentary evidence,
the Court finds such facts true. *See* S.D.N.Y.
Local Rule 56.1(c) ("Each numbered paragraph
in the statement of material facts set forth in the
statement required to be served by the moving
party will be deemed to be admitted for purposes
of the motion unless specifically controverted
by a correspondingly numbered paragraph in the
statement required to be served by the opposing
party."); *id.* at 56.1(d) ("Each statement by the
movant or opponent ... controverting any statement
of material fact[ ] must be followed by citation to
evidence which would be admissible, set forth as
required by Fed. R. Civ. P. 56(c).").

The Court begins by reviewing the evidence relating
to Wenning and Correa, including the Housing Court
proceedings that gave rise to the entries on their respective
On-Site screening reports. The Court then reviews the
evidence relating to On-Site's procedures for reporting
Housing Court proceedings.

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 182 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

### 1. Plaintiff Wenning

#### a. 2011 Housing Court Proceeding

**\*2**  Since at least 2005, and continuing into 2011, Wenning was the tenant in a rent-stabilized apartment at 208 East 82nd Street, Apt. 31, New York, NY 10028. Joint 56.1, ¶ 1. On or about November 15, 2010, Wenning's landlord, 82nd Street Associates LLC, notified her that it intended not to renew her lease, which was set to expire on February 28, 2011. *Id.* ¶¶ 3-4. The notice alleged, *inter alia*, that Wenning had not been using the apartment as her primary residence and had illegally sublet and/or assigned the apartment to another person. *Id.* ¶ 5. Wenning retained counsel. *Id.* ¶ 8.

On February 28, 2011, Wenning, her landlord, and their attorneys executed a "Stipulation of Settlement." *See* Dkt. 74 ("Scher Decl."), Ex. I ("Wenning Stip." or "Stipulation"). On or about March 11, 2011, the landlord commenced a proceeding in the Housing Part of the Civil Court of the City of New York ("Housing Court"), and soon thereafter filed the Stipulation there. Joint 56.1, ¶¶ 9, 11. In the Stipulation, Wenning consented to "a final judgment of possession" in the landlord's favor. Wenning Stip. ¶ 3. The Stipulation also provided that Wenning would be named as the respondent in the Housing Court proceeding,[2] *id.* ¶ 1, and would vacate the apartment by August 31, 2011, *id.* ¶ 5. Wenning further consented to pre-service of a Marshal's notice at any time after August 10, 2011, so that possession could be recovered on September 1 if Wenning had not, by then, vacated the apartment. *Id.* The landlord, in turn, agreed to waive Wenning's rent from March through July and to apply a security deposit toward the August rent. *Id.* ¶ 11.

[2]    The proceeding as instituted named the respondent as "Jane Doe." Joint 56.1, ¶ 10. Wenning testified that her understanding at the time was that her name would not "show up in anything." Scher Decl., Ex. F ("Wenning Dep."), at 48; *see id.* 48-51 (testifying that her counsel in the Housing Court proceeding —not her counsel in this case—told her she would not be listed as a party or "blacklisted").

On March 14, 2011, based on the Stipulation, the Housing Court entered a judgment of possession in the landlord's favor. Joint 56.1, ¶ 19; *see* Scher Decl., Ex. J ("Wenning Judgment"). Wenning voluntarily vacated and surrendered

possession of the apartment on or before August 31, 2011, and no warrant of eviction was executed to recover possession. Joint 56.1, ¶¶ 21, 168, 170.

#### b. Wenning's Efforts to Rent an Apartment

Wenning subsequently applied to rent a subsidized apartment at 510-550 West 45th Street, known as "Gotham West." *Id.* ¶ 22. Her application for the Gotham West lottery was handled by an organization called Common Ground Community Housing Development Fund Corporation, Inc. ("Common Ground"). *Id.* ¶ 23. On or about May 12, 2014, Common Ground obtained a tenant screening report on Wenning from On-Site. *Id.* ¶ 24; *see* Scher Decl., Ex. K ("Wenning Report"). The Wenning Report, which stated that it contained information "accurately copied from public records," included information relating to Wenning's 2011 Housing Court proceeding.[3] Joint 56.1, ¶ 176. It set out the case number, the court, and the filing date, and listed Wenning's landlord as the "plaintiff" and Wenning as the "defendant." *See* Wenning Report. Most relevant here, it described the "Case Type"[4] as "Forcible Entry/Detainer" (highlighted in yellow) and described the "Judgment" as "For Plaintiff."[5] *See id.;* Joint 56.1, ¶ 175. At the bottom of the Housing Court section, the Report stated that "[a] housing court record does not necessarily mean that a tenant owed rent or was evicted from an apartment." *See* Wenning Report.

[3]    It also included other information, such as criminal history and credit history. None of this other information reflected negatively on Wenning. *See* Joint 56.1, ¶¶ 172-73; Wenning Report.

[4]    On-Site's website provided customers with a glossary stating that "[t]he Case Type field shows the type of case this record contains, which will concern recovery of rent, compliance with the terms of the lease, or gaining possession of an apartment." Scher Decl., Ex. JJ.

[5]    For unknown reasons, perhaps a clerical error, the filing date is listed as April 2011 rather than March and the judgment date is May 14, 2011 rather than March 14, 2011.

**\*3**  Common Ground and/or Gotham West had set their tenant-screening criteria to automatically "fail" any

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

prospective tenant who had any housing court record collected by On-Site. *See* Joint 56.1, ¶ 25. [6] On this basis, Wenning's application failed, and on or about May 15, 2014, Denise St. Just-Cordero of Common Ground informed Wenning that her application for an apartment through the Gotham West lottery had been rejected. *Id.* ¶ 28. Just-Cordero told Wenning, *inter alia,* that Common Ground generally sees the term "Forcible Entry/Detainer" used "in situations where landlords institute a case against a tenant to have them removed from the apartment/lease." Scher Decl., Ex. M (email of May 15, 2014, 6:16 p.m.). Common Ground also gave Wenning a formal notice of rejection that listed, as the reason for rejection, "Housing court record – April 2011 – 'Forcible Entry/Detainer.' " *Id.,* Ex. N ("Wenning Rejection Letter"). However, Just-Cordero encouraged Wenning to appeal her rejection. Joint 56.1, ¶ 35.

[6]     Plaintiffs object that there is "no proffered evidence as to the prospective landlord's intent regarding setting screening criteria." Joint 56.1, ¶ 25. But plaintiffs ignore Exhibit L to the Scher Declaration, which purports to be "a true copy of the screening criteria settings" for the Gotham West lottery. Scher Decl. ¶ 14. There is no claim that this exhibit is inadmissible or that it inaccurately reflects the screening criteria that were set. And the landlord's subjective intent, which plaintiffs emphasize, is not relevant. Therefore, under Local Rule 56.1(c)-(d), the Court takes as true the proposition proffered by On-Site at Joint 56.1, ¶ 25.

A few days later, Wenning retained the services of her present counsel to aid in that appeal. *Id.* ¶ 36. Counsel promptly contacted On-Site to obtain a copy of the Wenning Report. *Id.* ¶¶ 37-38. Counsel also contacted Wenning's former landlord's attorney, seeking the landlord's consent to a stipulation vacating the Wenning Judgment, as well as a letter of reference for Wenning. *See id.* ¶¶ 39-40. On or about May 21, 2014, the landlord's counsel executed the stipulation and Wenning's counsel filed it with the Housing Court, copying On-Site. *See id.* ¶¶ 42-43.

On or about May 22, 2014—one week after Wenning first learned about the problem with her On-Site report—On-Site generated an amended screening report that no longer contained any reference to the Housing Court proceeding, and provided that report to Wenning's counsel. *Id.* ¶ 45. Wenning then forwarded the amended report to Common Ground. *Id.* ¶ 46. Finally, on May 28, 2014—13 days after Wenning's

application was denied—Wenning was approved as a tenant at Gotham West. *Id.* ¶ 47.

### c. Wenning's Reaction to Learning of the On-Site Report

In her deposition, Wenning repeatedly testified that, when she heard the term "Forcible Entry/Detainer" used to describe her 2011 Housing Court proceeding, she felt she was being called a criminal. *See* Wenning Dep. 55-57, 59, 82, 129; *see also id.* at 145 ("Forcible Entry/Detainer, comes across like, oh my God, what did I do? Somebody is just going to — some marshall [sic] is going to stampede in my apartment and pull me out by the hair."); *see id.* at 56 (similar testimony). She testified that she was "blindsided" because "[e]verything was perfect" with her application and she could "almost taste having a lease of [her] own." *See id.* at 57, 82. The words "Forcible Entry/Detainer" rung in her ears. *See id.* at 57, 139. She was "highly embarrassed" and "humiliated." *See id.* at 57, 83. She "had a meltdown and cried hysterically" and "was in a complete upset panic." *Id.* at 83, 117. She "became totally unglued" and her "world came apart." *Id.* at 81-82. Her life "was turned into hell" and she suffered "horrible distress" as she "[came] up against a very intimidating process" that required her "to go through hell and high water to turn it around." *Id.* at 130-32.

Wenning did not obtain medical treatment relating to this distress. Joint 56.1, ¶ 48. She testified that she "could have used some therapy," Wenning Dep. 143, but could not afford it. *See id.* 145-46.

### 2. Plaintiff Correa

**\*4** Correa's story is quite similar to Wenning's, at least in its essential facts.

#### a. 2012 Housing Court Proceeding

In 2012, Correa had been the subtenant of a rent-stabilized apartment at 309 West 57th Street, Apt. 1208, New York, NY for about four years. Joint 56.1, ¶ 49. Alexander Scroczynski was the prime tenant of the apartment; he sublet the apartment to Correa, and Correa believed that Scroczynski had the landlord's consent to do so. *Id.* ¶¶ 50, 181. On or about January 3, 2012, Correa's landlord mailed a Notice to

2016 WL 3538379

Cure to Scroczynski's attention at Apt. 1208, alleging that Scroczynski was subletting the apartment without consent. *Id.* ¶¶ 52-53. On or about January 27, 2012, the landlord mailed a Notice of Termination, stating that Scroczynski's tenancy would be terminated effective February 10, 2012 because he had failed to cure the defects cited in the Notice to Cure. *Id.* ¶¶ 56-57. On or about February 15, 2012, the landlord commenced a proceeding in Housing Court, identifying "Andres 'Doe' " as a "Respondent-Undertenant." *Id.* ¶¶ 59-60.

On or about February 28, 2012, Correa and the landlord executed a Stipulation of Settlement. *Id.* ¶ 63; *see* Scher Decl., Ex. S ("Correa Stip." or "Stipulation"). In the Stipulation, Correa acknowledged that he was being sued as "Andres 'Doe' " and consented to the entry of final judgment of possession in the landlord's favor. [7] Correa Stip. ¶¶ 2, 4. The landlord agreed to allow Correa to remain in possession of the apartment through October 31, 2012, provided he pay rent at the rent-stabilized rate. *Id.* ¶ 4. On or about March 30, 2012, the Housing Court entered a judgment of possession in the landlord's favor and against both Scroczynski and Correa. Joint 56.1, ¶ 68; *see* Scher Decl., Ex. T ("Correa Judgment"). Correa vacated the apartment on or before October 31, 2012, and a warrant of eviction was never executed to recover possession of the apartment. Joint 56.1, ¶¶ 79, 191.

[7]    Correa's Stipulation, unlike Wenning's, did not contemplate amendment of the case caption to reflect Correa's full name. *Compare* Wenning Stip. ¶ 2 ("The Petition is amended to include Deborah Wenning as a party Respondent and she is substituted in place of Jane Doe."), *with* Correa Stip. ¶ 2 ("Respondent Andres Correa ... waives any and all objections or defenses ... to a judgment being entered and enforced against him under the name 'Andres Doe', and acknowledges that petitioner has commenced this proceeding against him under the name 'Andres Doe' with his express consent and for his benefit."). It thus appears that Correa took reasonable steps to ensure that a judgment would not be entered against him by name. The record does not disclose why the Housing Court's judgment was ultimately entered against Correa by name, which initiated the chain of events leading to this action.

### b. Correa's Efforts to Rent an Apartment

Two subsequent housing applications by Correa are at issue in this suit.

#### i. Chelsea Park Application

In late 2012, Correa applied to rent an apartment in the building known as Chelsea Park, located at 260 West 26th Street, New York, NY. *Id.* ¶ 81. On or about April 4, 2013, the managing agent for the Chelsea Park landlord obtained a tenant-screening report on Correa from On-Site. *Id.* ¶ 83. [8] The Chelsea Park managing agent set its tenant-screening criteria to automatically "fail" prospective tenants with any housing court record. *Id.* ¶ 84. [9]

[8]    The report itself has not been produced.

[9]    For the reasons stated in footnote 6, and also because the fact is admitted at JSF ¶ 72, the Court takes this fact as true.

**\*5** On April 4, 2013, Correa met with the managing agent, who informed him that the On-Site report revealed that he had been involved in a Housing Court action. *Id.* ¶ 85. Correa contacted the attorney he had retained in connection with the Housing Court proceeding, who wrote a letter to the managing agent explaining the circumstances. *See id.* ¶¶ 87-88. Correa also emailed his former landlord's attorney requesting consent to a stipulation vacating the Judgment, which was denied. *Id.* ¶ 89. On October 16, 2013, the managing agent advised Correa that, to continue the application process, he needed to have the Housing Court record removed from his report. *Id.* ¶ 92. Therefore, Correa again sought his former landlord's consent to vacate the Judgment against him, and again was denied. *Id.* ¶¶ 96-97.

Eventually, Correa received a Notice of Adverse Action from Chelsea Park, dated June 12, 2014. *Id.* ¶ 98; Scher Decl., Ex. Z ("Chelsea Park Rejection"). It explained that Chelsea Park could not offer Correa a lease because his On-Site report "include[d] a landlord tenant court record or you owe money to a previous landlord." Chelsea Park Rejection ¶ 3.

#### ii. The Prince George Application

2016 WL 3538379

In or about May 2013, Correa applied to rent an apartment in the building known as the Prince George, located at 14 East 28th Street, New York, NY. Joint 56.1, ¶ 100. The managing agent for the Prince George's landlord was Common Ground. *Id.* ¶ 101. In or about June 2014—around the same time Correa received the Chelsea Park Rejection—Common Ground informed him that his name had reached the top of the waiting list and that they would proceed with a credit report. *Id.* ¶ 102. On or about June 11, 2014, Common Ground obtained a tenant-screening report on Correa from On-Site. *Id.* ¶ 103; *see* Scher Decl., Ex. AA ("Correa Report"). The Report stated that Correa was a "defendant" in a case brought by his landlord in February 2012. *See* Correa Report. It described the "Case Type" as "Forcible Entry/Detainer"; stated that a judgment had been entered for the landlord on March 30, 2012; and, in relevant part, was otherwise identical to the Wenning Report discussed above. *See* Joint 56.1, ¶ 201.

Common Ground, on behalf of the Prince George, also set its tenant-screening criteria to automatically "fail" prospective tenants with any housing court record. *Id.* ¶ 104. [10] On or about June 12, 2014, Common Ground informed Correa that, because the Correa Report revealed the existence of a Housing Court record, his application would be rejected. *Id.* ¶ 107. On or about June 13, 2014, Correa received a Notice of Adverse Action from the Prince George's landlord stating that his application was rejected because the Correa Report "include[d] a landlord tenant court record or you owe money to a previous landlord." *Id.* ¶¶ 111-12; *see* Scher Decl., Ex. DD ("Prince George Rejection").

[10]    For the reasons stated in footnote 6, this statement is taken as true.

Meanwhile, Correa obtained a copy of his On-Site report. *See id.* ¶¶ 109-10. Correa also retained his present counsel, who contacted his former landlord's attorney to, again, seek consent to vacate the Judgment against him. *See id.* ¶¶ 113-14. The landlord's attorney, this time, executed such a Stipulation. *Id.* ¶ 115; *see* Scher Decl., Ex. FF. On or about June 25, 2014, counsel filed the Stipulation and provided a copy to On-Site. *Id.* ¶ 116.

On-Site shortly thereafter generated, and provided to Correa's counsel, an amended report that omitted all references to the 2012 Housing Court proceeding. *Id.* ¶ 118.

*c. Correa's Reaction to Learning of the On-Site Report*

At his deposition, Correa testified that, when he heard he had been "blacklisted," *i.e.,* that he was denied an apartment because of his Housing Court record, it was "shocking" because he had "never done anything wrong." Scher Decl., Ex. G ("Correa Dep."), at 81. Indeed, Correa testified that when he was told that a Housing Court record had turned up, he "almost fainted." *Id.* at 85. Correa was concerned about his professional reputation as a journalist because of the implication that he had lied. *See id.* at 82; *see also id.* at 51-52 ("[C]redibility is everything for me. I made a living about telling the truth and helping people to tell the truth ... and I didn't want to end up with my name on the wrong list."). Correa also testified that he "got depressed" and for a time stopped applying for apartments because he thought he would have to go through the same "humiliating" and accusatory process. *Id.* at 83-84. As for Correa's reaction to the term "Forcible Entry/Detainer," he testified: "I still don't understand what that means. It must be terrible because forcible means to force something.... [I]t was terrible. Because forcible means that I did something against the law, that I forced something. That is what scared me when I read that. And that was totally inaccurate because I didn't do anything wrong." *Id.* at 91, 129. Correa also testified that the years since these events have been "a nightmare"—he has moved frequently, lost weight, started losing his hair, and almost lost his voice "because [of] the stress." *Id.* at 132.

### 3. On-Site's Procedures for Producing Tenant-Screening Reports

**\*6**  On-Site, a California-based company, provides tenant-screening services to landlords, managing agents, and rental agents across the United States. *See* Joint 56.1, ¶¶ 120-21. On-Site's reports cover a variety of areas, including public housing court records. *See id.* ¶ 122. On-Site's New York City business includes preparing tenant reports containing information about New York City Housing Court records, which are used in connection with rental applications by prospective tenants. *Id.* ¶ 210-11.

Since 2009, On-Site has obtained data relating to New York City Housing Court proceedings from LexisNexis Risk Data Retrieval Services LLC and its successors ("Lexis"). *Id.* ¶ 123. Before that, On-Site purchased Housing Court data directly from the New York State Office of Court

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 186 of 238
Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 3538379

Administration ("OCA"). *Id.* ¶ 124. Lexis is an established and experienced vendor, and On-Site believed it a reputable source of accurate information concerning Housing Court proceedings. *Id.* ¶¶ 125-26. Lexis obtains information directly from the paper files in the Housing Court clerk's office, which it translates into a daily stream of data made available to companies like On-Site. *Id.* ¶¶ 129-30. On-Site monitors complaints regarding the accuracy of the data obtained from Lexis. *Id.* ¶ 128.

Important here, Lexis uses the term "Forcible Entry/Detainer" to refer to proceedings in the New York City Housing Court —and housing courts across the country—that have resulted in the entry of a nonmonetary judgment of possession. *Id.* ¶ 134; *see* Scher Decl., Ex. H ("Johnson Dep."), at 94. However, there is evidence, including testimony from two On-Site executives, that term is not used in the New York City Housing Court. *See id.,* Ex. D ("Basart Dep."), at 35-36; *id.,* Ex. E ("Jones Dep."), at 124. Indeed, before 2009, when On-Site used the OCA's data, it used the term "holdover" to refer to such proceedings. Joint 56.1, ¶¶ 217-18. Since 2012, On-Site has used the term "Forcible Entry/Detainer" in 19 reports to refer to a New York City Housing Court proceeding. *Id.* ¶ 144. Before this action was filed, On-Site had not received any complaints (formal or informal) regarding the accuracy of that term. *Id.* ¶ 145. After this action was filed, On-Site changed its terminology; in lieu of "Forcible Entry/Detainer," it now uses the term "Civil Action for Possession." *Id.* ¶ 146.

On-Site's clients use a website to access its tenant-screening reports. They can use factors like income, credit history, bankruptcies, residency history, and criminal history to assist in screening these reports. *Id.* ¶ 148. Within the residency history category, On-Site's clients can choose to look at whether there are any "landlord tenant court records or unpaid landlord collections" going back as far as seven years. *Id.* ¶¶ 154-55. Clients are given the option to "ignore dismissed or satisfied records" or to "ignore filings only." *Id.* ¶ 156. They can also choose how many landlord-tenant court records they are unwilling to tolerate, ranging from "any number" to "more than 5." *Id.* ¶ 157. Finally, clients can rate the importance of housing court records on a scale from "not considered" to "pass/fail." *Id.* ¶ 158. Setting it to "pass/fail" results— and clients are advised that it will result—in an automatic recommendation of rejection. *Id.* ¶ 159. After clients set their criteria and parameters, On-Site produces a "scorecard" that summarizes the results. *Id.* ¶ 150.

**B. Procedural History**

On December 9, 2014, plaintiffs filed the initial Complaint in this case. Dkt. 1. On February 3, 2015, plaintiffs filed an Amended Complaint. Dkt. 3. On February 23, 2015, On-Site answered. Dkt. 6. On August 21, 2015, plaintiffs filed a Second Amended Complaint, removing, pursuant to a stipulation between the parties, a paragraph in the Amended Complaint seeking legal fees. Dkt. 37 ("SAC"). On September 29, 2015, On-Site answered. Dkt. 42.

**\*7** On January 12, 2016, On-Site moved for summary judgment. Dkt. 69. On-Site filed a brief in support, Dkt. 71 ("On-Site Br."); a Local Rule 56.1 Statement of Undisputed Facts, Dkt. 73 ("On-Site 56.1"); and the declaration of Brett A. Scher and attached exhibits, Dkt. 74 ("Scher Decl.").

On January 29, 2016, plaintiffs moved for partial summary judgment on their " 'Forcible Entry/Detainer' claim." Dkt. 78. As their accompanying brief clarified, plaintiffs sought judgment as a matter of law that the use of the term "Forcible Entry/Detainer" in plaintiffs' On-Site reports violated the FCRA and NYFCRA. *See* Dkt. 79 ("Pl. Br.") at 11-18. Plaintiffs also opposed granting summary judgment for On-Site on the SAC's other allegations of inaccuracies in the reports. Plaintiffs submitted a Local Rule 56.1 Statement of Undisputed Facts, Dkt. 80 ("Pl. 56.1"), and the declarations of James B. Fishman, Dkt. 81 ("Fishman Decl."); Deborah Wenning, Dkt. 82 ("Wenning Decl."); Andres Correa, Dkt. 83 ("Correa Decl."); and Alia Razzaq, Dkt. 84 ("Razzaq Decl.").

On February 12, 2016, On-Site filed a reply/opposition brief, Dkt. 88 ("On-Site Reply Br."); the Joint 56.1; a supplemental declaration of Brett A. Scher, Dkt. 86 ("Scher Supp. Decl."); and a declaration of Eric Basart, Dkt. 87 ("Basart Decl."). On February 29, 2016, plaintiffs filed a reply brief, Dkt. 90 ("Pl. Reply Br."). On March 31, 2016, the Court heard argument. Dkt. 98 ("Tr.").

**II. Applicable Legal Standards**

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v.*

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 187 of 238

*Goord,* 554 F.3d 255, 266 (2d Cir. 2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010). (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " *Cariou v. Prince,* 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993)).

## III. Discussion

**\*8** The Court begins by outlining the legal framework of the Fair Credit Reporting Act, focusing on the provision at issue here, 15 U.S.C. § 1681e(b), which mandates the use of reasonable procedures to assure accuracy in credit reports. [11] The Court then reviews the elements of § 1681e(b) claims, both those sounding in negligence and those sounding in willfulness. Finally, the Court turns to the claim under NYGBL § 349.

[11]     The Court does not separately address the NYFCRA. Its substantially similar language is construed the same as the FCRA's. *SeeOgbon v. Beneficial Credit Servs., Inc.,* No. 10 Civ. 3760 (PAE), 2013 WL 1430467, at \*7 n.6 (S.D.N.Y. Apr. 8, 2013) (citing *Scott v. Real Estate Fin. Grp.,* 183 F.3d 97, 100 (2d Cir. 1999)).

### A. FCRA Legal Framework
"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system,

and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 52 (2007). "The FCRA creates a private right of action against credit reporting agencies for the negligent or willful violation of any duty imposed under the statute." *Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 473 (2d Cir. 1995) (citing 15 U.S.C. §§ 1681*o* & 1681n) (citations omitted). The duty at issue in this case is imposed by 15 U.S.C. § 1681e(b), which provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

To prevail on a *negligence* claim under this provision, a plaintiff must establish that: (1) the consumer reporting agency ("CRA") reported inaccurate information about the plaintiff; (2) the CRA was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (3) the plaintiff was injured; and (4) the CRA's negligence caused t he plaintiff's injury. *Gorman v. Experian Info. Sols., Inc.,* No. 07 Civ. 1846 (RPP), 2008 WL 4934047, at \*4 (S.D.N.Y. Nov. 19, 2008) (citing *Whelan v. Trans Union Credit Reporting Agency,* 862 F. Supp. 824, 829 (E.D.N.Y. 1994)). Thus, succinctly stated, the elements of a negligence claim are (1) inaccuracy, (2) failure to follow reasonable procedures, (3) actual damages, and (4) causation. [12] A plaintiff who prevails on a negligence claim is entitled to actual damages and costs. *See*15 U.S.C. § 1681*o.*

[12]     There is no dispute about other precursors to such a claim. For instance, it is undisputed that On-Site is a "consumer reporting agency" and that it produced a "consumer report" as those terms are defined under the FCRA.

By contrast, a plaintiff who prevails on a willfulness claim is entitled to (1) either actual damages *or* statutory damages between $100 and $1,000; (2) punitive damages; and (3) costs. *See id.*§ 1681n; *Northrop v. Hoffman of Simsbury, Inc.,* 12 Fed.Appx. 44, 50 (2d Cir. 2001) (summary order) ("Actual damages are not a statutory prerequisite to punitive damages."). Thus, the elements of a willfulness claim are (1) inaccuracy and (2) a failure to follow reasonable procedures that is (3) knowing or reckless. *See*Safeco, 551 U.S. at 57-58 ("willfulness" in FCRA encompasses both knowing and reckless violations).

### B. Negligence Claim

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 188 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

As noted, the elements of a negligence claim under § 1681e(b) are (1) inaccurate information, (2) failure to follow reasonable procedures to assure accuracy, (3) actual damages, and (4) causation. The Court examines these elements in turn.

**\*9** Ultimately, the Court holds that, while plaintiffs have submitted sufficient evidence to reach a jury as to the elements of inaccuracy and unreasonableness in On-Site's use of the term "Forcible Entry/Detainer" to describe plaintiffs' Housing Court proceedings, their negligence claims founder on the elements of damages and causation.

### 1. Inaccurate Information

#### a. Legal Standards

The overwhelming weight of authority holds that a credit report is inaccurate under § 1681e(b) either "when it is patently incorrect *or* when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Dalton v. Capital Associated Indus., Inc.,* 257 F.3d 409, 415 (4th Cir. 2001) (quoting *Sepulvado v. CSC Credit Servs.,* 158 F.3d 890, 895 (5th Cir. 1998)) (alterations and internal quotation marks omitted) (emphasis added); *see also Schweitzer v. Equifax Info. Sols.LLC,* 441 Fed.Appx. 896, 902 (3d Cir. 2011); *Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 890-91 (9th Cir. 2010); *Koropoulos v. Credit Bureau, Inc.,* 734 F.2d 37, 40 (D.C. Cir. 1984). Although the Second Circuit has not yet addressed the issue, district courts in this Circuit have adopted this "materially misleading" test. *See, e.g.,Fitzgerald v. Chase Home Fin., LLC,* No. 10 Civ. 4148 (CS), 2011 WL 9195046, at \*10 (S.D.N.Y. Feb. 28, 2011).[13] Only one Circuit has clearly adopted the competing "technical accuracy" test. *SeeDickens v. Trans Union Corp.,* 18 Fed.Appx. 315, 318 (6th Cir. 2001).[14] On the strength of this authority, this Court adopts the "materially misleading" standard.

[13]    Three other Circuits have noted the issue but left it unresolved. *SeeTaylor v. Tenant Tracker, Inc.,* 710 F.3d 824, 827 n.2 (8th Cir. 2013); *Ray v. Equifax Info. Servs., LLC,* 327 Fed.Appx. 819, 826 n.3 (11th Cir. 2009); *Henson v. CSC Credit Servs.,* 29 F.3d 280, 285 n.4 (7th Cir. 1994).

[14]    Under this test, a CRA "satisfies its duty" under § 1681e(b) if its report "contains factually correct information about a consumer that might nonetheless be misleading or incomplete in some respect." *Dickens,* 18 Fed.Appx. at 318 (quoting *Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1157 (11th Cir. 1991)). The Eleventh Circuit's decision in *Cahlin* is sometimes cited as adopting the technical accuracy test, but did no such thing; it merely explained the differing approaches. *See* 936 F.2d at 1157. In 2009, the Eleventh Circuit stated that it has "not yet adopted either model." *Ray,* 327 Fed.Appx. at 826 n.3.

Under that test, mere imprecision—such as reporting that a plaintiff had "5 or more" late payments on an account rather than six—does not render information actionable. *Wagner v. TRW, Inc.,* 139 F.3d 898, 1998 WL 127812, at \*1 (5th Cir. 1998) (per curiam). Rather, a plaintiff must establish that the information provided by the CRA is "open to an interpretation that is directly contradictory to the true information." *Id.*

#### b. Application

Plaintiffs identify a host of alleged inaccuracies in their On-Site reports. They primarily focus on (1) the use of the term "Forcible Entry/Detainer" to describe the Housing Court proceedings in which plaintiffs were parties. *See* Pl. Br. 13-15. But they also challenge (2) the omission of "mitigating information," *e.g.,* that the plaintiffs had agreed before the initiation of Housing Court proceedings that they would voluntarily vacate their apartments, *seeid.* at 19-20; (3) the references to the parties in those proceedings as "plaintiffs" and "defendants," rather than "petitioners" and "respondents," *seeid.* at 18; and (4) "incorrect terms and misleading credit score[s]" in the Notices of Adverse Action that informed plaintiffs that their applications had been denied, *id.* at 21. The Court addresses these four asserted inaccuracies in turn.

##### i. "Forcible Entry/Detainer"

**\*10** On-Site argues that the term "Forcible Entry/Detainer" is a term of art and, as such, is not materially misleading. *See* On-Site Br. 4-5. According to On-Site, the term has common-law roots and is still used in various jurisdictions in the United States to describe "a summary proceeding to recover possession of premises forcibly or unlawfully detained." *Id.* at 4 (quoting http://thelawdictionary.org/forcible-entry-and-detainer).And, On-Site argues, its landlord clients are

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 189 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

familiar with this "prevailing industry verbiage" and would not assume a tenant involved in such a proceeding acted violently or forcefully, or that force was necessary to recover the apartment from the tenant. *Id.* at 6. Plaintiffs, in response, argue that the term, on its face, is inaccurate as applied to them. And, they emphasize, the term is not actually used in New York City Housing Court; rather it is a gloss that LexisNexis attached to certain cases, and which On-Site then reproduced. *See* Pl. Br. 13-14.

For the reasons that follow, in the Court's view, a reasonable jury could resolve the "materially misleading" element for either party. On On-Site's summary judgment motion, the record must be construed in the light most favorable to plaintiffs. Plaintiffs have adduced sufficient evidence to prevent summary judgment from being granted on this point for On-Site, because a reasonable jury could find that the term "Forcible Entry/Detainer" was misleading to an extent that it could be expected to have an adverse effect on the tenant whom On-Site thus described.

First, it is essentially undisputed that the term "Forcible Entry/Detainer" is not in the New York City Housing Court's lexicon. *See* Fishman Decl., Ex. B ("Scherer Report"), at 13; [15] Jones Dep. 124 (On-Site's chief technology officer testifying, "I don't believe that's a term that's used in New York."). On-Site's own witness, Eric Basart, testified that the typical terms used in Housing Court to describe eviction proceedings are "nonpayment" and "holdover." Basart Dep. 35-36. [16] Basart also conceded—in a clear understatement—that the term "Forcible Entry/Detainer" "likely" did not appear in the relevant public records in *this* case. *Id.* at 35.

[15]     On-Site misses the mark with its passing contention that Scherer "has no relevant expertise for the purposes of this case" because he "does not proffer that he is knowledgeable in the Fair Credit Reporting Act, credit reporting, or the tenant screening business." On-Site Reply Br. 3 n.2. Plaintiffs proffer Scherer as an expert in "New York landlord-tenant and housing law." Scherer Report 3. That field of expertise is relevant to this case. A finder of fact could fairly rely on Scherer's report for its analysis of that field.

[16]     "Nonpayment" describes cases brought because a tenant has allegedly failed to pay rent. "Holdover" describes cases where a landlord seeks to remove

the tenant for another reason, including the expiration of the tenancy. *See* Scherer Report 13.

Notably, where the term "Forcible Entry/Detainer" *is* used in New York law, it is used in an entirely different context —to describe a wrong committed by a landlord against a tenant. Section 853 of the New York Real Property Actions and Proceedings Law ("RPAPL") provides a damages cause of action for "forcible or unlawful entry or detainer" if an occupant is "put out of real property in a forcible or unlawful manner." N.Y. Real Prop. Acts. Law § 853; *see also Walls v. Giuliani,* 916 F. Supp. 214, 218 (E.D.N.Y. 1996) (recognizing that "Forcible Entry and Detainer" statutes "provide a remedy for occupants who are forcibly removed from real property"); *Rostant v. Swersky,* 912 N.Y.S.2d 200, 202 (1st Dep't 2010) (§ 853 provides treble damages for "wrongful eviction"). The New York State Supreme Court, and not the New York City Housing Court, has jurisdiction over such lawsuits. *See* Scherer Report 13; *Rostant,* 912 N.Y.S.2d at 201.

On-Site nevertheless argues that "Forcible Entry/Detainer" is essentially synonymous with what New York City courts call "holdover" proceedings, ones where the landlord seeks to remove the tenant for a reason other than non-payment of rent. *See* Basart Dep. 36 (comparing the use of these different terms to saying "12 eggs" as opposed to "a dozen eggs"); On-Site Br. 4-5. On-Site notes that many other states use the term "Forcible Entry/Detainer" to describe such proceedings. *See* Scher Decl., Ex. C ("Kuehn Report"), at 8 (citing Arizona, Illinois, Iowa, Maine, Nebraska, New Mexico, Ohio, Oklahoma, South Dakota, and Wyoming statutes). But plaintiffs have produced evidence that, whatever the practice is in those distant states, in New York City, "Forcible Entry/Detainer" is not at all synonymous with a holdover proceeding, but connotes something very different.

**\*11** In this case, the Court holds, a reasonable jury could find the local understanding of that term (*i.e.,* its meaning in New York City) to be the relevant metric for determining whether its use was accurate as opposed to materially misleading. Plaintiffs' Housing Court proceedings occurred in New York City, and the audience for plaintiffs' On-Site reports was, after all, New York City landlords. And, as plaintiffs note, such an audience—lacking any experiential basis for treating the term "Forcible Entry/Detainer" as synonymous with a holdover proceeding — could easily misconstrue it to connote that the landlord had been compelled to expel the tenant by force. As such, a reasonable jury could find that this evocative term inaccurately described the consensual proceedings to which Wenning and Correa were party, in which the Housing Court

2016 WL 3538379

did no more than so-order stipulations between a tenant and a landlord. The jury could also find that the term "Forcible Entry/Detainer" could be expected to cause reasonable New York City landlords to view prospective tenants negatively or to exclude them from consideration altogether. That is particularly so because the term does describe other New York City court proceedings, ones involving the use of force (by a landlord).

This holding does not oblige every CRA to replicate scrupulously the precise terms used in every housing court across the country. Jurisdictions assuredly use a variety of trivially distinct terms to describe the same underlying concepts, and a CRA is at liberty to use umbrella term to capture similar actions. Mere imprecision that is not materially misleading does not amount to an "inaccuracy" under the FCRA. Here, however, a reasonable jury could find a materially misleading statement. It could find that the term applied by On-Site falsely conveyed a degree of tenant intransigence—necessitating a forcible removal—that for the tenant could serve as a scarlet letter in the eyes of future landlords.

On-Site counters that landlords are "sophisticated parties" who would understand that a "Forcible Entry/Detainer" notation connotes a run-of-the-mill, peaceable holdover proceeding. *See* On-Site Br. 8-9. That argument, however, is properly directed to a jury, not to a court for a conclusive judgment as a matter of law. The summary judgment record certainly does not compel such a finding. On the contrary, On-Site's suggestion that New York City landlords widely understand this term is an *ipse dixit*, lacking empirical support. And it is all the more implausible because, to the extent that term is used at all in New York courts, it describes an action far afield from (and far more contentious than) a holdover proceeding resolved consensually by stipulation: an action by an occupant seeking damages for a landlord's wrongful, and perhaps forcible, eviction.

Further, the two cases that On-Site cites on this point are inapposite. In the first, *Dickens v. Trans Union Corp.*, the Sixth Circuit, applying the defendant-friendly "technical accuracy" standard which this Court has rejected, upheld a grant of summary judgment for Trans Union. Dickens had argued that his credit report was "misleading" because it described a car loan that Dickens had co-signed for his daughter as "Included in Bankruptcy" without specifying that it was not Dickens, but his daughter, who filed for bankruptcy, and because it listed the loan as "Charged Off as Bad Debt"

without indicating that the loan later was paid in full. 18 Fed.Appx. at 318. Dickens did not dispute that the report was technically accurate. He urged the Court instead to adopt the "materially misleading" test. *See id.* The Sixth Circuit rejected that invitation, while noting in *dicta* that the report was not misleading because it also accurately described Dickens as a "participant" on the relevant account, and there was "no question" that the bank that later denied Dickens's credit card application accurately "understood Dickens's role in the bankruptcy proceeding." *Id.*

In the second case cited by On-Site, *Toliver v. Experian Information Solutions, Inc.*, a district court granted summary judgment for Experian on the ground that an entry in Toliver's credit report regarding a credit card account on which Toliver had defaulted six years earlier and later charged off was not materially misleading. 973 F. Supp. 2d 707, 710-11 (S.D. Tex. 2013). Relevant here, Toliver argued that a code stating that her account was "open" was inaccurate. *Id.* at 718. She claimed that the term "open" could be misconstrued to suggest the account had not been charged off, but rather was "a fresh and new delinquency from the original lender." *Id.* (quoting the complaint). However, "open" was a term of art with a defined meaning for the target audience: It was defined in the Credit Reporting Resource Guide ("CRRG") to refer to "accounts where the entire balance is due upon demand or that have one payment due as scheduled." *Id.* The CRRG also noted that the term "open" was used not just by original lenders, but by various non-original creditors, including debt buyers like the one that had reported Toliver's debt to Experian. *See id.* at 719. And another code on the report accurately reflected that Toliver's account had been assigned to collections. *See id.* Because these codes were "well-defined and the definitions known and accessible to those in the credit reporting industry," the district court held that the codes were not misleading. *Id.*

**\*12** These precedents are readily distinguished, so as not to avail On-Site here. [17] Unlike in *Dickens* and *Toliver*, plaintiffs have persuasively explained why a reasonable jury could find the term "Forcible Entry/Detainer" materially misleading to the relevant audience. The connotations of struggle or resistance inherent in the term "Forcible Entry/ Detainer," in particular in the embedded term "forcible," make it a question of fact whether the term would likely mislead a potential landlord, to the detriment of the prospective tenant so described. A reasonable jury could find that a New York City landlord weighing a prospective tenant who had been party to a housing case involving "forcible

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 191 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

entry" would conclude that some physical intervention had been necessary to wrest possession from the tenant, and therefore would be wary to rent to such a person. [18] Such a landlord, a jury could find, might not appreciate that On-Site intended such terminology to connote a peaceable holdover proceeding. Put differently, the label that On-Site applied to Wenning's and Correa's housing court cases is sufficiently "open to an interpretation that is directly contradictory to the true information" regarding these tenants to support a jury finding that it is inaccurate. *Wagner,* 1998 WL 127812, at *1. [19]

[17]     On-Site argues that the "critical inquiry" is whether prospective New York landlords would understand the term "Forcible Entry/Detainer" to refer to Housing Court proceedings like plaintiffs'. *See* On-Site Reply Br. 3. The Court assumes *arguendo* that landlords are indeed the relevant audience. That said, where, as here, plaintiffs seek emotional damages caused by *their* misunderstanding of the term "Forcible Entry/Detainer," the relevant audience in assessing whether On-Site's terminology was materially misleading may, arguably, also include other expected readers of the reports, including the prospective tenant himself or herself. The Court has no occasion to resolve here the issue of the proper definition of the audience because, even adopting On-Site's definition, the record does not support summary judgment for On-Site on this element.

[18]     Notably, plaintiffs were not required to prove that any recipient was *actually* misled by this term. *See Dalton,* 257 F.3d at 415 (information must be "misleading in such a way and to such an extent that it *can be expected* to have an adverse effect") (quoting *Sepulvado,* 158 F.3d at 895) (alterations and internal quotation marks omitted) (emphasis added). Evidence that the inaccuracy did not actually mislead the relevant actors in a specific case would instead bear on the separate element of causation.

[19]     As neither party has adduced survey evidence showing how a New York City audience (whether limited to landlords or defined more broadly) would understand On-Site's terminology, it is particularly appropriate to rely on such a common-

sense, plain-reading interpretation of the disputed term.

*Toliver* is particularly inapposite, because there is evidence that "Forcible Entry/Detainer" is *not* a term of art with an established usage either in the forum (New York City Housing Court) or industry (New York real estate) at issue. *Toliver* found no inaccuracy given the definitive guidance supplied by the Credit Reporting Resource Guide. Here, in contrast, the summary judgment record here does not reflect an authoritative industry guidebook or glossary accessible to New York City landlords in which the term "Forcible Entry/Detainer" is defined in a manner consistent with On-Site's usage. And a landlord's theoretical ability to run "a quick search using either Google or Bing" that might "allay any confusion" does not, as On-Site's expert urges, eliminate the risk of confusion. Kuehn Report 8 n.12. The glossary that On-Site made available to its customers clarified only that On-Site's housing court records pertained to civil suits between tenants and landlords concerning "recovery of rent, compliance with the terms of the lease, or gaining possession of an apartment." Scher Decl., Ex. JJ. That definition does not rule out the possibility that a tenant who had been party to a "Forcible Entry/Detainer" proceeding had resisted and had been ousted by means of force, resulting in either Housing Court proceedings brought by the landlord or, conceivably, a tenant's civil suit claiming wrongful eviction under RPAPL § 853. [20]

[20]     Strictly speaking, a legally fluent landlord would be more likely to infer that "Forcible Entry/Detainer" refers to a Housing Court proceeding, not a § 853 proceeding, for several reasons. First, in a § 853 action, Wenning and Correa (whom On-Site listed as defendants in the "Forcible Entry/Detainer" cases) would presumably have been described as plaintiffs, and their landlords as defendants. Second, because New York City Housing Court does not have jurisdiction over § 853 actions, On-Site's reports might not pick up such actions. *See* Scher Decl., Ex. JJ. Therefore, a sophisticated landlord would likely infer that the actions indicated in Wenning's and Correa's reports had been brought in Housing Court. The FCRA does not, however, cover only those inaccuracies capable of duping sophisticated audiences. In any event, whatever the forum or the style of the legal action, the implication of the term "Forcible

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 192 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

Entry/Detainer" is that the tenant resisted vacating, requiring the landlord to resort to force.

**\*13** For these reasons, plaintiffs have produced sufficient evidence to reach the jury on the question of whether the term "Forcible Entry/Detainer" is inaccurate within the meaning of the FCRA. At the same time, because a reasonable jury could also conclude, on this record, that a New York City landlord would *not* be materially misled by the term, plaintiffs' cross-motion for summary judgment must be denied.

### ii. Omission of Mitigating Information

Plaintiffs also argue that their On-Site reports were inaccurate because they omitted crucial mitigating information—to wit, that plaintiffs consented to the entry of judgment against them, that they did so before Housing Court proceedings were initiated, that the judgments were for possession only and not for money, and that plaintiffs fully honored their duty to vacate. *See* Pl. Br. 19-20; SAC at ¶ 97(e)-(h). On-Site, pursuing summary judgment on this point, counters that § 1681e(b) does not impose any obligation to report such mitigating information. On-Site Br. 11.

In making this categorical argument, On-Site appears to urge adoption of the "technical accuracy" test, because, under the "materially misleading" test adopted by most courts (and this Court), the omission of crucial context could render a report actionable. Indeed, this scenario, as courts have noted, compellingly favors the materially-misleading test. Otherwise, "a consumer reporting agency could report that a person was 'involved' in a credit card scam, and without regard to [§ 1681e(b)] fail to report that he was in fact one of the victims of the scam." *Alexander v. Moore & Assocs., Inc.,* 553 F. Supp. 948, 952 (D. Haw. 1982); *see also Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir. 1986) ("[A]ny person could easily have construed the notation 'Litigation Pending' as an indication that the plaintiff was being sued ... while the actual situation was the reverse."). The Court therefore rejects On-Site's argument that liability under the FCRA cannot be based on an omission that leaves a materially misleading impression. Of course, a CRA's report need not be all-inclusive: As the Fifth Circuit has explained, completeness is not required "separate and apart from whether a particular entry or report is misleading." *Sepulvado,* 158 F.3d at 896.

On-Site separately argues that it is not obliged to obtain mitigating information where doing so would be unduly burdensome. *See* On-Site Br. 11-12. There is force to that

argument, but it is germane not to the element of inaccuracy, but rather to the separate element of reasonableness. *See Sepulvado,* 158 F.3d at 896 (statute does not reflexively require a CRA to investigate and report underlying details; rather, reasonableness implies drawing a context-specific balance); *Koropoulos,* 734 F.2d at 45 ("[W]e do not suggest that the [FCRA] requires all relevant credit information be included in agencies' reports: [It] only requires that agencies adopt reasonable procedures to ensure complete and precise reporting."); *Henson,* 29 F.3d at 285 (finding report inaccurate but holding, under reasonableness prong, that agencies are not required "to go beyond the face of numerous court records to determine whether they correctly report the outcome of the underlying action") (cited at On-Site Br. 11); *Wright v. Experian Info. Sols., Inc.,* 805 F.3d 1232, 1239 (10th Cir. 2015) (under reasonableness prong, CRAs "must look beyond information furnished to them when it is inconsistent with the[ir] own records, contains a facial inaccuracy, or comes from an unreliable source").

**\*14** In arguing that accuracy is to be evaluated without regard to whether mitigating information was omitted, On-Site relies principally on *Childress v. Experian Information Solutions, Inc.,* 790 F.3d 745 (7th Cir. 2015) (Posner, J.). *See* On-Site Br. 11-12. There, the Seventh Circuit affirmed a grant of summary judgment for Experian where the plaintiff had complained that her credit report inaccurately described her bankruptcy petition as "dismissed," rather than "withdrawn." *See id.* at 746. The Circuit, focusing on the reasonableness element, rejected the plaintiff's claim that Experian "should monitor all dismissals of bankruptcy petitions and investigate to determine whether they were dismissed at the request of the petitioner." *Id.* at 747. That, the Circuit noted, "would require a live human being, with at least a little legal training, to review every bankruptcy dismissal and classify it as either voluntary or involuntary." *Id.* This would not be reasonable given, *inter alia,* the "variance in bankruptcy docket entries." *Id.* Only in its last paragraph did the Circuit touch on the separate element of inaccuracy: It observed that plaintiff's bankruptcy petition was not inaccurate because "[e]very bankruptcy case that is 'withdrawn' at the request of the petitioner is dismissed." *Id.* As the above summary underscores, the *Childress* decision sheds light on the element of reasonable procedures, but it does not, as On-Site would have it, construe the element of inaccuracy.

A post-*Childress* district court decision demonstrates the continued viability of certain omission-based claims: "[A] report may be found to be inaccurate for § 1681e(b) purposes

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 193 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

if it fails to include clarifying information about an entry that is ambiguous, [but] failure to explain the significance of an accurate report entry ... is not sufficient to make a report inaccurate." *Taylor v. Screening Reports, Inc.,* No. 13 Civ. 2886, 2015 WL 4052824, at *5 (N.D. Ill. July 2, 2015) (cited at On-Site Br. 11; On-Site Reply Br. 5-6). The ultimate inquiry, as ever, is whether the omission of mitigating information renders the report materially misleading. *See also* *Stewart v. Credit Bureau, Inc.,* 734 F.2d 47, 55 (D.C. Cir. 1984) ("For a plaintiff to prevail on a section 1681e(b) claim based on allegations that a report is incomplete, the lack of completeness must be of a fundamental nature.").

Applying these principles, the decisive question here is whether a landlord's assessment of a prospective tenant's qualifications would be materially altered if the landlord knew not only that there had been a possessory judgment against the tenant in Housing Court (as On-Site's reports on Wenning and Correa conveyed), but also that the judgment had been entered on consent pursuant to a stipulation signed before the proceedings commenced, and that the tenant had fully complied with the terms of that stipulation. In the Court's view, this issue, too, is properly left for the jury. A reasonable jury could find that a landlord inclined to treat the tenant's Housing Court matter as disqualifying might change this view were these mitigating facts also disclosed. This scenario differs from the one presented to the Seventh Circuit in *Childress.* There, as Judge Posner observed, "the fact that [a bankruptcy] petition is dismissed at the petitioner's request [is not] a reliable sign that she decided not to stiff her creditors by seeking a discharge—she may have dismissed the petition because she thought she'd be denied a discharge." 790 F.3d at 747-48. Here, by contrast, the fact that the prospective tenants fully cooperated and complied with their landlords (eschewing adversarial litigation) and obtained favorable settlements allowing them to remain in their apartments for extended periods of time may be viewed as substantially mitigating the perceived risks associated with their tenancy.

Moreover, plaintiffs here adduced evidence that eviction proceedings can be brought in New York City Housing Court for completely innocent reasons, independent of any breach by the tenant, let alone a failure by the tenant to relinquish occupancy. Plaintiffs' expert describes some such circumstances:

(1) A summary proceeding may be commenced where a tenant has withheld rent in order to seek full compliance with the warranty of habitability, because there is no other

procedure to obtain a rent abatement, *see* Scherer Report 12;

**\*15**  (2) An innocent sublessee may be named as a respondent where the real dispute is between the landlord and the prime tenant who engaged in illegal subletting (as in Correa's case), *seeid.* at 16-17;

(3) A holdover proceeding may be commenced by a landlord seeking to clear an apartment because, *e.g.,* the landlord intends to use the apartment personally, or because the landlord seeks to demolish the entire building, *seeid.* at 17;

(4) Proceedings may be instituted as a means of harassment, or because of simple human error, *seeid.* at 17.

Based on this evidence, a reasonable jury could conclude that the context which plaintiffs fault On-Site for omitting could have materially affected how landlords assessed their desirability as prospective tenants.

For these reasons, plaintiffs have adduced sufficient evidence that On-Site's reports were rendered materially misleading, and thus inaccurate, within the meaning of the FCRA by virtue of their omission of important mitigating information.

### iii. Plaintiff/Defendant vs. Petitioner/Respondent

Plaintiffs separately claim that the On-Site reports were inaccurate because they referred to the parties in the Housing Court proceedings as "plaintiffs" and "defendants," as opposed to "petitioners" and "respondents." *See* Pl. Br. 18.

"Mere imprecision," however, is not tantamount to inaccuracy under the statute. *Toliver,* 973 F. Supp. 2d at 715 (citing *Wagner,* 1998 WL 127812, at *1); *see also* *Williams-Steele v. Trans Union,* No. 12 Civ. 310 (GBD) (JCF), 2014 WL 1407670, at *4 (S.D.N.Y. Apr. 11, 2014) (incorrect contact information in credit report is not actionable), *report and recommendation adopted,* 2015 WL 576707 (S.D.N.Y. Feb. 10, 2015), *aff'd,* 2016 WL 1039672 (2d Cir. Mar. 16, 2016). Here, the distinction between "plaintiff/defendant" and "petitioner/respondent" is too insignificant to give rise to cognizable inaccuracy under § 1681e(b). Those terms do not convey any substantive information about a prospective tenant. And plaintiffs offer nothing beyond unpersuasive speculation to suggest that a landlord's assessment of a

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 194 of 238
Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 3538379

prospective tenant would be affected by whether the tenant was described as a defendant or as a respondent.

Therefore, On-Site's use of the terms "plaintiff" and "defendant" does not render its reports inaccurate within the meaning of the FCRA. Summary judgment as to this aspect of plaintiffs' claim must be granted for On-Site.

### *iv. Notices of Adverse Action*

Finally, plaintiffs allege that "incorrect terms and misleading credit score[s]" appeared in the landlords' Notices of Adverse Action, which informed plaintiffs that their applications had been denied. *See* Pl. Br. 21. Plaintiffs argue that these notices are "false, deceptive, and misleading" because On-Site "automatically recommends to its customers that they reject any applicant who was named in a previous Housing Court proceeding, regardless of its outcome or nature." SAC ¶ 90.

The undisputed evidence establishes, however, that the landlords—On-Site's clients—retain discretion as to what weight, if any, to assign to Housing Court records. They can set their preferences so that any Housing Court record results in an automatic "fail" (as each landlord did in this case); they can set their preferences to essentially ignore such records; or they can tolerate some but not all types of Housing Court records. *See* Joint 56.1, ¶¶ 147-64. Here, plaintiffs were rejected because their prospective landlords set their parameters for Housing Court records at "pass/fail." *Id.* ¶¶ 160-64. The Notices of Adverse Action accurately conveyed this fact.

**\*16** Plaintiffs appear to seek a judicial determination that it violates the FCRA for a CRA to give a landlord the *option* of failing a prospective tenant on the basis of the tenant's having a Housing Court record. The Court is unaware of any legal authority for this claim. Moreover, factually, plaintiffs fail to adduce evidence that On-Site, as opposed to the prospective landlord, made the choice to disqualify them on that basis. With or without the options provided by On-Site, it would fall to the landlord whether to assign significance (and, if so, how much) to the fact that a prospective tenant had been involved in a Housing Court proceeding. Absent any evidence that the CRA caused the landlord to make this choice, a plaintiff's claim that such "blacklisting" is unlawful lies against, if anyone, the landlord. To the extent plaintiffs attempt to impose FCRA liability on On-Site based

on the existence of a setting enabling the landlord to choose automatic disqualification of applicants with any Housing Court record, summary judgment must be granted for On-Site.

\*\*\*

For these reasons, the Court holds that plaintiffs have adduced sufficient evidence to permit a jury to find that On-Site's use of the term "Forcible Entry/Detainer" and its omission of mitigating information constituted inaccuracies within the meaning of the FCRA. The Court now turns to the other statutory elements.

### 2. Reasonable Procedures to Assure Accuracy

### *a. Legal Standards*

The FCRA does not provide for strict liability for a CRA that reports inaccurate information. Rather, "the consumer must show that the agency failed to follow reasonable procedures in generating the inaccurate report." *Whelan,* 862 F. Supp. at 829 (citing *Cahlin,* 936 F.2d at 1156). "The standard for evaluating the reasonableness of an agency's procedures is 'what a reasonably prudent person would do under the circumstances.' " *Id.* at 831 (quoting *Houston v. TRW Info. Servs., Inc.,* 707 F. Supp. 689, 693 (S.D.N.Y. 1989)). Assessing reasonableness generally requires "balancing the potential harm from inaccuracy against the burden on the agency of safeguarding against such inaccuracy." *Houston,* 707 F. Supp. at 693; *see also Koropoulos,* 734 F.2d at 42 (recognizing need for a "balancing test"); *Childress,* 790 F.3d at 748 (assessing whether plaintiff's preferred procedure would be "a feasible task to lay on" the credit agencies). "Whether or not the credit reporting agency followed reasonable procedures 'will be a jury question in the overwhelming majority of cases.' " *Gorman,* 2008 WL 4934047, at \*4 (quoting *Cahlin,* 936 F.2d at 1156); *see also Sarver v. Experian Info. Sols.,* 390 F.3d 969, 971 (7th Cir. 2004); *Cousin v. Trans Union Corp.,* 246 F.3d 359, 368 (5th Cir. 2001); *McCauley v. Trans Union LLC,* No. 02 Civ. 4042 (VM), 2003 WL 22845741, at \*2 (S.D.N.Y. Nov. 26, 2003).

The case law reflects two diverging characterizations of the parties' respective burdens on summary judgment. The D.C. Circuit has held that a plaintiff "must minimally present

2016 WL 3538379

some evidence from which a trier of fact can infer that the consumer reporting agency failed to follow reasonable procedures in preparing a credit report." *Stewart,* 734 F.2d at 51. But, that Circuit has recognized, in some circumstances, "inaccurate credit reports by themselves can fairly be read as evidencing unreasonable procedures," *e.g.,* where a plaintiff's file contains internally inconsistent information. *Id.* The Ninth and Eleventh Circuits, in contrast, have adopted a more plaintiff-friendly approach in which a plaintiff's demonstration of inaccuracies shifts the onus to the defense: "[O]nce a plaintiff has demonstrated inaccuracies in the report, a defendant could prevail on summary judgment only if it were to produce evidence that demonstrates as a matter of law that the procedures it followed were reasonable."*Philbin v. Trans Union Corp.,* 101 F.3d 957, 965 (3d Cir. 1996) (interpreting *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333-34 (9th Cir. 1995); *Cahlin,* 936 F.2d at 1156).

Here, the outcome is the same under either approach. As to the reasonableness of On-Site's procedures resulting in the use of the term "Forcible/Entry/Detainer" to describe New York City Housing Court proceedings, that question is properly left to the jury. As to the reasonableness of On-Site's decision not to supplement plaintiffs' reports with plaintiff-specific mitigating information, however, summary judgment must be granted for the defense, given plaintiffs' failure to present any evidence on which a jury could reliably find unreasonable On-Site's failure to harvest and present such information.

### b. Application

#### i. Reasonableness of Using Term "Forcible/Entry Detainer"

**\*17** On-Site principally defends its procedures —including those that led it to use the term "Forcible/Entry Detainer"—on the ground that it was inherently reasonable to rely on Lexis to provide On-Site with accurate records. *See* On-Site Br. 14-16; On-Site Reply Br. 12-13. On-Site argues that, because Lexis is a reputable vendor that gathers data by actually examining paper files in Housing Court, On-Site acted reasonably in reproducing Lexis's data "verbatim." On-Site Br. 15.

Plaintiffs counter by citing several pieces of evidence that, they argue, made it unreasonable for On-Site to reproduce, uncritically, Lexis's data regarding plaintiffs' "Forcible Entry/ Detainer" cases in Housing Court. First, plaintiffs note that, before joining On-Site, On-Site's "compliance officer," [21]

Eric Basart, worked as a paralegal for a law firm that represented landlords in eviction proceedings in New York City Housing Court, and in that capacity he prepared "holdover" and "nonpayment" petitions. *See* Joint 56.1, ¶¶ 215-16. Thus, plaintiffs argue, Basart must have been aware that no Housing Court proceeding can be accurately described as "Forcible Entry/Detainer." *See* Pl. Br. 15. Second, On-Site itself previously used the term "holdover" to describe the proceedings that it described here as "Forcible/Entry Detainer" proceedings; On-Site's 2009 switch to using Lexis to collect New York City Housing Court data led it to change this terminology. *See* Joint 56.1, ¶¶ 217-18. Third, On-Site was aware or should have been aware that Lexis intended to use the term at issue here: Its 11-page contract with Lexis included a list of "Eviction Related Filing Types" that Lexis intended to use, which stated that Lexis planned to describe filings either as belonging to a "civil" case,[22] a "small claims" case,[23] or a "Forcible Entry/Detainer" case.[24] *See* Scher Decl., Ex. HH, Sched. B.

> [21]    Basart's title is vice president of corporate development, but the accuracy of plaintiffs' characterization of him as On-Site's FCRA compliance officer is not disputed. *See* Joint 56.1, ¶ 215.

> [22]    *E.g.,* "Civil New Filing," "Civil Dismissal," "Civil Judgment," and "Civil Judgment Release."

> [23]    *E.g.,* "Small Claims Judgment" and "Small Claims Judgment Release."

> [24]    *E.g.,* "Forcible Entry/Detainer" and "Forcible Entry/Detainer Release." There was also an entry for "Vacated Judgment."

In the Court's assessment, although the question is a close one, this evidence, viewed in combination, is sufficient to permit a reasonable jury to conclude that On-Site knew or should have known that the term "Forcible Entry/Detainer" was inaccurate as applied to New York City holdover proceedings, and that Lexis was nevertheless applying this term to such proceedings. Specifically, a jury could conclude that On-Site, through the firsthand experience of its compliance officer, was familiar with New York City Housing Court procedures and terminology, and was aware that in New York City the more innocuous *and* more accurate term "holdover" is used to describe proceedings resulting in judgments of possession for landlords. Moreover, a jury could find that On-Site itself had used this accurate term

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 196 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

when it directly received data from the Office of Court Administration, the administrative arm of the New York State court system. Yet On-Site chose a vendor that used a different term, and was on notice from its relatively brief contract with Lexis that Lexis intended to do so. *See* Basart Dep. 37 (acknowledging that he may have learned at the time he saw the contract that Lexis intended to use the term "Forcible Entry/Detainer," but that he did not raise any questions about it).

**\*18** Notwithstanding Lexis's concededly excellent reputation, On-Site was therefore arguably well-positioned to realize that the term Lexis employed had the potential to mislead On-Site's clients, particularly in New York City. Yet On-Site has come forward with no evidence that it ever suggested that Lexis change this terminology; that it ever considered (before this lawsuit) changing the term itself; or that it even gave any thought to whether the term could result in material misunderstandings. *See* Basart Dep. 59 (acknowledging that On-Site could have stopped using the term before this lawsuit was filed, but did not do so).

To be sure, a jury could alternatively find that it was reasonable for On-Site, at the outset of its relationship with Lexis, to accept categorically the labels used by this established, reputable vendor. And a jury could find that it was reasonable, too, for On-Site thereafter to maintain this terminology, insofar as, until Wenning and Correa filed this lawsuit, On-Site had not received any complaints about the "Forcible Entry/Detainer" formulation. Joint 56.1, ¶ 145. However, in light of the general presumption that reasonableness is a jury question, and given the contrary inferences that a rational jury could make from the assembled record as to whether On-Site used reasonable procedures to avoid inaccurately describing Housing Court proceedings like Wenning's and Correa's, the Court's judgment is that a jury, not the Court, should resolve the question of reasonableness.

In opposing this conclusion, On-Site relies on distinguishable authorities. It emphasizes decisions holding that the FCRA "does not hold a reporting agency responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures." *Sarver,* 390 F.3d at 972; *see also Henson,* 29 F.3d at 285-86; *Ogbon,* 2013 WL 1430467, at *7. But these cases involved the sort of unfortunate mix-ups that are endemic to a largely automated and computerized credit reporting system processing millions of updates every day. *See Sarver,* 390 F.3d at 970 (different person with same name was responsible for account attributed to plaintiff); *Henson,* 29 F.3d at 282 (court clerk erroneously noted in the Judgment Docket that a money judgment had been entered against plaintiff, which defendant then reported); *Ogbon,* 2013 WL 1430467, at *7 (plaintiff's identity was stolen and identity thief incurred debts that were attributed to plaintiff). The courts in these cases therefore were rightly concerned about construing the FCRA to compel CRAs to undertake onerous human review of presumptively trustworthy documents, such as court records. *See Henson,* 29 F.3d at 285-86 ("Requiring credit reporting agencies to look beyond the face of every court document to find the rare case when a document incorrectly reports the result of the underlying action would be unduly burdensome and inefficient."); *Sarver,* 390 F.3d at 972 ("What Sarver is asking, then, is that each computer-generated report be examined for anomalous information."); *see also Childress,* 790 F.3d at 747 ("What the plaintiff wants would thus require a live human being, with at least a little legal training, to review every bankruptcy dismissal and classify it as either voluntary or involuntary."); *Wright,* 805 F.3d at 1241 (CRAs not required to "employ individuals trained in American tax law to examine every [notice of federal tax lien] filed in a county recorder's office").

That fact pattern is not at issue here. Plaintiffs do not fault On-Site for failing to undertake a manual review of individual court files. (To On-Site's credit, such a review, in fact, was undertaken by its vendor, Lexis.) Plaintiffs instead fault On-Site for using a term that misleadingly suggested that a category of landlord-tenant actions involved "forcible entry" when they did not. Plaintiffs do not seek to require On-Site to conduct a manual, needle-in-a-haystack review of case files to confirm factual accuracy. Rather, plaintiffs' quarrel is with the global use of a term that, plaintiffs claim, is inherently inaccurate at least as to New York City Housing Court. And it is relevant to the reasonableness inquiry that the market in question is New York City. According to plaintiffs' expert, New York City has the highest volume of eviction cases of any city in the country—some 240,000 were filed in 2014, *see* Scherer Report 11—and On-Site issues "thousands" of reports to New York City customers every year. Basart Dep. 26. Under such circumstances, a jury could fairly conclude that it was reasonable to expect On-Site to give a degree of attention to whether the labels it applied in this large market were or were not categorically inaccurate. While a jury *could* balance the relevant burdens and benefits so as to favor On-Site's decision to defer categorically to Lexis's terminology, it is rightly the jury's role to make that determination.

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 197 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

**\*19** Therefore, the Court holds, plaintiffs have produced sufficient evidence to reach the jury on the question whether On-Site employed reasonable procedures in replicating Lexis's terminology rather than using the more localized lexicon with which On-Site was familiar.

#### ii. Reasonableness of Omitting Mitigating Information

On-Site's failure to provide mitigating information about plaintiffs presents a different issue. Plaintiffs' claim that On-Site had a duty to supplement its reports with more specific information about plaintiffs' Housing Court cases is closely akin to the claims of unreasonableness rejected in *Sarver, Henson,* and similar cases discussed above.

To be sure, plaintiffs could have adduced evidence that it was practical and economically rational for Lexis (and, by extension, On-Site) to extract case-specific mitigating information from each plaintiff's Housing Court files. But plaintiffs have not come forward with any such evidence; plaintiffs merely declare that On-Site should have supplemented the data in its reports, with no attention given to the cost side of the equation. *See* On-Site Reply Br. 14 n.10. In fact, the Court (in resolving a discovery dispute) recognized the need, under the FCRA, to balance "the expense and efficacy of [obtaining additional information] relative to On-Site's ability to pay." *See* Dkt. 47, *reported at* *Wenning v. On-Site Manager, Inc.,* 141 F. Supp. 3d 256, 258 (S.D.N.Y. 2015). Plaintiffs' failure to adduce such evidence, or indeed to engage in any evidence-based evaluation of the practicality and cost of requiring such supplementation, prevents them from reaching a jury on the question of reasonableness.

\*\*\*

Thus, of plaintiffs' claims, only the claim relating to On-Site's use of the term "Forcible Entry/Detainer" to describe New York City Housing Court proceedings satisfies the first two elements of an FCRA negligence claim. The Court proceeds to consider whether plaintiffs have produced sufficient evidence regarding damages and causation to survive summary judgment on their "Forcible Entry/Detainer" claim.

### 3. Damages

Plaintiffs seek only emotional damages allegedly caused by On-Site's use of the term "Forcible Entry/Detainer" to describe their prior Housing Court cases. Crucially, plaintiffs no longer pursue damages arising from the denial of their rental applications, although the SAC identified such damages. *See* SAC ¶ 99(a); Scher Decl., Ex. GG; Tr. 6-7. Plaintiffs' abandonment of these damages appears to reflect a recognition that the denial of their rental applications was not caused by On-Site's use of the term "Forcible Entry/ Detainer," but by the landlords setting their screening criteria to automatically "fail" any prospective tenant with a Housing Court history. *Seeid.* at 3-7 (colloquy between Court and counsel on element of causation). In other words, there is no evidence that the term "Forcible Entry/Detainer"—as opposed to the fact that plaintiffs had *any* Housing Court record, however described—led Wenning's and Correa's prospective landlords to deny their applications.

Therefore, the Court addresses only whether plaintiffs have adduced sufficient evidence of emotional damages to reach a jury.

#### a. Legal Standards for Emotional Damages Under FCRA

Emotional damages are recoverable in FCRA actions, even in the absence of out-of-pocket expenses. *See* *Casella,* 56 F.3d at 474. Such damages often arise from the denial of credit or a similarly adverse action brought about by an inaccuracy in a credit report. *See, e.g.,* *Pinner,* 805 F.2d at 1265 ("Pinner testified that he was embarrassed and humiliated about the credit denials from several retail stores."). But emotional damages may also be freestanding; where an inaccuracy *alone* causes emotional damages, plaintiffs may still recover under the FCRA. *See* *Guimond,* 45 F.3d at 1333 ("[N]o case has held that a denial of credit is a prerequisite to recovery under the FCRA."); *Dalton,* 257 F.3d at 418 ("[Plaintiff] need only show that he suffered damages from the false report, regardless of how [a prospective employer] reacted to the report.").

**\*20** The Second Circuit's decision in *Casella,* on which On-Site relies, is not to the contrary, although it does limit the circumstances under which emotional damages may be available on a freestanding basis. In *Casella,* the plaintiff's claim "boil[ed] down to the bare contention that he is entitled to damages for pain and suffering simply because he *knew* of an inaccurate and potentially damaging item in his credit report." 56 F.3d at 475. The Circuit held that a plaintiff

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 198 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

cannot recover emotional damages "when he has failed to show that any creditor or other person ever learned of the derogatory information from a credit reporting agency." *Id.; see also Trikas v. Universal Card Servs. Corp.,* 351 F. Supp. 2d 37, 45 (E.D.N.Y. 2005). After *Casella,* district courts in this Circuit have continued to hold that "a plaintiff can establish damages when there was no credit denial, as long as they can provide [sic] that creditors became aware of the inaccurate information." *Caltabiano v. BSB Bank & Trust Co.,* 387 F. Supp. 2d 135, 141 (E.D.N.Y. 2005); *see also Jones v. Experian Info. Sols., Inc.,* 982 F. Supp. 2d 268, 276 (S.D.N.Y. 2013) ("Courts have held that actual damages, in the form of pain and suffering, are not available unless the CRA improperly discloses the credit report."); *McMillan v. Experian,* 170 F. Supp. 2d 278, 286 n.10 (D. Conn. 2001) ("*Casella* does not itself *require* a denial of credit to make out a FCRA violation.").

Nevertheless, *Casella* underscores that a credit denial or similarly adverse event will often be what enables a plaintiff to establish bona fide emotional damages. *See* 56 F.3d at 475 (citing, *inter alia, Stevenson v. TRW, Inc.,* 987 F.2d 288, 297 (5th Cir. 1993) (plaintiff was denied credit three times and experienced considerable embarrassment from discussing his problems with business associates and creditors); *Pinner,* 805 F.2d at 1265 (embarrassment resulting from three credit denials and lengthy dealings with credit bureau)); *see also Bach v. First Union Nat. Bank,* 149 Fed.Appx. 354, 361-62 (6th Cir. 2005) (denial of mortgage application, which would have enabled plaintiff's granddaughter to easily care for her, made her feel ashamed and embarrassed). The case law further reflects that a plaintiff's emotional injury claim is more likely to survive summary judgment where it is detailed, objective, and corroborated. Some cases, in fact, have required third-party corroboration, holding that a plaintiff's "conclusory," "unsupported," and "subjective" testimony on emotional damages is insufficient as a matter of law. *See Neclerio v. Trans Union, LLC,* 983 F. Supp. 2d 199, 215 (D. Conn. 2013) ("conclusory"); *Okocha v. HSBC Bank USA, N.A.,* No. 08 Civ. 8650 (MHP), 2010 WL 5122614, at *6 (S.D.N.Y. Dec. 14, 2010) ("conclusory"); *Burns v. Bank of Am.,* 655 F. Supp. 2d 240, 251 (S.D.N.Y. 2008) ("unsupported"); *Caltabiano,* 387 F. Supp. 2d at 142 ("subjective"). Other courts, however, have not categorically required corroboration, and the Court holds that there is no statutory basis to categorically require third-party corroboration to permit a claim for emotional damages to reach the jury. *See Cortez v. Trans Union, LLC,* 617 F.3d 688, 720 (3d Cir. 2010) ("[C]orroboration goes only to the weight

of evidence of injury, not the existence of it."); *McMillan,* 170 F. Supp. 2d at 287.

A plaintiff's emotional damages must, however, be "demonstrable," as otherwise there is a risk that claims for emotional distress will be "fictitious and trivial." *Robinson v. Equifax Info. Servs., LLC,* 560 F.3d 235, 241 (4th Cir. 2009) (quoting *Sloane v. Equifax Info. Servs., LLC,* 510 F.3d 495, 503 (4th Cir. 2007)). Plaintiffs who rely on their own testimony must "explain their injury in reasonable detail and not rely on conclusory statements." *Llewellyn v. Allstate Home Loans, Inc.,* 711 F.3d 1173, 1182 (10th Cir. 2013) (quoting *Bagby v. Experian Info. Sols., Inc.,* 162 Fed.Appx. 600, 605 (7th Cir. 2006)) (alteration omitted). As the assembled case law reflects, various factors may bear on whether a claim of emotional injury is sufficiently demonstrable to reach a jury—including whether there is corroborative testimony or other objective evidence, *e.g.,* medical records; whether plaintiff's testimony is conclusory or detailed; whether plaintiff's asserted distress was short-lived or long-lasting; [25] and whether the emotional distress is linked to a credit denial or similarly adverse event. [26] Additionally, some forms of inaccuracies on credit reports may be "so inherently degrading that a jury could infer the existence of emotional distress." *Wantz v. Experian Info. Sols.,* 386 F.3d 829, 834 (7th Cir. 2004), *abrogated on other grounds by Safeco,* 551 U.S. 47.

[25]    *Compare, e.g., Cortez,* 617 F.3d at 719 (describing "two-year ordeal," corroborated by plaintiff's daughter), *with Taylor,* 710 F.3d at 829 ("[C]orroboration of a brief episode of frustration and unhappiness does not establish the sort of concrete emotional distress that is required to constitute a genuine injury and actual damages.").

[26]    In the related context of considering the potential excessiveness of an award for emotional distress, the Fourth Circuit considers "the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any." *Sloane,* 510 F.3d at 503.

Case 5:24-cv-00188-DNH-MJK Document 4 Filed 02/14/24 Page 199 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

### b. Application

**\*21** Plaintiffs' emotional-damages claims clear the initial bar set by *Casella*: As to each plaintiff, there is evidence that a prospective landlord learned of the inaccurate information, even if the inaccuracy did not ultimately cause any adverse action. *See Casella,* 56 F.3d at 475. But a closer examination of each plaintiff's deposition testimony—the only evidence that either plaintiff has offered on emotional damages—is necessary to determine whether that evidence is sufficient to survive summary judgment.

### i. Wenning

Wenning testified repeatedly that hearing the term "Forcible Entry/Detainer" made her feel like she was being called a criminal. *See* Wenning Dep. 55-57, 59, 82, 129, 145. She was humiliated, surprised, and "unglued." *Id.* at 82. When the Common Ground caseworker first told her that her application would be denied, Wenning testified, she "cried hysterically." *Id.* at 83.

This distressed condition, however, did not last long. Wenning promptly retained counsel, who, working with On-Site and Wenning's former landlord, secured the removal of the offending phrase from her On-Site report. One week after Wenning first learned of the problem, On-Site generated an amended report. Less than a week after that—13 days after Wenning's application was denied—Wenning was approved for an apartment at Gotham West. Her diligence and resourcefulness—and that of her counsel—averted what could have been longer-lasting harm.

Under the FCRA, however, the alacrity with which Wenning obtained a corrected On-Site report hurts her claim for emotional damages. The stressor—the errant description of Wenning's Housing Court proceeding as a "Forcible Entry/Detainer" case—persisted for only a week after Wenning learned of it. To be sure, this episode was longer-lived than the five-to-10-minute period that the Eighth Circuit held insufficient to establish genuine emotional damages. *Taylor,* 710 F.3d at 829. But Wenning's experience was far closer to *Taylor* than to the "two-year ordeal" that the Third Circuit held sufficient. *See Cortez,* 617 F.3d at 719; *see also Guimond,* 45 F.3d at 1332 (some seven months passed between republication of erroneous information and eventual removal from plaintiff's file); *Sloane,* 510 F.3d at 503

(plaintiff spent 21 months attempting to correct defendant's errors). The short time that Wenning was aware of the errant report militates against her claim of demonstrable emotional injury.

Significant, too, is the fact that On-Site's description achieved little circulation known to Wenning. Wenning learned of the report from a sympathetic supporter at Common Ground; it is not clear whether anyone at Gotham West knew about the report. (And, of course, Wenning disclosed the report to the counsel she retained.) And the errant account of her Housing Court case was not so inherently degrading as to make a resulting emotional injury obvious or inevitable. The On-Site report did not say anything about Wenning personally. It did not report a criminal record or a credit delinquency. At most, it described her case as one that resulted, for reasons unspecified, in a forceful eviction. The Court does not doubt that such a label—and the speculation it invites as to reasons behind the eviction—can cause emotional distress. But the assembled case law suggests that, without other objective consequences, the duration of the offending report and/or the level of publicity it generated would have to be greater to give rise to claim for emotional damages worthy of jury consideration.

**\*22** In addition, although the Court has held that third-party corroboration is not required, the case law has considered that factor in evaluating whether the claimed distress was demonstrable enough to reach a jury. *See Taylor,* 710 F.3d at 829 (third party witnessed plaintiff crying); *Cortez,* 617 F.3d at 719 (plaintiff's daughter testified that plaintiff was "under extreme stress," "cried often and lost weight," and "discussed her concerns about her credit report every time they spoke"); *Robinson,* 560 F.3d at 241 (plaintiff's family and friends "painted a detailed picture of her ongoing struggles with Equifax and the emotional toll"). Here, Wenning has not pointed to any corroboration whatsoever of her claim of emotional injury. Wenning did testify that she would have seen a therapist if she could have afforded one, but she could not. *See* Wenning Dep. 143-46. She also did not come forward with any lay outcry witness (e.g., a friend, family member, co-worker, or neighbor) to support her claim of contemporaneous distress.

Finally, because Wenning no longer maintains (and could not maintain) that the denial of her application was caused specifically by the term "Forcible Entry/Detainer," her claim for emotional damages is not buttressed by any connection to an objective adverse event akin to a denial of credit.

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

Considering these factors in combination and in light of the case law, the Court holds that Wenning has not produced sufficient evidence of emotional distress for a reasonable jury to award such damages. As nominal damages are not available for FCRA negligence claims, *see* *Cousin,* 246 F.3d at 371 n.19; *Davenport v. Sallie Mae, Inc.,* 124 F. Supp. 3d 574, 581 (D. Md.), *aff'd,* 623 Fed.Appx. 94 (4th Cir. 2015) (per curiam), Wenning cannot establish the required element of damages. On-Site's motion for summary judgment on Wenning's negligence claim must, therefore, be granted.

### ii. Correa

Correa's testimony as to his emotional distress is roughly similar to Wenning's. He testified that the term "Forcible Entry/Detainer" connoted that he had done something illegal, and that this "scared" him. Correa Dep. 129. He, too, testified that the denial of his application was shocking, depressing, and humiliating. *See* *id.* at 81-84. More distinctively, Correa testified that he was particularly concerned by the report's implication that he was dishonest, because he is a professional journalist. *See* *id.* at 51-52, 82. Finally, Correa testified, the years following the application denial were "a nightmare"— he has moved repeatedly and, because of stress, lost weight, started losing his hair, and almost lost his voice. *See* *id.* at 132.

Because of the duration of Correa's claimed distress, the distinctive harm that he felt to his reputation as a journalist, and the physical manifestations of his suffering, the Court holds that he has produced sufficient evidence on which a jury could award emotional damages.

The Court therefore proceeds to address the element of causation as to Correa only. The issue is whether Correa's emotional injury is attributable to the use of the term "Forcible Entry/Detainer" in his On-Site report or to the rejection of his rental application, which was not a product of any inaccuracy in that report.

### 4. Causation

#### a. Legal Standards

Causation is a necessary element of an award of actual damages in an FCRA negligence claim. *See* *Casella,* 56 F.3d at 474-75. Courts do not appear to have settled on terminology to describe the degree of causation that is necessary. In *Casella,* the Second Circuit cited one case using the concept of proximate causation and another using the term "causal factor." *See* *id.* at 475 (citing, respectively, *Hauser v. Equifax, Inc.,* 602 F.2d 811, 816 (8th Cir. 1979), and *Cahlin,* 936 F.2d at 1161); *see also* *Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 664 (7th Cir. 2001) ("causal relation" and "causal connection"); *Philbin,* 101 F.3d at 969 ("substantial factor"); *Gorman,* 2008 WL 4934047, at *6 ("substantial factor"); *Whelan,* 862 F. Supp. at 829 ("proximate[ ] cause[ ]"); *Lewis v. Ohio Prof'l Elec. Network LLC,* 248 F. Supp. 2d 693, 701 (S.D. Ohio 2003) ("causal link"). It is not clear how, if at all, these standards might differ from one another in the FCRA context.

**\*23** What *is* clear, however, is that any harm must be traceable to the inaccurate, FCRA-violating information—not just to the report that contained that information or to accurate data within the same report. *See* *Casella,* 56 F.3d at 474-75 (noting need for "causation between the harm alleged by [plaintiff] and [defendants'] alleged violations of the FCRA"); *Philbin,* 101 F.3d at 969 (plaintiff must produce evidence that "the inaccurate information was a substantial factor in bringing about the denial of credit"); *Crabill,* 259 F.3d at 664 (requiring "causal relation between the violation of the statute and the loss of credit"); *Gorman,* 2008 WL 4934047, at *6 ("[T]he inaccuracy in the credit report must proximately cause actual damages to plaintiff.").

#### b. Application

Correa's claim for emotional damages fails this last test. Unlike Wenning, who specifically testified that the term "Forcible Entry/Detainer" was what caused her emotional pain, Correa testified only that he was hurt by the denial of his rental application, not by that term specifically. *See* Correa Dep. 81 (tracing his "shock[ ]" to the fact he had been "blacklisted"); *id.* at 83 (recognizing that his application was denied because "they don't want to see my name in the [Housing Court] record," not because of the offending term). [27] This testimony does not avail Correa, because, as is undisputed, his rental applications were denied not because of On-Site's terminology or any inaccuracy in its reports, but because it *accurately* reported that Correa had been involved in a Housing Court proceeding.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 201 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

27      Later in his deposition, Correa testified that the "nightmare" he has experienced for "almost three years" is traceable to the fact that "somebody use[d] the wrong terms." Correa Dep. 132. This could be read to suggest that Correa blames the use of the term "Forcible Entry/Detainer" for the "nightmare" he describes, including moving frequently, losing possessions, losing weight, losing hair, and losing his voice. *Id.* In context, however, the only plausible reading of Correa's deposition testimony is that his "nightmare" was caused by the denial of the rental application, not by On-Site's use of the term "Forcible Entry/Detainer" itself. To the extent Correa blends these issues—suggesting that the term is to blame for the landlord's denial of his application—his testimony is definitively undercut by undisputed evidence as to the cause of the denial.

To be sure, Correa testified that he was "scared" when he read the term "Forcible Entry/Detainer" because it suggested that he "did something against the law, that [he] forced something." *Id.* at 129. But Correa's bare and conclusory testimony that he felt "scared" for an unspecified amount of time is insufficient to support emotional damages. *See Taylor,* 710 F.3d at 829 (plaintiff's testimony that she was "extremely upset and embarrassed" was insufficient); *Cousin,* 246 F.3d at 371 (plaintiff testified he felt "very upset [and] angry"); *Neclerio,* 983 F. Supp. 2d at 214 (plaintiff testified that he felt "powerless," "frustrated," and increased "pressure").

Thus, while Correa does describe demonstrable emotional distress, he does not describe distress that is causally connected to the sole actionable FCRA violation supported by the record.

### C. Willfulness Claim

Plaintiffs separately claim that On-Site willfully failed to employ reasonable procedures to assure accuracy, in violation of 15 U.S.C. § 1681n. Under that provision, a willful violation of the FCRA results in liability for (1) actual damages *or* statutory damages between $100 and $1,000; (2) punitive damages; and (3) costs. Thus, unlike with negligence claims, actual damages and causation are not elements of a willfulness claim. The elements of a willfulness claim under 15 U.S.C. § 1681e(b) are (1) inaccuracy and (2) a failure to follow reasonable procedures that is (3) reckless or knowing. *See Safeco,* 551 U.S. at 57-58. The Court has found that there is adequate evidence to establish the first two elements with

respect to plaintiffs' claim based on On-Site's use of the "Forcible Entry/Detainer" term. The Court now considers whether there is sufficient evidence of reckless or knowing conduct in connection with On-Site's use of that term.

#### a. Legal Standards

**\*24**   Willfulness under the FCRA entails "reckless disregard of statutory duty." *Id.* at 57. An "erroneous" interpretation of the FCRA is not "reckless" unless it is "objectively unreasonable." *Jones v. Halstead Mgmt. Co., LLC,* 81 F. Supp. 3d 324, 333 (S.D.N.Y. 2015) (quoting *Safeco,* 551 U.S. at 69). A reckless action entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco,* 551 U.S. at 68 (quoting *Farmer v. Brennan,* 511 U.S. 825, 836 (1994)).

As a general matter, courts have granted summary judgment to CRAs on willfulness claims when plaintiffs do not produce evidence that, after the CRA learned that its report was inaccurate, it failed to fix it. *See Houston,* 707 F. Supp. at 694 ("Once it confirmed that the public record was in error, [defendant] deleted the reference to the 1983 judgment against [plaintiff]."). Courts have also granted summary judgment to CRAs when there is no evidence of prior complaints about the problem on which plaintiffs' claim is based. *See Whelan,* 862 F. Supp. at 833-34 ("[T]here can be no question that Trans Union acted with the requisite [willfulness] given that it was not even put on notice that its report contained inaccurate information until [the filing of the lawsuit.]"). The Fourth Circuit's decision in *Dalton* is illustrative. The Circuit found that the plaintiff had adduced sufficient evidence of negligence, but did not find willfulness, for reasons including the absence of evidence of other consumer complaints similar to plaintiff's, the fact that the CRA had found reliable the firm it tasked with doing criminal background investigations, and the fact that the CRA corrected its mistake one day after plaintiff raised it. *See Dalton,* 257 F.3d at 417-18.

#### b. Application

Before this case was filed, On-Site had not received any complaints about its use of the term "Forcible Entry/ Detainer." Joint. 56.1, ¶ 145. Shortly after this lawsuit was filed, On-Site changed the term it uses to "Civil Action for Possession." *Id.* ¶ 146. Under *Dalton,* these facts strongly

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 202 of 238

Wenning v. On-Site Manager, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3538379

counsel against a finding of willfulness. Plaintiffs have come forward with evidence on which a negligence claim could rest—to wit, evidence that On-Site should have known that it could be inaccurate to use "Forcible Entry/Detainer" to describe New York City Housing Court records—but they have not identified any evidence that On-Site *actually* knew that such usage was inaccurate or that On-Site subjectively appreciated the risk of inaccuracy. On plaintiffs' willfulness claim, summary judgment must therefore be granted to On-Site.

### D. NYGBL § 349 Claim

A claim under New York General Business Law § 349 requires that "a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.,* 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.,* 18 N.Y.3d 940, 941 (2012)) (internal quotation marks omitted).

Plaintiffs' inability to establish unreasonableness (as to their omissions-related claim) and damages/causation (as to their "Forcible Entry/Detainer" claim) are together fatal to their NYGBL § 349 cause of action. *See Trikas,* 351 F. Supp. 2d at 46 ("Because Plaintiff has failed to prove any harm, which precluded any recovery for negligent violation of the FCRA, [the § 349] claim must also be dismissed.") [28]; *Podell v. Citicorp Diners Club, Inc.,* 914 F. Supp. 1025, 1036 n.3 (S.D.N.Y. 1996), *aff'd,* 112 F.3d 98 (2d Cir. 1997) ("[P]laintiff's inability as a matter of law to show the defendants were negligent [under the FCRA] also destroys any basis for [a § 349 claim].").

[28]    Plaintiffs have not cited any case holding that the standard for actual damages under § 349 is lower than under the FCRA.

**\*25**  Therefore, summary judgment must be granted to On-Site on plaintiffs' § 349 claim.

### CONCLUSION

For these reasons, the Court grants On-Site's motion for summary judgment and denies plaintiffs' motion for partial summary judgment. The Clerk of Court is respectfully directed to close the motions pending at docket numbers 69 and 78, and to close this case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 3538379

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 2354308
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Thomas NGUYEN, Plaintiff,

v.

RIDGEWOOD SAVINGS BANK
and Peter Boger, Defendants.
thomas Nguyen, Plaintiff,

v.

Chase Bank USA, N.A. and James Dimon, Defendants.
Thomas Nguyen and Tiffany Nguyen, Plaintiffs,

v.

Santander Bank, N.A., Roman Blanco,
Citibank, N.A., Michael Corbat, Experian
Information Solutions, Inc., Donald Robert,
Trans Union LLC, and Equifax, Inc., Defendants.

Nos. 14–CV–1058 (MKB), 14–CV–
3464 (MKB), 14–CV–3989 (MKB).
|
Signed May 15, 2015.

**Attorneys and Law Firms**

Thomas Nguyen, Brooklyn, NY, pro se.

Tiffany Nguyen, Brooklyn, NY, pro se.

Adam Matthew Marshall, Cullen and Dykman LLP, Garden City, NY, Marianne McCarthy, Cullen and Dykman Bleakley Platt, LLP, Garden City, NY, Christopher B. Turcotte, The Law Office of Christopher B. Turcotte, New York, NY, James A. Kassis, Rahil Darbar, Schenck Price Smith & King LLP, Florham Park, NJ, Raymond Alexander Garcia, Stroock & Stroock & Lavan, New York, NY, Jennifer Kathleen Messina, Jones Day, New York, NY, Matthew Samberg, Jones Day, Pittsburgh, PA, Camille Renee Nicodemus, Schuckit & Associates, P.C., Zionsville, IN, Christina Marie Conroy, Paul Allan Straus, King & Spalding, New York, NY, for Defendants.

### *MEMORANDUM & ORDER*

MARGO K. BRODIE, District Judge.

**\*1** Plaintiffs Thomas Nguyen ("Mr.Nguyen") and Tiffany Nguyen ("Ms . Nguyen"), proceeding *pro se,* commenced the above-captioned actions against Defendants, alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5301 *et seq.* ("CFPA"), particularly the section relating to the Bureau of Consumer Financial Protection, §§ 5481–5620, 42 U.S.C. §§ 1983 and 1985, and the New York State Fair Credit Reporting Act. The three Complaints name different Defendants but raise overlapping claims. [1]

[1]    These actions are three of seven filed by Mr. Nguyen in the Eastern District of New York in the last fifteen months, many of which have been dismissed. *See Nguyen v. Bush,* No. 15–CV–641 (E .D.N.Y. filed Feb. 6, 2015) (*see* Docket Entry No. 6 (dismissing complaint in full without leave to amend)); *Nguyen v. Milliken,* No. 15–CV–587 (E.D.N.Y. filed Jan. 30, 2015) (*see* Docket Entry No. 5 (dismissing complaint in full with leave to amend)); *Nguyen v. Santander Bank,* No. 14–CV–3989 (E.D.N.Y. filed June 26, 2014) (dismissing complaint at September 17, 2014 status conference, with leave to amend); *Nguyen v. JPM Chase Bank,* No. 14–CV–03464 (E.D.N.Y. filed June 2, 2014) (same); *Nguyen v. China Nat'l Offshore Oil Corp. (CNOOC),* No. 14–CV–3327 (E.D.N.Y. filed May 29, 2014) (dismissing complaint at September 17, 2014 status conference, in full with prejudice as any amendment would be futile) *appeal dismissed* No. 14–3871 (2d Cir. Mar. 6, 2015); *Nguyen v. Bank of America,* No. 14–CV–1243 (E.D.N.Y. filed Feb. 26, 2014) (*see* Docket Entry No. 22 (dismissing complaint in full with leave to amend)); *Nguyen v. Ridgewood Savings Bank,* No. 14–CV–1058 (E.D .N.Y. filed Feb. 28, 2014) (*see* Docket Entry No. 22 (dismissing complaint in full with leave to amend)).

Currently before the Court are seven separate motions to dismiss filed by Defendants Ridgewood Savings Bank and Peter Boger, (Ridgewood Mot. to Dismiss, No. 14–CV–1058 Docket Entry ("58DE") No. 37), Chase Bank USA, N.A. and James Dimon, (Chase Mot. to Dismiss, No. 14–CV–3464 Docket Entry ("64DE") No. 19), Santander Bank, N.A. and Roman Blanco, (Santander Mot. to Dismiss, No. 14–CV–3989, Docket Entry ("89DE") No. 46), Citibank, N.A. and Michael Corbat, (Citibank Mot. to Dismiss, 89DE No. 61),

Experian Information Solutions, Inc. and Donald Robert,[2] (Experian Mot. to Dismiss, 89DE No. 54), Trans Union LLC, (Trans Union Mot. to Dismiss, 89DE No. 50), and Equifax, Inc., (Equifax Mot. to Dismiss, 89DE No. 58). Defendants move pursuant to Rules 8, 9, and 12(b)(6) of the Federal Rules of Civil Procedure. Also before the Court is Mr. Nguyen's requests for default judgments against Ridgewood and Boger, (58DE Nos. 32–33), and against Experian and Robert. (*See* Am. Compl. in No. 14–CV–3989 ("3989 Am. Compl.") ¶ 17, 89DE No. 25; *see also* Letter dated Nov. 18, 2014 from Mr. Nguyen seeking default judgments against Experian and Robert, 89DE No. 32.)

[2] Experian Information Solutions, Inc. submitted a single motion to dismiss, noting that it was incorrectly identified in the Complaint as "Experian Inc." and "CEO Don Robert." (Cover Letter dated January 12, 2015 at 1, 89DE No. 53.) Robert did not join Experian's motion to dismiss, (*see generally* Experian Mot. to Dismiss), though Experian's counsel has entered an appearance on Robert's behalf, (89DE No. 69), and the memorandum of law in support of the motion seeks dismissal as to Robert for failure to state a claim, (Experian Mem., 89 DE No. 55 at 4–5, 12).

For the reasons discussed below, Defendants' motions to dismiss are granted as to Plaintiffs' federal claims, and Mr. Nguyen's motions for default judgments are denied. As Plaintiffs have previously been given the opportunity to amend their complaints in each action, and have failed to correct the deficiencies identified by the Court, the Amended Complaints are dismissed with prejudice as to all of Plaintiffs' federal claims.

### I. Background

#### a. Procedural background

Plaintiff Mr. Nguyen, proceeding *pro se,* filed the above-captioned actions challenging various actions of Ridgewood Savings Bank ("Ridgewood"); Peter Boger, Chairman, President and Chief Executive Officer ("CEO") of Ridgewood; Chase Bank USA, N.A. ("Chase"), incorrectly identified as JPMC Chase Bank in the initial Complaint; James Dimon, Chairman and Chief Executive Officer ("CEO") of JPMorgan Chase & Co., incorrectly identified as Jamie Dimon; Santander Bank, N.A. ("Santander"); Roman Blanco, Chairman and CEO of Santander; Citibank, N.A. ("Citibank"), incorrectly identified as Citibank (Citigroup);

Michael Corbat, CEO of Citigroup; Experian Information Solutions, Inc. ("Experian"), incorrectly identified as Experian, Inc.; Donald Robert, Chairman of Experian plc;[3] Trans Union LLC ("Trans Union"); and Equifax, Inc. ("Equifax"). Mr. Nguyen's daughter, Tiffany Nguyen, is also a Plaintiff in action 14–CV–3989. The three Complaints name different Defendants but raise overlapping claims and frequently contain overlapping allegations. Mr. Nguyen's submissions often reference all three actions, and the Amended Complaints filed in 14–CV–1058 and 14–CV–3989 include reference to the other actions in the captions. In addition, Mr. Nguyen submitted an identical "addendum" to his Amended Complaints in actions 14–CV–3464 and 14–CV–3989.

[3] Experian plc is the parent company of Experian Information Solutions, Inc. (Corporate Disclosure Statement ¶ 1, No. 14–CV–3989, Docket Entry No. 36.)

&ast;**2** On September 17, 2014, the Court dismissed the Complaints in 14–CV–3464 and 14–CV–3989 in their entirety pursuant to Rule 8 of the Federal Rules of Civil Procedure, for failure to plead with specificity the violation Plaintiffs allege, and permitted Plaintiffs to file amended complaints. (*See* Nos. 14–CV–3464 and 14–CV–3989, Minute Entry dated Sept. 17, 2014.) By Memorandum and Order dated December 17, 2014, the Court dismissed the Complaint in 14–CV–1058 for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs subsequently filed Amended Complaints, and Defendants now move to dismiss the Amended Complaints in all of the above-captioned actions.

#### b. Factual background

The following facts are taken from Plaintiffs' Amended Complaints, (Am. Compl. in No. 14–CV–1058 ("1058 Am. Compl."), 58DE No. 23; Am. Compl. in No. 14–CV–3464 ("3464 Am. Compl."), 64DE No. 12; 3989 Am. Compl.), an identical Addendum to the Amended Complaint submitted in actions 14–CV–3989 and 14–CV–3464 on October 24, 2014, (Am. Compl. Add., 64DE No. 14 and 89DE No. 27), and a Supplemental Addendum to the Amended Complaint filed in 14–CV–3989 on October 31, 2014, in which Mr. Nguyen "repeats and re-alleges ... the entire amended complaint in 14–[CV]–3464." (Suppl. Am. Compl. Add. ¶ 22, 89DE No. 28).

In sum, Plaintiffs appear to allege that Santander, Chase, Citibank and Ridgewood provided incorrect or inaccurate

information about Mr. Nguyen's accounts to Equifax, Experian and Trans Union, which affected Mr. Nguyen's credit score. Both Plaintiffs also experienced difficulty obtaining credit from Defendant banks at various times.

### i. Allegations against Santander, Blanco, Equifax, Experian and Trans Union

On or about February 19, 2007, Mr. Nguyen was approved for a "GoldOption" credit account with Santander, with a credit line of $15,000, and another "GoldOption" credit account with a credit line of $26,500 held by Bank of America, but serviced by FIA Card Services. (3989 Am. Compl. ¶ 2.) Mr. Nguyen alleges that he attempted to pay down his two credit accounts with his disposable income, but "[D]efendants were using unfair, deceptive, abusive acts or practices ... to drive [Mr. Nguyen] into destitution." In or about June of 2007, Mr. Nguyen went to a Bank of America branch to attempt to make a payment on his Santander credit card account, and alleges that Santander never received his $1000 payment .[4] (*Id.* ¶ 3.) Mr. Nguyen contacted a manager at one of the banks, and was eventually informed that "they found the money." (*Id.*) Mr. Nguyen alleges that his "credit-performance" on the Santander account "is considered AAA+++." (*Id.*)

[4]  It is unclear from the allegations in the Amended Complaint what connection Mr. Nguyen believes that Santander and Bank of America have beyond offering credit accounts with the name "GoldOption."

Mr. Nguyen alleges that from November 19, 2008 to the present, Santander, Bank of America, and FIA Card Services, acting in conspiracy with one another, committed unfair, deceptive, abusive acts or practices "against" his accounts, forcing him "eventually and gradually into a life of hell for so many years until" September 1, 2013, when Mr. Nguyen sustained atrial fibrillation and other heart conditions. (*Id.* ¶ 4.) At some point, Mr. Nguyen apparently requested that someone examine the "GoldOption portfolio," and "the office of President and CEO represented by Tom Jordan" contacted Experian. (*Id.* ¶ 5.) Mr. Nguyen was also sent a "suspicious, terrorizing, and threaten [*sic* ] letter ." (*Id.*) Plaintiffs allege that from October 16, 2013 through the date the present actions were filed, Experian, Bank of America and Santander "conspired in committed [*sic* ] a fraudulent act, criminal deception, grossly abusive" practice by "fabricating" the credit utilization ratio reported to Mr. Nguyen. (*Id.*) Mr. Nguyen recalculated his own credit utilization ratio, based

on a total credit limit of $71,000[5] and reached a different conclusion, placing him in the "top of .01% tail [*sic* ] on normal distribution curve of favorable credit rating and credit score." (*Id.*)

[5]  Plaintiffs allege that this reflects Mr. Nguyen's total credit limit on all of his revolving accounts.

**\*3**  In March or April of 2013, Mr. Nguyen alerted Janet Sanders, "Brooklyn Tech's payroll secretary,"[6] "Beth Johnson's UFT chapter leader" and Teresa Samuels, "UFT Brooklyn Rep." that something was wrong "inside." (*Id.* ¶ 10.) In September of 2013, Mr. Nguyen spent one week in Maimonides hospital in Brooklyn. (*Id.* ¶ 9.) Plaintiffs allege that Santander and Bank of America's actions with respect to Mr. Nguyen's credit accounts caused financial and psychological damage, and slowed Mr. Nguyen's recovery time. (*Id.*)

[6]  Exhibits annexed to the Supplemental Addendum to the Amended Complaints in 14–CV–3989 and 14–CV–3464 indicate that in 2012, and perhaps later, Mr. Nguyen was a math teacher at Brooklyn Technical High School. (Letter dated March 1, 2012 from Randy J. Asher, Principal of Brooklyn Technical High School to Mr. Nguyen, annexed to Supp. Am. Compl. Add. at Ex. 2.)

In or about January 2014 through October 2014, Plaintiffs allege that Santander committed a series of deceptive, unfair, and abusive acts or practices including various forms of fraud against Mr. Nguyen's checking account and a separate line of credit. (*Id.* ¶ 6.) Mr. Nguyen alerted the Consumer Financial Protection Bureau ("CFPB") and sent a letter to Blanco regarding the issue, and received a letter in reply from a bank representative on February 24, 2014 .[7] (*Id.*) On March 29, 2014, Mr. Nguyen attempted to withdraw $20 from his account ending in—1223 at Santander, and received a receipt regarding a different account, ending in –3496, indicating that there was a larger balance in the account than he knew was in his—1223 account.[8] (*Id.* ¶ 6c; Ex. SF 5.) Plaintiffs allege that this was a "set-up" and a scam. (3989 Am. Compl. ¶ 6c.) Plaintiffs allege that Santander, acting in concert with Bank of America and FIA Card Services, deceptively and fraudulently violated the FCRA and engaged in unfair and deceptive practices in relation to Mr. Nguyen's credit accounts. (*Id.* ¶ 9.) Mr. Nguyen further states that he "has suffered loss and damages including, but not limited to, financial loss, financial injuries, expenditure

of time and resources, emotional distress, A–Fib, mental anguish, humiliation, and embarrassment, entitling him to actual immediate relief." (*Id.*)

7    Plaintiffs state that they have attached the letter to the Complaint, but the copy filed is illegible. (*See* Ex. SF, annexed to 3989 Am. Compl.) Plaintiffs appear to object to computation of balances on Mr. Nguyen's account statements, alleging that the accounting is fraudulent. (3989 Am. Compl. ¶ 6; Ex. SF 3–4.)

8    It is not clear from the Complaint what relationship there is between the two accounts, and why Mr. Nguyen would receive a receipt for the account ending in—3496 when he attempted to withdraw $20 from the account ending in—1223.

In January 2014 "and thereafter," Mr. Nguyen contacted Experian, Trans Union and Equifax to "personally address[ ] the issue and offer[ ][an] amicable solution." (*Id.* ¶ 16.) On March 1, 2014, Plaintiffs allege that Experian committed unspecified fraud. (*Id.* ¶ 17.) Mr. Nguyen "gave the evidence to expose Experian [*sic* ] crime to the [Federal Trade Commission ("FTC") ] and CFPB." (*Id.*) Also in March 2014, Trans Union answered Mr. Nguyen's letter with an inaccurate credit report, in which Trans Union "deceptively sandbag[ged]" Mr. Nguyen's credit score by "suppress[ing] my payment's info[rmation] and data with JPM Chase [and] Ridgewood...." (*Id.* ¶ 18.) Plaintiffs also allege that Equifax used unfair practices against Mr. Nguyen for many years, apparently related to reporting a low credit utilization ratio and otherwise using or misusing Mr. Nguyen's FICO credit score. (*Id.*) Mr. Nguyen also apparently received two calls from Equifax's counsel in August, although he does not specify the year. (*Id.*) Plaintiffs complain that one of the calls was unprofessional because it was received at 9:26 PM on a Sunday evening, while Mr. Nguyen was serving food to his brother in a nursing home. (*Id.*)

**\*4** On April 28, 2014, Santander "and/or" Experian "fraudulently" collected $16.30 "instead of the usual one week prior to the 28th...." (*Id.* ¶ 6d.) Plaintiffs allege that Mr. Nguyen suffered "fears, financial and physical injuries, etc." (*Id.*) Since September 17, 2014, Mr. Nguyen has received more than one hundred "harass[ing] phone call[s]" from Santander. (*Id.* ¶ 6e.) On October 20, 2014, Mr. Nguyen received a telephone call asking him to verify his social security number, and spoke with two different individuals. (*Id.* ¶ 6e.) Mr. Nguyen "politely advised them to ask those [*sic*

] Blanco and [Vice President, Manager of Customer Relations JoAnn] Gruber and then hung up [.]" (*Id.* ¶ 6e.) On another occasion, Mr. Nguyen received a call from "Jeff," on behalf of Santander, at 8:00 AM on a Saturday. (*Id.*)

### ii. Allegations against Citibank and Michael Corbat

At the end of the 3989 Amended Complaint, Plaintiffs allege that Citibank and Corbat "were contacted" and discussed the Plaintiffs' allegations against them including conspiracy to commit murder. (*Id.* ¶ 20.) Plaintiffs refer to the Addendum to the Amended Complaint. (*Id.*) Therein, Plaintiffs allege that Citibank acted with non-party Expedia "et al" in a conspiracy with "several 'State Actors' to committing [*sic* ] murder or committing [*sic* ] to terrorize us in the post 9/11 era, etc. in pursuant to FCRA" and several sections of the United States Code. (Am.Compl.Add .1.)

At or about the time Mr. Nguyen's father passed away in January of 2014, Mr. Nguyen called Citibank "at about 2 3 am" requesting an increase in his credit line, which was refused. (Supp.Am.Compl.Add.¶ 15.) Mr. Nguyen allegedly purchased flights from Expedia to Vietnam to attend his father's funeral. Mr. Nguyen alleges that Citibank acted in conjunction with Expedia to commit unfair and deceptive acts against him, forcing him to extend his credit account over the credit limit. (*Id.*)

At some unspecified time, Mr. Nguyen brought to Citibank's attention an unauthorized charge on his account. (*Id.*) Citibank removed the charge from his account initially, but later recharged the credit account. (*Id.*)

On April 23, 2014, Citibank refused Ms. Nguyen a credit card account "because of terrorist activity," but still sent her a credit card in the mail. (*Id.* ¶ 19.) Plaintiffs allege this constitutes "discrimination, character defamation, abuse of power" and is "criminally fraud [*sic* ]." (*Id.*)

### iii. Allegations against Chase Bank and Dimon

Mr. Nguyen brought a separate action, not joined by Ms. Nguyen, against Chase Bank and Dimon, in which he alleges similar claims for fraud, unfair and deceptive business practices, violations of the FCPA and CFPA, and conspiracy pursuant to 42 U.S.C. § 1985. (3464 Am. Compl. ¶ III.) Mr. Nguyen alleges that Chase Bank engaged in "illegal and deceptive practices" between October 2005 and June 2012, and that on September 13, 2013, the CFPB ordered Chase to pay more than $309 million in damages to credit card

customers. (3464 Am. Compl. ¶¶ 1, 8.) On September 13, 2013, Mr. Nguyen filed a claim in Small Claims Court, Kings County, for "Chase's violation" relating to Mr. Nguyen's credit card account, seeking damages of $5000 ("Small Claims action"). (*Id.* ¶ 2.) In December 2013, Mr. Nguyen sent Dimon a letter regarding his credit card account, because it "was illegally charged and billed with illegal and deceptive practice products." (*Id.* ¶ 3.)

**\*5** Shortly after filing his Small Claims action, Mr. Nguyen received a telephone call requesting his appearance on "People's Court" with Dimon "or his representative." (*Id.* ¶ 4.) Mr. Nguyen alleges that he "smelled something fishy" and determined that the offer was related to fraud and collusion, though he does not allege who colluded and for what end the collusion occurred. (*Id.* ¶ 4.) On January 27, 2014, Mr. Nguyen received a letter from a lawyer stating, *inter alia,* "please contact me to discuss the litigation and whether we can reach an amicable resolution." (*Id* . ¶ 5.) On March 3, 2014, Mr. Nguyen received another telephone call from the "Judge Judy Show," asking if he would appear on the show regarding the small claims case. (*Id.* ¶ 6.) Mr. Nguyen apparently did not appear on either television show, instead appearing before Judge Harriet Thompson in April of 2014, where Mr. Nguyen indicated that he would bring the action in the United States District Court after discontinuing his Small Claims action. (*Id.* ¶ 7.)

Mr. Nguyen alleges that he had a "good if not perfect record with Chase until" July of 2014. (*Id.* ¶ 8.) He states that "Chase broke the law and had been ordered to pay [P]laintiff, one of the victims." (*Id.*) He also refers to a "fabricated charge-off" and indicates that this was a "false pretense" for Chase to conspire with Credit Reporting Agencies via "fraud-ridden report(s)." (*Id.*) According to Mr. Nguyen, Chase "knowingly and willingly used false and inaccurate credit information" to cut his credit line—on a different account—from $14,000 to $6700, and to raise the interest rate on his account. (*Id.* ¶ 9.) Mr. Nguyen then stopped "dealing with" Chase. (*Id.* ¶ 8.) He states that the conduct, including cutting his credit line, "changing Court TV shows," and "conspiring" with different lawyers and attorneys, were "unfair and abusive practice[s]" and "pervert[ed] the course justice [*sic* ]." (*Id.* ¶ 10.)

Mr. Nguyen spent a week at Maimonides Hospital in Brooklyn as a result of Defendants' conduct. (*Id.* ¶¶ 10, 15.) He suffered from "financial loss, financial injuries, expenditure of time and resources, emotional distress, A–Fib, mental anguish, humiliation, and embarrassment," which

he argues entitles him to relief. (*Id.* ¶ 14.) At the end of his Complaint, Mr. Nguyen repeats his allegations regarding his March or April 2013 contact with Janet Sanders, Beth Johnson's "UFT chapter leader" and Teresa Samuels. (*Id.* ¶ 15.)

### iv. Allegations against Ridgewood and Boger

Mr. Nguyen brought a third action, not joined by Ms. Nguyen, against Ridgewood and Boger, in which he alleges similar claims for fraud, unfair and deceptive business practices, violations of the FCRA and CFPA, and conspiracy pursuant to 42 U.S.C. § 1985. (1058 Am. Compl. ¶ III.) The facts alleged in Mr. Nguyen's Complaint are set forth in *Nguyen v. Ridgewood Savings Bank (Nguyen I),* ––– F.Supp.3d –––, 2014 WL 7182812 (E.D.N.Y. Dec. 17, 2014), which decision dismissed Mr. Nguyen's initial Complaint, but permitted him to file the instant Amended Complaint.

**\*6** In or about November of 2005, Mr. Nguyen opened a Certificate of Deposit ("CD") account of $8000 with Ridgewood. (1058 Am. Compl. ¶ 1.) In connection with the account, Mr. Nguyen received a television and a camcorder. (*Id.*) On or about October 2007, Mr. Nguyen obtained a secured loan of about 90% of the CD value. (*Id.* ¶ 2.) Sometime between 2005 and 2010, Mr. Nguyen began making monthly payments on his loan at the Ridgewood branch in Brooklyn, NY. (*Id.* ¶ 3.) In 2013, Mr. Nguyen contacted the Federal Deposit Insurance Corporation's ("FDIC") Consumer Response Center disputing the accuracy of Ridgewood's records as to the timeliness of twenty two of Mr. Nguyen's payments on his loan. (*Id.* ¶¶ 4–5, 18.) A short time "before or after" December 16, 2013, Mr. Nguyen contacted Ridgewood seeking an additional loan, and appears to allege that he was denied the loan in connection with the gifts he received in 2005. (*Id.* ¶ 7a.) Mr. Nguyen attempted to resolve these issues in person at the branch, but the persons with whom he had direct contact were no longer available. (*Id.* ¶ 7b.) Ridgewood then reported to Trans Union or Experian that Mr. Nguyen had missed payments on his loan. (*Id.*)

Mr. Nguyen alleges that Equifax, Trans Union, Experian, Ridgewood, "and all [D]efendants in all cases" were motivated by a discriminatory animus against him in a conspiracy against him. (*Id.* ¶ 19.)

### v. Additional allegations

In the Supplemental Addendum to his Amended Complaint on October 31, 2014, Mr. Nguyen includes a number of facts

not related to any of the Defendants in the above-captioned actions. He refers to actions surrounding the September 11, 2001 terrorist attacks in New York City, Mr. Nguyen's former employment at Brooklyn Technical High School, Mr. Nguyen's contact with the United States Embassy in the Republic of Singapore, alleged discrimination perpetrated by Randy Asher, [9] and the death of Mr. Nguyen's father in January of 2014. (Supp.Am.Compl.Add.¶¶ 1–14, 20, 30–31.) Mr. Nguyen also alleges that he "saw the perpetrator attempting or/ and conspiring to kill or/ and to terrorize" him on three separate airline flights, though he does not indicate who "the perpetrator" is or include any other details about what happened. (*Id.* ¶¶ 16–18.) Mr. Nguyen also attached documents relating to teaching evaluations at Brooklyn Technical High School, (*id.* at 12–18), and airline itineraries, (*id.* at 19–21). He did not indicate how any of these additional documents were relevant to the above-captioned cases.

[9]   Randy J. Asher appears to have been the principal at Brooklyn Technical High School in 2012. (*See* Supp. Am. Compl. Add. 12.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must take all of the factual allegations in the complaint as true." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir.2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 113 (2d Cir.2013) (quoting *Holmes v. Grubman,* 568 F.3d 329, 335 (2d Cir.2009)); *Matson v. Bd. of Educ.,* 631 F.3d 57, 63 (2d Cir.2011) (quoting *Connecticut v. Am. Elec. Power Co.,* 582 F.3d 309, 320 (2d Cir.2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson,* 631 F.3d at 63 (quoting *Iqbal,* 556 U.S. at 678); *see also Pension Ben. Guar. Corp.,* 712 F.3d at 717–18. A complaint need not contain "detailed factual allegations," but a plaintiff must do more than present "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Matson,* 631 F.3d at 63 (internal quotation marks omitted) (quoting *Iqbal,* 556 U.S. at 678). "[W]here the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Pension Ben. Guar. Corp.,* 712 F.3d at 718 (alteration in original) (quoting *Iqbal,* 556 U.S. at 679). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." [10] *Iqbal,* 556 U.S. at 678. In reviewing a *pro se* complaint, the court must be mindful that the plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (internal quotation marks omitted); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (noting that even after *Twombly,* the court "remain[s] obligated to construe a *pro se* complaint liberally"). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court must grant leave to amend the complaint. *Shabazz v. Bezio,* 511 F. App'x 28, 31 (2d Cir.2013) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

[10]   When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint, as well as (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) any documents deemed integral to the complaint, and (4) public records. *See Nielsen v. Rabin,* 746 F.3d 58, 65 (2d Cir.2014) (Jacobs, J. dissenting) (documents attached to the complaint and those incorporated by reference); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 156 (2d Cir.2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (public records). For the purposes of this Memorandum and Order, the Court deems Plaintiffs' supplemental submissions in support of the Amended Complaints as part of the Amended Complaints.

### b. Fair Credit Reporting Act claims

**\*7** As observed in *Nguyen I,* the FCRA regulates consumer credit reporting agencies to ensure the confidentiality, accuracy, relevancy, and proper utilization of consumer credit information. 15 U.S.C. § 1681(b); *Nguyen I,* —— F.Supp.3d at ——, 2014 WL 7192812, at \*2. Under the statute, "consumer reporting agencies," sometimes referred to as

"credit reporting agencies," are defined as entities which, for a monetary fee, "regularly engage[ ] in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). "The FCRA places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies." *Redhead v. Winston & Winston, P.C.,* No. 01–CV–11475, 2002 WL 31106934, at *3–5 (S.D.N.Y. Sept. 20, 2002) (citing 15 U.S.C. § 1681, *et seq.; Aklagi v. Nationscredit Fin. Servs. Corp.,* 196 F.Supp.2d 1186, 1192 (D.Kan.2002); *Thomasson v. Bank One, La., N.A.,* 137 F.Supp.2d 721, 722 (E.D.La.2001))). [11]

[11]    A "furnisher" is "an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 16 C.F.R. § 660.2. Plaintiffs do not specifically allege which Defendants they consider to be furnishers, and which they consider to be consumer reporting agencies.

#### i. Individual Defendants

Plaintiffs have set forth no allegations as to Blanco, Dimon, Corbat, Robert or Boger ("Individual Defendants") that establish the FCRA applies to them. Plaintiffs' FCRA claims are therefore dismissed as to the Individual Defendants.

#### ii. Furnishers of information

Plaintiffs appear to bring claims against all Defendant banks as furnishers of information, similar to those claims Mr. Nguyen brought against Ridgewood in *Nguyen I,* that is, that Defendant banks improperly provided inaccurate information to consumer reporting agencies, or failed to correct inaccurate information that was provided to the consumer reporting agencies. "As part of [its] regulatory scheme, the [FCRA] imposes several duties on those who furnish information to consumer reporting agencies." *Longman v. Wachovia Bank, N.A.,* 702 F.3d 148, 150–51 (2d Cir.2012) (citing 15 U.S.C. § 1681s–2). Among those obligations are the duties to provide accurate information to consumer reporting agencies, to correct inaccurate information, and to correct inaccurate information after receiving notice of a credit dispute directly from a consumer. 15 U.S.C. § 1681s–2(a); *see Longman,* 702 F.3d at 150 ("Among these are duties to refrain from knowingly reporting inaccurate information, *see* § 1681s–2(a)(1), and to correct any information they later discover to be inaccurate, *see* § 1681s–2(a)(2).). Furthermore, furnishers of information have a responsibility to conduct an investigation after receiving notice of a credit dispute from a consumer reporting agency. § 1681s–2(b); *see also Redhead,* 2002 WL 31106934, at *4 ("The FCRA imposes two [general] duties on furnishers of information, codified at 15 U.S.C. §§ 1681s–2(a) and (b).").

#### 1. Section 1681s–2(a)

**\*8** "[T]here is no private cause of action for violations of [Section] 1681s–2(a)." *Longman,* 702 F.3d at 151 (collecting cases); *Barberan v. Nationpoint,* 706 F.Supp.2d 408, 427 (S.D.N.Y.2010); *Trikas v. Universal Card Servs. Corp.,* 351 F.Supp.2d 37, 44 (E.D.N.Y.2005). Therefore, any claims Plaintiffs attempt to bring under Section 1681s–2(a) of the FCRA, including those claims relating to Plaintiff's complaints directly to Defendant banks, are dismissed.

#### 2. Section 1681s–2(b)

To state a claim under Section 1681s–2(b) of the statute, Plaintiffs must allege that a furnisher of information received notice from a consumer reporting agency of Mr. Nguyen's credit dispute. *See Markovskaya v. Am. Home Mortg. Servicing, Inc.,* 867 F.Supp.2d 340, 344 (E.D.N.Y.2012) ("Plaintiff's only claim can be pursuant to Section 1681s–2(b). As noted, such a claim is stated only when [p]laintiff can show that the furnisher received information regarding a consumer's credit directly from a credit reporting agency, and not only from the consumer."); *Dickman v. Verizon Commc'ns, Inc.,* 876 F.Supp.2d 166, 172–74 (E.D.N.Y.2012) ("[U]nder § 1681s–2(b), [a] defendant ha[s] no duty to investigate [a] credit dispute unless defendant received notice of the dispute from a consumer reporting agency." (alterations in original) (internal quotation marks omitted) (quoting *Prakash v. Homecomings Fin.,* No. 05–CV–2895, 2006 WL 2570900, at *3 (E.D.N.Y. Sept. 5, 2006))); *Kane v. Guar. Residential Lending, Inc.,* No. 04–CV–4847, 2005 WL 1153623, at *4 (E.D.N.Y. May 16, 2005) ("[T]he duty to investigate in Subsection (b) is triggered only after a furnisher of information receives notice *from a credit reporting agency* of a consumer's dispute."). "A plaintiff proceeding under [Section] 1681s–2(b) is required to show that the furnisher was told by a credit reporting agency that the consumer's information was disputed, as opposed to being told by the consumer directly." *Mendy v. JP Morgan Chase & Co.,* No. 12–CV–8252, 2014 WL 1224549, at *5 (S.D.N.Y. Mar.24, 2014) (internal quotation marks and citations omitted).

The majority of Plaintiffs' allegations are conclusory statements that Defendants Santander, Chase, Citibank and Ridgewood engaged in unfair and abusive practices, providing no indication of whether the alleged practice involved information reported to a consumer reporting agency. Plaintiffs appear to allege that Defendant banks forced Mr. Nguyen into destitution by refusing to extend him further credit or reducing his credit limits, which affected his credit utilization ratio and credit score, making it difficult for him to obtain further credit and leading to increased interest rates on his accounts. Plaintiffs also specifically allege certain practices on the part of each Defendant bank: that Santander charged Mr. Nguyen approximately sixteen dollars on the wrong date, and at an unspecified time; Citibank inappropriately dealt with a charge which Mr. Nguyen reported was unauthorized; Citibank "refused" Ms. Nguyen a credit card, though it eventually sent one to her in the mail; Chase billed Mr. Nguyen inappropriately; and Ridgewood improperly reported to Trans Union that Mr. Nguyen had made late payments on his account.

 **\*9** Plaintiffs allege that Mr. Nguyen notified the FTC, the CFPB and the FDIC Consumer Response Center regarding his issues with the Defendant banks, and the Amended Complaints allege that Experian, Trans Union and Equifax were involved in "conspiracy" with the Defendant banks. Plaintiffs also allege that Experian may have acted in conjunction with Santander to collect the sixteen dollars, although they are unclear and indeterminate on Experian's involvement, and allege that Mr. Nguyen contacted Experian, Trans Union and Equifax in January 2014, although there is no indication in any of Complaints of what Mr. Nguyen reported to them other than "address[ing] the issue [12] and offer [ing an] amicable solution in the interest of law and in the interest of our mother, America." (3989 Am. Compl. ¶ 16.) Even affording the Complaint a liberal reading, it is difficult to conclude from the allegations that Ridgewood, Chase, [13] Citibank or Santander received or ignored any notice of a dispute regarding the completeness or accuracy of any information provided to a consumer reporting agency. *See Dickman,* 876 F.Supp.2d at 172 ("[U]nder § 1681s–2(b), [a] defendant ha[s] no duty to investigate [a] credit dispute unless defendant received notice of the dispute from a consumer reporting agency." (alterations in original) (quoting *Prakash,* 2006 WL 2570900, at \*3)). Absent any allegation that (a) Plaintiffs notified a consumer reporting agency of a credit dispute or (b) any of the Defendant banks, Ridgewood, Chase, Citibank or Santander, was notified by a consumer reporting agency of a dispute as to the accuracy of the information

furnished to a consumer reporting agency, Plaintiffs fail to state a claim under the FCRA. Plaintiffs' claims are therefore dismissed with prejudice.

12    Though it is not clear from the Complaints, Plaintiffs vaguely tie "the issue" to their allegations that the consumer reporting agencies were engaged in fraud of some kind. (*See* 3989 Am. Compl. ¶ 16.)

13    Chase also moves for dismissal of Mr. Nguyen's FCRA claim on the ground that claims more than two years old are barred by the statute of limitations. The Court declines to address the statute of limitations, given that Mr. Nguyen has not plausibly identified a factual basis for his claim, including failing to identify when the claim arose.

### iii. Consumer reporting agencies

Plaintiffs allege generally that Equifax, Trans Union and Experian violated the FCRA. "The FCRA creates a private right of action against credit reporting agencies for the negligent or willful violation of any duty imposed under the statute."*Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 473 (2d Cir.1995) (internal citations omitted). [14] Based on their allegations, Plaintiffs appear to invoke Sections 1681e and 1681i of the FCRA against the Defendant consumer reporting agencies, which require consumer reporting agencies to insure that the reported information is accurate, and to investigate disputes as to the accuracy of reported information. [15]

14    Equifax argues that Equifax, Inc., the named Defendant in this action, is a holding company for Equifax Information Services LLC and is not a credit reporting agency subject to the FCRA. (Equifax Mot. to Dismiss 4 n. 1.) Because the Court has determined that Plaintiffs have failed to allege any facts that would support a claim against Equifax, the Court declines to address this argument.

15    Plaintiffs also reference 15 U.S.C. §§ 1681*o* and 1681n, which permit civil liability for consumer reporting agencies' negligent or willful noncompliance with the statute. Under Sections 1681*o* and 1681n, a plaintiff is entitled to actual damages as a result of defendants' noncompliance with the statute. "To maintain a claim under the

FCRA, Plaintiff bears the burden of demonstrating 'actual damages sustained' as a result of the Defendants' activities." *Caltabiano v. BSB Bank & Trust Co.,* 387 F.Supp.2d 135, 141 (E.D.N.Y.2005) (citing *Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 473 (2d. Cir.1995)). Defendants argue that Plaintiffs fail to adequately allege actual damages to support their claims under the statute. The Court declines to address Defendants' argument as to damages, as Plaintiff has failed to state a claim for liability under the statute.

**1. Section 1681e(b)**

Section 1681e(b) imposes a duty on consumer reporting agencies "to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b); *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 104 (2d Cir.1997) (same); *Gorman v. Experian Info. Solutions, Inc.,* No. 07–CV–1846, 2008 WL 4934047, at *4 (S.D.N.Y. Nov. 19, 2008) ("[T]he FCRA requires that consumer reporting agencies, such as Experian, 'follow reasonable procedures to assure maximum possible accuracy of the information' contained in the consumer report." (quoting 15 U.S.C. § 1681e(b))). In order to succeed on a claim under Section 1681e(b), a plaintiff must show that:

> ***10*** (1) the consumer reporting agency was negligent [or willful] in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury.

*Gorman,* WL 4934047, at *4 (quoting *Whelan v. Trans Union Credit Reporting Agency,* 862 F.Supp. 824, 829 (E.D.N.Y.1994)) (internal quotation marks omitted) (alteration in original); *Selvam v. Experian Info. Solutions, Inc.,* No. 13–CV–6078, 2015 WL 1034891, at *3 (E.D.N.Y. Mar.10, 2015) (same); *Agu v. Rhea,* No. 09–CV–4732, 2010 WL 5186839, at *5 (E.D.N.Y. Dec. 15, 2010) (same) (quoting *Gaft v. Mitsubishi Motor Credit of Am.,* No. 07–CV–527, 2009 WL 3148764, at *9 (E.D.N.Y. Sept. 29, 2009)). Merely

reporting inaccurate information is insufficient to give rise to liability under the FCRA, as the Act is not a strict liability statute. *See* 15 U.S.C. §§ 1681*o*, 1681n; *Ogbon v. Beneficial Credit Servs., Inc.,* No. 10–CV–3760, 2013 WL 1430467, at *6–7 (S.D.N.Y. Apr. 8, 2013) ("[A] credit reporting agency is not held strictly liable under the FCRA merely for reporting [inaccurate information]; rather, the consumer must show that the agency failed to follow reasonable procedures in generating the inaccurate report." (internal quotation marks and citations omitted)), *appeal dismissed* (Sept. 23, 2013); *Gaft,* 2009 WL 3148764, at *9 ("However, an inaccurate entry of credit information, in and of itself, is not a violation of the FCRA; rather ... plaintiff must allege that the consumer reporting agencies failed, through negligence or intention, to follow reasonable procedures to ensure the accuracy of the information.")

**2. Section 1681i**

Section 1681i sets out procedures consumer reporting agencies must follow to investigate disputes as to the accuracy of reported information. 15 U.S.C. § 1681i. These procedures include reinvestigating a consumer's record within a reasonable period of time after a consumer "directly conveys" a dispute as to the "completeness or accuracy of an item on his credit report" to the consumer reporting agency. *Podell,* 112 F.3d at 101 (citing *id* .§ 1681i(a)); *see also Longman,* 702 F.3d at 151 ("If a dispute is filed with the agency, both the agency and the furnisher of that information have a duty to reasonably investigate and verify that the information is accurate." (citing §§ 1681i(a)(1)(A), 1681s–2(b))). Section 1681i states, in relevant part, that if a consumer notifies a consumer reporting agency—either directly or indirectly—of a dispute as to the accuracy of any item of information contained in his file, within thirty days of notification the consumer reporting agency "shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." [16] 15 U.S.C. § 1681i(a) (1)(A); *see Jones v. Experian Info. Solutions, Inc.,* 982 F.Supp.2d 268, 272 (S.D.N.Y.2013) (quoting same). What constitutes a "reasonable" reinvestigation depends on the circumstances of the allegations. *Id.* (citing *Cortez v. Trans Union, LLC,* 617 F.3d 688, 713 (3d

[16]    In full, the relevant section states:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer

notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer....

15 U.S.C. § 1681i(a)(1)(A).

**\*11** Cir.2010)). "Prior to being notified by a consumer, a credit reporting agency generally has no duty to reinvestigate credit information." *Casella,* 56 F.3d at 474.

### 3. Plaintiffs fail to state a claim

Plaintiffs allege that Trans Union, Equifax and Experian have issued credit reports regarding Mr. Nguyen that contained fraudulent, inaccurate or "deceptive" information, particularly as it relates to Mr. Nguyen's credit utilization ratio and his "FICO" credit score. (*See* 3989 Am. Compl. ¶¶ 5, 18.) Plaintiffs also allege that Mr. Nguyen complained to these agencies about "the issue." (*Id.* ¶ 16.) Plaintiffs fail, however, to make any allegations relating to the procedures Trans Union, Equifax or Experian instituted to ensure the accuracy of the information in Mr. Nguyen's credit reports, to support a Section 1681e(b) claim. *See Ogbon,* 2013 WL 1430467, at \*7 (granting summary judgment on Section 1681e claim in favor of Trans Union and Experian because the plaintiff "ha[d] adduced no evidence to suggest that either defendant failed to follow reasonable procedures in preparing her credit report"); *Gaft,* 2009 WL 3148764 (dismissing FCRA claim, noting that the plaintiff's amended complaint was "devoid of any allegations concerning the reasonableness of the procedures used by the defendant consumer reporting agencies").

Plaintiffs also fail to make any allegations regarding either the procedures followed or investigations by Trans Union, Equifax or Experian in response to Mr. Nguyen's complaints, in order to support a Section 1681i claim. Plaintiffs' conclusory and broad allegations of fraud and deceptive practices, without explanation of how Defendants willfully or negligently violated the FCRA, do not suffice to state a claim under the statute. *See Selvam,* 2015 WL 1034891, at \*3–4 (dismissing FCRA claims against consumer reporting agency when plaintiff failed to explain how defendant willfully or negligently violated the statute, and did not set forth

how consumer reporting agency acted unreasonably with respect to disputed information); *Agu,* 2010 WL 5186839, at \*6 (dismissing FCRA claim against consumer reporting agencies because plaintiff "rests his Section 1681e claim on a combination of nonspecific, conclusory allegations about 'false' or 'derogatory' statements, and repetition of his argument that Bank of America incorrectly reported that he 'owe[d] more than once' "). Plaintiffs' FCRA claims against Trans Union, Equifax and Experian are dismissed, with prejudice.

### c. Consumer Financial Protection Act claims

Plaintiffs bring claims pursuant to the CFPA, specifically enumerating Sections 5531, 5536(a), 5563 and 5565. As an initial matter, Plaintiffs provide no facts beyond conclusory statements that Defendants engaged in unfair and abusive practices to support a finding that Defendants may be in violation of the CFPA. Furthermore, Plaintiffs provide no statutory basis, and the Court can find none, for finding a private right of action under these provisions of the statute, which outline duties, authorities and enforcement powers of the CFPB. *See Johnson v. J.P. Morgan Chase Nat'l Corporate Servs., Inc.,* No. 13–CV–678, 2014 WL 4384023, at \*5 (W.D.N.C. Aug. 5, 2014) ("[T]here is no private right of action under the CFPA.") *report and recommendation adopted,*2014 WL 4384024 (W.D.N.C. Sept.3, 2014); *In re Capital One Derivative S'holder Litig.,* No. 12–CV–1100, 2012 WL 6725613, at \*7 (E.D.Va. Dec. 21, 2012) ("[I]t is true that there are no private causes of action available under ... the Consumer Financial Protection Act ."); *see also Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110, 116 (2d Cir.2007) (A Court "cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided." (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979))). A related provision of the statute specifically provides that, "[i]f any person violates a Federal consumer financial law, the *Bureau* may ... commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 15 U.S.C. § 5564(a) (emphasis added). Therefore, Plaintiffs' claims under the CFPA are dismissed, with prejudice, as to all Defendants.

### d. Sections 1983 and 1985

**\*12** Plaintiffs invoke 42 U.S.C. §§ 1983 and 1985 in relation to vague allegations of conspiracy. Plaintiffs' claims are not cognizable under Section 1983 or 1985. In order to sustain

a claim for relief under Section 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)); *see Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) ("To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."); *Bartels v. Inc. Vill. of Lloyd,* 751 F.Supp.2d 387, 402 (E.D.N.Y.2010). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (citation and internal quotation marks omitted). Similarly, to bring a claim for conspiracy under Section 1985(3), a plaintiff must allege:

> (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.

*Finn v. Anderson,* 592 F. App'x 16, 20 (2d Cir.2014) (quoting *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999)) (internal quotation marks omitted).

Plaintiffs have not stated a claim under Section 1983 or 1985 against any Defendant. Plaintiffs have acknowledged that the Defendants are either private corporations or private individuals acting as corporate officers of the Defendant corporations. (1058 Am. Compl. ¶ II; 3464 Am. Compl. ¶ II; 3989 Am. Compl. ¶ II .) However, Plaintiffs have not alleged that any of the Defendants were acting under color of state law, nor have they provided any facts which would support such an allegation beyond the vague and conclusory statement that Defendants conspired with "State

Actors." Furthermore, Plaintiffs allege no specific violation of constitutional or federal rights, other than presenting vague and repeated references to conspiracy. These general allegations are insufficient to state a claim under Section 1983 or 1985(3). *See White v. Monarch Pharm., Inc.,* 346 F. App'x 739, 741 (2d Cir.2009) (noting that conclusory, vague, or general allegations are insufficient to state a claim for conspiracy pursuant to Section 1985 (citing *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983))); *Tekiner v. Dep't of Corr.,* No. 14–CV–1293, 2014 WL 2440671, at *3 (E.D.N.Y. May 30, 2014) ("To state a civil rights claim under § 1983, a complaint must contain 'specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under [§ ] 1983.' " (alteration in original) (quoting *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987))); *Houghton v. Cardone,* 295 F.Supp.2d 268, 273 (W.D.N.Y.2003) (same); *see also TADCO Const. Corp. v. Dormitory Auth. of State of N.Y.,* 700 F.Supp.2d 253, 262 (E.D.N.Y.2010) (noting that § 1983 "does not, however, itself create substantive rights, but 'merely provides a method for vindicating federal rights elsewhere conferred' " (quoting *Rateau v. City of New York,* No. 06–CV–4751, 2009 WL 3148765, at *4 (E.D.N .Y. Sept. 29, 2009))). Plaintiffs' claims pursuant to Sections 1983 and 1985 are dismissed, with prejudice, as to all Defendants.

### e. Federal criminal statutes

**\*13** Plaintiffs appear to assert that certain Defendants are in violation of 18 U.S.C. §§ 1111, 1113, 1117 and 1119, and have "possibl[y]" violated 18 U.S.C. §§ 2381 and 2382. These statutes, prohibiting murder, attempt to commit murder or manslaughter, conspiracy to commit murder, and foreign murder of United States nationals, and treason and misprision of treason, respectively, do not provide a private right of action. *See Shaughnessy v. New York,* No. 13–CV–271, 2014 WL 457947, at *7 (N.D.N.Y. Feb.4, 2014) (adopting report and recommendation which concluded "even if the claim were not completely conclusory, plaintiff may not sue any of the defendants for treason because there is no private right of action for the crime" (citations omitted)), *appeal dismissed* (May 28, 2014); *Patrick v. Buzbaugh,* No. 08–CV–1075, 2009 WL 311073, at *2 (W.D.Mich. Feb. 6, 2009) (dismissing a claim brought pursuant to section 2381); *Estate of Musayelova v. Kataja,* No.06–CV–881, 2006 WL 3246779, at *2 (D.Conn. Nov. 7, 2006) (denying reconsideration of dismissal of action including claims brought pursuant to 18 U.S.C. §§ 1111 and 1117, noting that there was no private cause of action); *see also Delarosa v. Serita,* No. 14–CV–

737, 2014 WL 1672557, at *2 (E.D.N.Y. Apr. 28, 2014) ("Violations of the Criminal Code do not provide a basis for a civil cause of action, unless the particular provision in question includes an express or implied private right of action." (quoting *Weinstein v. City of New York,* No. 13–CV–06301, 2014 WL 1378129, at *4 (S.D.N.Y. Apr.8, 2014))). Accordingly, Plaintiffs' claims pursuant to these federal criminal statutes are dismissed with prejudice.

Because Plaintiffs have failed to state a claim under the FCRA, CFPA, 42 U.S.C. §§ 1983 and 1985, or the referenced federal criminal statutes, all of Plaintiffs' federal claims are dismissed for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[17]

[17]    Defendants also moved for dismissal pursuant to Rules 8 and 9(b) of the Federal Rules of Civil Procedure, arguing that Plaintiffs failed to sufficiently plead their claims, and Rule 12(b)(5) of the Federal Rules of Civil Procedure, arguing that Plaintiffs failed to properly serve certain Defendants, including Corbat, (*see* Citibank Mot. to Dismiss 1 n. 1). Because the Court finds that Plaintiffs have failed to state a claim against any of the Defendants, the Court will not address the alternative grounds for dismissing the Complaints.

### f. New York State Fair Credit Reporting Act claims

Plaintiffs also bring claims pursuant to the New York State Fair Credit Reporting Act, specifically referring to N.Y. Gen. Bus. Law §§ 380–o, 380–*l*,380–m.[18] The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3) ( "District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction."). Because Plaintiffs' Complaints do not contain sufficient facts that may fairly be read to state a claim for any violation of Plaintiffs' federal rights, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Plaintiffs' state law claims are dismissed without prejudice.

[18]    Defendants argue that Plaintiffs' claims brought pursuant to the New York State Fair Credit Reporting Act are preempted, as outlined in 15 U.S.C. § 1681t(b). While this may be the case in some instances, *see Galper v. JPMorgan Chase, N.A.,* No. 13–CV3449, 2014 WL 1089061, at *3–

6 (S.D.N.Y. Mar.17, 2014) (discussing scope of preemptive effect of Section 1681t(b)(1)(F)), the Court declines to address the issue of federal preemption.

### g. Mr. Nguyen's request for default judgments

By letter dated November 18, 2014, Mr. Nguyen moved for default judgments against Experian and Robert, alleging that Plaintiffs had not received Experian's motion to dismiss or an answer to his Complaint, and arguing that "Experian is the biggest criminal ever in the history of [Mr. Nguyen's] life." (Letter dated Nov. 18, 2014 from Mr. Nguyen seeking default judgment against Experian and Robert 1, 89DE No. 32.) On March 27, 2015, Mr. Nguyen filed a letter renewing his request for default judgments on the grounds that Experian and Robert have failed to defend the action.[19] (Letter dated Mar. 24, 2015, 89DE No. 65.)

[19]    By letters dated March 6, 2015 and March 11, 2015, Mr. Nguyen requested default judgments against Ridgewood and Boger, which the Court denied. (*See* No. 14–CV–1058, Order dated Mar. 10, 2015 and Order dated Mar. 17, 2015.)

**\*14** Mr. Nguyen has failed to show a basis for his motion. As an initial matter, it is not clear that Experian and Robert have failed to defend this action. By Order of the Court dated November 6, 2014, Defendants were granted until December 5, 2014 to serve their motions to dismiss. On December 5, 2014, counsel for Experian electronically filed a letter indicating that Experian had served its motion to dismiss on Plaintiffs. (89DE No. 37.) Experian's counsel entered her appearance on the same day. (89DE No. 35.) Experian timely filed a motion to dismiss.[20] (*See* 89DE No. 54.) Second, because Plaintiffs have failed to state a claim against Experian and Robert, Mr. Nguyen cannot show that Experian and Robert are liable to him on the grounds alleged, even if they had defaulted. *See Lopez v. Yossi's Heimishe Bakery Inc.,* No. 13–CV–5050, 2015 WL 1469619, at *3 (E.D.N.Y. Mar.30, 2015) (adopting report and recommendation, which noted that "[w]ith respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiffs' burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action" (citing *Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir.2009) and *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 159 (2d Cir.1992))).

2015 WL 2354308

20    As discussed *infra* n. 2, Robert did not explicitly join Experian's motion to dismiss, but Experian and Robert are represented by counsel at the same law firm and Experian's memorandum of law in support of the motion to dismiss contains argument as to Robert.

**h. Plaintiffs will not be granted leave to amend**

"Generally, '[a] *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Obot v. Sallie Mae,* ——— F. App'x ———, 2015 WL 548202, at *2 (2d Cir. Feb.11, 2015) (alteration in original) (quoting *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014)). Plaintiffs have been granted leave to amend in all three of their actions, and Mr. Nguyen has been granted leave to file supplemental addenda to the Amended Complaints in 14–CV–3464 and 14–CV–3989. Plaintiffs have failed to address the deficiencies in their Complaints in accordance with the Court's prior orders, and the Court therefore dismisses all of Plaintiffs' federal claims

with prejudice. *See Shabtai v. Levande,* 38 F. App'x 684, 686–87 (2d Cir.2002) (affirming dismissal of *pro se* complaint after failure to file amended complaint that complied with Rule 8 of the Federal Rules of Civil Procedure, in accordance with district court's order). Plaintiffs will not be granted leave to further amend the Complaints.

**III. Conclusion**

For the foregoing reasons, the Court grants Defendants' motions to dismiss, with prejudice, all of Plaintiffs' federal claims and dismisses, without prejudice, Plaintiffs' state law claim. The Court denies Plaintiff's request for default judgments. The Clerk of the Court is directed to close these cases.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2354308

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Thompson v. Equifax Information Services LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2467662

2022 WL 2467662
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Carlene THOMPSON, Plaintiff,

v.

EQUIFAX INFORMATION SERVICES
LLC, Experian Information Solutions,
Inc. and Trans Union, LLC, Defendants.

20-CV-6101 (RPK) (ST)
|
Signed February 24, 2022

**Attorneys and Law Firms**

Carlene Thompson, Amityville, NY, Pro Se.

Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, Brenda Beauchamp, Akerman LLP, New York, NY, for Defendant Equifax Information Services, LLC

Cealagh P. Fitzpatrick, Jones Day, New York, NY, for Defendant Experian Information Solutions, Inc.

Camille Renee Nicodemus, Cayla Mary Irlbeck, Pro Hac Vice, Schuckit & Associates, P.C., Zionsville, IN, for Defendant TransUnion, LLC.

**REPORT AND RECOMMENDATION**

STEVEN TISCIONE, Magistrate Judge:

**\*1** Plaintiff Carlene Thompson commenced this suit *pro se* against Defendants Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian") and Trans Union, LLC ("Trans Union") (collectively "Defendants") alleging claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, and common law defamation. *See generally* Pl. Compl., ECF No. 1.

Defendants have jointly moved for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), which Plaintiff opposes. *See* Def. Br., ECF No. 22-1; Pl. Opp. Br., ECF No. 23; Def. Repl. Br., ECF No. 26. On June 2, 2021, the Honorable Rachel P. Kovner referred the motion to this Court for a Report and Recommendation. *See* Order, 20-cv-6101 (E.D.N.Y. July 2, 2021).

For the reasons set forth below, this Court respectfully recommends that Defendants' joint motion for a judgment on the pleadings be GRANTED, and Plaintiff's complaint be dismissed without prejudice.

**BACKGROUND**

**I. Factual Background**

The following facts are taken from the Complaint and declarations submitted in support of the instant motion, [1] and are assumed to be true for purposes of the motion. *See, e.g.,* Littlejohn v. City of New York, 795 F.3d 297, 306 (2d Cir. 2015) (motion to dismiss); *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir. 2010) (motion for judgment on the pleadings). Because Plaintiff is proceeding *pro se*, the Court also considers and incorporates factual allegations made for the first time in her response opposing the motions. *See, e.g.,* Saudager v. Walgreens Co., No. 18-CV-437, 2019 WL 498349, at *1 n.1 (S.D.N.Y. Feb. 8, 2019) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.") (quoting Walker v. Schult, 717 F.3d 119, 122 n.1 (2d Cir. 2013)).

[1]       In support of Defendants' joint motion, Equifax and Experian submitted attorney declarations attaching the consumer file that each respectively provided to Plaintiff and Plaintiff's Chapter 7 bankruptcy petition. *See* Bankruptcy Petition, Ex. A attached to the Declaration of Courtney S. Stieber, Esq. ("Stieber Decl."), ECF No. 22-2; Equifax Consumer File, Ex. B attached to the Stieber Decl., ECF No. 22-2; Experian Consumer File, Ex. A attached to the Declaration of Cealagh P. Fitzpatrick, Esq. ("Fitzpatrick Decl."), ECF No. 22-3. These exhibits are properly considered in the context of a Rule 12(c) motion as they are either public records or integral to and incorporated by reference to the Complaint. *See* Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 305 (2d Cir. 2021) ("[C]ourts may on a Rule 12(c) motion —just as on a Rule 12(b)(6) motion—consider extrinsic material that the complaint 'incorporate[s] by reference,' that is "integral" to the complaint.") (citation omitted). But they are not provided the

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 217 of 238

Thompson v. Equifax Information Services LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2467662

same assumption of truth as Plaintiff's allegations are at the motion to dismiss stage.

Plaintiff is a "consumer" and Defendants Equifax, Experian and Trans Union are "consumer reporting agencies" ("CRAs") as defined under the FCRA. Pl. Compl. ¶¶ 6, 7-9, ECF No. 1. On October 25, 2013, Plaintiff filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court, Eastern District of New York. *See* Bankruptcy Petition, Ex. A. attached to the Stieber Decl., ECF No. 22-2. In December 2020, Plaintiff "obtained her 'credit files' from Defendants" which showed that she "had public records in the United States Bankruptcy Court, Eastern District of New York." *Id.* These "credit files" indicated that the source of "this public record information was The United States Bankruptcy Court, Eastern District of New York." *Id.* ¶ 34. According to Plaintiff, Defendants did not obtain her bankruptcy information directly from the District Court. *Id.* at ¶ 36. Rather, Defendants obtained the information from a third-party vendor, LexisNexis. *Id.* at ¶ 37. Plaintiff alleges that "the information about this supposed bankruptcy was misleading and falsely represented," *id.* at ¶¶ 23, 38, and that "this error originated with Defendant's [*sic*] public records vendors, and not with 'The United States Bankruptcy Court Eastern District of New York.' " *Id.* at ¶ 39.

**\*2** Thereafter, Plaintiff sent a letter to Defendants requesting a description of the result of their investigation concerning her credit report. *Id.* at ¶ 40. In response, Defendants provided Plaintiff a reinvestigation response in addition to turning over her consumer file. *See id.* at ¶ 41. Plaintiff alleges that neither her "credit files" nor "personal credit reports" disclose that LexisNexis is the actual source of the information regarding her bankruptcy. *Id.* at ¶¶ 41, 46-47, 67, 71. According to Plaintiff, Defendants misdirected her "to courthouses and other government offices with which Defendants [have] no dealings with." *Id.* at ¶ 47.

Based on these allegations, Plaintiff claims that Defendants negligently and willfully: (1) failed to follow reasonable procedures to assure maximum possible accuracy of the information in consumer reports, pursuant to 15 U.S.C. § 1681e(b); (2) failed to comply with the reinvestigation requirements of 15 U.S.C. § 1681i(A); and (3) failed to disclose information, pursuant 15 U.S.C. § 1681g(A)(2). *Id.* at ¶¶ 60-144. As a result, Plaintiff alleges she suffered "emotional distress and financial loss," *id.* at ¶ 58, including, but not limited to, "credit damage, higher interest rates, damage to reputation, informational injury, embarrassment, humiliation and other emotional and mental distress," *id.* at ¶

87. *See also id.* at ¶ 59 ("As a result of the acts and conducts allege[d] above, Plaintiff has endured fear, humiliation, embarrassment, mental pain, suffering, inconvenience, and financial injury, including lost business profits."); Pl. Opp. Br., 20 ("As a result, [Plaintiff] was denied credit, including a mortgage refinance, was assessed higher interest rates on the credit [s]he did obtain, and encountered difficulty purchasing insurance and obtaining employment.").

Plaintiff also alleges that Defendants "published statements through writing using Plaintiff's personal information to falsely reflect that Plaintiff was responsible for a federal tax lien, various accounts, and deleting the accounts [s]he was responsible for which proves [P]laintiff has some good credit." Pl. Compl. ¶ 147, ECF No. 1. Defendants published statements are allegedly false because they do not accurately reflect "Plaintiff's accounts, ... credit information, and debt repayment history" and "Defendants knew the statements were false when made and had no factual basis for making the statements." *Id.* at ¶¶ 148-149. Plaintiff claims through this conduct, Defendants defamed her. *Id.* at ¶¶ 145-153.

## II. Procedural History

Plaintiff commenced the instant action on December 14, 2020, asserting eight claims under the FCRA and one common law claim for defamation against Defendants. *See generally id.* Defendants filed Answers to the Complaint on February 23 and 24 and March 5, 2021, respectively. *See* Trans Union Answer, ECF No. 9; Equifax Answer, ECF No. 10; Experian Answer, ECF. No. 10. Discovery is ongoing. *See* ECF No. 32.

On June 1, 2021, Defendants jointly moved for a judgment on the pleadings pursuant to Rule 12(c). *See generally* Def. Br., ECF No. 22-1. Defendants argue that Plaintiff fails to state a claim for violations of the FCRA because (1) she has not sufficiently alleged an injury-in-fact or causation to confer Article III standing and (2) Defendants accurately reported the existence of Plaintiff's bankruptcy and the source of this information. *Id.* Defendants further argue that Plaintiff's defamation claim should be dismissed because it is preempted by the FCRA. *Id.* In support of their joint motion, Defendants submit, among other things, the Declarations of Courtney S. Stieber, Esq. and Cealagh P. Fitzpatrick, Esq., which attach Plaintiff's bankruptcy petition filed with the Eastern District of New York and the consumer file Experian and Equifax provided to Plaintiff. *See generally* Stieber Decl., ECF No. 22-2; Fitzpatrick Decl., ECF No. 22-3.

2022 WL 2467662

**\*3** Plaintiff filed opposition to Defendants' motion on June 28, 2021. *See generally* Pl. Opp. Br., ECF No. 23. The opposition largely reiterates the allegations pleaded in the Complaint and includes caselaw almost entirely outside the Second Circuit to argue (1) that although the challenged credit information may technically be accurate it is nonetheless misleading, (2) Article III standing exists based on alleged procedural violations of the FCRA and damage to her credit score, and (3) her defamation claim is not preempted by the FCRA where she has alleged malice and willfulness. *Id.* On July 9, 2021, Defendants filed a reply in support of their motion arguing, among other things, that Plaintiff still fails to sufficiently identify any inaccuracy or misleading information regarding her reported bankruptcy and any alleged damage to Plaintiff's credit score is insufficient to establish an injury-in-fact or causation. *See generally* Def. Repl. Br., ECF No. 26.

On June 2, 2021, the Honorable Rachel P. Kovner referred the motion to this Court for a Report and Recommendation. *See* Order, 20-CV-6101 (E.D.N.Y. July 2, 2021).

## LEGAL STANDARD

Rule 12(c) provides that "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A court applies the same standard to a motion for judgment on the pleadings as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In evaluating the sufficiency of a complaint, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *id.*, but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (citation omitted). A pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct ..." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Iqbal*, 556 U.S. at 678; *accord Panjiva, Inc. v. United States Customs & Border Prot.*, 342 F. Supp. 3d 481, 485 (S.D.N.Y. 2018). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Dargahi v. Honda Lease Trust*, 370 F. App'x 172, 174 (2d Cir. 2010) (internal quotation marks and citation omitted); *accord Nathaniel v. City of N.Y.*, No. 16-CV-256, 2017 WL 3912986, at \*1 (E.D.N.Y. Sept. 6, 2017) (citations omitted).

"A document filed *pro se* is to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (internal quotations and citation omitted). Courts within this Circuit grant *pro se* litigants a " 'special solicitude' by interpreting a complaint filed *pro se* 'to raise the strongest claims that it suggests.' " *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). However, the "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (quoting *2 Moore's Federal Practice* § 12.31[1][b] (2005), at 12–61 (internal quotation marks omitted)). The court "need not argue a *pro se* litigant's case nor create a case for the *pro se* which does not exist." *Babin v. Dep't of the Treasury*, No. 20-CV-2702, 2021 WL 5860595, at \*9 (E.D.N.Y. Dec. 9, 2021) (citation omitted). Therefore, a court should "not hesitate to dismiss a *pro se* complaint if it fails altogether to satisfy the pleading standard." *Henry v. Davis*, No. 10-CV-7575, 2011 WL 3295986, at \*2 n.5 (S.D.N.Y. Aug. 1, 2011), *adopted by* 2011 WL 5006831 (Oct. 20, 2011).

## DISCUSSION

**\*4** Because the few factual allegations pleaded in the Complaint are vague and, at times, convoluted, the Court cannot determine with certainty the specific inaccuracies alleged to have been made by Defendants. Liberally construed, it appears, though it is unclear, that Plaintiff alleges that Defendants erroneously reported the existence of her bankruptcy petition, information related to Plaintiff's financial history including her bankruptcy petition, and the source of that information in her consumer file. Therefore, to the extent any of these three alleged inaccuracies are relevant, the Court will consider them.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 219 of 238

Thompson v. Equifax Information Services LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2467662

## I. Defendants' Motion Should Be Granted as Plaintiff Has Failed to Plead Facts Which Show a Federal Court Has Subject Matter Jurisdiction Under Article III of the United States Constitution

### a. Allegations Relating to Inaccurate Reporting of the Information Source

As a threshold issue, the Court first addresses Defendants' jurisdictional challenge, namely, that Plaintiff has failed to allege facts showing she has Article III standing. "Standing is a federal jurisdictional question determining the power of the court to entertain the suit." *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) (internal quotation marks and citation omitted). "Article III of the Constitution limits judicial power of the United States to the resolution of cases and controversies. This limitation is effectuated through the requirement of standing." *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009) (citations omitted). Article III standing requires plaintiffs to show (1) an "injury in fact," (2) a "causal connection" between that injury and the conduct at issue, and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted); *accord Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016), *as revised* (May 24, 2016) (citing *Lujan*, 504 U.S. at 560).

Contrary to Plaintiff's assertion, a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 578 U.S. at 341. Rather, to maintain an action under the FCRA, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent' " as a result of a violation. *Id.* at 1548. In other words, "not all inaccuracies cause harm or present any material risk of harm." *Id.* at 1550.

Denial of credit and other similarly adverse consequences are often the basis of FCRA damages, but "emotional damages may also be freestanding ... where an inaccuracy *alone* causes emotional damages." *Shimon v. Equifax Info. Servs. LLC* ("Shimon II"), 431 F. Supp. 3d 115, 123 (E.D.N.Y. 2020), *aff'd*, 994 F.3d 88 (2d Cir. 2021) (citing *Wenning v. On-Site Manager, Inc.*, No. 14-CV-9693, 2016 WL 3538379, at *19 (S.D.N.Y. June 22, 2016)). Moreover, a plaintiff cannot "recover for pain and suffering when he has failed to show that any creditor or other person ever learned of the derogatory

information from a credit reporting agency." See *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 475 (2d Cir. 1995).

Defendants argue that Plaintiff fails to allege either an injury-in-fact or causal connection to confer Article III standing. Specifically, relying on *Shimon v. Equifax Info. Servs. LLC* ("Shimon"), 994 F.3d 88, 93 (2d Cir. 2021) and *Artemov v. TransUnion, LLC*, No. 20-CV-1892, 2020 WL 5211068, at *7 (E.D.N.Y. Sept. 1, 2020), Defendants argue that, even assuming Defendants inaccurately disclosed the source of a Plaintiff's credit information, she cannot plausibly allege that this conduct caused her any injury because the credit information reported was itself accurate.

**\*5** In *Shimon* the Second Circuit upheld the District Court's dismissal on summary judgment of Plaintiff's claim for a negligent violation of Section 1681(g)(a) arising from the CRA Defendant's inaccurate representation that it obtained information about a civil judgment against Plaintiff directly from the state court, when, in reality, it obtained the information from a third party vendor, LexisNexis. *Shimon*, 994 F.3d at 92-93. In doing so, the Second Circuit provided:

> We agree that [Plaintiff] has failed to present any evidentiary basis for concluding that he suffered actual damages as a result of Equifax not disclosing or treating LexisNexis as a "source" or "furnisher" of information to it about the Judgment. Since the characterization provided by Equifax in its credit report was accurate, for [Plaintiff] to have learned that LexisNexis was the intermediary source of Equifax's information from the court would not have enabled [Plaintiff] to avoid the emotional damage he claims to have suffered as a result of Equifax's report that the debt was "satisfied." Nor would he have avoided any of the costs he claims to have incurred in disputing the credit report. [Plaintiff] points to no damages to him arising from Equifax's failure to treat LexisNexis as a "source" or "furnisher" of the information and notify it of [Plaintiff's] dispute.

2022 WL 2467662

*Id.* at 93.

However, different reasoning was applied by the District Court in its dismissal of Plaintiff's Section 1681(g)(a) willfulness claim on the CRA Defendant's motion to dismiss, which the Second Circuit affirmed. *Id.* That claim was dismissed on the grounds that Defendants' interpretation of the word "sources" in Section 1681(g)(a) to include the point of origin excluding a contractor working on the reporting agency's behalf was objectively reasonable. *See Shimon v. Equifax Info. Servs. LLC* ("Shimon III"), No. 18-CV-2959, 2018 WL 4906245, at *4 (E.D.N.Y. Oct. 9, 2018), *aff'd*, 994 F.3d 88 (2d Cir. 2021).

In relying on *Shimon*, Defendants appear to conflate the Second Circuit's reasoning for upholding the dismissal of Plaintiff's Section 1681(g)(a) negligence claim and Section 1681(g)(a) willfulness claim and ignore the procedural posture in which the issues were before the District Court.

First, with respect to the negligence claim, the emphasis of the Second Circuit's ruling was on the evidentiary proofs regarding the Plaintiff's damages submitted to the District Court on summary judgment. Yet, here, we are at the pleading stage where general factual allegations of injury are sufficient to plead standing. *See Haynes v. TransUnion, LLC*, No. 19-CV-7157, 2021 WL 2179346, at *5 (E.D.N.Y. Feb. 4, 2021), *report and recommendation adopted*, 2021 WL 3185581 (E.D.N.Y. July 28, 2021) (citing, among others, *Bischoff v. Osceola County*, 222 F.3d 874, 878 (11th Cir. 2000) ("when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing. However, when standing is raised at the summary judgment stage, the plaintiff can no longer rest on 'mere allegations.' ")); *see also Kola v. Forster & Garbus LLP*, No. 19-CV-10496, 2021 WL 4135153, at *3 (S.D.N.Y. Sept. 10, 2021) ("While '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice' to establish standing, on a motion for summary judgment 'the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts' that demonstrate standing.") (citing *Lujan*, 504 U.S. at 561). "It is well established in principle that the pleading standard for constitutional standing is lower than the standard for a substantive cause of action." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018).

**\*6** Additionally, Defendants do not seek to dismiss Plaintiff's Section 1681g(a)(2) willfulness claim on statutory interpretation grounds. Consequently, Defendant's reliance on *Shimon* to dismiss Plaintiff's claims for willful and negligent violations of Section 1681(g)(a)(2) is seemingly misplaced.

Instead, *Artemov* appears more analogous to the situation at hand. In *Artemov*, Plaintiff asserted, among other things, that the CRA Defendants issued credit reports reflecting a past due balance for an account Plaintiff held with a banking institution that was lower than the true overall balance. *Artemov*, 2020 WL 5211068, at *1. According to Plaintiff, this inaccuracy caused his credit score to decrease, resulting in a denial of credit. *Id.* The District Court in *Artemov* dismissed the FCRA claim arising from this allegation holding that, even accepting the factual allegations as true, Plaintiff has not shown on the face of the complaint that the CRA defendants conduct caused him an injury in fact. *Id.* at *6-7.

The District Court reasoned that the Plaintiff's theory of liability would have required the CRA Defendants to have disclosed a past due balance that was actually higher, resulting in a credit report which would have listed more bad debt and either the same or lower credit score. *Id.* As such, the alleged inaccuracy "could not have made a difference: in either case, the denial of credit was going to happen and any conclusion to the contrary is just, that, a conclusion, and one that makes no sense." *Id.* at *7. Thus, the District Court concluded that Plaintiff's alleged emotional distress and denial of credit as a result of the CRA defendants' conduct could not confer Article III standing because they were conclusory and implausible. *Id.*

Here, assuming the credit information reported was itself accurate, Plaintiff's allegations that Defendants' alleged failure to disclose the accurate source of her bankruptcy information in her credit file caused her to suffer "credit damage," "denial of credit" and "emotional distress" is conclusory and equally implausible. Plaintiff's credit information would have been the same irrespective of the source of the information provided in her credit file, and, thus, any credit damage and denial, as well as resulting emotional distress, could not have been avoided regardless of the source of her credit information.

### b. Allegations That the Information Reported Was Inaccurate

2022 WL 2467662

However, Plaintiff also does allege that her credit information was actually inaccurate or misleading. *See* Pl. Compl. ¶ 50, ECF No. 1 ("The inaccurate reporting of the bankruptcy occurred because Defendants failed to follow reasonable procedures ..."); *id.* at ¶ 122 ("Defendants violated 15 U.S.C. § 1681i(a)(5) by its conduct which includes, but is not limited to, failing to delete any information that ... was inaccurate or could not be verified"); *id.* at ¶ 146 ("Defendants published statements through writing using Plaintiff's personal information to falsely reflect that Plaintiff was responsible for a federal tax lien, various accounts, and deleting the accounts [s]he was responsible for which proves Plaintiff has some good credit"); *id.* at ¶ 148 ("These [credit reports] are false in that they inaccurately reflect Plaintiff's accounts and credit information and debt repayment history and paint Plaintiff as a financially irresponsible and delinquent person.")

 **\*7** While at the pleading stage a plaintiff may make general factual allegations to show injury, she still must plead facts that "plausibly allege" Article III standing. *John v. Whole Foods Market Group, Inc.,* 858 F.3d 732, 735-36 (2d Cir. 2017); *see also Molinari v. Equifax Inc.,* 2022 U.S. Dist. LEXIS 19382 at \*10 (E.D.N.Y. Feb. 1, 2022) ("Based on these facts, [Plaintiff's] alleged economic injury-in-fact is not plausible and not sufficient to establish he has standing to assert his claim."). A claim of injury or traceability that is "conclusory or threadbare" is insufficient for Article III standing. *Schwartz v. HSBC Bank USA, N.A.,* 2017 U.S. Dist. LEXIS 94019 at \*10 (S.D.N.Y. 2017).

Here, Plaintiff has alleged general injuries, but has not plausibly alleged that those injuries are fairly traceable to the actions of Defendants, an element of Article III standing. Plaintiff has not alleged with any specificity what the supposed inaccuracies are that were reported, how the reported information was misleading, or how the alleged inaccuracies led to the "emotional distress and financial loss" and the "fear, humiliation, embarrassment, mental pain, suffering, inconvenience, and financial injury" that Plaintiff alleges.

It is undisputed that Plaintiff did file a bankruptcy petition on October 25, 2013, in the Eastern District of New York. *See* Bankruptcy Petition, Ex. A. attached to the Stieber Decl., ECF No. 22-2. Despite vague and conclusory references to "misleading," "false," or "inaccurate" information, Plaintiff fails to plead any specific facts to support the claim that the existence of her bankruptcy or any specific information

regarding her bankruptcy was inaccurate or misleading. She also does not allege any specific inaccuracies regarding her reported "tax liens" and "various accounts." *See* Pl. Compl. ¶ 146, ECF No. 2. Without plausibly pleading inaccuracies, Plaintiff cannot plausibly plead an injury resulted from those inaccuracies. And even if Plaintiff did plead specific inaccuracies, she would still need to plead facts to plausibly show how those inaccuracies caused the injuries she alleges, none of which appear in this complaint. Her only allegations regarding a causal link are conclusory: "As a result of this conflict, the Plaintiff has suffered actual damages" and "As a result of the acts and conduct [alleged] Plaintiff has endured [injuries]." Pl. Compl., ¶¶ 123, 59, ECF No. 1.

Accordingly, because Plaintiff's allegations are insufficient to show Article III standing, the Court respectfully recommends that Defendants' motion for a judgment on the pleadings on the grounds that Plaintiff lacks Article III standing to pursue her claims be GRANTED.

In opposition to the instant motion, Plaintiff requests leave to amend her complaint. *See* Pl. Opp. Br., 21-24, ECF No. 23. Where a complaint is dismissed for lack of Article III standing, that dismissal must be without prejudice. *Carter v. HealthPort Techs, LLC,* 822 F.3d 47, 54 (2d Cir. 2016). Therefore, this Court recommends Plaintiff's complaint be dismissed without prejudice, giving Plaintiff the opportunity to amend and re-submit her complaint should she be able to plead facts showing Article III standing.

Because Plaintiff will be able to amend and re-submit her complaint and because the parties have already briefed the issue, I believe it prudent and economical for the purposes of this Report & Recommendation to also note that, even if Plaintiff were able to clear the Article III bar to jurisdiction, some of Plaintiff's underlying claims as pled in her current complaint would fail a 12(c) plausibility analysis. I provide my reasoning for that assessment below.

### II. Potential 12(c) Plausibility Analysis

### a. Source Disclosure Claim
### under 15 U.S.C. § 1681g(a)(2)

 **\*8** Section 1681g(a) requires CRAs to disclose to consumers all information in the consumer's file and the sources of that information. *See* 15 U.S.C. § 1681g(a). Relevant to this section, Plaintiff alleges that the consumer files provided by

Case 5:24-cv-00188-DNH-MJK    Document 4    Filed 02/14/24    Page 222 of 238

Thompson v. Equifax Information Services LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2467662

Defendants failed to disclose the actual source from which they obtained Plaintiff's bankruptcy information in violation of Section 1681g(a)(2). Pl. Compl. ¶¶ 70-73, ECF No. 1. As alleged by Plaintiff, in response to her consumer file request, Defendants inaccurately represented that it obtained Plaintiff's bankruptcy information from the district court, rather than LexisNexis. *Id.*

Defendants argue that Plaintiff's consumer files directly contradict her allegation because the files accurately disclosed that Defendants obtained Plaintiff's bankruptcy information from LexisNexis. Def. Br., 12-13, ECF No. 22-1. In support of their argument, Equifax and Experian submit the consumer file that each respectively provided to Plaintiff. Equifax's consumer file represents that the public records information "includes public record items Equifax obtained from local, state and federal courts through a third party vendor, LexisNexis," and provides the contact information for LexisNexis. Equifax Consumer File, Ex. B attached to the Stieber Decl., ECF No. 22-2. Experian's consumer file represents that the public records information "include public records items from court that Experian may have obtained through a third party vendor, LexisNexis," and likewise provides the contact information for LexisNexis. Experian Consumer File, Ex. A attached to the Fitzpatrick Decl., ECF No. 22-3. Therefore, even making all necessary inferences in Plaintiff's favor, based on the contents of these files, Plaintiff fails to state a claim for relief under Section 1681g(a)(2) against Equifax and Experian for failing to disclose they obtained Plaintiff's bankruptcy information from LexisNexis in her consumer file.

Accordingly, because the consumer files directly contradict Plaintiff's allegation that Equifax and Experian failed to disclose LexisNexis as the source of her bankruptcy information, should the Court reach a 12(c) plausibility analysis for Plaintiff's Section § 1681g(a)(2) claim (Count I), I would recommend dismissal of the claim against Equifax and Experian.

### b. Accuracy of Credit Report and Reinvestigation Claims under 15 U.S.C. §§ 1681e(b) and 1681i(A)

Section 1681e(b) imposes a duty on CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). To state a claim under Section 1681e(b), a plaintiff must allege that: "(1)

the consumer reporting agency was negligent or willful in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury." *Wimberly v. Experian Info. Sols.*, No. 18-CV-6058, 2021 WL 326972, at *5 (S.D.N.Y. Feb. 1, 2021) (quoting *Khan v. Equifax Info. Servs., LLC*, No. 18-CV-6367, 2019 WL 2492762, at *2 (E.D.N.Y. June 14, 2019)).

When the accuracy of a report is in dispute, Section 1681i outlines specific procedures that CRAs must follow to ensure the proper reinvestigation of disputed information. Section 1681i requires that if a consumer notifies a CRA of a dispute as to the accuracy of any item of information contained in his file, within 30 days of notification, the CRA "shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A); *Jones v. Experian Info. Solutions, Inc.*, 982 F. Supp. 2d 268, 272 (S.D.N.Y. 2013). To state a claim under Section 1681i, the plaintiff must also plausibly allege that "the disputed information is inaccurate." *Khan*, 2019 WL 2492762, at *3.

**\*9** The threshold question under both Sections 1681e(b) and 1681i "is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." *Id.* (collecting cases). A credit report is inaccurate "either when it is patently incorrect *or* when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Wimberly*, 2021 WL 326972, at *5 (quoting *Wenning*, 2016 WL 3538379, at *9). "Information provided by a consumer reporting agency is misleading where it is 'open to an interpretation that is directly contradictory to the true information.' " *Id.* (quoting *Wagner v. TRW, Inc.*, 139 F.3d 898, 1998 WL 127812, at *1 (5th Cir. 1998)).

Relevant to Sections 1681e(b) and 1681i, Plaintiff alleges that Defendants inaccurately or misleadingly reported the existence of her bankruptcy, information regarding her bankruptcy, and/or the source of that information. *See* Pl. Compl. ¶ 38, ECF No. 1 ("The information about this supposed bankruptcy was misleading and falsely represented."); *Id.* at ¶¶ 81-82 (Consumer reports prepared by Defendants "contained information about Plaintiff that was false, misleading, and inaccurate."); *Id.* at ¶ 85 (Plaintiff

"received letters and copies of [her] consumer file in which none of these letters or consumer files contains the actual source of the public records information that it reported about the Plaintiff."). Defendants argue that Plaintiff cannot sustain a claim for relief under Sections 1681e(b) and 1681i because the credit information regarding her bankruptcy was accurately reported. *See* Def. Br., 9-10, ECF No. 22-1; Def. Repl. Br., 7-8, ECF No. 26.

Here, Plaintiff fails to state a claim for relief under Sections 1681e(b) and 1681i based on the alleged reporting of her bankruptcy because, as detailed above in my Article III analysis, she has not alleged with any specificity the alleged inaccuracies reported or how the reported information was misleading. *See Khan*, 2019 WL 2492762, at *4 (dismissing claims under Sections 1681e(b) and 1681i "because [plaintiff] has not alleged facts showing that the information that Defendant reported about him is inaccurate"); *Wimberly*, 2021 WL 326972, at *5 (dismissing claims under Sections 1681e(b) and 1681i(a) because the complaint "pleads no specific *facts* to support ... proposed claims that the information Defendant reported was inaccurate"); *Ogbon v. Beneficial Credit Servs., Inc.*, No. 10-CV-3760, 2011 WL 347222, at *3 (S.D.N.Y. Feb. 1, 2011) (dismissing claims under Sections 1681e(b) and 1681i because the complaint, among other things, "does not identify the inaccurate information reported by each [consumer reporting agency] Defendant, or when the information was reported or to whom").

Similarly, Plaintiff fails to state a claim for relief under Sections 1681e(b) and 1681i based on the allegation that Defendants failed to disclose LexisNexis as the source of her reported bankruptcy in her consumer files. Plaintiff appears to conflate the source of her credit information with the credit information itself. *See Perez v. Experian*, No. 20-CV-9119, 2021 WL 4784280, at *9 (S.D.N.Y. Oct. 14, 2021), *report and recommendation adopted*, No. 20-CV-9119, 2021 WL 5088036 (S.D.N.Y. Nov. 2, 2021) ("[I]naccuracies are only actionable if they affect an assessment of a consumer's credit, insurance, or employment and fit within the definition of a 'consumer report' under the FCRA.") (citing 15 U.S.C. § 1681a(d)(1) and *Williams-Steele v. Trans Union*, No. 12-CV-0310, 2014 WL 1407670, at *4 (S.D.N.Y. Apr. 11, 2014), *adopted by* 2015 WL 576707 (Feb. 10, 2015), *aff'd sub nom. Williams-Steele v. TransUnion*, 642 F. App'x 72 (2d Cir. 2016) ("[N]o restriction is put on the use of information that is not a 'consumer report' ... Address information on a consumer, for example, is not a consumer report because

it is not information that bears on any of the characteristics described in 15 U.S.C. § 1681a(d)(1).")).

**\*10** To state a claim for relief under Sections 1681e(b) and 1681i, a plaintiff must sufficiently allege that their consumer report contains inaccurate *credit information. See Artemov*, 2020 WL 5211068, at *2 ("In considering a challenge under § 1681e(b) or § 1681i, the 'threshold question' is whether the *disputed credit information* is accurate ...") (citations omitted). As is relates to the consumer file, the failure to disclose the source of the disputed credit information more appropriately forms the basis of a claim under Section 1681g(a)(2). Therefore, even making all necessary inferences in Plaintiff's favor as required at this stage, Plaintiff fails to state a claim upon which relief can be granted under Sections 1681e(b) and 1681i for Defendants' alleged failure to disclose LexisNexis as the source of her bankruptcy information in her consumer file.

Accordingly, this Court would find, on Plaintiff's current complaint, that she fails to plausibly plead a claim under Sections 1681e(b) (Count II) and 1681i (Counts III-VIII).

### c. Defamation Claim

Defendants also argue that Plaintiff's defamation claim should be dismissed because it is preempted by the FCRA. *See* Def. Br., 13, ECF No. 22-1. Two sections of the FCRA are relevant to this argument. Section 1681h(e) provides that "no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, .... except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e). Section 1681t(b)(1)(F) preempts any state law claim "with respect to any subject matter regulated under ... section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t(b). Although the latter, which was enacted after Section 1681h(e), accomplishes a more sweeping preemption, its application is limited to furnishers of information to CRAs concerning subject matter regulated under Section 1681s-2. *See Macpherson v. JPMorgan Chase Bank*, N.A., 665 F.3d 45, 48 (2d Cir. 2011); *Mund v. Transunion*, No. 18-CV-6761, 2019 WL 955033, at *4 (E.D.N.Y. Feb. 27, 2019). Because Defendants are CRAs, Section 1681h(e) instead applies.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 224 of 238

Thompson v. Equifax Information Services LLC, Not Reported in Fed. Supp. (2022)

2022 WL 2467662

Section 1681h(e) preempts defamation claims against CRAs unless the alleged false information is furnished with malice or willful intent to injure the plaintiff. *See Frydman v. Experian Info. Sols., Inc.*, No. 14-CV-9013, 2016 WL 11483839, at *17 (S.D.N.Y. Aug. 11, 2016), *report and recommendation adopted*, 2016 WL 5661596 (S.D.N.Y. Sept. 30, 2016) ("[Section 1681h(e)] essentially affords ... qualified immunity against the types of state law claims asserted by [plaintiff] unless he can establish that [defendants] acted 'with malice or willful intent to injure' him") (citations omitted); *Ogbon*, 2013 WL 1430467, at *10 ("Thus, defendants have qualified immunity against defamation actions, which can only be overcome where plaintiff shows that defendants acted with malice or willful intent.") (collecting cases).

Defendants argue that Plaintiff cannot adequately plead maliciousness or willfulness because the information regarding her bankruptcy was accurately reported. *See* Def. Repl. Br., 11, ECF No. 26. However, based on the Complaint, Plaintiff's defamation claim does not appear to arise from the same conduct that gives rise to her FCRA claims. Indeed, Plaintiff's defamation claim alleges for the first time anywhere in the Complaint that Defendants falsely published that she "was responsible for a federal tax lien, various accounts, and deleting accounts [s]he was responsible for which proves plaintiff has some good credit." Pl. Compl. ¶ 146, ECF No. 1. Plaintiff alleges that Defendants knew these statements were false and had no factual basis for making them because she repeatedly notified Defendants that the information was inaccurate. *Id.* at ¶¶ 149-150. Moreover, according to Plaintiff, "Defendants [ ] acted with malice by failing to communicate the information provided to them by Plaintiff to [those] whom it provides credit information concerning the Plaintiff." *Id.* at ¶ 152. Defendants have not submitted exhibits showing her liens and accounts were accurately reported, and

Plaintiff has pled the alleged inaccurate reports were willful or malicious.

**\*11** Therefore, the Court would find at this point that the Plaintiff's defamation claim would survive under Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends that Defendants' motion for a judgment on the pleadings be GRANTED as to Plaintiff's complaint and that it be dismissed without prejudice.

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*, No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at *30 (S.D.N.Y. May 1, 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2467662

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1430467
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Florence OGBON, Plaintiff,

v.

BENEFICIAL CREDIT
SERVICES, INC. et al., Defendants.

No. 10 Civ. 3760(PAE).
|
April 8, 2013.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Plaintiff Florence Ogbon brings this action against defendants Trans Union, LLC ("Trans Union") and Experian Information Solutions, Inc. ("Experian") alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.,* and the New York Fair Credit Reporting Act ("NYFCRA"), N.Y. Gen. Bus. Law §§ 380 *et seq.* Ogbon also asserts common law claims of defamation and intentional and negligent infliction of emotional distress. Defendants move for summary judgment. For the reasons that follow, that motion is granted.

## I. Background

### A. Local Rule 56.1

The Court's account of the facts is based on the record evidence.[1] These facts are properly treated here as undisputed, because Ogbon, who is represented by counsel, failed to comply with Local Rule 56.1. Under that rule, the moving party must submit a statement of "the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. Local Rule 56.1(a). Defendants complied with this obligation, identifying admissible evidence sufficient to support each asserted fact. *See* Dkt. 140 ("Def.56.1"). In response, the non-moving party, here, Ogbon, must submit a responsive statement, which includes "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." S.D.N.Y. Local Rule 56.1(b). Notably, "[e]ach numbered paragraph in the statement of material

facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." S.D.N.Y. Local Rule 56.1(c). Additionally, "[e]ach statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed.R.Civ.P. 56(c)." S.D.N.Y. Local Rule 56.1(d).

1    This includes the Declaration of Angela Hamm in Support of Defendants' Joint Motion for Summary Judgment ("Hamm Decl.") (Dkt.144) and the exhibits attached thereto, including the Deposition of Florence Ogbon (Hamm Decl. Ex. 1) ("Ogbon Dep."), the Affidavit of Steven Reger and the exhibits attached thereto (Hamm Decl. Ex. 2) ("Reger Decl."), and the Declaration of Jason Scott and the exhibits attached thereto (Hamm Decl. Ex. 3) ("Scott Decl."); and the Declaration of Florence Ogbon ("Ogbon Decl.") (Dkt.162) and the exhibits attached thereto.

Ogbon's Local Rule 56.1 statement completely fails to comply with these requirements: Its numbered paragraphs do not correspond to defendants' statement and are utterly unresponsive to that statement; it lacks citation to a single piece of documentary evidence; and it consists of conclusory statements unsupported by any record evidence. *See* Dkt. 61 ("Pl. 5 6.1"). Ogbon's failure is particularly egregious in light of the fact that the Court pointedly drew the requirements of Local Rule 56.1 to Ogbon's counsel's attention at the conference held immediately prior to the filing of this motion:

> Let me just state to all of you [that] there is a distinct procedure in the local rules here consistent with my individual practices with regard to 56.1 statements. Mr. Okocha, with respect, I am looking at you in particular because there have been issues with regard to noncompliance with the Court's rules, and I don't want you to inadvertently hurt your client by not complying here. [A] party is required to submit a compliant 56.1 statement and submit an opposition to the other side's 56.1

statements. A common issue that I have seen in many cases involves the moving party making an appropriate statement in a 56.1 about a factual proposition backed up by evidence and then the other party in its opposition simply denying it without any factual reference point. The case law is crystal clear that that is insufficient, that a general unsubstantiated denial functions as an admission of the fact that it is responsive to.

**\*2** Dkt. 167 (Transcript of January 4, 2013 Pre–Motion Conference ("Tr.")).

As the Court emphasized to Ogbon's counsel at the pre-motion conference, Ogbon's failure to comply with the requirements of Local Rule 56.1 "permits the [C]ourt to conclude that the facts asserted in [defendants'] statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) (citing *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998)). "In the typical case, failure to respond results in a grant of summary judgment once the court assures itself that Rule 56's other requirements have been met." *Id.* (citing *Millus v. D'Angelo,* 224 F.3d 137, 138 (2d Cir.2000)).

With that prelude, the Court proceeds to recite the undisputed facts of the case.

### B. Factual Background

#### 1. The Theft of Ogbon's Identity

Ogbon is a native of Nigeria, who attended college in the United States from 1978 to 1984. Ogbon Dep. 25, 224–25. [2] In 1978, Ogbon was issued a Social Security Number. *Id.* at 14, 234. In 1984, after receiving a degree from Southern University, Ogbon returned to Nigeria. *Id.* at 24–27. She remained in Nigeria until June 2007, when she returned to the United States. *Id.* at 24.

[2]     In her opposition brief, Ogbon argues that her own deposition testimony is inadmissible on this motion, because (1) defendants included only portions of the transcript of her deposition in the summary judgment record, and (2) Ogbon has

not authenticated the transcript as reflecting her true testimony. These arguments are frivolous. First, defendants properly excerpted only those portions of the deposition transcript relevant to this motion; to the extent Ogbon believes that some other portion was relevant, she was at liberty to supplement the record in her opposition papers. Second, "[t]he fact that Plaintiff did not sign the deposition transcript does not ... make it inadmissible, as a deponent is required to sign the deposition transcript only if review of the transcript is requested before the deposition is completed and changes are made by the deponent." *Dore v. Wormley,* 690 F.Supp.2d 187, 178 n. 2 (S.D.N.Y.2010) (quoting *Merring v. Town of Tuxedo, N.Y.,* No. 07 Civ. 10381(CS), 2009 WL 849752, at \*1 n. 7 (S.D.N.Y. Mar. 31, 2009)). Ogbon does not claim to have made such a request. Her deposition is admissible.

Upon returning to the United States in 2007, Ogbon learned that her identity had been stolen. *Id.* at 45. On May 28, 2008, she filed a complaint with the local police in Minnesota, where she was living at the time, claiming that an unknown person had been using her name and Social Security Number for 10 years to obtain tax refunds, open credit and bank accounts, and file for bankruptcy twice. *Id.* at 23–24, 45–48; *id.* Ex. 3. In February 2009, Ogbon, then living in New York, filed another identity theft complaint, this time with local police in Georgia. *Id.* at 52–54; *id.* Ex. 5. Ogbon alleged that Veronica Ilenre, a former friend and neighbor from Ogbon's previous stay in the United States, *see id.* at 54–55, 65, 237–38, had used Ogbon's name to incur debts, obtain a mortgage, file tax returns, and declare bankruptcy, *id.* at 38, 44–45, 76–77.

In May 2011, Ilenre was arrested in Georgia on several charges of identity theft. *Id.* Ex. 9. In 2012, Ilenre pled guilty in Georgia state court and was sentenced to a term of work release and probation. *Id.* Ex. 11. Ilenre was ordered to pay $50,000 in restitution to Ogbon, *id.,* an amount which Ogbon has been receiving in installments, *id.* at 74.

#### 2. Ogbon's Interactions with Trans Union

Trans Union is a "consumer reporting agency" as defined by the FCRA. Reger Decl. ¶ 2. It regularly receives information from creditors ("Furnishers"), compiles that information to create consumer credit reports, and makes these reports available to clients who are engaged in

credit-related transactions. *Id.* ¶ 4. Trans Union has credit files on approximately 210 million customers and collects information from more than 85,000 Furnishers, who report credit information to Trans Union on a monthly basis. *Id.* ¶¶ 6–7, 9. Trans Union has an incentive to accurately report consumer information, and it contractually requires that Furnishers report only accurate information. *Id.* ¶¶ 10, 13–15. Trans Union is a member of the Consumer Data Industry Association (the "CDIA"), a trade association through which credit reporting agencies share consumer information. *Id.* ¶ 16.

**\*3** On May 23, 2008, Ogbon contacted Equifax, another credit reporting agency, to request that an initial fraud alert be placed on her credit file.*Id.* ¶ 47. That same day, Equifax notified Trans Union through the CDIA Fraud Exchange of Ogbon's request. *Id.* ¶ 48. Trans Union responded by adding an initial fraud alert to Ogbon's credit file, suppressing her credit file from promotion, and notifying her by letter of this action and enclosing a Fraud Bill of Rights. *Id.* ¶ 49.

On February 3, 2009, Ogbon contacted Trans Union by telephone to notify Trans Union that she had been a victim of identity theft and to request a copy of her credit report. Ogbon Dep. 242; Reger Decl. ¶ 53; *id.* Ex. A. In response to Ogbon's inquiry, Trans Union added a fraud alert to her file, changed the name on her credit file to include her middle name, and deleted the telephone number and a previous address associated with her file. Reger Decl. ¶ 54; *id* . Ex. B. Trans Union also notified Ogbon that the mailing address she provided did not match the information in Trans Union's file, and, on February 3, 2009, sent Ogbon a letter requesting that she provide acceptable proof of her current address. *Id.* Ex. A; Ogbon Dep. 243–47. The letter specified the acceptable forms of proof of address and advised Ogbon of the proper procedure for contacting Trans Union to request that a valid identity theft report from a law enforcement agency—such as the 2008 Minnesota report or the 2009 Georgia report—be added to her file. Reger Decl. Ex. A. The next day, February 4, 2009, Ogbon contacted Trans Union again, and was again advised that she needed to provide proof of her identification and address. *Id.* ¶ 55.

On February 10, 2009, Trans Union received correspondence from Ogbon enclosing a number of documents, including her Social Security Card, which constituted acceptable proof of her Social Security Number; however, the other documents did not provide acceptable proof of her address. Reger Decl. ¶¶ 56–57; *id.* Ex. C; Ogbon Dep. 247–56. Accordingly, on

February 12, 2009, Trans Union sent Ogbon another letter setting forth four reasons why her submissions were deficient, and again explaining the acceptable forms of proof of address. Reger Decl. ¶ 58; *id.* Ex. D; Ogbon Dep. 258–59.

On March 2, 2009, Trans Union received additional documents from Ogbon, including her New York State learner's permit and a bill from ConEdison, addressed to her and her son-inlaw. Reger Decl. ¶ 59, *id.* Ex. E; Ogbon Dep. 262–65. The learner's permit listed Ogbon's address as "10 Cleveland Pl. 3, Yonkers, N.Y. 10710"; the Con Edison bill omitted the apartment number, listing her address as "10 Cleveland Pl., Yonkers, N.Y. 10710," although it also mentions that service was delivered to "10 Cleveland Plac [sic] 3." Reger Decl. Ex. E. Because of this minor discrepancy in the apartment number (or lack thereof), Trans Union deemed Ogbon's submission insufficient proof of her address. *Id.* ¶ 59. When Ogbon called Trans Union on March 13, 2009, Trans Union once again notified her that her proof of address was deficient. *Id.* ¶ 60. On March 14, 2009, Trans Union received another notice from CDIA Fraud Exchange, and accordingly updated the fraud alert on Ogbon's file. *Id.* ¶ 61; *id.* Ex. F.

**\*4** Trans Union had no further communication with Ogbon until Ogbon, represented by counsel, filed this lawsuit, on May 6, 2010. *Id.* ¶ 62. After Ogbon's counsel provided Trans Union with the 2008 Minnesota police report and the 2009 Georgia police report that Ogbon had filed, Trans Union processed all reports pursuant to its standard procedures and removed all disputed information from Ogbon's credit file. *Id.* ¶¶ 63–64. Trans Union's credit file for Ogbon currently lists her accounts as satisfactory and includes an Extended Fraud Alert, which will remain in her file until July 2018. *Id.* ¶ 65; *id.* Ex. G.

### 3. Ogbon's Interactions with Experian

Like Trans Union, Experian is a consumer reporting agency as defined by the FCRA, which regularly receives information from Furnishers and compiles that information to create consumer credit reports. Scott Decl. ¶¶ 6–8. It also has files on more than 200 million consumers and employs procedures to ensure the accuracy of these files. *Id.* ¶¶ 9–23.

On May 23, 2008, Experian was notified by another credit reporting agency that Ogbon had contacted them regarding possible identity theft. *Id.* ¶ 25. The same day, Experian sent Ogbon a letter notifying her that a security alert had been placed in her file, explaining how she could request a copy of

her credit report, and providing information about preventing identity theft. *Id.* & Ex. A; Ogbon Dep. 84–86. Ogbon did not make any contact with Experian until February 2, 2009,[3] when she called Experian to request a copy of her credit report and to add a security alert to her report. Scott Decl. ¶ 27; Ogbon Dep. 304. The same day, Experian sent Ogbon a letter again notifying her that a security alert had been placed in her file, and explaining that she would have to provide sufficient proof of her identity, including her Social Security Number, in order to obtain a free credit report or to dispute information in her file. Scott Decl. ¶ 27; *id.* Ex. B.

[3]   In her deposition, Ogbon equivocates as to whether she ever contacted Experian in 2008: "Q: When in 2008 did you [send a copy of your identity theft report to Experian]? A: I'm not sure of the dates specifically. I'm not sure of the dates. Let me not say. I don't want to tell lies, but I did. I'm not sure of the dates now. I can't give you the dates specifically." Ogbon Dep. 86–87. Ogbon has no record of any communications sent to Experian in 2008, *see id.* at 87, and Experian has no record of any such contact, *see* Scott Decl. ¶ 26.

On March 2, 2009, Experian received a package from Ogbon enclosing her New York State learner's permit and Con Edison bill. Scott Decl. ¶ 28; *id.* Ex. C. That package did not include proof of her Social Security Number, nor did it contain any information regarding Ogbon's desired relief. *Id.* ¶ 28; *id.* Ex. C. On March 6, 2009, Experian sent Ogbon a letter again asking her to provide sufficient identifying information, including her Social Security Number. *Id.* ¶ 29. On March 14, 2009, Ogbon called Experian to request a free copy of her credit report. *Id.* ¶ 31. Experian again informed her of the need to provide information confirming her identity, and on the same day sent her another letter to that effect. *Id.; id.* Ex. D. Ogbon did not respond. *Id.* ¶ 32; Ogbon Dep. 305.

On September 12, 2009, Ogbon's counsel sent a letter to Experian styled as a "Validation Letter/Cease and Desist Letter/Dispute and Investigation and Re-investigation Letter and Intent to Sue Letter." Scott Decl. Ex. E. The letter states that "if any negative information is placed on my client's Credit Reports by your agency after receipt of this notice, this will cause us to file lawsuit against you and your organization/firm." *Id.* It also demands that "[i]f any negative report is already place [sic] in my client's credit file you should instruct that it be deleted immediately." *Id.* Although the letter lists Ogbon's name and address, it does not provide

any other information confirming her identity, such as her Social Security Number, and the letter repeatedly refers to Ogbon using the pronoun "he." *Id.* Further, the bank account numbers referenced in the letter did not match those that appeared in Ogbon's credit file. Scott Decl. ¶ 33. Accordingly, on September 24, 2009, Experian replied by letter to Ogbon's counsel, informing him that Experian had been unable to determine what relief Ogbon was seeking, and notifying him that, under the FCRA, Experian could not furnish Ogbon's credit report without proper identifying information. *Id.* ¶ 34; *id.* Ex. F (citing § 1681h of the FCRA). Neither Ogbon nor her counsel responded to this letter until the filing of this case. *Id.* ¶¶ 35–36. Once Ogbon's counsel provided Experian with Ogbon's identification information and information about the nature of the dispute, Experian removed all information from Ogbon's file that she claimed resulted from fraudulent activity. *Id.* ¶ 37.

**C. Procedural History**

**\*5**  On May 6, 2010, Ogbon filed her original Complaint, naming Trans Union, Experian, Equifax Information Services, Inc. ("Equifax"), Beneficial Credit Services, Inc. ("Beneficial"), and Bank of America, N.A. as defendants. Dkt. 1. Four of these defendants—Beneficial had not been served—moved to dismiss the complaint for failure to state a claim. Dkt. 10, 17.

On February 1, 2011, the Hon. George B. Daniels, who was previously assigned to the case, granted that motion, but granted Ogbon leave to file a motion to amend her complaint. Dkt. 34. On March 1, 2011, Ogbon filed a motion to amend. Dkt. 39. Bank of America opposed that motion, Dkt. 43, and Judge Daniels denied as futile Ogbon's motion to amend as to Bank of America, Dkt. 61. Trans Union, Experian, and Equifax did not oppose the motion to amend. On October 11, 2011, Ogbon filed her Amended Complaint, bringing claims against Trans Union, Experian, Equifax, and Beneficial. Dkt. 69.[4]

[4]   On October 6, 2011, the case was reassigned to this Court. Dkt. 68.

On November 28, 2011, Ogbon filed a Second Amended Complaint, bringing additional claims and naming eight additional defendants. Dkt. 76. On December 23, 2011, several defendants moved to dismiss the Second Amended Complaint. Dkt. 79. On January 13, 2012, Ogbon filed an untimely opposition. Dkt. 90.[5]  On September 4, 2012, the

2013 WL 1430467

Court granted defendants' motion to dismiss the Second Amended Complaint, finding that Ogbon had directly violated an Order given by Judge Daniels—at a September 13, 2011 status conference—regarding the deadline for adding parties and claims. *See* Dkt. 117, at 3. Accordingly, the Court dismissed the eight additional defendants from the case and restored the Amended Complaint as the operative pleading.

5  On February 7, 2012, Ogbon settled her claims against Beneficial. Dkt. 101.

In the ensuing discovery period, Ogbon's counsel was habitually delinquent in complying with discovery obligations and court orders, requiring the Court's repeated intervention. *See, e.g.,* Dkt. 122, 128, 131; *see also* Dkt. 75. On January 4, 2013, the Court held a pre-motion conference. At that conference, the Court raised several outstanding discovery disputes, but the parties agreed that these issues would not materially affect the anticipated summary judgment motion, and therefore could be addressed after the resolution of that motion. Dkt. 136; *see* Tr. 7–12, 17. As noted, the Court gave the parties clear instructions at that conference regarding the applicable rules governing summary judgment motions. *Id.* at 16.

On February 1, 2013, Trans Union and Experian filed a joint motion for summary judgment. Dkt. 138–146. On February 27, 2013, Ogbon voluntarily dismissed her claims against Equifax. Dkt. 149. On March 11, 2013, Ogbon timely filed a memorandum of law in opposition to defendants' motion, attaching a Local Rule 56.1 Statement and the Declaration of Florence Ogbon. Dkt. 152. Ogbon's submissions were rejected by the Court's electronic filing system, however. On March 13, 2013, Ogbon attempted to correct the docketing error; in doing so, however, Ogbon filed materially different papers than she had on March 11, 2013, which had been the deadline for her opposition. On March 15, 2013, defendants called this discrepancy to the Court's attention by letter; the Court struck the untimely documents from the record and directed Ogbon to refile her opposition papers in exactly the form they had been submitted on March 11. Dkt. 157. On March 16, 2013, Ogbon did so. Dkt. 158–60. On March 18, 2013, Ogbon requested leave to supplement her opposition papers with the additional items added on March 13; the Court denied that request, finding that Ogbon's failure to timely file these materials was not a product of good faith excusable neglect, but rather was consistent with a pattern of disregard for Court orders and deadlines. Dkt. 161. On March 19, 2013, defendants filed their reply papers. Dkt. 163, 166.

## II. Applicable Legal Standard

 **\*6**  A court should grant summary judgment only when the submissions, taken together, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a material factual question; in making this determination, the court must view all facts "in the light most favorable" to the non-movant. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.,* 521 F.3d 130, 132 (2d Cir.2008). To survive a motion for summary judgment, the opposing party must establish a genuine issue of material fact by "citing to particular parts of materials in the record." Fed.R.Civ.P. 56(c)(1). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## III. Discussion

### A. FCRA Claims

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 52 (2007). "The FCRA creates a private right of action against credit reporting agencies for the negligent or willful violation of any duty imposed under the statute." *Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 474 (2d Cir.1995) (citing 15 U.S.C. §§ 1681*o* & 1681n); *see Okocha v. HSBC Bank USA, N.A.,* No. 08 Civ. 8650(MBP), 2010 WL 5122614, at \*5 (S.D.N.Y. Dec. 14, 2010). Ogbon alleges that defendants violated several duties under the FCRA. The Court addresses these claims in turn.

### 1. The § 1681e(b) Claim

Ogbon's first claim is that defendants violated their duties under § 1681e, which provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the

report relates." 15 U.S.C. § 1681e(b); *see Podell v. Citicorp Diners Club., Inc.,* 112 F.3d 98, 104 (2d Cir.1997).

"To succeed on a claim under this section, a plaintiff must establish that: (1) the consumer reporting agency was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury." *Gorman v. Experian Info. Solutions, Inc.,* No. 07 Civ. 1846(RPP), 2008 WL 4934047, at *4 (S.D.N.Y. Nov. 19, 2008) (quoting *Whelan v. Trans Union Credit Reporting Agency,* 862 F.Supp. 824, 829 (E.D.N.Y.1994)); *see Houston v. TRW Info. Servs., Inc.,* No. 88 Civ. 186(MEL), 1989 WL 59850, at *1 (S.D.N.Y. May 2, 1989), *aff'd* 896 F.2d 543 (2d Cir.1990)). Even if the information contained in the challenged credit report is inaccurate, "a credit reporting agency is not held strictly liable under the FCRA merely for reporting it; rather, the consumer must show that the agency failed to follow reasonable procedures in generating the inaccurate report." *Whelan,* 862 F.Supp. at 829 (citing *Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991); *Stewart v. Credit Bureau, Inc.,* 734 F.2d 47, 51 (D.C.Cir.1984)); *see Gorman,* 2008 WL 4934047, at *4.

**\*7** "The standard for evaluating the reasonableness of an agency's procedures is what a reasonably prudent person would do under the circumstances." *Whelan,* 862 F.Supp. at 831 (citing *Houston v. TRW Info. Servs., Inc.,* 707 F.Supp. 689, 693 (S.D.N.Y.1989)) (additional citations omitted)). "Whether or not the credit reporting agency followed reasonable procedures 'will be a jury question in the overwhelming majority of cases.' " *Gorman,* 2008 WL 4934047, at *4 (citing *Cahlin,* 936 F.2d at 1156). However, "[t]o defeat a motion for summary judgment on a § 1681 e(b) claim, a plaintiff must minimally present *some* evidence from which a trier of fact can infer that the consumer reporting agency failed to follow reasonable procedures in preparing a credit report." *Whelan,* 862 F.Supp. at 831 (citation omitted) (emphasis added).

Summary judgment is merited in favor of both Trans Union and Experian here, because Ogbon has adduced no evidence to suggest that either defendant failed to follow reasonable procedures in preparing her credit report. Ogbon argues only that, because there was an error, the procedures must have been unreasonable. But the FCRA does not impose such

strict liability. *Whelan,* 862 F.Supp. at 829; *see Sarver v. Experian Info. Solutions,* 390 F.3d 969, 972 (7th Cir.2004) ("[A] mistake does not render the procedures unreasonable.").

Both Trans Union and Experian have provided detailed explanations of the procedures they utilize to ensure the accuracy of their credit reports. *See* Reger Decl. ¶¶ 4–46; Scott Decl. ¶¶ 11–23. Unfortunately, Ogbon's identity was stolen by Ilenre, who opened accounts and incurred debts using Ogbon's name and Social Security Number. But Ogbon has identified no basis on which a jury could find that the defendants had a basis to question the accuracy of the reports it had received from Furnishers that Ogbon herself had incurred the debts in question. *See* Reger Decl. ¶¶ 33–38 (stating that the Furnishers who provided information regarding Ogbon are reliable sources of information and have no systemic problems with their respective procedures); *see also Sarver,* 390 F.3d at 972 (The FCRA "does not hold a reporting agency responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures."). Under these circumstances, there is no genuine issue as to whether the defendants followed reasonable procedures. *See Podell,* 112 F.3d at 105 (affirming grant of summary judgment for credit reporting agency, finding that agency did follow reasonable procedures, *even though* it continued to report plaintiff's indebtedness after being advised by his creditors that this was in error, because agency also received subsequent reports from those same creditors reaffirming the debts: "[agency] was entitled to report [plaintiff's indebtedness], at least until it heard from him directly"). Summary judgment is therefore merited in favor of defendants on this claim.[6]

6    Ogbon also brings a claim under the parallel provision of the NYFCRA, which provides: "Consumer reporting agencies shall maintain reasonable procedures designed to assure maximum possible accuracy of the information concerning the individual about whom the report relates." N.Y. Gen. Bus. Law § 380 j(e). Because the language of this statute is substantially similar to the parallel federal provision, it must be construed the same way. *Scott v. Real Estate Fin. Grp.,* 183 F.3d 97, 100 (2d Cir.1999). Accordingly, summary judgment is granted in defendants' favor on this claim.

**2. The § 1681i Claim**

**\*8**  Ogbon's second claim is that defendants violated their duty to reinvestigate disputed information. The FCRA provides:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file....

15 U.S.C. § 168 11(a)(1)(A). Notwithstanding this duty, "a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer ... if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information." § 168 11(a)(3)(A). "Prior to being notified by a consumer, a credit reporting agency generally has no duty to reinvestigate credit information." *Casella*, 56 F.3d at 474. The operative question here is whether Ogbon ever provided defendants with sufficient indentifying information to investigate the disputed credit information, thereby triggering defendants' duty to reinvestigate.

As to Experian, Ogbon clearly did not. On May 23, 2008, having received notice from another credit reporting agency of the possible theft of Ogbon's identity, Experian sent Ogbon a letter detailing the identifying information it would need from her to send her a free copy of her credit report. Scott Decl. ¶ 25; *id.* Ex. A; Ogbon Dep. 84–86. Experian sent similar letters to Ogbon, in response to her inquiries, on February 2, 2009, March 6, 2009, and March 14, 2009. Scott Decl. ¶¶ 27, 29, 31; *id.* Exs. B, D. Although Ogbon contacted Experian by phone on numerous occasions, the only identifying information she ever sent to Experian lacked proof of her Social Security Number. *Id.* ¶ 28; *id.* Ex. C. Nor did the "Cease and Desist" letter sent by Ogbon's counsel contain sufficient identifying information for Experian to investigate

Ogbon's claim. *Id.* Ex. E. When Experian responded to Ogbon's counsel requesting such information, it received no response. *Id.* ¶¶ 35–36. Because of Ogbon's failure to provide her Social Security Number (and to specify the precise nature of her dispute), it was entirely reasonable for Experian to decline to reinvestigate Ogbon's claim until it received such information. *See Anderson v. Trans Union*, 405 F.Supp.2d 977, 984 (W.D.Wis.2005) ("Given [plaintiff's counsel's failure to provide an accurate Social Security Number] and defendant's duty under §§ 1681(b) and 1681e(b) to follow reasonable procedures to insure both the accuracy and confidentiality of plaintiff's credit information, defendant's prompt decision to confirm plaintiff's social security number was both reasonable and prudent. If any unreasonable action was taken in this case, it was the failure of plaintiff's attorney to provide prompt confirmation of plaintiff's social security number ."). Summary judgment is therefore merited in Experian's favor.

**\*9**  Like Experian, Trans Union repeatedly notified Ogbon of the need to provide identifying information and the proper means by which to do so. Reger Decl. ¶¶ 49, 55, 58, 60; *id.* Exs. A, D. Ogbon's claim against Trans Union presents a slightly closer question, however, because Ogbon provided Trans Union with more identifying information: On February 10, 2009, she sent Trans Union a copy of her Social Security Card, *see* Reger Decl. Ex. C, and on March 2, 2009, she sent Trans Union her New York State learner's permit and a bill from ConEdison, both of which bore her home address, *see id.* Ex. E. Trans Union still found this proof of her identity insufficient, however, because of a minor discrepancy in the home address listed on these two documents—one included the apartment number, one did not. *Id.* ¶ 59.

Although the Court can understand Ogbon's frustration with Trans Union's extreme attention to detail, it is mindful that Trans Union has a duty to protect the confidentiality and security of Ogbon's information. *See* 15 U.S.C. § 1681(b) ("It is the purpose of [the FCRA] to require that consumer reporting agencies adopt reasonable procedures ... with regard to the confidentiality ... of [consumer] information."); *cf.* 15 U.S.C. § 1681h(a) (1) ("A consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g of this title, that the consumer furnish proper identification."). And upon receiving Ogbon's March 2, 2009 correspondence, Trans Union did not rebuff, unexplained, her efforts to dispute the charges; rather, it notified her once again that her proof of address was deficient and explained why. Reger Decl. ¶ 60. This was a readily

correctable problem. Moreover, Trans Union was particularly justified in proceeding with an abundance of caution when trying to confirm Ogbon's address (and thus identity), because her previous submission to Trans Union had contained documents bearing three different home addresses. *Id.* Ex. C; *see Singletary v. Equifax Info. Servs., LLC,* No. 2:09–CV–0489–SLB, 2012 WL 4329273, at \*9 (N.D.Ala. Sept. 18, 2012) (credit reporting agency's policy of insisting on exact matching of consumer's full address does not require more than the minimal personal information necessary to properly identify the consumer (citing 12 C.F.R. § 1022.123 (regulation setting forth appropriate proof of identity))); *Anderson,* 405 F.Supp.2d at 984 (given defendant's duty "to follow reasonable procedures to insure both the accuracy and confidentiality of plaintiff's credit information, defendant's prompt decision to confirm plaintiff's social security number was both reasonable and prudent"). Finally, even assuming that Ogbon had sufficiently proven her identity, Trans Union had very little data to work with, because Ogbon's correspondence never provided concrete information as to which charges she sought to dispute. *See Petty v. Equifax Info. Servs., LLC,* No. CCB–10–694, 2010 WL 4183542, at \*3 (D.Md. Oct. 25, 2010) ("The [FCRA] requires that a consumer notify a [credit reporting agency] of the existence and nature of a dispute for an obvious reason: Without notice of a consumer's dispute, including an explanation of why a consumer believes his or her report is inaccurate or incomplete, a CRA generally would not know what information to reinvestigate, how to reinvestigate it, or whether upon reinvestigation the information is indeed inaccurate or incomplete."). For these reasons, summary judgment is also merited in Trans Union's favor. [7]

[7]
Ogbon also brings a claim under the parallel provision of the NYFCRA, which provides: "If a consumer disputes any item of information contained in his file, and such dispute is directly conveyed to the consumer reporting agency by the consumer, the consumer reporting agency shall promptly re-investigate and record the current status of such information, unless it has reasonable grounds to believe that the dispute by the consumer is frivolous." N.Y. Gen. Bus. Law § 380–f(a). Once again, the Court construes this statute in the same way as its similar federal analogue, and therefore grants summary judgment in defendants' favor on this claim. *Scott,* 183 F.3d at 100.

### 3. The § 1681g Claim

**\*10** Ogbon's Amended Complaint briefly references § 1681g, which requires credit reporting agencies to "clearly and accurately disclose" to consumers "[a]ll information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a). However, a condition precedent to the consumer reporting agency's making such a disclosure is that "the consumer furnish proper identification." § 1681h(a)(1). As noted in Part III(A)(2), *supra,* Ogbon failed to do so. Summary judgment is therefore merited in defendants' favor. [8]

[8]
Ogbon does not resist this conclusion: She does not address this claim in her brief. It is therefore waived. *See Global Cross Estate Rep. v. Winnick,* No. 04 Civ. 2258(GEL), 2006 WL 2212776, at \*23 (S.D.N.Y. Aug. 3, 2006); *First Capital Asset Mgmt. v. Brickellbush, Inc.,* 218 F.Supp.2d 369, 392–93 (S.D.N.Y.2002).

### 4. The § 1681b(a) Claim

The Amended Complaint also makes passing reference to § 1681b(a), which specifies the only circumstances under which a consumer reporting agency may furnish a consumer's credit report. 15 U.S.C. § 1681b(a); *see also* § 1681e(a) (requiring that consumer reporting agencies "maintain reasonable procedures designed ... to limit the furnishing of consumer reports" to the permissible purposes listed in § 1681b, and outlining what these procedures must entail). "To prove a violation of section 1681b, a plaintiff must show that credit information was obtained for an impermissible purpose." *Stonehart v. Rosenthal,* No. 01 Civ. 651(SAS), 2001 WL 910771, at \*3 (S.D.N.Y. Aug. 13, 2001); *see Perl v. Am. Express,* 12 Civ. 4380(ER), 2012 WL 2711270, at \*2 (S.D.N.Y. July 9, 2012). Ogbon has failed to adduce any evidence that any entity obtained her credit information for an impermissible purpose. Indeed, she does not even address this claim in her opposition brief. Summary judgment is therefore merited in defendants' favor. [9]

[9]
Defendants also argue that, even assuming Ogbon could establish liability on one or more of these claims, summary judgment is still merited because Ogbon has not adduced sufficient evidence of damages, is not entitled to punitive damages, and is not entitled to declaratory relief. *See* Def. Br. 17–21. Having found no triable issue of fact as to defendants' liability on Ogbon's FCRA and

2013 WL 1430467

NYFCRA claims, the Court need not reach this argument.

### B. State Common Law Claims

Ogbon also asserts common law claims of defamation and intentional infliction of emotional distress.

#### 1. Defamation

The FCRA provides that:

> [N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency ... based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). [10] Thus, defendants have "qualified immunity against defamation actions," which can only be overcome where plaintiff shows that defendants acted with malice or willful intent. *Houston,* 707 F.Supp. at 695;*see Whelan,* 862 F.Supp. at 833–34;*see also Holmes v. Experian Info. Solutions, Inc.,* No. 11–4705–cv, 2013 WL 48692, at *2 (2d Cir. Jan. 4, 2013) (summary order) (holding that "FCRA preempts claims of negligence by consumer reporting agencies, allowing recovery only for malice or willfulness"); *Ross v. F.D.I. C.,* 625 F.3d 808, 814 (4th Cir.2010) ("Congress intended this section's general bar on defamation ... actions to be quid pro quo for providing full disclosure under the FCRA. The only exception to this bar is a narrow one, requiring proof of 'malice or willful intent to injure [the] consumer.' " (citations omitted) (alteration in original)).

[10]    Because defendants are "consumer reporting agencies," not "persons who furnish information to consumer reporting agencies," the broader

preemption provision of 15 U.S.C. § 1681t(b)(1) (F) does not apply. *See Okocha v. HSBC Bank USA, N.A.,* 700 F.Supp.2d 369, 374–75 (S.D.N.Y.2010).

**\*11** The FCRA does not define "malice," and circuit courts are split as to whether state or federal law governs the meaning of malice under § 1681h(e). *See Ross,* 625 F.3d at 815 (collecting cases). The Second Circuit has not weighed in, but several district courts in this circuit have applied federal law and defined malice by reference to the standard set forth in *N.Y. Times Co. v. Sullivan,* 376 U.S. 254 (1964). *See, e.g.,Adams v. Nat'l Eng'g Serv. Corp.,* 620 F.Supp.2d 319, 335 (D.Conn.2009); *Cadet v. Equifax Credit Servs.,* No. 05–CV–4843, at *5 (E.D.N.Y. Jan. 18, 2008); *Frost v. Experian,* No. 98 Civ. 2106(JGK)(JCP), 1999 WL 287373, at *6 (S.D.N.Y. May 6, 1999). Under that standard, the question is whether the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co.,* 376 U.S. at 280. Measured by any standard, however, Ogbon's claim fails, because she has failed to adduce any evidence that defendants made false statements with malice or willful intent to injure her. As noted, defendants received information from Furnishers, whom defendants reasonably believed to be reliable sources, that Ogbon had incurred various debts. Defendants had no reason to doubt the accuracy of this information and Ogbon failed to provide defendants with sufficient information to confirm her identity and identify the nature of her dispute. Summary judgment is therefore merited in defendants' favor.

#### 2. Negligent and Intentional Infliction of Emotional Distress

Defendants argue that Ogbon's claims for negligent and intentional infliction of emotional distress are preempted. Def. Br. 21–23. Although the FCRA preempts state law claims *"in the nature of* defamation, invasion of privacy, or negligence" absent a showing of malice or willfulness, it does not explicitly mention of common law claims of negligent or intentional infliction of emotional distress. 15 U.S.C. § 1681h(e) (emphasis added). At least one district court in this circuit has therefore held that defendants are not entitled to qualified immunity from such claims. *See Adams,* 620 F.Supp.2d at 335;*see also Davis v. Md. Bank,* No. 00–04191, 2002 WL 32713429, at *14 (N.D. Cal. June 19, 2002) (intentional infliction of emotional distress claim not preempted by § 1681h(e)). The Court need not reach the preemption question, however, because Ogbon's claims are plainly deficient on the merits.

2013 WL 1430467

A claim of intentional infliction of emotion distress requires a showing of "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121 (1993). Ogbon has not adduced any evidence that either defendant engaged in any extreme or outrageous conduct. As discussed, defendants acted reasonably in compiling credit information that they received from reliable Furnishers and refusing to reinvestigate Ogbon's claims until she provided sufficient information to verify her identity and inform defendants of the nature of her dispute. Moreover, Ogbon has adduced no evidence that either defendant acted with intent to cause her distress.

**\*12** Ogbon's negligent infliction of emotional distress claim is similarly unavailing. Such a claim may be established by either a "bystander theory" [11] or the "direct duty theory:" [12] *Mortise v. United States,* 102 F.3d 693,696 (2d Cir.2006). Ogbon has adduced no evidence showing that any emotional distress she suffered stemmed from "either (I) physical injury or the threat of physical injury, or (2) breach of a special duty between [Ogbon] and defendant[s]." *Okocha,* 700 F.Supp.2d at 376. Accordingly, summary judgment is merited in defendants' favor on both of these claims.

[11]   Under the bystander theory, "[a] plaintiff may recover for a purely emotional injury ... when: (1)

she is threatened with physical harm as a result of defendant's negligence; and (2) consequently she suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family." *Mortise v. United States,* 102 F.3d 693,696 (2d Cir.2006) (citing *Bovsun v. Sanperi,* 61 N.Y.2d 219,230–31 (1984)).

[12]   "Under the 'direct duty' theory a plaintiff has a cause of action for negligent infliction of emotional distress if she suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." *Mortise,* 102 F.3d at 696 (citing *Kennedy v. McKesson Co.,* 58 N.Y.2d 500,504 (1983)).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of Court is directed to terminate the motion pending at docket number 138, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1430467

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00188-DNH-MJK   Document 4   Filed 02/14/24   Page 235 of 238
Mitchell v. Experian Information Solutions, Inc., Slip Copy (2023)

2023 WL 2990479

2023 WL 2990479
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Hakim MITCHELL, Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC., Defendant.

22-CV-5883 (RPK) (RER)
|
Signed April 18, 2023

**Attorneys and Law Firms**

Hakim Mitchell, Brooklyn, NY, Pro Se.

Bo Gilbertson, New York, NY, Brett Michael Weinstein, Jones Day, New York, NY, for Defendant.

### MEMORANDUM AND ORDER

RACHEL P. KOVNER, United States District Judge:

**\*1** *Pro se* plaintiff Hakim Mitchell sued defendant Experian Information Solutions, Inc. in New York state court, alleging violations of multiple provisions of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, and defamation under New York state law. After removing the case to federal court, *see* Not. of Removal (Dkt. #1), Experian moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons set out below, defendant's motion is granted.

### BACKGROUND

On July 27, 2022, plaintiff filed a Summons with Notice in New York County Civil Court, stating that plaintiff was suing three credit reporting agencies—Experian, TransUnion LLC, and Equifax Information Services, LLC—"for defamation of Character" and seeking $50,000 in damages. Not. of Removal, Ex. A 2–3 (ECF Pagination) (Dkt. #1-2) ("State Court Filings"). Subsequently, plaintiff voluntarily dismissed his claims against both TransUnion and Equifax, leaving Experian as the only defendant. *See* State Court Filings 4–5. Experian then served plaintiff with a demand for complaint

pursuant to N.Y. C.P.L.R. § 3012(b), *see* Not. of Removal ¶ 2 n.1; State Court Filings 7.

On September 13, 2022, plaintiff responded by filing a one-page complaint. State Court Filings 9 ("Compl.").[1] The complaint alleges that plaintiff "contacted Experian every month for three years to current by certified mail with proof regarding negatively reporting accounts and inaccurate information and willful noncompliance," and that as a result Experian was "in violation of [plaintiff's] rights" under various provisions of the FCRA. *Id.* at ¶ 1. Specifically:

- Plaintiff asserts that defendant violated 15 U.S.C. § 1681a(d)(2)(B), seemingly because plaintiff's credit report did not exclude a transaction that was "supposed to be excluded" because "a social security card was used in the transaction." Compl. ¶ 2.

- Plaintiff asserts that defendant violated 15 U.S.C. §§ 1681e(b) and 1681i(5) because plaintiff's credit report was not "100% accurate." Compl. ¶ 3.

- Plaintiff asserts that defendant violated 15 U.S.C. § 1681i(7) because his "account ... was reported without valid evidence." Compl. ¶ 4.

- Plaintiff asserts that defendant violated 15 U.S.C. § 1681i(5)(B)(ii)–(iii) because some "item was deleted"— presumably from plaintiff's credit report—and then was "reinserted ... without notifying [plaintiff within] 5 days." Compl. ¶ 5.

- Finally, plaintiff asserts that defendant violated 15 U.S.C. § 1681b because he "never gave [defendant] any written consent to report anything on [his] reports." Compl. ¶ 6.

Plaintiff's complaint did not contain any allegations regarding the defamation claim mentioned in the earlier Summons with Notice. *Compare* Compl., *with* State Court Filings 2–3.

---

1    The complaint contains six unnumbered paragraphs. For the sake of clarity, I have supplied paragraph numbers.

Experian moves to dismiss the complaint under Rule 12(b)(6). Mot. to Dismiss (Dkt. #9).

### STANDARD OF REVIEW

**\*2** Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To avoid dismissal on that basis, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (discussing Fed. R. Civ. P. 8). The facial "plausibility standard is not akin to a probability requirement," but it requires a plaintiff to allege sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)) (quotation marks omitted). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [of the facts alleged] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation marks omitted).

At the motion-to-dismiss stage, a court may consider only (i) the complaint itself, (ii) documents either attached to the complaint or incorporated in it by reference, (iii) documents the plaintiff relied on and knew of when bringing suit, and (iv) matters in the public record that are subject to judicial notice. *See, e.g.,* *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999). When reviewing the complaint on a motion to dismiss, the court must accept all facts alleged in a complaint as true. *Iqbal*, 556 U.S. at 678. The court, however, is not obligated to adopt "mere conclusory statements" or "threadbare recitals of the elements of a cause of action" that are not "supported by factual allegations." *Id.* at 678–79.

The complaint of a *pro se* plaintiff must be "liberally construed, and ... however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). *Pro se* status, however, does not " 'exempt a party from compliance with relevant rules of procedural and substantive law.' " *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

**DISCUSSION**

Plaintiff has not plausibly alleged that Experian violated the FCRA or defamed him, so the complaint is dismissed.

**I. Plaintiff's FCRA Claims Are Dismissed**
Plaintiff has failed to plausibly allege any violations of the FCRA. Plaintiff asserts that defendant violated several provisions of the FCRA—Sections 1681a, 1681b, 1681e, and 1681i—but has failed to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable" under any of those provisions. *Iqbal*, 556 U.S. at 678.

*Section 1681a.* Plaintiff cites Section 1681a(d)(2)(B) and seems to argue that defendant is liable under that section for including information in his credit report that was "supposed to be excluded." Compl. ¶ 2.[2] But Section 1681a(d)(2) does not impose any substantive obligations on credit reporting agencies; instead, it is a definitional provision explaining that certain reports are not "consumer report[s]" within the meaning of the FCRA, and thus not subject to its requirements. *See, e.g.,* *Rivera v. TransUnion*, No. 22-CV-1038 (MPS), 2022 WL 17370506, at *3 (D. Conn. Oct. 31, 2022) (rejecting plaintiff's claim that "TransUnion 'includ[ed] excluded experiences like transactional information' " under Section 1681a(d)(2) because that section "actually provides that a report containing [certain] information ... does not qualify as a consumer report subject to the FCRA" and thus "do[es] not articulate [a] dut[y] that TransUnion owed to plaintiff"). This provision accordingly cannot form the basis of any cause of action. *See ibid.* In any event, plaintiff has not alleged "what information [defendant] allegedly reported" that was supposed to be excluded, when, "to whom, or any other information that could support such a claim." *Henry v. Flagstar Bank, FSB*, No. 16-CV-1504 (JMA) (AKT), 2019 WL 1471267, at *2 (E.D.N.Y. Mar. 31, 2019). Accordingly, he has failed to state a claim under Section 1681a.

2      Plaintiff erroneously refers to this provision as "15 U.S. Code 1681(2)(B)," Compl. ¶ 2—omitting reference to subsection (d)—and defendant repeats the typo in its motion to dismiss, *see* Mot. to Dismiss 3. No such provision exists. From context it is apparent that both parties meant to invoke 15 U.S.C. § 1681a(d)(2)(B).

**\*3** *Section 1681b.* Plaintiff next asserts that defendant violated Section 1681b, which sets out the permissible purposes for which a credit reporting agency may furnish a consumer report to a third party, because plaintiff "never gave

[defendant] any written consent to report anything on [his] consumer reports." Compl. ¶ 6. But Section 1681b requires a credit reporting agency to obtain a consumer's consent only in very limited circumstances involving employment relationships, underage consumers, and medical information, *see Rivera*, 2022 WL 17370506, at *3, and plaintiff has alleged no facts indicating any of those narrow carveouts is applicable here. Absent such an allegation, Section 1681b provides that a credit reporting agency "*may* furnish a consumer report" for certain permissible purposes, 15 U.S.C. § 1681b(a) (emphasis added), and to state a cause of action under that provision, "a plaintiff must allege both that the defendant used or obtained the plaintiff's credit report for an impermissible purpose, and that the violation was willful or negligent," *Braun v. Client Servs. Inc.*, 14 F. Supp. 3d 391, 396 (S.D.N.Y. 2014) (citation omitted). Plaintiff has not done so here.

*Sections 1681e and 1681i.* Finally, plaintiff invokes Sections 1681e and 1681i, the portions of the FCRA requiring credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy," 15 U.S.C. § 1681e(b), and to take a series of actions when a consumer disputes the accuracy of information contained in his file, *see* 15 U.S.C. § 1681i. *See* Compl. ¶¶ 3–5 (citing 15 U.S.C. §§ 1681e(b), 1681i(5), and 1681i(7)). To bring claims under these provisions, plaintiff must plausibly allege (among other things) that (1) the disputed information was in fact inaccurate and (2) that defendant failed to follow reasonable procedures. *See, e.g., Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269–70 (2d Cir. 2023) (discussing claims under Section 1681e(b)); *Jones v. Experian Info. Sols., Inc.*, 982 F. Supp. 2d 268, 272–74 (S.D.N.Y. 2013) (discussing claims under Section 1681i). Plaintiff has not done so. Plaintiff asserts that certain information was "deleted" and then "reinserted," that information was "reported without valid evidence," and that his report was "not ... 100% accurate." Compl. ¶¶ 3–5. But he does not say "*what* information [Experian] allegedly reported," deleted, or reinserted, "why it was allegedly false, or any other information that could support such a claim," such as what actions Experian took—or failed to take—in response to plaintiff's disputes. *Henry*, 2019 WL 1471267, at *2 (emphasis added). The Court therefore cannot "draw the reasonable inference that the defendant is liable" under either Section 1681e or 1681i. *Iqbal*, 556 U.S. at 678.

Plaintiff's FCRA claims are accordingly dismissed.

## II. Any Defamation Claim Contained in Plaintiff's Complaint is Likewise Dismissed

Plaintiff's complaint does not reference defamation, but both his state-court Summons with Notice and his opposition to defendant's motion to dismiss describe this action as one for "defamation of character." Pl.'s Opp'n to Mot. to Dismiss 2 (Dkt. #13); State Court Filings 3. To the extent plaintiff's complaint is construed to include a defamation claim, the claim fails for two independent reasons.

First, the FCRA expressly preempts "any action or proceeding in the nature of defamation ... with respect to the reporting of information against any consumer reporting agency ... based in whole or in part on [a consumer] report[,] except as to false information furnished with malice or willful intent to injure such consumer," 15 U.S.C. § 1681h(e), and plaintiff has alleged no facts permitting an inference of malice on defendant's part. Accordingly, insofar as plaintiff's defamation claim relates to the contents of his credit report, it is preempted.

And even were the claim not preempted by the FCRA, it is too conclusory to survive dismissal. To state a claim for defamation, "the alleged defamatory statements [must] be pleaded with sufficient specificity to put the defendants on notice." *Bloom v. Fox News of Los Angeles*, 528 F. Supp. 2d 69, 74 (E.D.N.Y. 2007) (collecting cases). "In assessing whether a defamation claim has been plead with sufficient particularity, courts look to whether [the] complaint references the alleged defamatory statement, identifies who made the statement, when it was made, the context in which it was made, whether it was made orally or in writing and whether it was made to a third party." *Ibid.* (quotation marks omitted). Plaintiff's Summons with Notice contains none of this information, instead merely stating that plaintiff "is suing ... Experian for defamation of Character." State Court Filings 3. Plaintiff's defamation claim is accordingly dismissed.

## CONCLUSION

**\*4** Defendant's motion to dismiss is granted, and the complaint is dismissed. Plaintiff may file an amended complaint within 30 days of the date of this Order. The new complaint must be captioned "Amended Complaint" and shall bear the same docket number as this Order. Plaintiff is advised that the amended complaint will replace his initial complaint.

**Mitchell v. Experian Information Solutions, Inc., Slip Copy (2023)**

2023 WL 2990479

All further proceedings are stayed for 30 days. If plaintiff does not file an amended complaint within 30 days, judgment shall be entered dismissing the case. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, so *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2990479

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.